United States District Court
Southern District of Texas

**ENTERED**
January 16, 2025
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-90611** |
| **WESCO AIRCRAFT** | § | |
| **HOLDINGS, INC.,** *et al.*, | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **WESCO AIRCRAFT** | § | |
| **HOLDINGS, INC.,** *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 23-3091** |
| | § | |
| **SSD INVESTMENTS LTD.,** *et* | § | |
| *al.*, | § | |
| | § | |
| Defendants. | § | |

### <u>REPORT AND RECOMMENDATION</u>

This is the first of three Reports and Recommendations to be issued in connection with this adversary proceeding. The adversary proceeding concerned challenges to an uptier transaction implemented by Wesco Aircraft Holdings, Inc. on March 28, 2022. On that date, Wesco entered into a financing transaction with a select group of its noteholders (the "2022 Transaction"). The 2022 Transaction was intended to provide $250 million in funding—money that the parties determined was needed to avert a liquidity crisis—in return for an exchange of the participating noteholders' outstanding secured and unsecured notes for new, super-senior first-lien and second-lien notes. The transaction required stripping the collateral from liens securing Wesco's outstanding secured notes in order to provide senior liens to

secure (i) the new $250 million; and (ii) the newly exchanged pre-existing notes.

This R&R addresses Langur Maize's claims. Langur Maize is a holder of Wesco's unsecured notes. It purchased its notes after the 2022 Transaction took place. Langur Maize argues the 2022 Transaction was impermissible under the unsecured note indenture. Langur Maize asserts claims for breach of contract, tortious interference with contract, and civil conspiracy against the transaction participants. On July 10, 2024, the Court made an oral ruling holding that the 2022 Transaction breached certain sections of the unsecured note indenture.

Wesco is liable to Langur Maize for those breaches. The Court recommends the District Court issue a declaration of liability for breach of contract against Wesco. The Court recommends dismissal by the District Court of the balance of Langur Maize's breach of contract claims.

Langur Maize does not have standing to assert its tortious interference claim against its named defendants. This results in the failure of both its tortious interference and civil conspiracy claims. The Court recommends dismissal by the District Court of the tortious interference and civil conspiracy claims.

## BACKGROUND

### I.    FACTUAL BACKGROUND

Wesco Aircraft Holdings, Inc. is the largest independent distribution and supply chain services provider in the civilian and military aerospace industry. Case No. 23-90611, ECF No. 13 at 3. The current Wesco, operating under the name "Incora," was formed in January 2020 after completion of a leveraged buyout between Wesco's predecessor entity and Pattonair, a leading aerospace services provider based in the United Kingdom. Case No. 23-90611, ECF No. 13 at 16–17.

On November 27, 2019, Wesco's predecessor entered into three separate note indentures to fund the leveraged buyout of Pattonair: (1) $650 million in face amount of 8.50% senior secured notes due 2024 (the "2024 Notes"); (2) $900 million in face amount of 9.00% senior secured notes due 2026 (the "2026 Notes"); and (3) $525 million in face amount of 13.125% unsecured notes due 2027 (the "2027 Notes").  ECF Nos. 601-7 at 1; 601-8 at 1; 601-20 at 1.  On January 9, 2020, Wesco entered into the Notes Security Agreement to provide liens on certain Wesco assets to the holders of the 2024 Notes and 2026 Notes.  ECF No. 601-24 at 5–6.

The documents executed in 2019 and 2020 were the initial seed in the future uptier transaction.  The documents specifically contemplated that two-thirds of the holders of a class of securities could authorize a non-pro rata transaction.  Although there is no evidence that the parties foresaw Wesco's 2022 liquidity crisis (see below), the documents were drafted by brilliant financers and lawyers who contemplated the potential benefits that a non-pro rata future transaction could offer.

At all relevant times through the bankruptcy petition date, Wesco was owned through a chain of three holding companies that were controlled by Platinum Equity Advisors, a private equity firm.  ECF No. 630 at 229; Case No. 23-90611, ECF No. 13 at 17–18, 24–25.  Wesco's direct parent company was Wolverine Intermediate Holding II Corporation, which in turn was directly owned by Wolverine Intermediate Holding Corporation, which in turn was directly owned by Wolverine Top Holding Corporation.  ECF No. 630 at 225, 227; Case No. 23-90611, ECF No. 13 at 17–18, 24.

Wesco's holding companies were primarily controlled by employees of Platinum.  Wolverine Intermediate Holding Corporation's board was comprised of (i) Platinum employees; and (ii) Patrick Bartels, who was denominated as an independent director.  ECF No. 630 at 227–28.  From and after January 2020, Mary Ann Sigler, a partner and chief financial officer at Platinum, was the sole director of Wesco Aircraft

Holdings, Inc., Wolverine Intermediate Holding II Corporation, Wolverine Intermediate Holding Corporation (between January 2020 and October 2021), and Wolverine Top Holding Corporation. ECF No. 630 at 224–29. Ms. Sigler was also the sole member of Wesco Intermediate Holding Corporation's audit committee. ECF No. 694 at 84.

## A.    Wesco's Liquidity Crisis

Wesco faced a liquidity crisis during the height of the COVID-19 pandemic. The pandemic drastically impacted the aerospace industry. ECF No. 630 at 13. Travel restrictions led to a swift decline in demand for aerospace services, and in combination with supply chain disruptions, caused Wesco to suffer decreased revenue and cash flows, sparking a liquidity shortfall. ECF No. 630 at 13; Case No. 23-90611, ECF No. 13 at 4. Platinum, Wesco's equity sponsor, infused additional capital to generate liquidity runway. Platinum provided $25 million in equity into Wesco and Wesco issued a $25 million promissory note to Wolverine Top Holding Corporation, but these attempts were insufficient to cure the cash shortfall. ECF Nos. 601-21; 630 at 13–14; Case No. 23-90611, ECF No. 13 at 29.

By the fourth quarter of 2021, Wesco's liquidity shortfall significantly worsened. ECF No. 630 at 148. Wesco's estimates indicated that the company might miss the interest payment on its outstanding notes due November 2021. ECF No. 630 at 148. Wesco "barely made" the interest payment, and its cash situation "continued to get tighter and tighter." ECF Nos. 630 at 14; 664 at 47.

Wesco continued to endure serious financial pressures and predicted a deficit running through the due date of its May 2022 interest payment on outstanding debt. ECF No. 664 at 47–48. Katsumi, Wesco's factoring agent, withdrew from its factoring agreement with Wesco. The company was concerned that it might not have the ability to repay the $40 million owed to Katsumi. ECF No. 664 at 48–50. Although Wesco did repay Katsumi in early 2022, these financial pressures nevertheless

had an impact on Wesco's outlook and threatened a negative result on Wesco's upcoming statutory audit in the United Kingdom. ECF No. 664 at 50, 51–52. If Wesco received a negative audit result, Wesco's asset-based lending agreement would be in default. ECF No. 664 at 54–55. Wesco's auditors indicated that a cash injection of $150 million to $200 million would be required to obtain a clean audit opinion. ECF No. 664 at 125. Wesco requested its United Kingdom auditors to delay publishing their audit opinion until they found their needed liquidity cushion. ECF No. 630 at 189.

Wesco sought to delay filing its financial statements with the auditors until they received a cash injection, but the auditors informed the company they would strike off the company if they did not receive the statements. ECF No. 664 at 56. If the auditors were to strike off the company, it would be illegal for Wesco to do business in the United Kingdom. ECF No. 664 at 56. The auditors were only able to delay the audit results until the end of March 2022. ECF No. 630 at 189.

The pressures sparked a liquidity crisis in March 2022. At this time, Wesco had not "regained a satisfying buffer in liquidity." ECF No. 630 at 188. Wesco was also concerned about suppliers shortening their payment periods. For each day that a vendor reduced its payables, Wesco was an additional $5 million shorter in cash. ECF No. 664 at 53. Wesco began stretching its payment terms with the suppliers and was paying them "later and later." ECF No. 630 at 188. The suppliers started reacting by stopping shipment or requesting cash up front. ECF No. 630 at 188–89. Wesco distributes parts from suppliers to customers. ECF No. 630 at 167. Its relationship with its suppliers is the core of its business and is "irreplaceable" for its operations. ECF No. 630 at 167. But in the eyes of its suppliers, a distributor is "at the end of the day, always replaceable." ECF No. 630 at 167.

These circumstances lead to an urgent, imminent need to generate liquidity. ECF No. 630 at 189.

### B.  The Funding Proposals

#### (1)  *The Majority Group Proposal*

Wesco began exploring funding options by the fourth quarter of 2021.  At the end of October 2021, Platinum received outreach contemplating a potential financing transaction from PIMCO and Silver Point Capital, two existing holders of the company's outstanding 2024 Notes and 2026 Notes (the "Majority Group").  ECF No. 630 at 146. About a month prior in September 2021, Silver Point had begun contemplating a "Serta type transaction where 2/3 of the 1L elevates above the other 1/3."  ECF No. 700-35 at 4.  PIMCO and Silver Point then began increasing their holdings of the 2024 Notes and 2026 Notes, recognizing the need for a 66 2/3% vote of the notes in order to obtain the necessary consents under the Indentures to authorize the form of transaction they were contemplating.  ECF Nos. 700-58 at 3; 725-28 at 4–19; 729-53 at 26–29; 734-8 at 3; 955 at 198–99.  On December 23, 2021, the Majority Group sent Wesco an initial confidential proposal for a new money transaction.  ECF No. 639-1 at 1.

The Majority Group's initial proposal contemplated a transaction to provide $200 million of new, super-senior debt and an extension on the maturities of the group's then-held notes.  ECF No. 639-1 at 3.  The proposal stated that PIMCO and Silver Point held "over two-thirds of the outstanding secured notes due 2024 and over one-half of the outstanding secured notes due 2026 issued by Wesco Aircraft Holdings, Inc."  ECF No. 639-1 at 1.

PIMCO and Silver Point intended that they would be the only secured noteholders participating in a transaction to exchange their existing 2024 Notes and 2026 Notes for new super-senior first-lien debt. ECF No. 639-1 at 3.  The proposal also permitted the 2027 Noteholders and Wolverine Top Holding Corporation PIK Noteholders to participate in an exchange of their notes into super-senior second-out debt.  ECF No. 639-1 at 3.  Wesco countered the proposal by seeking to include PIMCO, Silver Point, and "potentially other holder(s)."  ECF No. 639-2 at 3.  PIMCO and Silver Point eventually agreed that some (but not all)

other secured noteholders could participate in the transaction. ECF No. 610-11 at 7.

Wesco negotiated with the Majority Group over the course of the next few months, culminating with agreed terms on February 26, 2022. ECF No. 610-11 at 2. The negotiations led to an agreement for the group to provide $250 million in new money in return for an exchange of the group's then-held 2024 Notes and 2026 Notes into super-senior first-lien notes (the "1L Notes") and then-held 2027 Notes into super-senior second-lien notes (the "1.25L Notes"). ECF No. 610-11 at 7–8. For the 1L Notes and 1.25L Notes to be secured, the 2024 and 2026 Indentures would have to be amended to release the liens securing the 2024 Notes and 2026 Notes, rendering the notes unsecured at a time of a severe liquidity crisis. ECF Nos. 700-58 at 3; 955 at 49–51, 199–200.

The dollar amount of the new 1L Notes would include both the $250 million of the new funding and the principal amount of the exchanged 2024 Notes and 2026 Notes. ECF No. 610-11 at 7. The terms of the 1L Notes would include a rate of 7.5% cash and 3% PIK, certain call protections, a November 2026 maturity date accelerating to October 2024 if over $50 million of 2024 Notes remained outstanding, and covenants to be based on the existing covenants with potential mutually agreed modifications to debt incurrence, liens, investments, restricted payments, and creation of unrestricted subsidiaries. ECF No. 610-11 at 7. The transaction would be a "par-for-par exchange" into the 1L Notes with a 1.125% PIK fee payable to the participating 2024 Notes and 2026 Notes. ECF No. 610-11 at 7.

The 1.25L Notes would have a potential $1.05 billion basket "which includes exchange debt and basket for future incurrence / exchange." ECF No. 610-11 at 8. The terms of the notes would include a rate of 10% all PIK (with any second-out debt used to exchange future debt being cash interest neutral and any second-out debt raised in the form of new money being 100% PIK pending further discussion) and an elimination of all material negative covenants on the unsecured notes. ECF No. 610-11 at 8.

With respect to the secured exchange, the participating noteholders would include PIMCO, Silver Point, and certain other participating holders pending further agreement. ECF No. 610-11 at 7. The parties eventually agreed that the participants would include PIMCO, Silver Point, Senator Investment Group, Citadel, Olympus Peak Asset Management, and Macquarie Asset Management. ECF Nos. 738 at 44–45; 868 at 26–27. However, Olympus Peak and Macquarie did not end up participating in the transaction. ECF No. 955 at 104.

The decision to allow additional participants was not an eleemosynary one. Evidence admitted at trial revealed that the Majority Group determined that they were in error when they believed they held over two-thirds of the 2026 Notes. They believed that participation of these additional institutions was required to obtain the requisite 66 2/3% vote of the 2026 Notes to approve the transaction. ECF Nos. 868 at 18; 1013 at 188–89; 1173 at 25. As it turns out, even the additional participants did not hold a sufficient amount of debt to create a two-thirds majority.

Moreover, Senator held a majority of the Wolverine Top Holding Corporation PIK notes not held by Platinum, and consent of the notes would have been necessary to amend the notes' indenture to permit the issuance of $250 million in incremental debt.[1] ECF No. 738 at 45. All other holders of 2024 Notes and 2026 Notes would be excluded from the transaction. ECF Nos. 697 at 106; 939 at 200, 202–03.

With respect to the unsecured exchange, PIMCO's and Silver Point's initial proposal did not seek to exclude other holders of unsecured 2027 Notes. ECF No. 639-1 at 3. But the parties eventually settled on terms permitting only Carlyle Group (and its co-investor

---

[1] Senator held approximately $38.4 million of the Wolverine Top Holding Corporation PIK notes. ECF No. 604-2 at 4. Although the Wolverine Top Holding Corporation PIK notes were not exchanged, Senator provided the consents under those notes to make the necessary amendments to the notes' indenture. ECF Nos. 738 at 45; 879 at 89–90.

Spring Creek Capital), Senator, and Platinum to exchange their 2027 Notes for 1.25L Notes.  ECF No. 610-11 at 8.

Carlyle's participation was required because it held a majority of the 2027 Notes not held by Platinum.  Consequently, it had the ability to provide the requisite consent to amend the 2027 Indenture to permit the transaction.  The exchange of Carlyle's then-held 2027 Notes into 1.25L Notes was provided as consideration for both the consents and the agreement to exchange cash interest notes for PIK notes.  ECF Nos. 738 at 47; 832 at 78–79 ("Carlyle provided consent for the company to raise $250 million of new money to provide cash to balance sheet liquidity for the business to improve its runway.  It had also PIK'ed the majority of our cash interests.  In exchange for that, we were allowed to exchange our notes into new one and a quarter lien notes.").

The facts surrounding the group's decision to exclude other 2027 Noteholders is a point of contention.  Trial testimony demonstrates that PIMCO and Silver Point believed that the inclusion of all 2027 Noteholders would have provided additional benefits to Wesco's liquidity through the exchange of additional cash interest notes for PIK interest notes.  ECF Nos. 639-1 at 3; 868 at 93–95, 120 (Jason Prager— Silver Point); 879 at 185 (James O'Connell—PJT Partners); 955 at 90 (Samuel Dostart—PIMCO); 969 at 77–78 (Samuel Dostart—PIMCO); 1115 at 172–73 (Mr. Bartels).

James O'Connell, an employee of PJT Partners (Wesco's financial advisor), testified on multiple occasions that Carlyle was not willing to include other 2027 Noteholders into the exchange.  ECF Nos. 738 at 7, 9–10; 879 at 120–21, 125.  Although there are inconsistencies in Mr. O'Connell's testimony,[2] the Court nevertheless found him to be a

---

[2] Mr. O'Connell first testified that Carlyle was willing to permit Platinum to participate in the exchange but later clarified that Carlyle was initially unwilling to permit Platinum's participation.  ECF No. 879 at 120–21, 125.  Mr. O'Connell also testified in his deposition, admitted into the record, that he did not recall Carlyle asking to exclude Platinum's notes from the exchange.  ECF No. 879 at 131.  The history of the parties' negotiations demonstrate that Carlyle did initially seek to

credible witness. Mr. Bartels also testified that, at least as of February 17, 2022, the PIMCO and Silver Point group and Wesco agreed that they would not exclude any particular 2027 Noteholders. ECF No. 1115 at 172. Conversely, Jesse Hou, an employee at Carlyle, testified that although Carlyle did not want other participants in the transaction, it "never specifically asked to exclude anyone." ECF No. 832 at 70, 139–41.

The trial testimony, although credible, is conflicting. Nevertheless, the circumstances of the transaction and the parties' proposals suggest that Carlyle was the driving force behind the decision to exclude other 2027 Noteholders. Wesco's January 2022 lender advisor presentation states that the company would plan to negotiate the unsecured exchange with Carlyle and Platinum, representing its two largest unsecured creditors. ECF No. 538-12 at 53. Upon successfully negotiating a second lien capacity with the secured creditors, participating unsecured noteholders would then be permitted to uptier their notes into the 1.25L Notes. ECF No. 538-12 at 53. The presentation states that Wesco "would then launch an exchange to all Unsecureds." ECF No. 538-12 at 53. The presentation does suggest a two-step exchange, where initial participating notes are first exchanged followed by an exchange available to all other 2027 Noteholders. ECF No. 538-12 at 53–54. But the presentation did not define who was eligible to participate. ECF No. 538-12 at 53–54. The presentation also contains a financial proposal illustrating that Wesco believed the greatest liquidity benefits would be achieved if all unsecured notes participated in the transaction. ECF No. 538-12 at 55. Raymond Carney, Wesco's chief financial officer, testified that although he did not remember actual negotiations, he agreed with this interpretation of the presentation. ECF Nos. 664 at 30; 694 at 122–24. The presentation demonstrates the obvious: it was in Wesco's economic interest to seek an

---

exclude Platinum and eventually conceded on permitting Platinum's participation. ECF Nos. 610-35 at 10; 832 at 112–12.

exchange of all unsecured notes and Wesco recognized that interest when contemplating the transaction.

On February 16, 2022, Wesco made an initial proposal to Carlyle for an exchange transaction of the 2027 Notes. ECF No. 610-7 at 2. At this stage, potential participants were still referred to as "participating Unsecured Noteholders," and who would be eligible to participate remained undefined. ECF No. 610-7 at 2. Carlyle's counterproposal shows that Carlyle was amenable to potentially permitting other holders (except for Platinum[3]) to participate in the transaction. ECF No. 610-13 at 4. On February 27, 2022, Carlyle received the first proposal from Wesco contemplating the eventually consummated uptier transaction. ECF No. 610-14 at 2. This proposal stated that "Carlyle, Senator and Platinum may exchange unsecured holdings into Super Senior Second-Out Debt at par; but for the avoidance of doubt, HoldCo PIK notes will not be eligible to participate." ECF No. 610-14 at 11. The participation provision is ambiguous on whether Wesco wanted additional 2027 Noteholders to participate. Although the proposal does not provide for additional noteholders, its specific reference to the exclusion of the HoldCo PIK notes suggests that the potential for additional 2027 Noteholder participants was not abandoned at this stage. Carlyle's counterproposal agreed with the change except that it sought to exclude Platinum, but Carlyle eventually conceded to include Platinum in the exchange. ECF No. 610-35 at 10.

The negotiations surrounding the permitted note basket best reveal the intentions of the parties with respect to limiting participants. Wesco sought a permitted note basket of "$1,050mm which includes exchange debt and basket for future incurrence / exchange." ECF No. 610-34 at 9. This matches Wesco's prior presentations and its economic incentive to maximize the exchange of cash interest notes into PIK interest notes. Given that the there was a total $525 million in outstanding 2027 Notes as of March 2022, this basket would have been

---

[3] Mr. Hou testified that Carlyle believed that Platinum's exclusion would best support maximizing Wesco's liquidity. ECF No. 832 at 112–13.

sufficient to include all 2027 Noteholders into the exchange. ECF No. 1115 at 173.

Carlyle rejected the proposal and sought a basket to "be sized for exchange of Carlyle and Senator unsecured debt (but not Holdco debt). Carlyle to have consent rights to all further uptiers and New Money—and a ROFR on New Money." ECF No. 610-35 at 9. Mr. Hou testified that Carlyle "wanted the basket to be sized precisely to match Carlyle and Senator's holding and . . . no more." ECF No. 832 at 120. Carlyle had an economic interest in limiting participation. Mr. Hou testified that Carlyle sought to limit participation in the transaction to avoid lien dilution on the 1.25L Notes. ECF No. 832 at 140. Carlyle's attempt to limit the note basket and Mr. Hou's testimony on the motivation behind that decision provide convincing evidence that the decision to exclude other 2027 Noteholders was driven by Carlyle.

### (2)    The Minority Group Proposal

By February 2022, another group of noteholders had organized to propose an alternative financing transaction (the "Minority Group"). ECF No. 630 at 174–75. On February 14, 2022, counsel to the Minority Group sent Wesco's counsel correspondence stating they believed they held in excess of one-third of the aggregate amount of 2026 Notes, indicating they had a blocking position on the Majority Group's uptier transaction. ECF Nos. 639-4 at 2; 738 at 56–59. Although the correspondence requested that Wesco "immediately engage with the Ad Hoc Group and Akin Gump [the Minority Group's counsel] to discuss potential solutions to the Company's capital structure challenges and/or liquidity needs," the correspondence did not contain a financing proposal or indicate whether the group had retained a financial advisor. ECF Nos. 639-4 at 2; 738 at 60. The Minority Group did not retain a financial advisor until March 2022. ECF No. 738 at 61. Notwithstanding the absence of a financial advisor, the Minority Group was comprised of major financial institutions and represented by a law firm with deep financial expertise. Wesco's engagement with the Minority Group existed, but was not robust.

On February 21, 2022, the Minority Group's counsel sent further correspondence to Wesco disclosing that the group held $317.7 million in 2026 Notes, reflecting 36.02% of the outstanding 2026 Notes (or $394.71 million in 2026 Notes, reflecting 44.75%, with the inclusion of unsettled trades and notes out on loan). ECF Nos. 639-5 at 1–3; 738 at 62. The correspondence stated that the group was willing and able to engage with Wesco to facilitate a transaction that would provide Wesco its needed liquidity without having to modify the existing debt documents. ECF Nos. 639-5 at 1–3; 738 at 63. Mr. O'Connell testified that they had follow up discussions with the Minority Group's noteholders following the correspondence and provided diligence materials to the group's financial advisor, Perella Weinberg Partners, once it was retained. ECF No. 738 at 63–64, 73.

The Minority Group sent Wesco correspondence attaching an initial proposal on March 6, 2022. ECF Nos. 639-7; 738 at 68. The correspondence states that the Minority Group's advisors were reiterating their request "for all diligence information that has previously been provided to [the Majority Group] so we can provide the Company with a proposal to address its liquidity concerns." ECF No. 639-7 at 2. Mr. O'Connell testified that Wesco did not provide the Minority Group's advisors all the diligence they provided to the Majority Group, but that the Minority Group requested and was provided information that the Majority Group had not received. ECF No. 738 at 71. Mr. O'Connell testified that it is typical for different parties to a transaction to seek different information. ECF No. 738 at 71.

The proposed transaction sought to provide $100 million of financing through a non-guarantor term loan and around $47.5 million of financing that was unavailable under Wesco's ABL facility. ECF Nos. 639-7 at 16; 738 at 73. The total financing would be $147.5 million with the inclusion of a maturity extension of $43 million of the 2024 Notes through November 2026 and an exchange of Carlyle's and Platinum's 2027 Notes into new PIK Unsecured Notes due 2027. ECF Nos. 639-7 at 17; 738 at 73. The proposal sought the creation of a non-guarantor

restricted entity structured as a joint venture as the borrower for the term loan.  ECF Nos. 639-7 at 17; 738 at 74.

Although Mr. O'Connell believed that the proposal would not require amendments to the Indentures, he found that the proposal had shortcomings.  ECF No. 738 at 74.  Mr. O'Connell testified that in order to negotiate better terms with the Minority Group, he communicated to the group that the proposal lacked in the up-front liquidity Wesco needed and expressed his concern on the group's ability to obtain Carlyle's and Platinum's agreement to exchange their 2027 Notes.  ECF No. 738 at 75.

Wesco did not send the Minority Group a counter proposal.  ECF No. 1007 at 38, 59.  Following the rejection of the proposal, the Minority Group sought additional diligence information from Wesco, but the group did not receive all the requested diligence.  ECF Nos. 639-9 at 1; 738 at 78–80; 1007 at 68.

On March 11, 2022, the Minority Group sent Wesco a revised proposal.  ECF Nos. 536-22 at 4; 738 at 83.  The proposal sought to provide the new money without needing any amendments to the secured Indentures.  ECF No. 630 at 184.  The proposal provided $173 million of financing, about $25 million higher than the prior proposal.  ECF Nos. 536-22 at 5; 738 at 83.  The proposal relied on certain exceptions to the Indentures to issue new debt facilities that would not rely on existing note baskets and would be based on an enhancement of Wesco's ABL lending facility.  ECF No. 630 at 183–84.  The proposal relied on three different facilities: (1) a $100 million new money term loan, which required creating a non-guarantor restricted joint venture entity; (2) a $47.5 million ABL facility, which required using capacity from Wesco's existing ABL facility; and (3) the issuance of incremental $25 million in new secured PIK notes due 2026.  ECF No. 536-22 at 6–7; 1007 at 66–67.  However, a condition precedent to issuing the $25 million secured PIK notes was that Platinum would be required to equitize its $25 million promissory note due 2024 to free up basket capacity.  ECF Nos. 536-22 at 7; 1007 at 67.

The proposal also sought to amend interest and amortization terms for the group's 2024 Notes and 2026 Notes and extend maturities on 2024 Notes through November 2026. ECF No. 536-22 at 5. A condition precedent to the amendment would be Platinum agreeing to exchange its 2027 Notes into new PIK unsecured notes, agreeing to PIK 100% interest through November 2024, and foregoing its $7 million annual management fee. ECF Nos. 536-22 at 7; 1007 at 67–68. The proposal also offered to replace or provide credit support for certain existing factoring facilities. ECF No. 536-22 at 5. *The Minority Group would be willing to provide the full amount of the capital if needed, but all secured noteholders would be permitted to participate.* ECF No. 1007 at 65–67.

The proposal contained an alternative structure. Under the alternative structure, the Minority Group would be willing to increase the size of the term loan to $250 million, which would be supported by letters of credit provided by third parties. ECF Nos. 536-22 at 8; 1007 at 72. These letters of credit would have to be collateralized. ECF No. 1007 at 72. The premise was that the new facilities would not be prohibited under the Indentures if they had a third-party security, which the proposal sought to provide through third-party letters of credit. ECF No. 630 at 184. The Minority Group agreed to backstop the $250 million in letters of credit, which rights would also be offered to all secured noteholders. ECF No. 1007 at 70–71.

Wesco and its advisors did not believe that the Minority Group's proposed transaction was viable. With respect to the main proposal, Wesco did not see the $173 million in financing as sufficient to satisfy its liquidity concerns. ECF No. 738 at 84. With respect to the $100 million new money term loan, it was unclear what assets could be identified to transfer to the new entity. ECF No. 738 at 85–86. Consents would also have to be obtained from Wesco's ABL lender in order to use capacity from Wesco's ABL loan for $47.5 million of the financing. ECF No. 738 at 89. Wesco was also concerned with the condition precedent requiring Platinum's equitization of its $25 million promissory note.

ECF No. 738 at 84. If Platinum refused to convert its $25 million promissory note into equity, there would be no available basket for $25 million secured PIK notes. ECF No. 738 at 91–92. The proposal also sought to extend the principal maturities of between $43 million to $90 million of 2024 Notes, which was vastly inferior to the Majority Group's proposal that extended maturities of over $450 million of 2024 Notes. ECF Nos. 536-22 at 4; 738 at 94.

With respect to the alternative proposal, Wesco determined that its method of securitizing the facilities with third-party letters of credit was not feasible because the letters of credit would need a form of security themselves. ECF Nos. 630 at 184; 738 at 96. Mr. Vorderwuelbecke testified that Wesco determined there would be around a 50% loan-to-value ratio for the letters of credit, and with $250 million in letters of credit, there would be a need to obtain $500 million in assets to back the letters of credit. ECF No. 630 at 184–85. The company did not find it realistic to locate $500 million in unencumbered assets. ECF No. 630 at 184. Wesco believed that the Minority Group only had a "slim" chance of implementing the proposal, whereas at the same time they had already developed a fully negotiated agreement with the Majority Group. ECF No. 630 at 186. The conclusion was reached without detailed discussions with the Minority Group about the concerns. For example, the Minority Group offered to back the letter of credit proposal. As long as the Minority Group was providing the letters of credit, concerns about the quality of collateral would not be pressing. The lack of engagement was striking. Although it was disappointing, it was not, in itself, actionable.

Wesco and its advisors believed the Majority Group's proposal was superior to the Minority Group's in terms of maturity extensions, amortization reductions, and cash interest reductions. ECF Nos. 630 at 202–03; 1351 at 21–23, 32–33. The company concluded that the Majority Group's proposal "provided the most liquidity for the longest period of time." ECF No. 1351 at 12. Moreover, PIMCO and Silver Point were in a "power position" that would allow them to prevent Wesco from

getting financing from other sources, and Wesco expected PIMCO and Silver Point to use that power. ECF No. 697 at 107–08. Wesco and its advisors rejected the proposal and never made a counterproposal to the Minority Group. ECF No. 1007 at 78.

After having considered the comprehensive record, the Court concludes that the Majority Group's proposed transaction was superior for Wesco when compared to the Minority proposal. The problem was that the Majority Group's transaction was not actionable because they did not control two-thirds of the 2026 Notes.

## C.    The 2022 Transaction

### (1)    *The Majority Group's Holdings*

The Majority Group did not hold the required two-thirds interest in the 2026 Notes. Rather than fully engage with the Minority Group, the Majority Group decided to proceed by sleight of hand. The Majority Group decided to use its 51% majority stake to issue new 2026 Notes to itself. By becoming holders of the newly issued notes, the Majority Group would raise their ownership percentage to over two-thirds. At that point, they incorrectly believed, they could proceed with their non-pro rata transaction.

The 2024 and 2026 Indentures required a 66 2/3% vote to amend the Indentures if the amendment had the "effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents." ECF Nos. 601-8 at 131; 601-20 at 129. The transaction would require releasing collateral from liens securing the 2024 Notes and 2026 Notes in order to secure the 1L Notes and 1.25L Notes. ECF Nos. 700-58 at 3; 955 at 49–51, 199–200. Therefore, the simple majority vote of the 2026 Notes was ineffective and a two-thirds vote was required.

As of February 16, 2022, the Majority Group only held $522.5 million in 2026 Notes, or 59.2%, available to vote. ECF Nos. 542-8 at 2; 868 at 39–40. Although the group "held" 67.1% of the 2026 Notes, 1.5% of those holdings were unsettled trades and 6.4% were notes out on loan

and ineligible to vote or participate in the exchange.  ECF Nos. 542-8 at 2; 868 at 39–440, 447.  The Majority Group did hold over two-thirds of the 2024 Notes.  ECF Nos. 542-8 at 2; 868 at 38–39.

The Majority Group also held sufficient 2027 Notes to consent to amending the 2027 Indenture.  ECF Nos. 603-6 at 5; 602-37 at 4; 832 at 77.  Consent of a simple majority of holders of 2027 Notes was required in order to amend various provisions of the 2027 Indenture to permit the additional issuance of $250 million in incremental debt, which was funded through the issuance of additional 2026 Notes.  ECF Nos. 738 at 47; 832 at 78–79.

### (2)    *Resignation of BNY Mellon, Appointment of WSFS, and Board Approval of the 2022 Transaction*

On February 23, 2022, Kevin Smith (a Platinum employee) informed The Bank of New York Mellon Trust Company, the indenture trustee for the 2024 Notes, 2026 Notes, and 2027 Notes, about anticipated litigation in connection with the Majority Group's transaction and that Wesco would not object if BNY Mellon resigned as trustee.  ECF No. 827 at 184.  On March 14, 2022, BNY Mellon resigned as trustee and Wilmington Savings Fund Society ("WSFS") was appointed as the successor trustee.  ECF Nos. 707-57 at 32; 1350 at 213–14.  Patrick Healy (a WSFS employee) testified that it is common for WSFS to be appointed as a successor trustee for transactions that "involve lender-on-lender violence or creditor issues."  ECF No. 1350 at 5, 214–15.

On March 24, 2022, the board of directors of Wolverine Intermediate Corporation, including Mr. Bartels, voted in favor of pursuing the Majority Group's transaction.  ECF Nos. 536-24 at 2; 630 at 199.  The evidence demonstrates that the board and its advisors believed the transaction to be in the company's best interest.  ECF Nos. 630 at 209; 738 at 35, 112–13; 868 at 236.  All directors other than Mr. Bartels left the meeting and then Mr. Bartels, in his capacity as

independent director,[4] solely approved the portion of the transaction involving the exchange of notes held by Platinum-affiliated entities. ECF Nos. 536-24 at 2; 630 at 205.

### (3)    The 2022 Transaction Documents

The transaction was completed on March 28, 2022.  ECF No. 1184 at 46.   Because the Majority Group did not have a supermajority vote of the 2026 Notes, the group instead agreed to a mandatory and automated closing sequence to allow for the issuance of additional 2026 Notes to be used to vote for lien-releasing amendments to the 2026 Indenture.[5]

The Majority Group relied on certain simple majority provisions in the Indentures to permit the initial amendments.  Section 9.02 of the 2024 Indenture and 2026 Indenture provides that any amendment or supplement, except in certain enumerated circumstances, may be made "with the consent of the Holders of at least a majority" of the "then outstanding" 2024 Notes and 2026 Notes.  ECF Nos. 601-8 at 130; 601-20 at 127–28.  An exception to the majority vote requirement is the two-thirds vote required under the lien release provision.  ECF Nos. 601-8 at 131; 601-20 at 129.  The secured Indentures also have certain "sacred rights" provisions that require the support of each affected noteholder. ECF Nos. 601-8 at 130–31; 601-20 at 128–29.  Section 9.02 of the 2027 Indenture has similar consent requirements to amend the Indenture, but only contains two consent thresholds.   Similar to the secured Indentures, it requires consent of a simple majority to make any

---

[4] Although Mr. Bartels was appointed as an independent director, evidence admitted at trial suggests that he did not act independently.

[5] The 2022 Transaction was orchestrated through a ten-minute closing call.  All parties had possession of fully executed transaction documents prior to the closing call, and each transaction document was deemed delivered automatically without any action required of any party.  The facts surrounding the closing call are relevant only to the issue of whether the 2022 Transaction complied with the 2026 Indenture.  Because those facts are not relevant to Langur Maize's claims, they are not explained in great detail in this R&R.  The Court has invalidated those portions of the Transaction that stripped the first liens securing the 2026 Notes.

amendment or supplement except in certain enumerated circumstances. ECF No. 601-7 at 116. The Indenture contains similar "sacred rights" provisions that require the consent of each affected noteholder. ECF No. 601-7 at 117–18. The 2027 Indenture does not contain a supermajority lien-release provision.

The 2022 Transaction was documented as follows:

The original Indentures were amended via the Third Supplemental Indentures to the 2024, 2026, and 2027 Indentures. The purpose of the Third Supplemental Indentures was to permit the issuance to the Majority Group of $250 million in additional 2026 Notes secured by the existing collateral. These amendments were made pursuant to the simple majority provision contained in § 9.02 of the original Indentures. ECF Nos. 601-30 at 1; 601-39 at 1; 604-18 at 1. The Third Supplemental Indentures contained three principal amendments: (1) adding new definitions of "Additional 2026 Secured Notes" and "Note Purchase Agreement;" (2) amending the definition of permitted liens to include liens securing the additional 2026 Notes; and (3) allowing the incurrence of the additional 2026 Notes. ECF Nos. 601-39 at 2, 601-30 at 2, 604-18 at 2. The Third Supplemental Indentures were accompanied by consent letters of the respective notes and the Wolverine Top Holding Corporation PIK notes. ECF Nos. 601-27; 601-29; 602-37; 603-2; 603-5; 603-16; 604-2; 604-16; 604-24; 604-40.

Wesco's issuance to the Majority Group of $250 million in aggregate principal amount of additional 2026 Notes was performed through the Note Purchase Agreement. ECF No. 602-24 at 4, 10. The original 2026 Indenture contemplated the issuance of additional secured notes on a *pari passu* basis in the form of "Additional Secured Notes," subject to limitations on the incurrence of debt and liens. ECF No. 601-8 at 54, 111. The Third Supplemental Indentures amended the definitions necessary to permit the purchase of the additional 2026 Notes. ECF Nos. 601-39 at 2, 601-30 at 2, 604-18 at 2.

The Fourth Supplemental Indentures released the liens securing the 2024 Notes and 2026 Notes, as held by WSFS as the trustee for the notes, allowed for the issuance of new secured debt, and removed certain covenants that could prevent consummation of the 2022 Transaction. ECF Nos. 601-33 at 1–3; 601-34 at 1–5; 604-4 at 1–5. The Fourth Supplemental Indentures were accompanied by the consent letters of a two-thirds majority of holders of 2024 Notes and 2026 Notes (including the holders of the additional 2026 Notes), a majority of the 2027 Notes, and a majority of the Wolverine Top Holding Corporation PIK notes. ECF Nos. 602-22; 602-33; 603-8; 603-10; 603-11; 603-13; 603-17; 603-29; 604-1; 604-17.

The Exchange Agreement facilitated the exchange of participating 2024 Notes, 2026 Notes, and 2027 Notes for 1L Notes and 1.25L Notes. Pursuant to the Exchange Agreement, the participating secured noteholders agreed to deliver their 2024 Notes and 2026 Notes to Wesco, and in exchange, Wesco agreed to issue them the 1L Notes. ECF No. 604-19 at 17. Similarly, the participating unsecured noteholders agreed to deliver their 2027 Notes to Wesco in exchange for the 1.25L Notes. ECF No. 604-19 at 18.

The Amended and Restated Notes Security Agreement was designed to grant first liens to the holders of the new 1L Notes. ECF No. 602-27 at 6–8.

## II. PROCEDURAL BACKGROUND

On June 1, 2023, Wesco and its related entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *See, e.g.*, Case No. 23-90611, ECF No. 1. That same day, the Court entered an order directing joint administration of the Chapter 11 cases. Case No. 23-90611, ECF No. 73. Wesco's joint Chapter 11 plan of reorganization was confirmed on December 27, 2024. Case No. 90611, ECF No. 2528.

### A. The New York Lawsuits

On October 28, 2022, the Minority Group's 2024 Noteholders and 2026 Noteholders (the "2024/2026 Noteholders") commenced a lawsuit

in New York state court challenging the 2022 Transaction. ECF No. 201-36. The 2024/2026 Noteholders alleged that the 2022 Transaction impermissibly "transferred hundreds of millions of dollars of value" by "strip[ping] Plaintiffs of the liens securing their Senior Secure Notes and simultaneously hand[ing] those liens to Platinum and other [participating] Noteholders." ECF No. 201-36 at 5–6. The 2024/2026 Noteholders sought a judgment holding that the transaction "is null and void and not enforceable" and an order avoiding and unwinding the transaction. ECF No. 201-36 at 71. The lawsuit was stayed by order of this Court. ECF No. 21.

On March 27, 2023, Langur Maize L.L.C. commenced a New York state court lawsuit challenging the 2022 Transaction. ECF No. 201-39. Langur Maize is a 2027 Noteholder that purchased its notes after the 2022 Transaction closed. ECF No. 176 at 74. Langur Maize alleged that the 2022 Transaction "sought to boost Platinum's and Carlyle's returns by allowing them to exchange their Unsecured Notes for new 1.25 Lien secured notes . . . , which trade at far higher prices than the Unsecured Notes and enjoy priority over all unsecured claims in any recoveries in bankruptcy or liquidation." ECF No. 201-39 at 4. Langur Maize sought recovery in the form of damages and the avoidance and unwinding of the 2022 Transaction. ECF No. 201-39 at 40. The Langur Maize New York lawsuit was stayed by order of this Court. ECF Nos. 41; 71.

### B.    This Adversary Proceeding

On June 1, 2023, Wesco filed a complaint in this adversary proceeding against the 2024/2026 Noteholders and Langur Maize. ECF No. 1 at 37–53. Wesco filed its first amended complaint on July 9, 2023. ECF No. 63. The amended complaint requested a declaration confirming the validity of the 2022 Transaction and a declaration confirming that Langur Maize and the 2024/2026 Noteholders that acquired their notes after the 2022 Transaction lack standing to pursue their claims against non-debtor parties other than WSFS. ECF No. 63 at 63–73.

The 2024/2026 Noteholders and Langur Maize filed counterclaims against all parties involved in the 2022 Transaction. The 2024/2026 Noteholders' first amended counterclaims seek a declaration of standing; a declaration for breach of contract against Wesco, the Guarantor Defendants, and WSFS; a declaration for breach of the implied covenant of good faith and fair dealing against Wesco, the Guarantor Defendants, WSFS, PIMCO, Silver Point, Senator, and Citadel; the imposition of an equitable lien against Wesco, the Guarantor Defendants, Platinum, Wolverine Top Holding Corporation, and the Majority Group's participating noteholders; equitable subordination of claims held by Platinum, Wolverine Top Holding Corporation, and the Majority Group's participating noteholders; a declaration for tortious interference with contract against Platinum, and alternatively against PIMCO, Silver Point, Senator, and Citadel; and a declaration for conversion against Platinum, Wolverine Top Holding Corporation, and the Majority Group's participating noteholders. ECF No. 144 at 58–73.

Langur Maize's crossclaims, third-party claims, and counterclaim seek damages for breaches of (i) § 3.02 of the 2027 Indenture and § 4 of the 2027 Notes against Platinum, Wolverine Top Holding Corporation, Carlyle, Senator, and WSFS; (ii) § 6.05 of the 2027 Indenture and § 4 of the 2027 Notes against Platinum, Wolverine Top Holding Corporation, Carlyle, Senator, and WSFS; and (iii) § 9.02(10) of the 2027 Indenture and § 4 of the 2027 Notes against Platinum, Wolverine Top Holding Corporation, Carlyle, Senator, and WSFS. The lawsuit also sought damages for (i) tortious interference with contract against Platinum, Wolverine Top Holding Corporation, Carlyle, and Senator; (ii) unjust enrichment against all defendants; (iii) breach of the implied covenant of good faith and fair dealing against all defendants; and (iv) civil conspiracy against all defendants. In addition, the suit sought a declaration that (a) the 2022 Transaction violated the 2027 Indenture and (b) Langur Maize has standing to sue parties other than Wesco, WSFS, and the Guarantor Defendants. ECF No. 142 at 31–41.

On July 31, 2023, the parties entered a stipulated comprehensive scheduling order. ECF No. 193. Pursuant to the scheduling order, the parties agreed to permit the 2024/2026 Noteholders and Langur Maize to seek declaratory relief with regard to liability as to their non-debtor claims (and to modify the automatic stay to the extent necessary to permit declaratory relief). ECF No. 193 at 6–7. The parties agreed that, in the event of a finding of liability, any remedies would be determined subsequently in this adversary proceeding or in a separate litigation. ECF No. 193 at 7.

The parties filed motions for summary judgment with respect to their claims. Following oral argument on the motions, the Court issued its memorandum opinion, memorandum opinion supplement, and an order and amended order on the summary judgment motions. ECF Nos. 508; 509; 553; 554. The Court declared that the 2024/2026 Noteholders have standing to assert their claims. ECF No. 554 at 2. With respect to Langur Maize's standing, the Court held that, although Langur Maize had standing to assert its claims against Wesco, WSFS, and the entities that guaranteed Wesco's obligations pursuant to N.Y. G.O.L. § 13-107, there remained a genuine issue of material fact as to whether Langur Maize had standing to assert its claims against other entities. ECF Nos. 508 at 19–28; 553 at 1–3.

Pursuant to the amended order on the summary judgment motions, the Court dismissed the following claims asserted by the 2024/2026 Noteholders and Langur Maize:

| 2024/2026 Noteholders First Amended Counterclaims | | |
|---|---|---|
| **Count** | **Description** | **Claim Against** |
| Two | Breach of Contract— Breach of §§ 2.01 and 4.12 of the Original Secured Note Indenture | Guarantor Defendants |
| Two | Breach of Contract | WSFS |

| | Three | Breach of Implied Covenant of Good Faith and Fair Dealing | All parties |
|---|---|---|---|
| | Four | Equitable Lien | All parties |
| | Five | Equitable Subordination | All parties |
| | Seven | Conversion | All parties |

ECF No. 554 at 1–2.

| **Langur Maize Crossclaims, Third-Party Claims, and Counterclaim** | | |
|---|---|---|
| **Count** | **Description** | **Claim Against** |
| One | Breach of § 3.02 of the Indenture and § 4 of the 2027 Notes | WSFS |
| Two | Breach of § 6.05 of the Indenture and § 4 of the 2027 Notes | WSFS |
| Three | Breach of § 9.02(10) of the Indenture and § 4 of the 2027 Notes | WSFS |
| Five | Unjust Enrichment | All parties |
| Six | Breach of Implied Covenant of Good Faith and Fair Dealing | All parties |

ECF No. 554 at 2.

Trial of the adversary proceeding commenced on January 25, 2024. The Court heard testimony from twenty-one witnesses and admitted hundreds of exhibits. There were thirty-five days of trial spread over nearly six months. On July 10, 2024, the Court made three principal oral rulings:

(1) the rights, liens, and interests that were for the benefit of all holders of the 2026 Notes as they existed on March 27, 2022, remained in full force and effect on March 29, 2022;

(2) the selection of the 2027 Notes for exchange was not done in a manner permitted under the 2027 Indenture; and

(3) no relief is granted to the holders of the 2024 Notes.

ECF No. 1474 at 3.

The Court stated that these principal interlocutory rulings would be replaced by final written rulings. ECF No. 1474 at 3. The Court also took the 2024/2026 Noteholders' and Langur Maize's remaining claims under advisement. This R&R addresses Langur Maize's claims.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Venue is proper in this District pursuant to 28 U.S.C. § 1409. The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

The Court confirms the rulings in its January 14 Memorandum Opinion as to which claims are and are not core. ECF No. 508 at 32–36. Langur Maize's claim for a determination of standing is core. ECF No. 508 at 34. Langur Maize's tort and contract claims are not core. ECF No. 508 at 34–36. The Court may not enter final judgment with respect to the tort and contract claims.

## DISCUSSION

This R&R addresses (1) Langur Maize's standing, (2) Langur Maize's causes of action for breach of contract, (3) Langur Maize's cause of action for tortious interference with contract, and (4) Langur Maize's cause of action for civil conspiracy.

## I.    LANGUR MAIZE'S STANDING

Langur Maize seeks a declaration of its standing to sue the entities not covered by N.Y. G.O.L. § 13-107. Section 13-107 provides:

1. Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.

2. As used in this section, "bond" shall mean and include any and all shares and interests in an issue of bonds, notes, debentures or other evidences of indebtedness of individuals, partnerships, associations or corporations, whether or not secured.

3. As used in this section, "indenture" means any mortgage, deed of trust, trust or other indenture, or similar instrument or agreement (including any supplement or amendment to any of the foregoing), under which bonds as herein defined are issued or outstanding, whether or not any property, real or personal, is, or is to be, pledged, mortgaged, assigned, or conveyed thereunder.

N.Y. Gen. Oblig. Law § 13-107. It is undisputed that Langur Maize received authorization letters from DTC (the record holder of the 2027 Notes) authorizing it to bring suit.

In its summary judgment rulings, the Court held that § 13-107 confers upon Langur Maize Article III standing to assert its claims against Wesco, WSFS, and all defendants that guaranteed Wesco's obligations under the 2027 Notes. ECF No. 508 at 19–20. The Court left open the question of whether Langur Maize had standing to sue parties not covered by the statute. The Court found that, because Langur Maize purchased its 2027 Notes after the 2022 Transaction had already taken place at a substantial discount, it did not itself suffer an

injury for purposes of Article III standing unless it purchased its notes without knowledge of the 2022 Transaction. ECF No. 508 at 23–25. Langur Maize was candid with the Court on the issue and admitted that it purchased its 2027 Notes with knowledge of the transaction.

Based on that acknowledgement, Langur Maize has Article III standing only if it was assigned those claims by a party with standing. ECF No. 553 at 1–2. To this point, the Court determined that the DTC authorization letters were not sufficient to grant standing because DTC had not itself suffered an injury stemming from the 2022 Transaction. ECF No. 508 at 21–22, 26–28.

The issue left for determination is whether Langur Maize's purchase of the 2027 Notes effected an automatic assignment of claims against parties not covered by § 13-107 from the prior beneficial owners of the notes. ECF No. 553 at 1–3. The Court answers the question in the negative.

In the absence of a direct injury, a plaintiff may obtain Article III standing if it obtains an assignment of an injured party's claim. *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008). Upon a successful assignment, the assignee "stand[s] in the place of the injured party and satisf[ies] the constitutional requirement of an 'injury-in-fact.'" *Id.* "To assign a claim effectively, the claim's owner 'must manifest an intention to make the assignee the owner of the claim.'" *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 418 (2d Cir. 2015) (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir.1997)). No particular language is necessary to validly assign a claim, "so long as the language manifests [the assignor's] intention to transfer *at least title or ownership, i.e.*, to accomplish 'a completed transfer of the entire interest of the assignor in the particular subject of assignment.'" *Id.* (quoting *Advanced Magnetics, Inc.*, 106 F.3d at 17). The subject of the assignment is the claim itself. *See id.*

Despite the absence of specific language evidencing a transfer of ownership of a claim, N.Y. G.O.L. § 13-107 automatically assigns claims under a bond or security against an obligor, trustee, or depositary under an indenture, or a guarantor of an obligor's, trustee's, or depositary's obligations.  N.Y. Gen. Oblig. Law § 13-107(1).  Under § 13-107, "the buyer of a bond receives exactly the same 'claims or demands' as the seller held before the transfer."  *Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 97 N.Y.2d 456, 461 (2002).

With respect to claims against parties other than an obligor, trustee/depositary, or guarantor, Langur Maize argues that the relevant inquiry for determining the assignment of *tort* claims is whether "the entire interest in the notes" has been assigned.  *See, e.g.*, ECF No. 1484 at 6.  New York courts have held that the assignment of the entire interest in a contract is sufficient to assign *contract* claims.  *See Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 236 (S.D.N.Y. 2007) (finding language in an assignment clause stating "I hereby sell, assign, transfer, and set over . . . all my right, title, and interest in and to the within contract" as sufficient to transfer contract claims but not tort claims (citing *Fox v. Hirschfeld*, 142 N.Y.S. 261, 264 (App. Div. 1913))).  But the courts have unambiguously held that such language is not sufficient to assign tort claims.

In support of its proposition, Langur Maize relies on *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.* 772 F.3d 111 (2d Cir.), *as amended* (Nov. 12, 2014), *certified question accepted sub nom. Commonwealth of Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co. Inc.*, 24 N.Y.3d 1028, 22 N.E.3d 187 (2014), *and certified question answered sub nom. Commonwealth of Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 25 N.Y.3d 543, 35 N.E.3d 481 (2015).  There, the court stated that "[t]he question in this case is whether Commerzbank has offered sufficient evidence to allow a trier of fact to find that DAF assigned its entire interest in the notes to Dresdner, including, therefore, its right to sue for fraud."  *Id.* at 123.  But the court did not answer the question, instead

certifying the issue for determination by the New York courts. *Id.* at 123–24.

Upon certification, the Court of Appeals of New York clarified that language evidencing the assignment of the entire interest in notes is insufficient to transfer tort claims. In *Commonwealth of Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, the court determined that the parties' dispute as to whether fraud claims were assigned pursuant to a note sale turned on the issue of whether an "unqualified" sale of the "whole interest" in notes is sufficient to transfer fraud claims that arise under the notes. 25 N.Y.3d 543, 549 (2015). The court acknowledged that fraud and tort claims are "freely assignable in New York." *Id.* at 550. But the court found that the right to assert fraud or tort claims "related to a contract or note does not *automatically* transfer with the respective contract or note." *Id.* (collecting authorities). Rather, "where an assignment of fraud or other tort claims is intended in conjunction with the conveyance of a contract or note, there must be some language—although no specific words are required—that evinces that intent and effectuates the transfer of such rights." *Id.* ("Without a valid assignment, 'only the . . . assignor may rescind or sue for damages for fraud and deceit' because 'the representations were made to it and it alone had the right to rely upon them.'" (quoting *Nearpark Realty Corp. v. City Investing Co.*, 112 N.Y.S.2d 816, 817 (Sup. Ct. 1952))).

The court held that the record did not reflect any explicit assignment of tort causes of action. *Id.* at 551. The plaintiff had conceded that there was no explicit assignment of tort claims in connection with the sale of notes. *Id.* Although the plaintiff contended that the transfer of the notes "was 'unqualified' and, therefore, implicitly included claims related thereto," the court found such a transfer insufficient. *Id.* The plaintiff's idea that "in the absence of language to the contrary, . . . tort claims automatically transferred . . . with the notes" was contrary to New York law that requires "either some expressed intent or reference to tort causes of action, or some explicit

language evidencing the parties' intent to transfer broad and unlimited rights and claims, in order to effectuate such an assignment." *Id.*

Other New York cases further reinforce the *Commonwealth* court's findings. For example, in *Dexia SA/NV v. Stanley*, citing *Commonwealth*, the court found that language in an agreement to deliver "all right, title, and interest" in securities did not include fraud claims since only rights in the subject securities were assigned "without explicitly referencing any related tort claims or the overall transaction." 22 N.Y.S.3d 833, 833 (2016). In *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, the court found that, although language transferring "all of [BAII's] rights, title and interest in (a) the Participation Agreement," standing alone, may be deemed insufficient to transfer tort claims, other circumstances indicated an intent to transfer the claims. 57 F.3d 146, 152 (2d Cir. 1995). Specifically, the same assignment language also included an assignment of "all rights, title and interest in '(b) [BAII's] participation in [the Marceca Loan],'" and that provision was interpreted as giving meaning beyond the transfer of rights, title, and interest in the Participation Agreement since that language was already included in subparagraph (a) of the assignment. *Id.* The court looked elsewhere in the assignment, quoting language stating that the transfer was being made of "all of [BAII's] rights and interest in the *transaction described* in Paragraphs (a) and (b)." *Id.* The court construed the transfer of the interest in the "transaction" as broader than a transfer of an interest in the contract, leading the court to conclude that the language is sufficient to effect an assignment of tort claims. *Id.* As an additional factor, the court also noted that the assignment was drafted in anticipation that that the assignor would be dissolved, and a "party about to become defunct has little incentive to reserve transactional rights when transferring its interests to its surviving parent corporation." *Id.* at 152–53.

Similarly, in *Int'l Design Concepts, LLC*, the court found a valid assignment of tort causes of action where the transfer of assets contained the following language:

> [A]ll assets of [AGI], including, *without limitation*, the undersigned's now and hereinafter existing Accounts Receivable, Contract Rights, Inventory, Machinery and Equipment, General Intangibles, including Borrower's trademarks and trade names and all products and proceeds thereof (as defined in the Load Documents and collectively the "Collateral"). Because of the inability of [AGI] to pay the Obligations which are currently due and owing, the undersigned hereby grants you *all rights of possession in and to* the Collateral . . . ."

486 F. Supp. 2d at 237. The court found that the assignment of "all assets of [AGI]" to be "broad enough to encompass all causes of action owned by AGI." *Id.* A subsequent transfer of assets contained similarly broad language: "HSBC 'hereby sells, grants, assigns, transfers, conveys and sets over to [IDC] *all* of [HSBC's] right, title and interest in and to all of the Collateral . . . .'" *Id.* And again, "AGI was a defunct entity and would have had little incentive to reserve transactional rights." *Id.*; *Commonwealth of Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 25 N.Y.3d at 552 (noting the assignment in *Int'l Design* "expressly provided that it was 'without limitation'" (quoting *Int'l Design Concepts, LLC*, 486 F. Supp. 2d at 236–37)).

Langur Maize identifies language in the 2027 Indenture and DTC procedures that indicate an intent to transfer the entire interest in 2027 Notes upon a sale of a beneficial interest in the notes. Section 2.06(b) of the 2027 Indenture states: "The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures." ECF No. 601-7 at 52. The 2027 Indenture defines the "Applicable Procedures" as: "[W]ith respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary . . . that apply to such transfer or exchange." ECF No. 601-7 at 10. The 2027 Indenture also provides that "[t]he rights of Beneficial Owners in the Global Note shall be exercised only through

the Depositary subject to the Applicable Procedures."  ECF No. 601-7 at 61.  The DTC rules provide:

> [DTC] shall hold the entire interest in, and shall have the authority of a holder of Securities to act, in its sole discretion, with respect to any Securities Delivered Versus Payment, which are the subject of an Incomplete Transaction, to issue or transfer the entire interest in such Securities . . . .[6]

DTC Rules, Rule 9(b) § 2.

The DTC rules express the steps taken when a beneficial interest in the 2027 Notes is transferred from a seller to a purchaser.  During the transfer of beneficial interests, DTC holds the entire interest in the notes and has the authority to then transfer that entire interest to the purchaser.  But the language does not demonstrate any intention of the seller to transfer its ownership of tort causes of action.  The rules are merely procedures to ensure that a purchaser obtains the entire beneficial ownership interest in the seller's notes.  As the *Commonwealth* court found, there is no expressed intent or reference to tort causes of action or "some explicit language evidencing the parties' intent to transfer broad and unlimited rights and claims." *Commonwealth of Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 25 N.Y.3d at 551.  For there to be an assignment of tort claims, the evidence must have demonstrated some language referencing an assignment of claims accruing pursuant to a transaction or a seller's injury to its interest in the notes.  *See Dexia SA/NV*, 22 N.Y.S.3d at 833.  In the absence of such evidence, the Court cannot conclude that the DTC procedures effectuated a transfer of a prior beneficial owner's tort claims to Langur Maize.  But the language is nevertheless sufficient to indicate

---

[6] A "Delivery Versus Payment" is defined in the DTC rules as essentially a purchase transaction of the security.  DTC Rules, Rule 1.  An "Incomplete Transaction" is any Delivery Versus Payment transaction where the securities have been credited to DTC's account but have not yet been credited to the account of the purchaser.  DTC Rules, Rule 1.

an intent to transfer a seller's contract claims, as a transfer of an entire interest in a contract transfers all rights under the contract itself. *See Int'l Design Concepts, LLC*, 486 F. Supp. 2d at 236.

In its January 23 memorandum opinion supplement, the Court expressed its concerns with the unworkable circumstance that would arise if the 2027 Indenture's no-action clause contractually barred prior beneficial owners from obtaining authorization to bring suit under the Indenture. ECF No. 553 at 2 ("Put simply, the sellers to Langur Maize would 'own' claims, but could never prosecute them. It makes no sense.").

The language of the 2027 Indenture's no-action clause and DTC's authorization letter template reveal that the drafters could not have intended for prior beneficial owners to be barred from raising claims they still owned.

The Court does not determine whether any consent must be obtained for a holder of a tort claim to sue for a matter retained by the sellers to Langur Maize. It appears that DTC never owned the tort claims. If it never owned the claims, the Court does not understand how its consent could be required.

Nevertheless, on the assumption that DTC's consent is required, the 2027 Indenture's § 2.08 no-action clause makes no mention of a requirement that a beneficial holder still own its notes in order to exercise its rights. It merely provides that "[t]he rights of Beneficial Owners in the Global Note shall be exercised only through the Depositary subject to the Applicable Procedures." ECF No. 601-7 at 61. The section also states that

> nothing herein shall prevent the Issuer, the Trustee, or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by any Depositary (or its nominee), as a Holder, with respect to such Global Note or shall impair, as between such Depositary and owners of beneficial interests

> in such Global Note, the operation of customary practices governing the exercise of the rights of such Depositary (or its nominee) as Holder of such Global Note.

ECF No. 601-7 at 61.

DTC's authorization letter template is written in the past tense, indicating that the DTC can provide authorization to sue to any beneficial holder, so long as they held notes on the relevant date:

> On **Insert the relevant date** ("**Subject Date**"), Cede & Co., as nominee of The Depository Trust Company ("DTC"), was a holder of record of the Notes.

> DTC is informed by the Participant that the Subject Notes credited to the Participant's Account on the Subject Date were beneficially owned by Beneficial Owner, a customer of the Participant.

> At the request of the Participant, on behalf of the Beneficial Owner, Cede & Co., as the holder of record of the Subject Notes on the Subject Date, hereby authorized the Participant, solely with respect to the Subject Notes beneficially owned by the Beneficial Owner on the Subject Date, to take any and all actions and exercise any and all rights and remedies that Cede & Co., as the holder of record of the Subject Notes on the Subject Date, is entitled to take . . . under the terms of the Notes, the related guarantees, the related indenture, and any other controlling documents.

ECF No. 1364-29 at 3. The language does not limit authorization to current beneficial holders. So long as the holder owned its notes as of the subject date, it could potentially obtain authorization to sue. Any other language would contravene New York law, under which transferors retain their standing to litigate claims they did not expressly assign. *See Dexia SA/NV, Dexia Holdings, Inc. v. Stanley*, 41 Misc. 3d

1214(A), at *5 (N.Y. Sup. 2013) ("FSAM did not assign fraud claims to assignee-plaintiffs Dexia SA/NV, DHI and DCL; to the extent any fraud claims exist, they remain with FSAM alone."), *aff'd sub nom. Dexia SA/NV v. Stanley*, 22 N.Y.S.3d 833 (2016).

Langur Maize's breach of contract claims were fully assigned by application of DTC's transfer procedures. They may be asserted to the extent permitted following the Court's orders on the parties' motions for summary judgment. The claims are against Platinum, Wolverine Top Holding Corporation, Carlyle, and Senator. Langur Maize's eighth claim for relief also seeks a declaration that "the [2022 Transaction] violated the terms of the Indenture." ECF No. 142 at 40. The claim is asserted against all defendants. ECF No. 142 at 39. This is a contract claim that was fully assigned to Langur Maize by application of the DTC transfer procedures. Langur Maize asserts a tortious interference with contract claim against Platinum, Wolverine Top Holding Corporation, Carlyle, and Senator. Those entities are not covered by N.Y. G.O.L. § 13-107 and the claim was not assigned by the seller. Langur Maize does not have standing to assert this claim, which the Bankruptcy Court recommends should be dismissed by the District Court. Langur Maize asserts a civil conspiracy claim against all defendants. Pursuant to § 13-107, the claim may be asserted only against Wesco, WSFS, and the entities that guaranteed Wesco's obligations under the 2027 Indenture. The balance of the civil conspiracy claims should also be dismissed.

## II.    THE 2022 TRANSACTION BREACHED THE 2027 INDENTURE

In its July 10 oral ruling, the Court found that the 2022 Transaction breached the 2027 Indenture. ECF No. 1474 at 3.

The Court's finding of breach is based on an interpretation of the interplay between §§ 3.02 and 3.07(h) of the 2027 Indenture. Section 3.02, titled "Selection of Notes to Be Redeemed or Purchased," provides:

> If less than all of the Unsecured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof, the Trustee will select Unsecured Notes for redemption or

> purchase *pro rata*, by lot or by such method as it shall deem
> fair and appropriate (subject to applicable DTC procedures
> with respect to the Global Notes, including the Applicable
> Procedures).

ECF No. 601-7 at 63.

> Section 3.07(h), titled "Optional Redemption," provides:

> The Issuer or its Affiliates may at any time and from time
> to time purchase Unsecured Notes.  Any such purchases
> may be made through open market or privately negotiated
> transactions with third parties or pursuant to one or more
> tender or exchange offers or otherwise, upon such terms
> and at such prices as well as with such consideration as the
> Issuer or any such Affiliates may determine.  To the extent
> Unsecured Notes are purchased or otherwise acquired by
> the Issuer, such Unsecured Notes may be cancelled and all
> obligations thereunder terminated.

ECF No. 607-7 at 65–66.

If Wesco relies on § 3.07(h), it must acquire notes either through
open market transactions, "privately negotiated transactions with third
parties," through tender/exchange offers, or "otherwise."  Platinum's
interpretation of § 3.07(h) offered during closing arguments is fraught
with difficulties.  Platinum asserts an internally contradictory
interpretation of the first two sentences of the subsection.  Platinum
argues that the first sentence grants unbridled authority to purchase
unsecured notes.  It argues that the second sentence is merely an
unrestricted list of examples of what the first sentences might mean.
Platinum also argues that the word "otherwise" implies that any
purchase at all is permitted, essentially eliminating all meaning from
the phrase "through open market or privately negotiated transactions
with third parties or pursuant to one or more tender or exchange offers."
Platinum argues, unpersuasively, that it is a "third party" to Wesco.

Platinum's interpretation of "otherwise" is contradicted by the Supreme Court's recent ruling in *Purdue Pharma*. There, in rejecting an overbroad interpretation of § 1123(b)(6) of the Bankruptcy Code, the Court held that a "catchall must be interpreted in light of its surrounding context and read to 'embrace only objects similar in nature' to the specific examples preceding it." *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 217 (2024) (quoting *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 512 (2018)). A day after *Purdue Pharma*, the Court applied the same logic when it considered the word "otherwise" contained in 18 U.S.C. § 1512. *Fischer v. United States*, 603 U.S. 480, 489–98 (2024).

Section 3.07(h)'s "otherwise" catchall provision is preceded by a series of examples that denote that the pricing of the purchase of unsecured notes would be governed by market forces. Those examples are:

- Open market transactions

- Privately negotiated transactions with third parties

- Pursuant to tender offers

- Pursuant to exchange offers

Applying New York law, the Fifth Circuit in *Serta* recently interpreted the meaning of the phrase "open market purchase" contained as an exception to a pro-rata sharing provision in a loan agreement. *In re Serta Simmons Bedding, L.L.C.*, No. 23-20181, 2024 WL 5250365, at *11–17 (5th Cir. Dec. 31, 2024). There, the parties' syndicated loan agreement contained a sacred rights provision that required pro rata sharing on any payment or prepayment of principal, payment of interest, and conversion for any given class of debt issued by the debtor under the loan documents. *Id.* at *3. Because the provision was a sacred right, it could not be modified or waived without the unanimous consent of any affected lender. *Id.* But the provision contained an exception allowing the debtor to repay its loans without ratable sharing between lenders. *Id.* The exception provided that the

lender may, at any time, "assign all or a portion of its rights and obligations to any Affiliated Lender[7] on a non-pro rata basis . . . (B) through open market purchases[.]" *Id.* *Serta* involved the validity of an uptier transaction where a select group of lenders provided the debtor with "$200 million in new financing in exchange for $200 million in first-out, super-priority debt." *Id.* at *4. The lenders also exchanged $1.2 billion of their first-lien and second-lien loans for around $875 million in second-out, super-priority debt. *Id.* The participating lenders and the debtor had argued that the uptier transaction was an open market purchase based on an interpretation of the provision to mean "a transaction in which something is obtained for monetary value in a market where prices are set by competitive negotiations between private parties." *Id.* at *13.

The court disagreed, holding that "an open market purchase is a purchase of corporate debt that occurs on the secondary market for syndicated loans." *Id.* at *12. The court observed that common usage of the phrase contemplates a "specific market in which various parties may participate and the prices are set by competition." *Id.* The court invalidated the uptier transaction and found that "if [the debtor] wished to make a § 9.05(g) open market purchase and thereby circumvent the sacred right of ratable treatment, it should have purchased its loans on the secondary market. Having chosen to privately engage with individual lenders outside of this market, [the debtor] lost the protection of § 9.05(g)." *Id.* at *14.

As *Serta* confirms, § 3.07(h)'s inclusion of "open market transactions" reflects an intent of the drafters to permit the Issuer to purchase notes on the appropriate secondary market for those notes. Although § 3.07(h) also allows for purchases through private negotiations with third parties, the phrase must be interpreted within the context of the transactions permitted by § 3.07(h), which all reflect purchases at a price obtained through market forces. In this case, the

---

[7] "Affiliated Lender" was defined under the loan documents to include the debtor. *Serta*, 2024 WL 5250365, at *3.

"third party" was not a third party at all.  It was Platinum, Wesco's sponsor.

Platinum makes a strained argument to the contrary.  It argues that Platinum—the 100% equity owner of Wolverine Top Holding Corporation, the entity that selects Wesco's directors, and the entity whose employees and officers dominate Wesco's board—was a third party to Wesco.  Platinum asks the Court to ignore the common usage of the term "third parties" for two reasons.  First, Platinum argues it is an "Affiliate," which is a defined term under the 2027 Indenture.  ECF No. 601-7 at 9 ("Affiliate of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.").  According to Platinum, if the drafters intended to exclude Platinum, the phrase should have stated "non-Affiliates" rather than third parties.  Platinum's second argument is that "third parties" means "non-signatories" to the 2027 Indenture.  Platinum's arguments ignore that "non-Affiliates" and "non-signatories" are merely one part of a larger group of third parties.

In common legal writings, the term "third party" is uniformly used in a manner that excludes "affiliates."  *See Oppenheimer v. Harriman Nat. Bank & Tr. Co. of City of New York*, 301 U.S. 206, 211 (1937) ("The bank had power to sell the stock in question whether acquired by it in accordance with or contrary to section 83, and whether the stock belonged to it, the affiliate or a third party."); *United States v. Brown*, 459 F.3d 509, 513 (5th Cir. 2006) ("The Government contended, however, that the sale was a sham because Enron executives orally promised Merrill a flat fee of $250,000 and a guaranteed 15% annual rate of return over the six-month period of Merrill's investment; Enron executives allegedly promised that Enron or an affiliate would buyback Merrill's interest in the barges if no third party could be found."); *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 328 (1988) (Scalia, J., dissenting) ("That same phenomenon renders inexplicable Justice BRENNAN's perception that all affiliated trademark holders are less in need of, or less deserving of, § 526(a) protection against the products of their foreign

affiliates. It is not the affiliates who are doing the damage but third parties.").

Platinum's argument is not frivolous. It would be possible to use the term "third party" to refer to a non-signatory or a non-Affiliate. But the 2027 Indenture contains no such language raising an inference of Platinum's limited interpretation. Rather, the phrase suggests an intention to exclude all related parties, whether "Affiliates," signatories, or otherwise. This interpretation is better supported by the drafters' decision to include the broader group of "third parties" rather than the narrower group of "non-Affiliates" or "non-signatories." Read in context, Platinum is not a third party.

Platinum's second argument with respect to its interpretation of § 3.07(h) is also unavailing. It argues that the first sentence is not modified by the second sentence. But why give examples if those examples do not explain anything at all? Under Platinum's reading, the first sentence of the paragraph would authorize any purchase from anyone at any time and at any price. Platinum's interpretation, if true, unhinges § 3.07(h) from any restrictions of any kind. The Court cannot read the first sentence if it would render the second superfluous. The interpretation is also unsupported by the words of the second sentence, where the sentence refers to first sentence through the phrase "[a]ny such purchases." The better interpretation is that the second sentence strictly limits the first. The words and phrases in a contract should be construed so as to give full meaning and effect to all of its provisions. *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014).

Fundamentally, Platinum's interpretation of § 3.07(h) runs afoul of its plain meaning. Section 3.07(h) permits the Issuer or its Affiliates to purchase 2027 Notes. But those purchases must be made through open market or privately negotiated transactions with third parties, through tender or exchange offers, or some other form that reflects a purchase at market-derived pricing. This is an easy reading of § 3.07(h).

Platinum alleges that § 3.02 applies only to redemptions and never to purchases. The argument divorces redemptions from purchases.

Langur Maize provides a cogent explanation of the only rational interpretation of § 3.02. The first sentence of § 3.02 reads: "If less than all of the Unsecured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof, the Trustee will select Unsecured Notes for redemption ***or purchase*** *pro rata*, by lot or by such method as it shall deem fair and appropriate . . . ." ECF No. 601-7 at 63. The operation of § 3 of the 2027 Indenture can be explained by hypothetical examples. As explained below, § 3.02 imposes a market test on the selection of notes for all purchases, including purchases under § 3.07(h).

All parties and the Court agree that § 3.07 regulates redemptions of the 2027 Notes. If a redemption occurs, the price, terms, and conditions of the redemptions are specified in § 3.07. ECF No. 601-7 at 65–66. If a redemption of all of the bonds occurs in accordance with § 3, there is no need for a further regulatory paragraph. The terms for a 100% redemption are identical to all parties. But what occurs if there is a partial redemption or a sale? On what terms can those events occur? Those terms are set forth in § 3.02.

The opening clause of § 3.02 makes clear that it only applies if less than 100% of the notes are redeemed: "If less than all of the Unsecured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof . . . ." ECF No. 601-7 at 63. When a purchase or redemption of less than all of the notes occurs, there are only three remaining possibilities:

- Some of the notes could be redeemed.

- All of the notes could be purchased.

- Some of the notes could be purchased.

When less than all of the notes are redeemed, § 3.02 mandates a fairness in the selection of the notes to be purchased, whether by

redemption or otherwise.  It allows for a random selection of notes, a *pro rata* purchase, or any other similar method that the Trustee "shall deem fair and appropriate."

The Court should not read the 2027 Indenture so as to render the word "purchase" meaningless in § 3.02, especially since the word "purchase" is used fourteen times in that section.  ECF No. 601-7 at 63; *see Chesapeake Energy Corp.*, 773 F.3d at 114.  If notes are purchased, then Wesco was required to follow the provisions of §§ 3.02 and 3.07(h).

Sections 3.02 and 3.07(h) impose two specific limitations when notes are purchased by the Issuer: first, purchases are subject to § 3.02's market test for selection, and second, under § 3.07(h), those purchases must be made through a transaction that reflects market-derived pricing.  These limitations work in conjunction to help derive a fair market transaction for purchases.  Neither of these conditions were met on March 28, 2022.

First, the parties do not dispute that the 2022 Transaction involved a purchase of 2027 Notes by Wesco, the Issuer of the Notes.  ECF No. 601-7 at 7.  The purchase was performed through the Exchange Agreement.  The Exchange Agreement provides:

(A) each Existing 2027 Notes Holder hereby agrees to deliver to the Issuer, at the Exchange Closing, the Exchanged Unsecured Notes held by such Holder (which amount is set forth opposite such Holder's name on Schedule III under the heading "*Principal Amount of Exchanged Unsecured Notes*"), and (B) in consideration therefor, the Issuer hereby agrees to issue such Holder a principal amount of New 1.25 Lien Notes equal to 101.125% of (x) the principal amount of such Holder's Exchanged Unsecured Notes, *plus* (y) all unpaid interest on such Exchanged Unsecured Notes accrued to, but not excluding, the Closing Date, with the aggregate principal amount of New 1.25 Lien Notes delivered to such Holder

> being in minimum denominations of $2,000 and integral
> multiples of $1,000 in excess thereof (which amount is set
> forth opposite such Holder's name on <u>Schedule III</u> under
> the heading "*Principal Amount of New 1.25 Lien Notes
> Received*") . . . .

ECF No. 604-19 at 18.

The terms of the exchange do not begin to satisfy § 3.07(h).  It cannot be disputed that the exchange was not an open market transaction.  *See Serta*, 2024 WL 5250365, at *12–14.  Wesco negotiated solely with the Majority Group when reaching all agreed terms.  Section 3.07(h) also permits private transactions with third parties.  As set forth above, Platinum was not a third party.  Section 3.07(h) also allows purchases through "tender or exchange offers[8] or otherwise."  As set forth in detail above, the Supreme Court has made it abundantly clear that "or otherwise" language merely means that a comparable type of open market transaction could occur.  The transaction cannot be justified under § 3.07(h).

Nor can the transaction be saved under §3.02.  Section 3.02 requires any redemption or purchase to be "*pro rata*, by lot or by such method as [the Trustee] shall deem fair and appropriate."  Carlyle and Senator were permitted to exchange their 2027 Notes because their participation was required to obtain the consents necessary to amend the Indentures to permit the issuance of incremental $250 million in debt.  And Platinum was included in the transaction following negotiations with Carlyle.  No other 2027 Noteholder was ever offered the opportunity to participate in the exchange.  This transaction was not pro rata, it was not by lot, and there was no determination by WSFS that the transaction was "fair" to the excluded holders; WSFS was merely a soldier taking instructions.

---

[8] Although purchases through "exchange offers" are permissible under § 3.07(h), the parties wisely have not argued that the purchase of 2027 Notes was made pursuant to an exchange offer within the meaning of the provision.

The 2022 Transaction breached §§ 3.02 and 3.07(h) of the 2027 Indenture.

### A.     The Breaching Parties

The parties contest exactly who may be held liable for the breach of the 2027 Indenture.  The participating unsecured noteholders argue they are not parties to the 2027 Indenture and therefore cannot be held liable under it.  ECF No. 1396 at 101–02.  Langur Maize also argues that, in its January 23 memorandum opinion supplement and amended order, the Court dismissed WSFS as a party against Langur Maize's breach of contract claims, and WSFS breached § 3.02 as the "Trustee" who did not select 2027 Notes for purchase by fair method.  ECF No. 1395 at 4–5.  Langur Maize asks the Court to reconsider the dismissal of its breach of contract claims against WSFS.  ECF No. 1395 at 16.

Langur Maize's breach of contract claims (its first through third claims for relief) are asserted against Platinum, Carlyle, Senator, WSFS, and Wolverine Top Holding Corporation.  ECF No. 142 at 31–34.  In its amended summary judgment order, the Court dismissed these claims against WSFS.  ECF No. 554 at 2.  Langur Maize's eighth claim for relief seeks a declaration against all defendants that "the [2022 Transaction] violated the terms of the Indenture."  ECF No. 142 at 39–40.  The eighth claim for relief is a contract claim that permits a finding of breach against all defendants, including Wesco, the Issuer of the 2027 Notes.  ECF No. 142 at 7.

### (1)     Wesco Breached the 2027 Indenture

Section 3.07(h) states that "[t]he Issuer . . . may at any time and from time to time purchase Unsecured Notes."  ECF No. 601-7 at 66.  As explained above, this provision is limited by § 3.07(h)'s language requiring market-derived pricing.  Wesco, as Issuer, breached the 2027 Indenture by failing to execute a purchase in compliance with § 3.07(h).

Section 3.02 provides that "[i]f less than all of the Unsecured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof, the Trustee will select Unsecured Notes for redemption or

purchase *pro rata*, by lot or by such method as it shall deem fair and appropriate." ECF No. 601-7 at 63. Section 3.02 accordingly imposes a duty upon WSFS to employ a fair method in selecting notes for purchase.

Section 3.02 must be read in conjunction with WSFS's limitation of liability under § 7.01 of the 2027 Indenture. Under § 7.01(b)(2), "in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture." ECF No. 601-7 at 108. Section 7.01(c) provides a further limitation: "The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that: (1) this paragraph does not limit the effect of paragraph (b) of this Section 7.01 . . . ." ECF No. 601-7 at 108.

Langur Maize argues that the Court erred in failing to consider that WSFS may be held liable for its own negligent conduct under § 7.01(c). ECF No. 1395 at 16. Section 7.01(c) states that the paragraph does not limit the effect of paragraph (b), and § 7.01(b)(2) provides that, unless WSFS acts in bad faith, it may conclusively rely on certificates and opinions furnished to it. The Court reads these paragraphs together to mean that WSFS may be held liable for its negligence or willful misconduct in performing its duties unless it was acting in reliance on certificates or opinions, and in that case, WSFS can only be held liable for bad faith conduct.

Mr. Healy, a WSFS employee, testified that WSFS relied on officers' certificates from Wesco and opinions of counsel from Wesco's counsel in executing the Third Supplemental Indentures and Fourth Supplemental Indentures. ECF No. 1350 at 151. Section 9.06 of the 2027 Indenture provides that, in executing a supplement, the trustee "will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon . . . an Officer's Certificate and an Opinion of Counsel . . . ." ECF No. 601-7 at 118. The testimony indicates good

faith reliance on these certificates and opinions in executing the supplemental indentures.  ECF No. 1350 at 152.

WSFS was not a party to the Exchange Agreement and did not participate in any decisions regarding which 2027 Noteholders would be selected for exchange.  ECF No. 1350 at 149–50, 261–63.  The evidence indicates that WSFS's role in the 2022 Transaction involved the following: WSFS received authentication orders for the additional 2026 Notes and 1L/1.25L Notes, a cancellation order to cancel the additional 2026 Notes, officer's certificates and opinions of counsel for the execution of the Third Supplemental Indentures and Fourth Supplemental Indentures, consent letters, an irrevocable instruction from Wesco to cancel all exchanged 2024 Notes, 2026 Notes, and 2027 Notes delivered to WSFS, and an instruction from Wesco to approve the 1L Notes and 1.25L Notes for deposit with the DTC's book entry system.  ECF Nos. 707-42 at 2; 711-10 at 2–46; 1150-5 at 1; 1150-18 at 1–3; 1150-22 at 1; 1298-22 at 1–5.  The deposit instruction contains "exchange spreadsheets" providing information about the holders of the exchanged 2024 Notes, 2026 Notes, and 2027 Notes, the amount of their holdings, and amount of exchanged 1L Notes and 1.25L Notes to reflect in the deposit.  ECF No. 1298-22 at 3–5.  Mr. Healy testified that WSFS does not exercise any discretion in the withdrawal and deposit process.  ECF No. 1350 at 129.  WSFS follows the instructions as set forth in the spreadsheets, which Mr. Healy testified is the typical process employed for DTC withdrawals and deposits.  ECF No. 1350 at 129–30.

The evidence demonstrates that WSFS relied in good faith on the instructions provided to it from Wesco's officers and counsel and did not deviate from its typical procedures with respect to its duties.  By providing officer's certificates and opinions of counsel with respect to the Third Supplemental Indentures and Fourth Supplemental Indentures, Wesco's officers and counsel were certifying to WSFS that the issuance of additional 2026 Notes, 1L Notes, and 1.25L Notes, and the release of liens securing the 2024 Notes and 2026 Notes, was done in a manner permitted by the Indentures.  WSFS was entitled to rely on these

statements. Although WSFS was not a party to the Exchange Agreement and was not involved in the selection of 2027 Notes prior to the 2022 Transaction, all documents in the 2022 Transaction were executed as part of a single closing call. By relying on officer's certificates and opinions of counsel affirming that the supplemental indentures complied with the original indentures, WSFS was entitled to rely in good faith on the instruction from the same counsel as to which exchanged notes to cancel and certify for deposit into the book entry system.

Wesco, as a purchasing Issuer under § 3.07(h), had an obligation to ensure the selection of notes was done in a manner that complied with § 3.02. By failing to involve WSFS in the selection of notes and failing to utilize a fair method in selecting notes for exchange, Wesco breached § 3.02 of the 2027 Indenture.

### (2)    The Participating Unsecured Noteholders and Wolverine Did Not Breach the 2027 Indenture

With respect to the participating unsecured noteholders—Carlyle (and Spring Creek), Platinum, and Senator—neither of these entities are parties to the 2027 Indenture. ECF No. 601-7 at 7. Langur Maize argues that, although the participating unsecured noteholders are not parties, they are parties to the 2027 Notes themselves, which incorporate the terms of the 2027 Indenture by reference and therefore impose liability under those terms. ECF No. 1395 at 14 (incorporating Langur Maize's argument on summary judgment).

"As a general rule, in order for someone to be liable for a breach of contract, that person must be a party to the contract." *A & V 425 LLC Contracting Co. v. RFD 55th St. LLC*, 830 N.Y.S.2d 637, 643 (Sup. Ct. 2007); *Pac. Carlton Dev. Corp. v. 752 Pac., LLC*, 851 N.Y.S.2d 59 (Sup. Ct. 2007) (citing *A&V 425 LLC Contracting Co. v. RFD 55th St. LLC*, 830 N.Y.S.2d 637, 643 (Sup. Ct. 2007)), *aff'd as modified*, 62 A.D.3d 677, 878 N.Y.S.2d 421 (2009). "Contractual obligations cannot be imposed on an intended beneficiary absent a showing that the third party manifested acceptance to be bound or the existence of an agency

relationship with one of the contracting parties." D*ynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 374 (S.D.N.Y. 2015); *Saray Turizm A.S. v. MTS Logistics, Inc.*, No. 17 CIV. 7495, 2021 WL 1199470, at *9 (S.D.N.Y. Mar. 30, 2021).

"The doctrine of incorporation by reference 'is grounded on the premise that the material to be incorporated is so well known to the contracting parties that a mere reference to it is sufficient.'" *Maines Paper & Food Serv., Inc. v. Keystone Assocs.*, 23 N.Y.S.3d 398, 400 (2015) (quoting *Chiacchia v. National Westminster Bank*, 507 N.Y.S.2d 888, 890 (1986)). "[F]or the terms of a separate [writing] to be incorporated by reference, it must be clear that the parties knew of and consented to the terms to be incorporated by reference." *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 585–86 (S.D.N.Y. 2018) (quoting *Norcast S.ar.l. v. Castle Harlan, Inc.*, Case No. 12 CIV. 4973 PAC, 2014 WL 43492, at *5 (S.D.N.Y. Jan. 6, 2014)). Courts consider two factors in making the determination: "(1) whether the allegedly incorporated document is expressly identified and so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt[,] and (2) whether the language incorporating the document clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract." *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 279 (S.D.N.Y. 2022) (internal quotation marks and citations omitted).

Langur Maize argues the following provision placed on the back of the 2027 Notes incorporates the terms of the 2027 Indenture: "The terms of the Unsecured Notes include those stated in the Indenture. The Unsecured Notes are subject to all such terms, and the Holders are referred to the Indenture for a statement of such terms." ECF No. 601-7 at 135.

Although Langur Maize's cited clause refers to and incorporates the terms of the 2027 Indenture into the 2027 Notes, this incorporation is insufficient to demonstrate an intent of the 2027 Noteholders to be bound to someone else's obligations under §§ 3.02 and 3.07 of the 2027

Indenture. Sections 3.02 and 3.07 are obligations of the Issuer, its Affiliates, and the Trustee of the 2027 Indenture. The sections describe the requirements that must be met when conducting a purchase or redemption. There is nothing in those sections that purport to impose any obligations to those other than the Issuer, its Affiliates, or the Trustee.

Rather, the incorporation clause in the 2027 Notes is intended to act in the reverse—i.e., so that the 2027 Noteholders can enforce obligations of the Indenture parties. This reading is better supported by the incorporation clause itself. The sentence preceding Langur Maize's cited language states "[t]he Issuer issued the Unsecured Notes under an Indenture dated as of November 27, 2019 (the "*Indenture*") among the Initial Issuer, the Guarantors party thereto from time to time and the Trustee." ECF No. 601-7 at 135. And the sentences following the cited language provide: "To the extent any provision of this Unsecured Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. *The Unsecured Notes are unsecured obligations of the Issuer*." ECF No. 601-7 at 135 (emphasis added). The 2027 Indenture describes the obligations of the Indenture parties. Because those obligations are owed to the 2027 Noteholders, the 2027 Notes incorporate the terms of the 2027 Indenture so that those obligations may be enforced by the intended beneficiaries.

Because the participating unsecured noteholders are not parties to the 2027 Indenture, they cannot be obligated or held liable for breaches under the Indenture. And even if the participating unsecured noteholders are third-party beneficiaries of the 2027 Indenture, Langur Maize does not have the right to sue another third-party beneficiary absent a manifestation of the third-party beneficiary to be bound to the contract. There is no evidence in a record demonstrating a manifestation by the participating unsecured noteholders to be bound to the 2027 Indenture. *See N.F. Gozo Corp. v. Kiselman*, 960 N.Y.S.2d 846, 848 (App. Term 2012) ("While the status of an intended third-party beneficiary gives that individual a right to sue on a contract to which

that individual is not a party, this status does not confer upon one of the parties to the agreement the right to sue the third-party beneficiary.").

The participating unsecured noteholders cannot be held liable for a breach of the 2027 Indenture. Wolverine Top Holding Corporation is not a party to the 2027 Indenture and therefore also cannot be held liable for breach. ECF No. 601-7 at 1.

## III.  WESCO, WSFS, AND THE GUARANTORS ARE NOT LIABLE FOR CIVIL CONSPIRACY

Langur Maize asserts a claim for civil conspiracy against all defendants. ECF No. 142 at 39. Through N.Y. G.O.L. § 13-107, the claim may be asserted against Wesco, WSFS, and the entities that guaranteed Wesco's obligations under the 2027 Indenture.

"New York law does not provide a substantive tort of civil conspiracy." *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995). "Rather, a plaintiff must plead specific wrongful acts that constitute an independent tort." *Id.* "Allegations of conspiracy are permitted . . . to show that the substantive tortious acts complained of flowed from a common scheme or plan and to connect each defendant with an actionable injury." *Id.* "Thus, allegations of civil conspiracy are proper 'for the purpose of establishing joint liability by co-participants in tortious conduct.'" *Id.* (quoting *John's Insulation, Inc. v. Siska Const. Co.*, 774 F. Supp. 156, 162 (S.D.N.Y. 1991)).

Langur Maize's civil conspiracy claim is based on the underlying tort of tortious interference with contract asserted against the participating unsecured noteholders. ECF No. 142 at 39. Langur Maize's allegations center around the participating unsecured noteholders' tacit agreement to tortiously interfere with the 2027 Indenture through the negotiation and execution of the 2022 Transaction. ECF No. 1395 at 35.

Langur Maize does not assert a tortious interference claim against Wesco, WSFS, or the entities that guaranteed Wesco's

obligations under the 2027 Indenture.  Nor can it, as these entities are parties to the 2027 Indenture and cannot tortiously interfere with it. *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 88 (S.D.N.Y. 2012) (internal quotation marks and citations omitted) ("[O]nly a stranger to a contract, such as a third party, can be held liable for tortious interference with the contract."); ECF No. 601-7 at 7 (Wesco, Trustee, and Guarantors are parties to the 2027 Indenture).  Under New York law, these entities cannot be held liable for civil conspiracy because there is no allegation that they engaged in any substantive underlying tort.

Langur Maize's civil conspiracy claim fails.

## CONCLUSION

The Court recommends that the District Court:

1. Declare that Wesco Aircraft Holdings, Inc. is liable to Langur Maize for its breach of the 2027 Indenture.

2. Dismiss the balance of Langur Maize's claims.

3. Award damages to Langur Maize, after trial or remand to this Court.

SIGNED 01/15/2025

_____
Marvin Isgur
United States Bankruptcy Judge