United States District Court
Southern District of Texas

**ENTERED**

January 17, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-90611** |
| **WESCO AIRCRAFT** | § | |
| **HOLDINGS, INC.,** *et al.*, | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **WESCO AIRCRAFT** | § | |
| **HOLDINGS, INC.,** *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 23-3091** |
| | § | |
| **SSD INVESTMENTS LTD.,** *et al.*, | § | |
| | § | |
| Defendants. | § | |

### <u>REPORT AND RECOMMENDATION</u>

This is the second of three Reports and Recommendations to be issued in connection with this adversary proceeding. The adversary proceeding concerned challenges to an uptier transaction implemented by Wesco Aircraft Holdings, Inc. on March 28, 2022. On that date, Wesco entered into a financing transaction with a select group of its noteholders (the "2022 Transaction"). The 2022 Transaction was intended to provide $250 million in funding—money that the parties determined was needed to avert a liquidity crisis—in return for an exchange of the participating noteholders' outstanding secured and unsecured notes for new, super-senior first-lien and second-lien notes. The transaction required stripping the collateral from liens securing Wesco's outstanding secured notes to provide senior liens to secure (i) the new $250 million; and (ii) the newly exchanged pre-existing notes.

This R&R addresses the 2024/2026 Noteholders' breach of contract claim. During the July 10 oral ruling, the Court held that the 2022 Transaction breached the 2026 Indenture. The 2026 Noteholders' rights and liens remained effective according to their terms notwithstanding the 2022 Transaction. The 2022 Transaction complied with the 2024 Indenture. No relief is granted to the holders of the 2024 Notes.

## BACKGROUND

### I. FACTUAL BACKGROUND

Wesco Aircraft Holdings, Inc. is the largest independent distribution and supply chain services provider in the civilian and military aerospace industry. Case No. 23-90611, ECF No. 13 at 3. The current Wesco, operating under the name "Incora," was formed in January 2020 after completion of a leveraged buyout between Wesco's predecessor entity and Pattonair, a leading aerospace services provider based in the United Kingdom. Case No. 23-90611, ECF No. 13 at 16–17.

On November 27, 2019, Wesco's predecessor entered into three separate note indentures to fund the leveraged buyout of Pattonair: (1) $650 million in face amount of 8.50% senior secured notes due 2024 (the "2024 Notes"); (2) $900 million in face amount of 9.00% senior secured notes due 2026 (the "2026 Notes"); and (3) $525 million in face amount of 13.125% unsecured notes due 2027 (the "2027 Notes"). ECF Nos. 601-7 at 1; 601-8 at 1; 601-20 at 1. On January 9, 2020, Wesco entered into the Notes Security Agreement to provide liens on certain Wesco assets to the holders of the 2024 Notes and 2026 Notes. ECF No. 601-24 at 5–6.

The documents executed in 2019 and 2020 were the initial seed in the future uptier transaction. The documents specifically contemplated that two-thirds of the holders of a class of securities could authorize a non-pro rata transaction. Although there is no evidence that the parties foresaw Wesco's 2022 liquidity crisis (see below), the

documents were drafted by brilliant financers and lawyers who contemplated the potential benefits that a non-pro rata future transaction could offer.

At all relevant times through the bankruptcy petition date, Wesco was owned through a chain of three holding companies that were controlled by Platinum Equity Advisors, a private equity firm. ECF No. 630 at 229; Case No. 23-90611, ECF No. 13 at 17–18, 24–25. Wesco's direct parent company was Wolverine Intermediate Holding II Corporation, which in turn was directly owned by Wolverine Intermediate Holding Corporation, which in turn was directly owned by Wolverine Top Holding Corporation. ECF No. 630 at 225, 227; Case No. 23-90611, ECF No. 13 at 17–18, 24.

Wesco's holding companies were primarily controlled by employees of Platinum. Wolverine Intermediate Holding Corporation's board was comprised of (i) Platinum employees; and (ii) Patrick Bartels, who was denominated as an independent director. ECF No. 630 at 227–28. From and after January 2020, Mary Ann Sigler, a partner and chief financial officer at Platinum, was the sole director of Wesco Aircraft Holdings, Inc., Wolverine Intermediate Holding II Corporation, Wolverine Intermediate Holding Corporation (between January 2020 and October 2021), and Wolverine Top Holding Corporation. ECF No. 630 at 224–29. Ms. Sigler was also the sole member of Wesco Intermediate Holding Corporation's audit committee. ECF No. 694 at 84.

### A.    Wesco's Liquidity Crisis

Wesco faced a liquidity crisis during the height of the COVID-19 pandemic. The pandemic drastically impacted the aerospace industry. ECF No. 630 at 13. Travel restrictions led to a swift decline in demand for aerospace services, and in combination with supply chain disruptions, caused Wesco to suffer decreased revenue and cash flows, sparking a liquidity shortfall. ECF No. 630 at 13; Case No. 23-90611, ECF No. 13 at 4. Platinum, Wesco's equity sponsor, infused additional

capital to generate liquidity runway.  Platinum provided $25 million in equity into Wesco and Wesco issued a $25 million promissory note to Wolverine Top Holding Corporation, but these attempts were insufficient to cure the cash shortfall.  ECF Nos. 601-21; 630 at 13–14; Case No. 23-90611, ECF No. 13 at 29.

By the fourth quarter of 2021, Wesco's liquidity shortfall significantly worsened.  ECF No. 630 at 148.  Wesco's estimates indicated that the company might miss the interest payment on its outstanding notes due November 2021.  ECF No. 630 at 148.  Wesco "barely made" the interest payment, and its cash situation "continued to get tighter and tighter."  ECF Nos. 630 at 14; 664 at 47.

Wesco continued to endure serious financial pressures and predicted a deficit running through the due date of its May 2022 interest payment on outstanding debt.  ECF No. 664 at 47–48.  Katsumi, Wesco's factoring agent, withdrew from its factoring agreement with Wesco.  The company was concerned that it might not have the ability to repay the $40 million owed to Katsumi.  ECF No. 664 at 48–50.  Although Wesco did repay Katsumi in early 2022, these financial pressures nevertheless had an impact on Wesco's outlook and threatened a negative result on Wesco's upcoming statutory audit in the United Kingdom.  ECF No. 664 at 50, 51–52.  If Wesco received a negative audit result, Wesco's asset-based lending agreement would be in default.  ECF No. 664 at 54–55.  Wesco's auditors indicated that a cash injection of $150 million to $200 million would be required to obtain a clean audit opinion.  ECF No. 664 at 125.  Wesco requested its United Kingdom auditors to delay publishing their audit opinion until it found its needed liquidity cushion. ECF No. 630 at 189.

Wesco sought to delay filing its financial statements with the auditors until it received a cash injection, but the auditors informed the company they would strike off the company if they did not receive the statements.  ECF No. 664 at 56.  If the auditors were to strike off the company, it would be illegal for Wesco to do business in the United

Kingdom. ECF No. 664 at 56. The auditors were only able to delay the audit results until the end of March 2022. ECF No. 630 at 189.

The pressures sparked a liquidity crisis. By March 2022, Wesco had not "regained a satisfying buffer in liquidity." ECF No. 630 at 188. Wesco was also concerned about suppliers shortening their payment periods. For each day that a vendor reduced its payables, Wesco was an additional $5 million shorter in cash. ECF No. 664 at 53. Wesco began stretching its payment terms with the suppliers and was paying them "later and later." ECF No. 630 at 188. The suppliers started reacting by stopping shipment or requesting cash up front. ECF No. 630 at 188–89. Wesco distributes parts from suppliers to customers. ECF No. 630 at 167. Its relationship with its suppliers is the core of its business and is "irreplaceable" for its operations. ECF No. 630 at 167. But in the eyes of its suppliers, a distributor is "at the end of the day, always replaceable." ECF No. 630 at 167.

These circumstances lead to an urgent, imminent need to generate liquidity. ECF No. 630 at 189.

### B.    The Funding Proposals

#### (1)    *The Majority Group Proposal*

Wesco began exploring funding options by the fourth quarter of 2021. At the end of October 2021, Platinum received outreach contemplating a potential financing transaction from PIMCO and Silver Point Capital, two existing holders of the company's outstanding 2024 Notes and 2026 Notes (the "Majority Group"). ECF No. 630 at 146. In September 2021, Silver Point had begun contemplating a "Serta type transaction where 2/3 of the 1L elevates above the other 1/3." ECF No. 700-35 at 4. PIMCO and Silver Point then began increasing their holdings of the 2024 Notes and 2026 Notes, recognizing the need for a 66 2/3% vote of the notes to obtain the necessary consents under the Indentures to authorize the form of transaction they were contemplating. ECF Nos. 700-58 at 3; 725-28 at 4–19; 729-53 at 26–29; 734-8 at 3; 955 at 198–99. On December 23, 2021, the Majority Group

sent Wesco an initial confidential proposal for a new money transaction. ECF No. 639-1 at 1.

The Majority Group's initial proposal contemplated a transaction to provide $200 million of new, super-senior debt and an extension on the maturities of the group's then-held notes. ECF No. 639-1 at 3. The proposal stated that PIMCO and Silver Point held "over two-thirds of the outstanding secured notes due 2024 and over one-half of the outstanding secured notes due 2026 issued by Wesco Aircraft Holdings, Inc." ECF No. 639-1 at 1.

PIMCO and Silver Point intended that they would be the only secured noteholders participating in a transaction to exchange their existing 2024 Notes and 2026 Notes for new super-senior first-lien debt. ECF No. 639-1 at 3. The proposal also permitted the 2027 Noteholders and Wolverine Top Holding Corporation PIK Noteholders to participate in an exchange of their notes into super-senior second-out debt. ECF No. 639-1 at 3. Wesco countered the proposal by seeking to include PIMCO, Silver Point, and "potentially other holder(s)." ECF No. 639-2 at 3. PIMCO and Silver Point eventually agreed that some (but not all) other secured noteholders could participate in the transaction. ECF No. 610-11 at 7.

Wesco negotiated with the Majority Group over the course of the next few months, culminating with agreed terms on February 26, 2022. ECF No. 610-11 at 2. The negotiations led to an agreement for the group to provide $250 million in new money in return for an exchange of the group's then-held 2024 Notes and 2026 Notes into super-senior first-lien notes (the "1L Notes") and then-held 2027 Notes into super-senior second-lien notes (the "1.25L Notes"). ECF No. 610-11 at 7–8. For the 1L Notes and 1.25L Notes to be secured, the 2024 and 2026 Indentures would have to be amended to release the liens securing the 2024 Notes and 2026 Notes, rendering the notes unsecured at a time of a severe liquidity crisis. ECF Nos. 700-58 at 3; 955 at 49–51, 199–200.

The dollar amount of the new 1L Notes would include both the $250 million of the new funding and the principal amount of the exchanged 2024 Notes and 2026 Notes. ECF No. 610-11 at 7. The terms of the 1L Notes would include a rate of 7.5% cash and 3% PIK, certain call protections, a November 2026 maturity date accelerating to October 2024 if over $50 million of 2024 Notes remained outstanding, and covenants to be based on the existing covenants with potential mutually agreed modifications to debt incurrence, liens, investments, restricted payments, and creation of unrestricted subsidiaries. ECF No. 610-11 at 7. The transaction would be a "par-for-par exchange" into the 1L Notes with a 1.125% PIK fee payable to the participating 2024 Notes and 2026 Notes. ECF No. 610-11 at 7.

The 1.25L Notes would have a potential $1.05 billion basket "which includes exchange debt and basket for future incurrence / exchange." ECF No. 610-11 at 8. The terms of the notes would include a rate of 10% all PIK (with any second-out debt used to exchange future debt being cash interest neutral and any second-out debt raised in the form of new money being 100% PIK pending further discussion) and an elimination of all material negative covenants on the unsecured notes. ECF No. 610-11 at 8.

With respect to the secured exchange, the participating noteholders would include PIMCO, Silver Point, and certain other participating holders pending further agreement. ECF No. 610-11 at 7. The parties eventually agreed that the participants would include PIMCO, Silver Point, Senator Investment Group, Citadel, Olympus Peak Asset Management, and Macquarie Asset Management. ECF Nos. 738 at 44–45; 868 at 26–27. However, Olympus Peak and Macquarie did not end up participating in the transaction. ECF No. 955 at 104.

The decision to allow additional participants was not an eleemosynary one. Evidence admitted at trial revealed that the Majority Group determined that it was in error when it believed it held over two-thirds of the 2026 Notes. The Majority Group believed that participation of these additional institutions was required to obtain the

requisite 66 2/3% vote of the 2026 Notes to approve the transaction. ECF Nos. 868 at 18; 1013 at 188–89; 1173 at 25. As it turns out, even the additional participants did not hold a sufficient amount of debt to create a two-thirds majority.

Moreover, Senator held a majority of the Wolverine Top Holding Corporation PIK notes not held by Platinum, and consent of the notes would have been necessary to amend the notes' indenture to permit the issuance of $250 million in incremental debt.[1] ECF No. 738 at 45. All other holders of 2024 Notes and 2026 Notes would be excluded from the transaction. ECF Nos. 697 at 106; 939 at 200, 202–03.

With respect to the unsecured exchange, PIMCO's and Silver Point's initial proposal did not seek to exclude other holders of unsecured 2027 Notes. ECF No. 639-1 at 3. But the parties eventually settled on terms permitting only Carlyle Group (and its co-investor Spring Creek Capital), Senator, and Platinum to exchange their 2027 Notes for 1.25L Notes. ECF No. 610-11 at 8.

Carlyle's participation was required because it held a majority of the 2027 Notes not held by Platinum. Consequently, it had the ability to provide the requisite consent to amend the 2027 Indenture to permit the transaction. The exchange of Carlyle's then-held 2027 Notes into 1.25L Notes was provided as consideration for both the consents and the agreement to exchange cash interest notes for PIK notes. ECF Nos. 738 at 47; 832 at 78–79 ("Carlyle provided consent for the company to raise $250 million of new money to provide cash to balance sheet liquidity for the business to improve its runway. It had also PIK'ed the majority of our cash interests. In exchange for that, we were allowed to exchange our notes into new one and a quarter lien notes.").

---

[1] Senator held approximately $38.4 million of the Wolverine Top Holding Corporation PIK notes. ECF No. 604-2 at 4. Although the Wolverine Top Holding Corporation PIK notes were not exchanged, Senator provided the consents under those notes to make the necessary amendments to the notes' indenture. ECF Nos. 738 at 45; 879 at 89–90.

The facts surrounding the group's decision to exclude other 2027 Noteholders is a point of contention.  Trial testimony demonstrates that PIMCO and Silver Point believed that the inclusion of all 2027 Noteholders would have provided additional benefits to Wesco's liquidity through the exchange of additional cash interest notes for PIK interest notes.  ECF Nos. 639-1 at 3; 868 at 93–95, 120 (Jason Prager—Silver Point); 879 at 185 (James O'Connell—PJT Partners); 955 at 90 (Samuel Dostart—PIMCO); 969 at 77–78 (Samuel Dostart—PIMCO); 1115 at 172–73 (Mr. Bartels).

James O'Connell, an employee of PJT Partners (Wesco's financial advisor), testified on multiple occasions that Carlyle was not willing to include other 2027 Noteholders into the exchange.  ECF Nos. 738 at 7, 9–10; 879 at 120–21, 125.  Although there are inconsistencies in Mr. O'Connell's testimony,[2] the Court nevertheless found him to be a credible witness.  Mr. Bartels also testified that, at least as of February 17, 2022, the PIMCO and Silver Point group and Wesco agreed that they would not exclude any particular 2027 Noteholders.  ECF No. 1115 at 172.  Conversely, Jesse Hou, an employee at Carlyle, testified that although Carlyle did not want other participants in the transaction, it "never specifically asked to exclude anyone."  ECF No. 832 at 70, 139–41.

The trial testimony, although credible, is conflicting.  Nevertheless, the circumstances of the transaction and the parties' proposals suggest that Carlyle was the driving force behind the decision to exclude other 2027 Noteholders.  Wesco's January 2022 lender advisor presentation states that the company would plan to negotiate the

---

[2] Mr. O'Connell first testified that Carlyle was willing to permit Platinum to participate in the exchange but later clarified that Carlyle was initially unwilling to permit Platinum's participation.  ECF No. 879 at 120–21, 125.  Mr. O'Connell also testified in his deposition, admitted into the record, that he did not recall Carlyle asking to exclude Platinum's notes from the exchange.  ECF No. 879 at 131.  The history of the parties' negotiations demonstrate that Carlyle did initially seek to exclude Platinum and eventually conceded on permitting Platinum's participation.  ECF Nos. 610-35 at 10; 832 at 112–12.

unsecured exchange with Carlyle and Platinum, representing its two largest unsecured creditors. ECF No. 538-12 at 53. Upon successfully negotiating a second lien capacity with the secured creditors, participating unsecured noteholders would then be permitted to uptier their notes into the 1.25L Notes. ECF No. 538-12 at 53. The presentation states that Wesco "would then launch an exchange to all Unsecureds." ECF No. 538-12 at 53. The presentation does suggest a two-step exchange, where initial participating notes are first exchanged followed by an exchange available to all other 2027 Noteholders. ECF No. 538-12 at 53–54. But the presentation did not define who was eligible to participate. ECF No. 538-12 at 53–54. The presentation also contains a financial proposal illustrating that Wesco believed the greatest liquidity benefits would be achieved if all unsecured notes participated in the transaction. ECF No. 538-12 at 55. Raymond Carney, Wesco's chief financial officer, testified that although he did not remember actual negotiations, he agreed with this interpretation of the presentation. ECF Nos. 664 at 30; 694 at 122–24. The presentation demonstrates the obvious: it was in Wesco's economic interest to seek an exchange of all unsecured notes and Wesco recognized that interest when contemplating the transaction.

On February 16, 2022, Wesco made an initial proposal to Carlyle for an exchange transaction of the 2027 Notes. ECF No. 610-7 at 2. At this stage, potential participants were still referred to as "participating Unsecured Noteholders," and who would be eligible to participate remained undefined. ECF No. 610-7 at 2. Carlyle's counterproposal shows that Carlyle was amenable to potentially permitting other holders (except for Platinum[3]) to participate in the transaction. ECF No. 610-13 at 4. On February 27, 2022, Carlyle received the first proposal from Wesco contemplating the eventually consummated uptier transaction. ECF No. 610-14 at 2. This proposal stated that "Carlyle, Senator and Platinum may exchange unsecured holdings into Super

---

[3] Mr. Hou testified that Carlyle believed that Platinum's exclusion would best support maximizing Wesco's liquidity. ECF No. 832 at 112–13.

Senior Second-Out Debt at par; but for the avoidance of doubt, HoldCo PIK notes will not be eligible to participate." ECF No. 610-14 at 11. The participation provision is ambiguous on whether Wesco wanted additional 2027 Noteholders to participate. Although the proposal does not provide for additional noteholders, its specific reference to the exclusion of the HoldCo PIK notes suggests that the potential for additional 2027 Noteholder participants was not abandoned at this stage. Carlyle's counterproposal agreed with the change except that it sought to exclude Platinum, but Carlyle eventually conceded to include Platinum in the exchange. ECF No. 610-35 at 10.

The negotiations surrounding the permitted note basket best reveal the intentions of the parties with respect to limiting participants. Wesco sought a permitted note basket of "$1,050mm which includes exchange debt and basket for future incurrence / exchange." ECF No. 610-34 at 9. This matches Wesco's prior presentations and its economic incentive to maximize the exchange of cash interest notes into PIK interest notes. Given that the there was a total $525 million in outstanding 2027 Notes as of March 2022, this basket would have been sufficient to include all 2027 Noteholders into the exchange. ECF No. 1115 at 173.

Carlyle rejected the proposal and sought a basket to "be sized for exchange of Carlyle and Senator unsecured debt (but not Holdco debt). Carlyle to have consent rights to all further uptiers and New Money— and a ROFR on New Money." ECF No. 610-35 at 9. Mr. Hou testified that Carlyle "wanted the basket to be sized precisely to match Carlyle and Senator's holding and . . . no more." ECF No. 832 at 120. Carlyle had an economic interest in limiting participation. Mr. Hou testified that Carlyle sought to limit participation in the transaction to avoid lien dilution on the 1.25L Notes. ECF No. 832 at 140. Carlyle's attempt to limit the note basket and Mr. Hou's testimony on the motivation behind that decision provide convincing evidence that the decision to exclude other 2027 Noteholders was driven by Carlyle.

### (2)    *The Minority Group Proposal*

By February 2022, another group of noteholders had organized to propose an alternative financing transaction (the "Minority Group"). ECF No. 630 at 174–75. On February 14, 2022, counsel to the Minority Group sent Wesco's counsel correspondence stating they believed the Minority Group held in excess of one-third of the aggregate amount of 2026 Notes, indicating it had a blocking position on the Majority Group's uptier transaction. ECF Nos. 639-4 at 2; 738 at 56–59. Although the correspondence requested that Wesco "immediately engage with the Ad Hoc Group and Akin Gump [the Minority Group's counsel] to discuss potential solutions to the Company's capital structure challenges and/or liquidity needs," the correspondence did not contain a financing proposal or indicate whether the group had retained a financial advisor. ECF Nos. 639-4 at 2; 738 at 60. The Minority Group did not retain a financial advisor until March 2022. ECF No. 738 at 61. Notwithstanding the absence of a financial advisor, the Minority Group was comprised of major financial institutions and represented by a law firm with deep financial expertise. Wesco's engagement with the Minority Group existed, but was not robust.

On February 21, 2022, the Minority Group's counsel sent further correspondence to Wesco disclosing that the group held $317.7 million in 2026 Notes, reflecting 36.02% of the outstanding 2026 Notes (or $394.71 million in 2026 Notes, reflecting 44.75%, with the inclusion of unsettled trades and notes out on loan). ECF Nos. 639-5 at 1–3; 738 at 62. The correspondence stated that the group was willing and able to engage with Wesco to facilitate a transaction that would provide Wesco its needed liquidity without having to modify the existing debt documents. ECF Nos. 639-5 at 1–3; 738 at 63. Mr. O'Connell testified that they had follow up discussions with the Minority Group's noteholders following the correspondence and provided diligence materials to the group's financial advisor, Perella Weinberg Partners, once it was retained. ECF No. 738 at 63–64, 73.

The Minority Group sent Wesco correspondence attaching an initial proposal on March 6, 2022. ECF Nos. 639-7; 738 at 68. The correspondence states that the Minority Group's advisors were reiterating their request "for all diligence information that has previously been provided to [the Majority Group] so we can provide the Company with a proposal to address its liquidity concerns." ECF No. 639-7 at 2. Mr. O'Connell testified that Wesco did not provide the Minority Group's advisors all the diligence it provided to the Majority Group, but that the Minority Group requested and was provided information that the Majority Group had not received. ECF No. 738 at 71. Mr. O'Connell testified that it is typical for different parties to a transaction to seek different information. ECF No. 738 at 71.

The proposed transaction sought to provide $100 million of financing through a non-guarantor term loan and around $47.5 million of financing that was unavailable under Wesco's ABL facility. ECF Nos. 639-7 at 16; 738 at 73. The total financing would be $147.5 million with the inclusion of a maturity extension of $43 million of the 2024 Notes through November 2026 and an exchange of Carlyle's and Platinum's 2027 Notes into new PIK Unsecured Notes due 2027. ECF Nos. 639-7 at 17; 738 at 73. The proposal sought the creation of a non-guarantor restricted entity structured as a joint venture as the borrower for the term loan. ECF Nos. 639-7 at 17; 738 at 74.

Although Mr. O'Connell believed that the proposal would not require amendments to the Indentures, he found that the proposal had shortcomings. ECF No. 738 at 74. Mr. O'Connell testified that in order to negotiate better terms with the Minority Group, he communicated to the group that the proposal lacked in the up-front liquidity Wesco needed and expressed his concern on the group's ability to obtain Carlyle's and Platinum's agreement to exchange their 2027 Notes. ECF No. 738 at 75.

Wesco did not send the Minority Group a counter proposal. ECF No. 1007 at 38, 59. Following the rejection of the proposal, the Minority Group sought additional diligence information from Wesco, but the

group did not receive all the requested diligence. ECF Nos. 639-9 at 1; 738 at 78–80; 1007 at 68.

On March 11, 2022, the Minority Group sent Wesco a revised proposal. ECF Nos. 536-22 at 4; 738 at 83. The proposal sought to provide the new money without needing any amendments to the secured Indentures. ECF No. 630 at 184. The proposal provided $173 million of financing, about $25 million higher than the prior proposal. ECF Nos. 536-22 at 5; 738 at 83. The proposal relied on certain exceptions to the Indentures to issue new debt facilities that would not rely on existing note baskets and would be based on an enhancement of Wesco's ABL lending facility. ECF No. 630 at 183–84. The proposal relied on three different facilities: (1) a $100 million new money term loan, which required creating a non-guarantor restricted joint venture entity; (2) a $47.5 million ABL facility, which required using capacity from Wesco's existing ABL facility; and (3) the issuance of incremental $25 million in new secured PIK notes due 2026. ECF No. 536-22 at 6–7; 1007 at 66–67. However, a condition precedent to issuing the $25 million secured PIK notes was that Platinum would be required to equitize its $25 million promissory note due 2024 to free up basket capacity. ECF Nos. 536-22 at 7; 1007 at 67.

The proposal also sought to amend interest and amortization terms for the group's 2024 Notes and 2026 Notes and extend maturities on 2024 Notes through November 2026. ECF No. 536-22 at 5. A condition precedent to the amendment would be Platinum agreeing to exchange its 2027 Notes into new PIK unsecured notes, agreeing to PIK 100% interest through November 2024, and foregoing its $7 million annual management fee. ECF Nos. 536-22 at 7; 1007 at 67–68. The proposal also offered to replace or provide credit support for certain existing factoring facilities. ECF No. 536-22 at 5. *The Minority Group would be willing to provide the full amount of the capital if needed, but all secured noteholders would be permitted to participate.* ECF No. 1007 at 65–67.

The proposal contained an alternative structure. Under the alternative structure, the Minority Group would be willing to increase the size of the term loan to $250 million, which would be supported by letters of credit provided by third parties. ECF Nos. 536-22 at 8; 1007 at 72. These letters of credit would have to be collateralized. ECF No. 1007 at 72. The premise was that the new facilities would not be prohibited under the Indentures if they had a third-party security, which the proposal sought to provide through third-party letters of credit. ECF No. 630 at 184. The Minority Group agreed to backstop the $250 million in letters of credit, which rights would also be offered to all secured noteholders. ECF No. 1007 at 70–71.

Wesco and its advisors did not believe that the Minority Group's proposed transaction was viable. With respect to the main proposal, Wesco did not see the $173 million in financing as sufficient to satisfy its liquidity concerns. ECF No. 738 at 84. With respect to the $100 million new money term loan, it was unclear what assets could be identified to transfer to the new entity. ECF No. 738 at 85–86. Consents would also have to be obtained from Wesco's ABL lender in order to use capacity from Wesco's ABL loan for $47.5 million of the financing. ECF No. 738 at 89. Wesco was also concerned with the condition precedent requiring Platinum's equitization of its $25 million promissory note. ECF No. 738 at 84. If Platinum refused to convert its $25 million promissory note into equity, there would be no available basket for $25 million secured PIK notes. ECF No. 738 at 91–92. The proposal also sought to extend the principal maturities of between $43 million to $90 million of 2024 Notes, which was vastly inferior to the Majority Group's proposal that extended maturities of over $450 million of 2024 Notes. ECF Nos. 536-22 at 4; 738 at 94.

With respect to the alternative proposal, Wesco determined that its method of securitizing the facilities with third-party letters of credit was not feasible because the letters of credit would need a form of security themselves. ECF Nos. 630 at 184; 738 at 96. Mr. Vorderwuelbecke testified that Wesco determined there would be

around a 50% loan-to-value ratio for the letters of credit, and with $250 million in letters of credit, there would be a need to obtain $500 million in assets to back the letters of credit. ECF No. 630 at 184–85. The company did not find it realistic to locate $500 million in unencumbered assets. ECF No. 630 at 184. Wesco believed that the Minority Group only had a "slim" chance of implementing the proposal, whereas at the same time it had already developed a fully negotiated agreement with the Majority Group. ECF No. 630 at 186. The conclusion was reached without detailed discussions with the Minority Group about the concerns. For example, the Minority Group offered to back the letter of credit proposal. As long as the Minority Group was providing the letters of credit, concerns about the quality of collateral would not be pressing. The lack of engagement was striking.

Wesco and its advisors believed the Majority Group's proposal was superior to the Minority Group's in terms of maturity extensions, amortization reductions, and cash interest reductions. ECF Nos. 630 at 202–03; 1351 at 21–23, 32–33. The company concluded that the Majority Group's proposal "provided the most liquidity for the longest period of time." ECF No. 1351 at 12. Moreover, PIMCO and Silver Point were in a "power position" that would allow them to prevent Wesco from getting financing from other sources, and Wesco expected PIMCO and Silver Point to use that power. ECF No. 697 at 107–08. Wesco and its advisors rejected the proposal and never made a counterproposal to the Minority Group. ECF No. 1007 at 78.

After having considered the comprehensive record, the Court concludes that the Majority Group's proposed transaction was superior for Wesco when compared to the Minority proposal. The problem was that the Majority Group's transaction was not actionable because it did not control two-thirds of the 2026 Notes.

### C.    The 2022 Transaction

#### (1)    The Majority Group's Holdings

The Majority Group did not hold the required two-thirds interest in the 2026 Notes.  Rather than fully engage with the Minority Group, the Majority Group decided to proceed by sleight of hand.  The Majority Group decided to use its 51% majority stake to issue new 2026 Notes to itself.  By becoming holders of the newly issued notes, the Majority Group would raise their ownership percentage to over two-thirds.  At that point, the Majority Group incorrectly believed that it could proceed with its non-pro rata transaction.

The 2024 and 2026 Indentures required a 66 2/3% vote to amend the Indentures if the amendment had the "effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents."  ECF Nos. 601-8 at 131; 601-20 at 129.  The transaction would require releasing collateral from liens securing the 2024 Notes and 2026 Notes in order to secure the 1L Notes and 1.25L Notes.  ECF Nos. 700-58 at 3; 955 at 49–51, 199–200.  Therefore, the simple majority vote of the 2026 Notes was ineffective and a two-thirds vote was required.

As of February 16, 2022, the Majority Group only held $522.5 million in 2026 Notes, or 59.2%, available to vote.  ECF Nos. 542-8 at 2; 868 at 39–40.  Although the group "held" 67.1% of the 2026 Notes, 1.5% of those holdings were unsettled trades and 6.4% were notes out on loan and ineligible to vote or participate in the exchange.  ECF Nos. 542-8 at 2; 868 at 39–440, 447.  The Majority Group did hold over two-thirds of the 2024 Notes.  ECF Nos. 542-8 at 2; 868 at 38–39.

The Majority Group also held sufficient 2027 Notes to consent to amending the 2027 Indenture.  ECF Nos. 603-6 at 5; 602-37 at 4; 832 at 77.  Consent of a simple majority of holders of 2027 Notes was required in order to amend various provisions of the 2027 Indenture to permit the additional issuance of $250 million in incremental debt, which was

funded through the issuance of additional 2026 Notes.  ECF Nos. 738 at 47; 832 at 78–79.

> ### *(2)    Resignation of BNY Mellon, Appointment of WSFS, and Board Approval of the 2022 Transaction*

On February 23, 2022, Kevin Smith (a Platinum employee) informed The Bank of New York Mellon Trust Company, the indenture trustee for the 2024 Notes, 2026 Notes, and 2027 Notes, about anticipated litigation in connection with the Majority Group's transaction and that Wesco would not object if BNY Mellon resigned as trustee.  ECF No. 827 at 184.  On March 14, 2022, BNY Mellon resigned as trustee and Wilmington Savings Fund Society ("WSFS") was appointed as the successor trustee.  ECF Nos. 707-57 at 32; 1350 at 213–14.  Patrick Healy (a WSFS employee) testified that it is common for WSFS to be appointed as a successor trustee for transactions that "involve lender-on-lender violence or creditor issues."  ECF No. 1350 at 5, 214–15.

On March 24, 2022, the board of directors of Wolverine Intermediate Corporation, including Mr. Bartels, voted in favor of pursuing the Majority Group's transaction.  ECF Nos. 536-24 at 2; 630 at 199.  The evidence demonstrates that the board and its advisors believed the transaction to be in the company's best interest.  ECF Nos. 630 at 209; 738 at 35, 112–13; 868 at 236.  All directors other than Mr. Bartels left the meeting and then Mr. Bartels, in his capacity as independent director,[4] solely approved the portion of the transaction involving the exchange of notes held by Platinum-affiliated entities.  ECF Nos. 536-24 at 2; 630 at 205.

---

[4] Although Mr. Bartels was appointed as an independent director, evidence admitted at trial suggests that he did not act independently.

### (3)     The 2022 Transaction Documents

The transaction was completed on March 28, 2022. ECF No. 1184 at 46. Because the Majority Group did not have a supermajority vote of the 2026 Notes, the group instead agreed to a mandatory and automated closing sequence to allow for the issuance of additional 2026 Notes to be used to vote for lien-releasing amendments to the 2026 Indenture.

The Majority Group relied on certain simple majority provisions in the Indentures to permit the initial amendments. Section 9.02 of the 2024 Indenture and 2026 Indenture provides that any amendment or supplement, except in certain enumerated circumstances, may be made "with the consent of the Holders of at least a majority" of the "then outstanding" 2024 Notes and 2026 Notes. ECF Nos. 601-8 at 130; 601-20 at 127–28. An exception to the majority vote requirement is the two-thirds vote required under the lien release provision. ECF Nos. 601-8 at 131; 601-20 at 129. The secured Indentures also have certain "sacred rights" provisions that require the support of each affected noteholder. ECF Nos. 601-8 at 130–31; 601-20 at 128–29. Section 9.02 of the 2027 Indenture has similar consent requirements to amend the Indenture, but only contains two consent thresholds. Similar to the secured Indentures, it requires consent of a simple majority to make any amendment or supplement except in certain enumerated circumstances. ECF No. 601-7 at 116. The Indenture contains similar "sacred rights" provisions that require the consent of each affected noteholder. ECF No. 601-7 at 117–18. The 2027 Indenture does not contain a supermajority lien-release provision.

The 2022 Transaction was documented as follows:

The original Indentures were amended via the Third Supplemental Indentures to the 2024, 2026, and 2027 Indentures. The purpose of the Third Supplemental Indentures was to permit the issuance to the Majority Group of $250 million in additional 2026 Notes secured by the existing collateral. These amendments were made

pursuant to the simple majority provision contained in § 9.02 of the original Indentures. ECF Nos. 601-30 at 1; 601-39 at 1; 604-18 at 1. The Third Supplemental Indentures contained three principal amendments: (1) adding new definitions of "Additional 2026 Secured Notes" and "Note Purchase Agreement;" (2) amending the definition of permitted liens to include liens securing the additional 2026 Notes; and (3) allowing the incurrence of the additional 2026 Notes. ECF Nos. 601-39 at 2, 601-30 at 2, 604-18 at 2. The Third Supplemental Indentures were accompanied by consent letters of the respective notes and the Wolverine Top Holding Corporation PIK notes. ECF Nos. 601-27; 601-29; 602-37; 603-2; 603-5; 603-16; 604-2; 604-16; 604-24; 604-40.

Wesco's issuance to the Majority Group of $250 million in aggregate principal amount of additional 2026 Notes was performed through the Note Purchase Agreement. ECF No. 602-24 at 4, 10. The original 2026 Indenture contemplated the issuance of additional secured notes on a *pari passu* basis in the form of "Additional Secured Notes," subject to limitations on the incurrence of debt and liens. ECF No. 601-8 at 54, 111. The Third Supplemental Indentures amended the definitions necessary to permit the purchase of the additional 2026 Notes. ECF Nos. 601-39 at 2, 601-30 at 2, 604-18 at 2.

The Fourth Supplemental Indentures released the liens securing the 2024 Notes and 2026 Notes, as held by WSFS as the trustee for the notes, allowed for the issuance of new secured debt, and removed certain covenants that could prevent consummation of the 2022 Transaction. ECF Nos. 601-33 at 1–3; 601-34 at 1–5; 604-4 at 1–5. The Fourth Supplemental Indentures were accompanied by the consent letters of a two-thirds majority of holders of 2024 Notes and 2026 Notes (including the holders of the additional 2026 Notes), a majority of the 2027 Notes, and a majority of the Wolverine Top Holding Corporation PIK notes. ECF Nos. 602-22; 602-33; 603-8; 603-10; 603-11; 603-13; 603-17; 603-29; 604-1; 604-17.

The Exchange Agreement facilitated the exchange of participating 2024 Notes, 2026 Notes, and 2027 Notes for 1L Notes and

1.25L Notes.  Pursuant to the Exchange Agreement, the participating secured noteholders agreed to deliver their 2024 Notes and 2026 Notes to Wesco, and in exchange, Wesco agreed to issue them the 1L Notes.  ECF No. 604-19 at 17.   Similarly, the participating unsecured noteholders agreed to deliver their 2027 Notes to Wesco in exchange for the 1.25L Notes.  ECF No. 604-19 at 18.

The Amended and Restated Notes Security Agreement was designed to grant first liens to the holders of the new 1L Notes.  ECF No. 602-27 at 6–8.

### (4)   *The Closing Call*

Prior to a closing call that occurred at 8:15 a.m. on March 28, 2022, all parties had possession of fully executed transaction documents.  Pursuant to the agreements made at the Closing Call, each transaction document was deemed delivered automatically without any action required of any party.  ECF Nos. 694 at 56, 58; 710-56 at 2–8; 711-10 at 2; 1184 at 220, 225–26.  As explained below, the Majority Group had an irrevocable right to execution of the entire transaction once the parties possessed the fully executed transaction documents and released their funds in escrow.

Counsel to the parties agreed ahead of the Closing Call that "everything happens in order and at the same time."  ECF No. 733-55 at 2.   PIMCO and Silver Point authorized their counsel to "release signature pages" at the closing "concurrent with the release of all other parties' signature pages."  ECF No. 710-9 at 2–4.  By 5:06 a.m. ET on March 28, 2022, Wesco's counsel had circulated the fully executed copies of the transaction documents in escrow pending release and requested confirmation of release of signature pages.  ECF No. 1146-3 at 2.  At 7:18 a.m. ET, PIMCO's and Silver Point's counsel sent executed versions of the Exchange Agreement and Note Purchase Agreement to representatives at Silver Point, PIMCO, and Citadel.  ECF No. 710-49 at 2, 243, 285, 293–97, 299–303.  PIMCO's and Silver Point's counsel

indicated that they held "execution versions for all documents" at that point.  ECF No. 710-49 at 2.

On March 28, after every party to the 2022 Transaction had possession of the fully executed transaction documents, the Closing Call began at approximately 8:15 a.m. ET.  The Closing Call lasted about ten minutes.  ECF No. 1184 at 48.  The Closing Call agenda, which was read as a script during the call, asked the representatives at each firm to confirm they were "ready to close and that their clients authorize[d] the release of all of their signature pages in the following order in accordance with the Exchange Agreement."  ECF No. 1146-5 at 2; 1184 at 14, 42–43.  And the "authorization [would] be to release all signature pages in the following order without any further action by any party."  ECF No. 1146-5 at 2.  Each law firm was asked to "confirm that their clients are ready to close and authorize release of their clients' signature pages," "which release will be without any further action by any party."  ECF No. 1146-5 at 3.

The Closing Call was completed at around 8:25 a.m. ET, at which point the signatures for the note purchase and exchange documents were automatically released.  ECF No. 1146-5 at 2–3; 1184 at 246.  By 8:26 a.m. ET, PIMCO's and Silver Point's counsel confirmed the release of the funds from escrow and the signature pages.  ECF No. 716-15 at 2; 1150-7 at 1.  The email was sent by PIMCO's and Silver Point's counsel to representatives of Silver Point, PIMCO, and Citadel.  ECF No. 716-15 at 2.  An internal Citadel email sent at 8:26 a.m. ET indicated the "transaction has officially closed."  ECF No. 1117-15 at 1.

At 8:27 a.m. ET, WSFS's counsel confirmed the escrowed funds were to be released.  ECF No. 1150-8 at 1.  At 8:53 a.m. ET, a representative of Carlyle emailed members of Spring Creek confirming that the transaction "[c]losed this morning" and that "all sig[nature] pages released, [and] wires released."  ECF No. 723-8 at 2.  Andres Osornio, counsel to Wesco, testified that the parties agreed on the Closing Call that the authorization to release signatures would be without any further action by any party, and that after the Closing Call,

there was nothing else to be agreed upon or negotiated in connection with the 2022 Transaction.  ECF No. 1184 at 8–10, 206.

Because of the automaticity of the closing events, the release of signatures under the Third Supplemental Indentures had "the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents."  The simple majority vote was ineffective.

## II.    PROCEDURAL BACKGROUND

On June 1, 2023, Wesco and its related entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  *See, e.g.*, Case No. 23-90611, ECF No. 1.  That same day, the Court entered an order directing joint administration of the Chapter 11 cases.  Case No. 23-90611, ECF No. 73.  Wesco's joint Chapter 11 plan of reorganization was confirmed on December 27, 2024.  Case No. 90611, ECF No. 2528.

### A.    The New York Lawsuits

On October 28, 2022, the Minority Group's 2024 Noteholders and 2026 Noteholders (the "2024/2026 Noteholders") commenced a lawsuit in New York state court challenging the 2022 Transaction.  ECF No. 201-36.  The 2024/2026 Noteholders alleged that the 2022 Transaction impermissibly "transferred hundreds of millions of dollars of value" by "strip[ping] Plaintiffs of the liens securing their Senior Secure Notes and simultaneously hand[ing] those liens to Platinum and other [participating] Noteholders."  ECF No. 201-36 at 5–6.  The 2024/2026 Noteholders sought a judgment holding that the transaction "is null and void and not enforceable" and an order avoiding and unwinding the transaction.  ECF No. 201-36 at 71.  The lawsuit was stayed by order of this Court.  ECF No. 21.

On March 27, 2023, Langur Maize L.L.C. commenced a New York state court lawsuit challenging the 2022 Transaction.  ECF No. 201-39.  Langur Maize is a 2027 Noteholder that purchased its notes after the 2022 Transaction closed.  ECF No. 176 at 74.  Langur Maize alleged that the 2022 Transaction "sought to boost Platinum's and Carlyle's returns

by allowing them to exchange their Unsecured Notes for new 1.25 Lien secured notes . . . , which trade at far higher prices than the Unsecured Notes and enjoy priority over all unsecured claims in any recoveries in bankruptcy or liquidation." ECF No. 201-39 at 4.  Langur Maize sought recovery in the form of damages and the avoidance and unwinding of the 2022 Transaction.  ECF No. 201-39 at 40.  The Langur Maize New York lawsuit was stayed by order of this Court.  ECF Nos. 41; 71.

### B.    This Adversary Proceeding

On June 1, 2023, Wesco filed a complaint in this adversary proceeding against the 2024/2026 Noteholders and Langur Maize.  ECF No. 1 at 37–53.  Wesco filed its first amended complaint on July 9, 2023.  ECF No. 63.  The amended complaint requested a declaration confirming the validity of the 2022 Transaction and a declaration confirming that Langur Maize and the 2024/2026 Noteholders that acquired their notes after the 2022 Transaction lack standing to pursue their claims against non-debtor parties other than WSFS.  ECF No. 63 at 63–73.

The 2024/2026 Noteholders and Langur Maize filed counterclaims against all parties involved in the 2022 Transaction.  The 2024/2026 Noteholders' first amended counterclaims seek a declaration of standing; a declaration for breach of contract against Wesco, the Guarantor Defendants, and WSFS; a declaration for breach of the implied covenant of good faith and fair dealing against Wesco, the Guarantor Defendants, WSFS, PIMCO, Silver Point, Senator, and Citadel; the imposition of an equitable lien against Wesco, the Guarantor Defendants, Platinum, Wolverine Top Holding Corporation, and the Majority Group's participating noteholders; equitable subordination of claims held by Platinum, Wolverine Top Holding Corporation, and the Majority Group's participating noteholders; a declaration for tortious interference with contract against Platinum, and alternatively against PIMCO, Silver Point, Senator, and Citadel; and a declaration for conversion against Platinum, Wolverine Top

Holding Corporation, and the Majority Group's participating noteholders.  ECF No. 144 at 58–73.

Langur Maize's crossclaims, third-party claims, and counterclaim seek damages for breaches of  (i) § 3.02 of the 2027 Indenture and § 4 of the 2027 Notes against Platinum, Wolverine Top Holding Corporation, Carlyle, Senator, and WSFS; (ii) § 6.05 of the 2027 Indenture and § 4 of the 2027 Notes against Platinum, Wolverine Top Holding Corporation, Carlyle, Senator, and WSFS; and (iii) § 9.02(10) of the 2027 Indenture and § 4 of the 2027 Notes against Platinum, Wolverine Top Holding Corporation, Carlyle, Senator, and WSFS.  The lawsuit also sought damages for (i) tortious interference with contract against Platinum, Wolverine Top Holding Corporation, Carlyle, and Senator; (ii) unjust enrichment against all defendants; (iii) breach of the implied covenant of good faith and fair dealing against all defendants; and (iv) civil conspiracy against all defendants.  In addition, the suit sought a declaration that (a) the 2022 Transaction violated the 2027 Indenture and (b) Langur Maize has standing to sue parties other than Wesco, WSFS, and the Guarantor Defendants.  ECF No. 142 at 31–41.

On July 31, 2023, the parties entered a stipulated comprehensive scheduling order.  ECF No. 193.  Pursuant to the scheduling order, the parties agreed to permit the 2024/2026 Noteholders and Langur Maize to seek declaratory relief with regard to liability as to their non-debtor claims (and to modify the automatic stay to the extent necessary to permit declaratory relief).  ECF No. 193 at 6–7.  The parties agreed that, in the event of a finding of liability, any remedies would be determined subsequently in this adversary proceeding or in a separate litigation.  ECF No. 193 at 7.

The parties filed motions for summary judgment with respect to their claims.  Following oral argument on the motions, the Court issued its memorandum opinion, memorandum opinion supplement, and an order and amended order on the summary judgment motions.  ECF Nos. 508; 509; 553; 554.  The Court declared that the 2024/2026 Noteholders have standing to assert their claims.  ECF No. 554 at 2.  With respect to

Langur Maize's standing, the Court held that, although Langur Maize had standing to assert its claims against Wesco, WSFS, and the entities that guaranteed Wesco's obligations pursuant to N.Y. G.O.L. § 13-107, there remained a genuine issue of material fact as to whether Langur Maize had standing to assert its claims against other entities.  ECF Nos. 508 at 19–28; 553 at 1–3.

Pursuant to the amended order on the summary judgment motions, the Court dismissed the following claims asserted by the 2024/2026 Noteholders and Langur Maize:

| **2024/2026 Noteholders First Amended Counterclaims** | | |
|---|---|---|
| **Count** | **Description** | **Claim Against** |
| Two | Breach of Contract—Breach of §§ 2.01 and 4.12 of the Original Secured Note Indenture | Guarantor Defendants |
| Two | Breach of Contract | WSFS |
| Three | Breach of Implied Covenant of Good Faith and Fair Dealing | All parties |
| Four | Equitable Lien | All parties |
| Five | Equitable Subordination | All parties |
| Seven | Conversion | All parties |

ECF No. 554 at 1–2.

| **Langur Maize Crossclaims, Third-Party Claims, and Counterclaim** | | |
|---|---|---|
| **Count** | **Description** | **Claim Against** |
| One | Breach of § 3.02 of the Indenture and § 4 of the 2027 Notes | WSFS |

| Two | Breach of § 6.05 of the Indenture and § 4 of the 2027 Notes | WSFS |
|---|---|---|
| Three | Breach of § 9.02(10) of the Indenture and § 4 of the 2027 Notes | WSFS |
| Five | Unjust Enrichment | All parties |
| Six | Breach of Implied Covenant of Good Faith and Fair Dealing | All parties |

ECF No. 554 at 2.

Trial of the adversary proceeding commenced on January 25, 2024. The Court heard testimony from twenty-one witnesses and admitted hundreds of exhibits. There were thirty-five days of trial spread over nearly six months. On July 10, 2024, the Court orally made three principal rulings:

(1) the rights, liens, and interests that were for the benefit of all holders of the 2026 Notes as they existed on March 27, 2022, remained in full force and effect on March 29, 2022;

(2) the selection of the 2027 Notes for exchange was not done in a manner permitted under the 2027 Indenture; and

(3) no relief should be granted to the holders of the 2024 Notes.

ECF No. 1474 at 3.

The Court stated that these principal interlocutory rulings would be replaced by final written rulings. ECF No. 1474 at 3. The Court also took the 2024/2026 Noteholders' and Langur Maize's remaining claims under advisement. This R&R addresses the 2024/2026 Noteholders' breach of contract claim.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a).  Venue is proper in this District pursuant to 28 U.S.C. § 1409.  The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

The Court confirms the rulings in its January 14 Memorandum Opinion as to which claims are and are not core.  ECF No. 508 at 32–36.  The 2024/2026 Noteholders' cause of action for breach of contract is not core.  ECF No. 508 at 34–36.  The Court may not enter final judgment.

## DISCUSSION

In this R&R, the Court addresses the 2024/2026 Noteholders' cause of action for breach of contract.

### I.    THE 2022 TRANSACTION BREACHED THE 2026 INDENTURE.  THE TRANSACTION WAS INEFFECTIVE AS TO THE 2026 NOTEHOLDERS

In its July 10 oral ruling, the Court held that the Third Supplemental Indenture to the 2026 Indenture was not effective as to the 2026 Noteholders because the Majority Group did not have the requisite two-thirds vote to execute the Third Supplemental Indenture.  ECF No. 1474 at 28.  The Court also held that the 2022 Transaction complied with the 2024 Indenture.  ECF No. 1474 at 3.  The Court explains those rulings below.

### A.    The Fact That the 2022 Transaction Benefitted Wesco Does Not Permit a Breach

Under New York law, the good faith of a breaching party to a contract does not insulate the breaching party from liability.  *Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, No. 17 CIV. 6334 (PGG), 2020 WL 2614765, at \*16 (S.D.N.Y. May 22, 2020), *aff'd sub nom.* Kirschner v. JP Morgan Chase Bank, N.A., 79 F.4th 290 (2d Cir. 2023).

In negotiating and entering into the 2022 Transaction, Wesco acted in what it sincerely believed was its best interest.  As explained

above, Wesco faced a severe liquidity crisis in the months leading up to the 2022 Transaction. The evidence reflects that Wesco believed the Majority Group's facilitation of $250 million in additional funding was necessary to provide the company with its needed liquidity runway to avert the crisis. Although Wesco also had the option of an alternative funding source through the Minority Group's proposal, Wesco for good reason did not believe that proposal to be viable. Wesco believed that the Majority Group's transaction was the only actionable method of obtaining its needed funding. Based on its needs—and without complying with its prior agreements—Wesco entered into a transaction that had the effect of releasing the liens of excluded 2024 Noteholders and 2026 Noteholders in order to provide those liens to select participating noteholders' exchanged 1L Notes and 1.25L notes.

Not all actions taken in the best interest of a party are done in good faith. Although the Court makes no findings in this R&R as to whether Wesco's entry into the 2022 Transaction was done in good faith,[5] the 2022 Transaction failed to comply with the 2026 Indenture. Wesco's and the Majority Group's mental states have no effect on any contract-based claims.

## B. The Third Supplemental Indenture to the 2026 Indenture Was Not Effectively Executed

The 2024/2026 Noteholders assert a breach of § 9.02 of the 2024 Indenture and 2026 Indenture. Section 9.02 provides:

> In addition, without the consent of the Holders of at least 66 2/3% in aggregate principal amount of the 2026 Secured Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1) have the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents

---

[5] The parties' mental states may have an impact on the 2024/2026 Noteholders' claim against the Majority Group for tortious interference with contract. The tortious interference claim is addressed in a separate R&R.

(except as permitted by the terms of this Indenture, the Security Documents or the Intercreditor Agreements) or changing or altering the priority of the security interests of the Holders of the 2026 Secured Notes in the Collateral under the ABL Intercreditor Agreement or the Pari Passu Intercreditor Agreement . . . .

ECF Nos. 601-8 at 131; 601-20 at 129.

The authorization to issue additional 2026 Notes to the Majority Group through the Third Supplemental Indenture would have been permitted by a simple majority vote unless the amendment "ha[d] the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents . . . ." ECF Nos. 601-8 at 130–31; 601-20 at 127–29. If the execution of the Third Supplemental Indenture had such an effect, a 66 2/3% supermajority vote was required in order to execute the amendment. With respect to the 2024 Notes, the parties do not dispute that the Majority Group held the requisite supermajority consent of those notes prior to its entry into the 2022 Transaction. But because the 66 2/3% vote was not obtained for the execution of the Third Supplemental Indenture to the 2026 Notes, if the amendment required supermajority consent, it could not legally be implemented.

The parties dispute the meaning of the term "effect." Under New York law, a court should interpret a contract based on the language of the agreement to construe it in accordance with the parties' intent. *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002). Courts should aim to give full effect to all the contract's provisions. *Chesapeake Energy Corp.*, 773 F.3d at 114. Courts should read contracts as a whole to ensure that the contract's general purpose is given effect. *Matter of Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (internal quotations marks omitted); *see also God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 6 N.Y.3d 371, 376 (2006) (a party may not pick and choose provisions).

Effect means "something produced by an agent or cause; a result, outcome, or consequence." *Effect, Black's Law Dictionary* (12th ed.

2024). Effect also means "[t]o bring about" or "to make happen." *Id*. Under § 9.02, a two-thirds vote of the outstanding 2026 Notes would be required to make an amendment that would cause or bring about a release of all or substantially all of the collateral from the liens held by the 2026 Noteholders. The record is clear, and the parties do not dispute, prior to the 2022 Transaction the Majority Group did not have the two-thirds vote to amend the 2026 Indenture.

While the Court is limited to the four corners in interpreting an unambiguous contract, whether the Third Supplemental Indenture to the 2026 Notes had the effect of releasing collateral from liens is not a matter of contract interpretation. It is not possible to determine what effect the amendment had without looking beyond the contract to the resulting effect. The Court must consider the environment in which the Third Supplemental Indenture was executed. That environment is one of the 2022 Transaction.

PIMCO and Silver Point only offered new money on the condition that the entire transaction would take place. PIMCO and Silver Point were unwilling to provide new money on a *pari passu* basis. ECF Nos. 694 at 70–71; 697 at 106. Rather, they demanded super-senior first-lien debt. ECF Nos. 694 at 71–72; 939 at 200. From Silver Point's perspective, the transaction would not have worked without elevated lien status because the participating noteholders were providing new money at a lower interest rate than they would have if the new money were issued on a *pari passu* basis. ECF No. 1013 at 107–08. The Majority Group was also unwilling to open the transaction to all secured noteholders. ECF Nos. 694 at 72; 939 at 203. In fact, there is no evidence that the Majority Group strongly considered the possibility of purchasing additional 2026 Notes on a *pari passu* basis. PIMCO and Silver Point stated, "[w]e are funding new money and need to know that all consents get delivered and the exchange actually happens. Having certainty that everyone performs under each document once this thing gets started has been a fundamental point for us from day 1." ECF No. 782-11 at 1. PIMCO and Silver Point also indicated they were "not ever going to be ok removing specific performance" because it was "a key deal point" for them. ECF Nos. 733-55 at 4; 782-11 at 2. PIMCO and Silver Point were mistaken in reliance on the specific performance provision

because the provision was contained in the Exchange Agreement and not the Third Supplemental Indentures. ECF No. 604-19 at 39. But specific performance was guaranteed nonetheless because of the automaticity of the closing of the 2022 Transaction.

After the failed attempt by PIMCO and Silver Point to acquire the requisite 66 2/3% supermajority of 2026 Notes necessary to consent to their contemplated transaction, the parties redesigned the 2022 Transaction to be comprised of a series of agreements, each of which would trigger the next—a domino agreement. As detailed in the factual background, the 2022 Transaction was designed to be self-implementing. Prior to the Closing Call, the parties each held fully executed copies of all closing documents. No further signatures were required. The release of each of the documents would occur in a planned but automatic sequence with no action required of any party. The release without any further action meant the signatures did not depend on further releases by the parties. The release of signatures depended on the happening of certain events, but not the confirmation of those events. Once the transaction was commenced on the Closing Call, it was concluded at the same time automatically through the release of the fully executed documents. The moment the Third Supplemental Indentures were executed, the rest of the documents (having already been delivered in executed form subject to release) were released and effective automatically and instantaneously. The signature releases continued after the note purchase documents were executed without any action of the parties, and the exchange documents were released without further action once the purchase of additional 2026 Notes was consummated. ECF No. 1146-5 at 2–3. The transaction was, in fact, automatic.

The Majority Group did not believe its $250 million investment into the purchase of additional 2026 Notes was at risk for not being exchanged for the new first-lien 1L Notes through the Exchange Agreement. However, it argues that there was no legal obligation to exchange the notes at the time the signatures were released because counterparty signatures could have been rescinded. It further argues that, because there was no legal obligation to exchange the notes, lien release was not an inevitable result from the execution of the Third

Supplemental Indentures. Accordingly, the Third Supplemental Indenture could not have had the effect of releasing collateral from liens. This is not true based on New York law on escrow agreements and principles of agency law.

The execution of the 2022 Transaction became irrevocable once the fully executed transaction documents were possessed by the parties and the funds were released in escrow. At that point, all actions necessary for the execution of the 2022 Transaction had been taken, and each step of the 2022 Transaction was automatically effective without further action by any party. This created a legal right in the beneficiaries of the 2022 Transaction—the Majority Group—to enforce the transaction. And the legal right existed prior to the execution of the Third Supplemental Indentures. Thus, when the Majority Group went at risk, it immediately possessed a legal right to enforce all steps of the 2022 Transaction, including the Fourth Supplemental Indentures, which authorized the lien stripping. The Third Supplemental Indentures had the irrevocable effect of releasing collateral from liens. The supermajority vote provision was thereby triggered as a consequence of the effectiveness of the Third Supplemental Indentures.

New York courts create a legally enforceable right to the execution of a transaction when all escrow obligations are complete:

> From the time the deposit is made the escrow agent becomes the trustee of both the party making the same and of the one for whose benefit it is made. If the deposit is made under and upon conditions to be fulfilled by another and without original consideration, it is doubtless true that the person making the same may revoke his proposition at any time before the opposite party has complied with the conditions to be by him performed. Upon the other hand, when such opposite party has complied with the conditions and obligations under which the deposit was made, he becomes entitled to the property deposited for his benefit.

*Mechanics' Nat. Bank v. Roughead*, 78 N.Y.S. 800, 808 (App. Div. 1902), *aff'd sub nom. Mechanics' Nat. Bank of Providence v. Jones*, 175 N.Y. 518 (1903) ("We think that under these principles, even if defendants

originally had the right to revoke the escrow agreement and withdraw their instrument of transfer, the plaintiffs had complied with the conditions by them to be performed prior to the service of the notice of January 25th, and that their rights had thereby become fixed."). Similarly, "the law regards the escrow relationship as a fiduciary one. . . . Consequently, 'upon acceptance of the agreement, [the escrow agent] has the duty of strict execution of its terms and conditions.'" *George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F. Supp. 381, 386 (S.D.N.Y. 1991) (quoting 55 N.Y. Jur.2d *Escrows* § 19 (1986)).

New York courts also create an enforceable obligation to execute a transaction when an agency power is coupled with an interest. *See Artists Rts. Enf't Corp. v. Robinson*, 67 Misc. 3d 1213(A), at *7–8 (N.Y. Sup. Ct. 2020), *aff'd*, 192 A.D.3d 573, 145 N.Y.S.3d 33 (2021). New York courts have adopted the Restatement's common law standard. *See id.*; *Ravallo v. Refridgerated Holdings, Inc.*, No. 08-CV-8207, 2009 WL 612490, at *4 (S.D.N.Y. Feb. 25, 2009).

The Restatement (Third) Of Agency § 3.12(1) provides:

A power given as security is a power to affect the legal relations of its creator that is created in the form of a manifestation of actual authority and held for the benefit of the holder or a third person. This power is given to protect the legal or equitable title or to secure the performance of a duty apart from any duties owed the holder of the power by its creator that are incident to a relationship of agency under § 1.01. It is given upon the creation of the duty or title or for consideration. It is distinct from actual authority that the holder may exercise if the holder is an agent of the creator of the power.

Comment (b) to § 3.12 states "[i]f the creator of a validly created power given as security purports to revoke the holder's authority contrary to the agreement pursuant to which the creator granted the power, specific performance of the holder's rights is an appropriate remedy, subject to the court's discretion in granting an equitable remedy." *Id.* § 3.12 cmt. b. Comment (b) also provides that the power

> may also be created and held for the benefit of a third party, other than the holder of the power. The creator of the power and the holder have the ability to create an enforceable right in a third party to benefit from the power, just as two parties to a contract have the ability to create a right in a third-party beneficiary.

*Id.*

Under both escrow obligations and agency duties, the Majority Group had an irrevocable right to force the completion of all steps of the 2022 Transaction at the time the Third Supplemental Indentures were executed. As a result, the effectiveness of all subsequent transaction documents, including the Fourth Supplemental Indentures, was an inevitable result of the execution of the Third Supplemental Indentures. The supermajority vote provision was triggered at that time. The existence of the additional 2026 Notes authorized by the Third Supplemental Indentures was required in order to be able to obtain the supermajority vote. Because the additional 2026 Notes and their votes did not exist at the time the parties entered into the Third Supplemental Indenture to the 2026 Notes, the Third Supplemental Indenture was not properly approved and could not have been effective as to the 2026 Noteholders. This negates the effectiveness against the 2026 Noteholders of every subsequent step in the series of transactions.

As to any effect on the 2026 Noteholders, the 2022 Transaction failed at the execution of the very first document—the Third Supplemental Indenture. Thus, the 2022 Transaction did not release the liens securing the 2026 Notes. The 2026 Notes remain secured by first liens. Because the Majority Group held the requisite supermajority to consent to the Third Supplemental Indenture to the 2024 Notes, the 2022 Transaction was effective as to the 2024 Notes.

## CONCLUSION

The Court recommends that the District Court:

1.  Enter a declaration finding that the rights, liens, and interests that were for the benefit of all of the holders of 2026 Notes as they existed on March 27, 2022, remained in full force and effect on March 29, 2022.

2.  Dismiss the balance of the 2024/2026 Noteholders' breach of contract claims.

SIGNED 01/17/2025

Marvin Isgur
United States Bankruptcy Judge