IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CASE NO: 23-90611 |
| WESCO AIRCRAFT HOLDINGS, INC., *et al.*, | § § § § | CHAPTER 11 |
| Debtors. | § § | |
| WESCO AIRCRAFT HOLDINGS, INC., *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | ADVERSARY NO. 23-3091 |
| SSD INVESTMENTS LTD., *et al.*, | § § § § | |
| Defendants. | § | |

## REPORT & RECOMMENDATION

This is the third Report and Recommendation to be issued in connection with this adversary proceeding. The adversary proceeding concerns challenges to an uptier transaction implemented by Wesco Aircraft Holdings, Inc. on March 28, 2022. On that date, Wesco entered into a financing transaction with a select group of its noteholders (the "2022 Transaction"). The 2022 Transaction was intended to provide $250 million in funding—money that Wesco determined was needed to avert a liquidity crisis—in return for an exchange of the participating noteholders' outstanding secured and unsecured notes for new, super-senior first-lien and second-lien notes.

This R&R addresses the 2024/2026 Noteholders' claim for tortious interference with contract asserted against Platinum, PIMCO, Silver

1 / 17

Point, Senator, and Citadel. The Court recommends dismissal of the tortious interference claim.

## BACKGROUND

I. **FACTUAL BACKGROUND**

Wesco Aircraft Holdings, Inc. is the largest independent distribution and supply chain services provider in the civilian and military aerospace industry.[1] Case No. 23-90611, ECF No. 13 at 3. The current Wesco, operating under the name "Incora," was formed in January 2020 after completion of a leveraged buyout between Wesco's predecessor entity and Pattonair, a leading aerospace services provider based in the United Kingdom. Case No. 23-90611, ECF No. 13 at 16–17.

On November 27, 2019, Wesco's predecessor entered into three separate note indentures to fund the leveraged buyout of Pattonair: (1) $650 million in face amount of 8.50% senior secured notes due 2024 (the "2024 Notes"); (2) $900 million in face amount of 9.00% senior secured notes due 2026 (the "2026 Notes"); and (3) $525 million in face amount of 13.125% unsecured notes due 2027 (the "2027 Notes"). ECF Nos. 601-7 at 1; 601-8 at 1; 601-20 at 1. On January 9, 2020, Wesco entered into the Notes Security Agreement to provide liens on certain Wesco assets to the holders of the 2024 Notes and 2026 Notes. ECF No. 601-24 at 5–6.

The documents contemplated that two-thirds of the holders of a class of securities could authorize a non-pro rata transaction. Although there is no evidence that the parties foresaw Wesco's 2022 liquidity crisis (see below), the documents were drafted by brilliant financiers and lawyers who contemplated the potential benefits that a non-pro rata future transaction could offer.

---

[1] The factual background has been summarized for purposes of this R&R. For a more detailed explanation of the facts, see the Court's R&Rs at ECF Nos. 1519, 1520.

At all relevant times through the bankruptcy petition date, Wesco was owned through a chain of three holding companies that were controlled by Platinum Equity Advisors, a private equity firm. ECF No. 630 at 229; Case No. 23-90611, ECF No. 13 at 17–18, 24–25. Wesco's direct parent company was Wolverine Intermediate Holding II Corporation, which in turn was directly owned by Wolverine Intermediate Holding Corporation, which in turn was directly owned by Wolverine Top Holding Corporation. ECF No. 630 at 225, 227; Case No. 23-90611, ECF No. 13 at 17–18, 24.

Wesco's holding companies were primarily controlled by employees of Platinum. Wolverine Intermediate Holding Corporation's board was comprised of (i) Platinum employees; and (ii) Patrick Bartels, who was denominated as an independent director. ECF No. 630 at 227–28. From and after January 2020, Mary Ann Sigler, a partner and the chief financial officer at Platinum, was the sole director of Wesco Aircraft Holdings, Inc., Wolverine Intermediate Holding II Corporation, Wolverine Intermediate Holding Corporation (through October 2021), and Wolverine Top Holding Corporation. ECF No. 630 at 224–29. Ms. Sigler was also the sole member of Wesco Intermediate Holding Corporation's audit committee. ECF No. 694 at 84.

### A. Wesco's Liquidity Crisis

Wesco faced a liquidity crisis during the height of the COVID-19 pandemic. The pandemic drastically impacted the aerospace industry. ECF No. 630 at 13. Travel restrictions led to a swift decline in demand for aerospace services, and in combination with supply chain disruptions, caused Wesco to suffer decreased revenue and cash flows, sparking a liquidity shortfall. ECF No. 630 at 13; Case No. 23-90611, ECF No. 13 at 4. Platinum, Wesco's equity sponsor, infused additional capital to generate liquidity runway. Platinum provided $25 million in equity into Wesco and Wesco issued a $25 million promissory note to Wolverine Top Holding Corporation. These attempts were insufficient to cure the cash shortfall. ECF Nos. 601-21; 630 at 13–14; Case No. 23-90611, ECF No. 13 at 29.

By the fourth quarter of 2021, Wesco's liquidity shortfall significantly worsened. ECF No. 630 at 148. Wesco's estimates indicated that the company might miss the interest payment on its outstanding notes due November 2021. ECF No. 630 at 148. Wesco "barely made" the interest payment, and its cash situation "continued to get tighter and tighter." ECF Nos. 630 at 14; 664 at 47.

Wesco continued to endure serious financial pressures and predicted a deficit running through the due date of its May 2022 interest payment on outstanding debt. ECF No. 664 at 47–48. Katsumi, Wesco's factoring agent, withdrew from its factoring agreement with Wesco. The company was concerned that it might not have the ability to repay the $40 million owed to Katsumi. ECF No. 664 at 48–50. Although Wesco did repay Katsumi in early 2022, these financial pressures nevertheless had an impact on Wesco's outlook and threatened a negative result on Wesco's upcoming statutory audit in the United Kingdom. ECF No. 664 at 50, 51–52. If Wesco received a negative audit result, Wesco's asset-based lending agreement would be in default. ECF No. 664 at 54–55. Wesco's auditors indicated that a cash injection of $150 million to $200 million would be required to obtain a clean audit opinion. ECF No. 664 at 125.

Wesco sought to delay filing its financial statements with the auditors until it received a cash injection, but the auditors informed the company they would strike off the company if they did not receive the statements. ECF No. 664 at 56. If the auditors were to strike off the company, it would be illegal for Wesco to do business in the United Kingdom. ECF No. 664 at 56. The auditors were only able to delay the audit results until the end of March 2022. ECF No. 630 at 189.

The pressures sparked a liquidity crisis. By March 2022, Wesco had not "regained a satisfying buffer in liquidity." ECF No. 630 at 188. Wesco was also concerned about suppliers shortening their payment periods. For each day that a vendor reduced its payables, Wesco was an additional $5 million shorter in cash. ECF No. 664 at 53. Wesco began stretching its payment terms with the suppliers and was paying them

"later and later." ECF No. 630 at 188. The suppliers started reacting by stopping shipment or requesting cash up front. ECF No. 630 at 188–89. Wesco distributes parts from suppliers to customers. ECF No. 630 at 167. Its relationship with its suppliers is the core of its business and is "irreplaceable" for its operations. ECF No. 630 at 167. But in the eyes of its suppliers, a distributor is "at the end of the day, always replaceable." ECF No. 630 at 167.

These circumstances lead to an urgent, imminent need to generate liquidity. ECF No. 630 at 189.

### B. The Funding Proposals

#### *(1) The Majority Group Proposal*

Wesco began exploring funding options by the fourth quarter of 2021. At the end of October 2021, Platinum received outreach contemplating a potential financing transaction from PIMCO and Silver Point Capital, two existing holders of the company's outstanding 2024 Notes and 2026 Notes (the "Majority Group"). ECF No. 630 at 146. On December 23, 2021, the Majority Group sent Wesco an initial confidential proposal for a new money transaction. ECF No. 639-1 at 1.

Wesco negotiated with the Majority Group over the course of the next few months, culminating with agreed terms on February 26, 2022. ECF No. 610-11 at 2. The negotiations led to an agreement for the group to provide $250 million in new money in return for an exchange of the group's then-held 2024 Notes and 2026 Notes into super-senior first-lien notes (the "1L Notes") and then-held 2027 Notes into super-senior second-lien notes (the "1.25L Notes"). ECF No. 610-11 at 7–8. For the 1L Notes and 1.25L Notes to be secured, the 2024 and 2026 Indentures would have to be amended to release the liens securing the 2024 Notes and 2026 Notes, rendering the notes unsecured at a time of a severe liquidity crisis. ECF Nos. 700-58 at 3; 955 at 49–51, 199–200.

Although PIMCO and Silver Point did not initially seek to include other participants in the transaction, the parties eventually agreed that the participating holders of 2024 Notes and 2026 Notes would include

PIMCO, Silver Point, Senator Investment Group, Citadel, Olympus Peak Asset Management, and Macquarie Asset Management. ECF Nos. 738 at 44–45; 868 at 26–27. Olympus Peak and Macquarie did not end up participating in the transaction. ECF No. 955 at 104. PIMCO and Silver Point believed that participation of Citadel, Olympus Peak, and Macquarie was required to obtain the requisite 66 2/3% vote of the 2026 Notes to approve the transaction. ECF Nos. 868 at 18; 1013 at 188–89; 1173 at 25. Moreover, Senator held a majority of the Wolverine Top Holding Corporation PIK notes not held by Platinum, and consent of the notes would have been necessary to amend the notes' indenture to permit the issuance of $250 million in incremental debt. ECF No. 738 at 45. As it turns out, even the additional participants did not hold a sufficient amount of debt to create a two-thirds majority.

### *(2) The Minority Group Proposal*

By February 2022, another group of noteholders had organized to propose an alternative financing transaction (the "Minority Group"). ECF No. 630 at 174–75. On February 14, 2022, counsel to the Minority Group sent Wesco's counsel correspondence stating they believed the Minority Group held in excess of one-third of the aggregate amount of 2026 Notes, indicating it had a blocking position on the Majority Group's uptier transaction. ECF Nos. 639-4 at 2; 738 at 56–59. Although the correspondence requested that Wesco "immediately engage with the Ad Hoc Group and Akin Gump [the Minority Group's counsel] to discuss potential solutions to the Company's capital structure challenges and/or liquidity needs," the correspondence did not contain a financing proposal or indicate whether the group had retained a financial advisor. ECF Nos. 639-4 at 2; 738 at 60. The Minority Group did not retain a financial advisor until March 2022. ECF No. 738 at 61. Notwithstanding the absence of a financial advisor, the Minority Group was comprised of major financial institutions and represented by a law firm with deep financial expertise. Wesco's engagement with the Minority Group existed, but was not robust.

On February 21, 2022, the Minority Group's counsel sent further correspondence to Wesco disclosing that the group held $317.7 million in 2026 Notes, reflecting 36.02% of the outstanding 2026 Notes (or $394.71 million in 2026 Notes, reflecting 44.75%, with the inclusion of unsettled trades and notes out on loan). ECF Nos. 639-5 at 1–3; 738 at 62. The correspondence stated that the group was willing and able to engage with Wesco to facilitate a transaction that would provide Wesco its needed liquidity without having to modify the existing debt documents. ECF Nos. 639-5 at 1–3; 738 at 63. Mr. O'Connell testified that they had follow up discussions with the Minority Group's noteholders following the correspondence and provided diligence materials to the group's financial advisor, Perella Weinberg Partners, once it was retained. ECF No. 738 at 63–64, 73. But the evidence reflects that the Minority Group did not receive all the diligence materials it requested. ECF Nos. 639-9 at 1; 738 at 78–80; 1007 at 68.

The Minority Group sent Wesco correspondence attaching an initial proposal on March 6, 2022. ECF Nos. 639-7; 738 at 68. On March 11, 2022, the Minority Group sent Wesco a revised proposal. ECF Nos. 536-22 at 4; 738 at 83. Wesco and its advisors did not believe that the proposals were viable. Wesco and its advisors believed the Majority Group's proposal was superior to the Minority Group's proposal in terms of maturity extensions, amortization reductions, and cash interest reductions. ECF Nos. 630 at 202–03; 1351 at 21–23, 32–33. The company concluded that the Majority Group's proposal "provided the most liquidity for the longest period of time." ECF No. 1351 at 12. Moreover, PIMCO and Silver Point were in a "power position" that would allow them to prevent Wesco from getting financing from other sources, and Wesco expected PIMCO and Silver Point to use that power. ECF No. 697 at 107–08. Wesco and its advisors rejected the proposals and never made a counterproposal to the Minority Group. ECF No. 1007 at 78.

After having considered the comprehensive record, the Court concludes that the Majority Group's proposed transaction was superior

for Wesco when compared to the Minority proposal.  The problem was that the Majority Group's transaction was not actionable because it did not control two-thirds of the 2026 Notes.

### C. The 2022 Transaction

#### *(1) The Majority Group's Holdings*

The Majority Group did not hold the required two-thirds interest in the 2026 Notes.  Rather than fully engage with the Minority Group, the Majority Group decided to proceed by sleight of hand.  The Majority Group decided to use its 51% majority stake to issue new 2026 Notes to itself.  By becoming holders of the newly issued notes, the Majority Group would raise their ownership percentage to over two-thirds.  At that point, the Majority Group incorrectly believed that it could proceed with its non-pro rata transaction.

The 2024 and 2026 Indentures required a 66 2/3% vote to amend the Indentures if the amendment had the "effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents."  ECF Nos. 601-8 at 131; 601-20 at 129.  The transaction would require releasing collateral from liens securing the 2024 Notes and 2026 Notes in order to secure the 1L Notes and 1.25L Notes.  ECF Nos. 700-58 at 3; 955 at 49–51, 199–200.  Therefore, the simple majority vote of the 2026 Notes was ineffective and a two-thirds vote was required.

As of February 16, 2022, the Majority Group only held $522.5 million in 2026 Notes, or 59.2%, available to vote.  ECF Nos. 542-8 at 2; 868 at 39–40.  Although the group "held" 67.1% of the 2026 Notes, 1.5% of those holdings were unsettled trades and 6.4% were notes out on loan and ineligible to vote or participate in the exchange.  ECF Nos. 542-8 at 2; 868 at 39–440, 447.  The Majority Group did hold over two-thirds of the 2024 Notes.  ECF Nos. 542-8 at 2; 868 at 38–39.

### *(2) Board Approval of the 2022 Transaction*

On March 24, 2022, the board of directors of Wolverine Intermediate Holding Corporation, including Mr. Bartels, voted in favor of pursuing the Majority Group's transaction. ECF Nos. 536-24 at 2; 630 at 199. The evidence demonstrates that the board and its advisors believed the transaction to be in the company's best interest. ECF Nos. 630 at 209; 738 at 35, 112–13; 868 at 236. All directors other than Mr. Bartels left the meeting and then Mr. Bartels, in his capacity as independent director, solely approved the portion of the transaction involving the exchange of notes held by Platinum-affiliated entities. ECF Nos. 536-24 at 2; 630 at 205.

### *(3) The 2022 Transaction Documents*

The transaction was completed on March 28, 2022. ECF No. 1184 at 46. Because the Majority Group did not have a supermajority vote of the 2026 Notes, the group instead agreed to a mandatory and automated closing sequence to allow for the issuance of additional 2026 Notes to be used to vote for lien-releasing amendments to the 2026 Indenture.

The transaction was documented through (1) the Third Supplemental Indentures and Note Purchase Agreement, which were intended to facilitate the issuance of additional 2026 Notes; (2) the Fourth Supplemental Indentures, which were intended to release the liens securing the 2024 Notes and 2026 Notes; and (3) the Exchange Agreement, which was intended to facilitate the exchange of participating 2024 Notes, 2026 Notes, and 2027 Notes for 1L Notes and 1.25L Notes.

## II. PROCEDURAL BACKGROUND

On June 1, 2023, Wesco and its related entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *See, e.g.*, Case No. 23-90611, ECF No. 1. That same day, the Court entered an order directing joint administration of the Chapter 11 cases. Case No. 23-90611, ECF No. 73. Wesco's joint Chapter 11 plan of reorganization was confirmed on December 27, 2024. Case No. 90611, ECF No. 2528.

### A. The New York Lawsuits

On October 28, 2022, the Minority Group's 2024 Noteholders and 2026 Noteholders (the "2024/2026 Noteholders") commenced a lawsuit in New York state court challenging the 2022 Transaction. ECF No. 201-36. The 2024/2026 Noteholders alleged that the 2022 Transaction impermissibly "transferred hundreds of millions of dollars of value" by "strip[ping] Plaintiffs of the liens securing their Senior Secure Notes and simultaneously hand[ing] those liens to Platinum and other [participating] Noteholders." ECF No. 201-36 at 5–6. The 2024/2026 Noteholders sought a judgment holding that the transaction "is null and void and not enforceable" and an order avoiding and unwinding the transaction. ECF No. 201-36 at 71. The lawsuit was stayed by order of this Court. ECF No. 21.

On March 27, 2023, Langur Maize L.L.C. commenced a New York state court lawsuit challenging the portion of the 2022 Transaction involving the exchange of unsecured 2027 Notes. ECF No. 201-39. Langur Maize is a 2027 Noteholder that purchased its notes after the 2022 Transaction closed. ECF No. 176 at 74. The Langur Maize New York lawsuit was stayed by order of this Court. ECF Nos. 41; 71.

### B. This Adversary Proceeding

On June 1, 2023, Wesco filed a complaint in this adversary proceeding against the 2024/2026 Noteholders and Langur Maize. ECF No. 1 at 37–53. Wesco filed its first amended complaint on July 9, 2023. ECF No. 63. The amended complaint requested a declaration confirming the validity of the 2022 Transaction. ECF No. 63 at 70–71.

The 2024/2026 Noteholders and Langur Maize filed counterclaims against all parties involved in the 2022 Transaction. Following summary judgment, the 2024/2026 Noteholders' remaining claims were for breach of contract and tortious interference with contract. Langur Maize's remaining claims were for breach of contract, tortious interference with contract, and civil conspiracy. If the District Court follows the recommendations in the two previous R&Rs, the only

remaining claim is the 2024/2026 Noteholders' claim for tortious interference with contract against Platinum, and alternatively against PIMCO, Silver Point, Senator, and Citadel. *See* ECF Nos. 1519, 1520.

Trial of the adversary proceeding commenced on January 25, 2024. The Court heard testimony from twenty-one witnesses and admitted hundreds of exhibits. There were thirty-five days of trial spread over nearly six months. With respect to the 2024/2026 Noteholders' claims, on July 10, 2024, the Court orally ruled that the rights, liens, and interests that were for the benefit of all holders of the 2026 Notes as they existed on March 27, 2022, remained in full force and effect on March 29, 2022, and that no relief should be granted to the holders of the 2024 Notes. ECF No. 1474 at 3. On January 17, 2025, the Court issued an R&R memorializing the findings. ECF No. 1520.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Venue is proper in this District pursuant to 28 U.S.C. § 1409. The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

The Court confirms the rulings in its January 14 Memorandum Opinion as to which claims are and are not core. ECF No. 508 at 32–36. The 2024/2026 Noteholders' cause of action for tortious interference with contract is not core. ECF No. 508 at 34–36. The Bankruptcy Court may not enter final judgment.

## DISCUSSION

This R&R addresses the 2024/2026 Noteholders' cause of action for tortious interference with contract. The 2024/2026 Noteholders allege that Platinum (acting as Wesco's corporate sponsor) and the participating secured noteholders tortiously interfered with the 2024 Indenture and 2026 Indenture through their negotiation and execution of the 2022 Transaction. ECF No. 144 at 69.

To establish a claim for tortious interference with contract, the 2024/2026 Noteholders must show: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional and improper procuring of a breach; and (4) damages. *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007). "In response to such a claim, a defendant may raise the economic interest defense—that it acted to protect its own legal or financial stake in the breaching party's business." *Id.*

## I. THE ECONOMIC INTEREST DEFENSE PROTECTS PLATINUM AND THE PARTICIPATING NOTEHOLDERS

Assuming the 2024/2026 Noteholders can establish the elements of a tortious interference claim, Platinum and the participating noteholders are protected from liability under the economic interest defense.

A defendant may raise the economic interest defense as a complete defense to a tortious interference with contract claim. *White Plains Coat & Apron Co.*, 8 N.Y.3d at 426. To establish the defense, a defendant must prove that in interfering with the contract, the defendant was acting to protect its own legal or financial stake in the breaching party's business. *Id.* The defense has been applied where "defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *Id.* (footnotes omitted). The defendant need not have been acting to protect the economic interest of the breaching party; it is sufficient that the defendant was acting to protect its own economic interest in the breaching party. *Don King Prods., Inc. v. Smith*, 47 F. App'x 12, 16 (2d Cir. 2002). "The imposition of liability in spite of the defense of economic interest requires a showing of either malice on the

one hand, or fraudulent or illegal means on the other[.]" *Foster v. Churchill*, 87 N.Y.2d 744, 750 (1996) (citation omitted).

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.* ("*TriMark*") involved an uptier transaction where one group of first lien lenders were subordinated, without their consent, to another group of *pari passu* first lien lenders. 72 Misc. 3d 1218(A), at *5 (N.Y. Sup. Ct. 2021). "The Lender Defendants purportedly worked with the Borrower Defendant (TriMark), in a carefully-crafted multi-step process, to swap their First Lien loans for a new category of 'super senior' debt that is to be repaid in full before Plaintiffs' nominally 'first' priority loans are repaid at all." *Id.* at *2. The plaintiffs sued TriMark's equity sponsors for tortious interference with contract "for their alleged roles in orchestrating the Liquidity Transaction." *Id.* at *11.

In dismissing the tortious interference claim, the court first held that the equity sponsors were acting to protect their interest in TriMark, the breaching party, through the transaction. *Id.* The court found that the equity sponsors held "an 86.6% equity stake in the company . . . , and that both of them 'stand to gain or to lose money on their investments depending on TriMark's financial performance[.]'" *Id.* Therefore, "the same events that battered TriMark's financial performance during the pandemic also threatened the Equity Sponsors' economic interests." *Id.* Similar to Wesco, the pandemic had "put tremendous strains on TriMark's business." *Id.* The Liquidity Transaction "'provide[d] new cash to the company' at a precarious time and 'also benefited its Equity Sponsors[.]'" *Id.* The court held that because the equity sponsors were significant stockholders in TriMark's business and acted to protect the financial value of their investment, the economic interest defense barred the tortious interference claim. *Id.*

The court recognized that the transaction provided the company with $120 million in financing, and the mere fact that "Defendants could have secured a *better* deal for TriMark" did not impact the analysis because there was no authority for the idea that the economic interest defense turns on whether the transaction was "the best deal [the

breaching party] could secure at the time." *Id.* at *11–12. And because the plaintiffs only pled conclusory allegations of malice and there was no evidence of illegality or fraud, the court sustained the defendants' defense. *Id.*

Similarly, *Robertshaw US Holding Corp. v. Invesco Senior Secured Management, Inc.* (*In re Robertshaw US Holding Corp.*) involved an uptier transaction where the plaintiffs sued the company's equity sponsor (who was also a transaction participant) for tortious interference with contract. 662 B.R. 146, 151, 153–54, 164 (Bankr. S.D. Tex. 2024). This Court, applying New York law, held that "even if a prima facie showing of tortious interference could be established by [the plaintiff], the economic interest defense would overcome any such claim." *Id.* at 166. The Court reasoned that "One Rock had a right under New York law to protect its economic interest in Robertshaw by entering into the December Transactions and not allowing what it believed to be a value-destructive bankruptcy filing," and the fact that "Robertshaw ended up filing bankruptcy . . . or that parties understood Robertshaw could potentially file does not change the answer." *Id.* And because there was no showing of malice, the economic interest defense precluded the tortious interference claim. *Id.*

Courts have applied these same principles outside of the uptier transaction contest. *See U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 18 CIV. 4044 (VM), 2019 WL 4744220, at *9 (S.D.N.Y. Aug. 26, 2019) (finding that a noteholder's economic interest in future repayment of its notes justified its inducement of a breach of the issuer's agreement to pay invoices to a service provider); *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 579 N.Y.S.2d 353, 354 (1992) (secured creditor privileged to interfere with contract in order to protect its security interest in collateral); *Bank of New York Mellon, London Branch v. Cart 1, Ltd.*, No. 18-CV-6093 (JPO), 2021 WL 2358695, at *4 (S.D.N.Y. June 9, 2021) (internal quotation marks omitted) ("CRC [a noteholder] was an express third party beneficiary of [the CART 1] Indenture . . . . Furthermore, under the Indenture, BNYM's disbursement of credit

protection payments to DB would reduce CRC's own payouts. . . . It follows that CRC had a legal and a financial interest in BNYM's proper management of the CART 1 funds. Even if CRC procured BNYM's breach of the Indenture, it was justified in any good-faith attempt to enforce its rights.").

Courts generally find that a defendant does not act to protect its economic interest in a breaching party when its actions solely serve self-interests unrelated to the breaching party. *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, No. 16 CIV. 2767 (GBD), 2019 WL 1649983, at *16–17 (S.D.N.Y. Mar. 28, 2019) (internal quotation marks and citations omitted) ("If Mariano [Patriot's majority shareholder] induced Patriot to breach the New Warrants by failing to encumber his shares, . . . Mariano would be able to keep the Funds' $27 million investment without relinquishing his controlling interest. . . . By failing to unencumber his shares, Mariano was clearly acting to protect [*his*] *own* direct interests, rather than [his] interests in the breaching party."); *Wells Fargo Bank, N.A. v. ADF Operating Corp.*, 855 N.Y.S.2d 68, 69 (2008) ("The economic interest defense is not applicable because plaintiff alleged that defendants were not acting to protect their financial interests in ADF LI when they sold their interests to a third party, but rather sold to profit themselves to the detriment of ADF LI[.]").

Platinum's and the participating noteholders' conduct aligns with cases where courts found defendants to be acting to protect their economic interest in the breaching party. Platinum and the participating noteholders have an economic interest in Wesco. Platinum is Wesco's equity sponsor and noteholder. It has an economic interest in both the financial outlook of its subsidiary and in the repayment of its notes. The participating noteholders have an economic interest in the repayment of their notes.

Under New York law, any potential interference with the 2026 Indenture by Platinum and the participating noteholders was done to protect their economic interests in Wesco. The evidence reflects that Wesco faced a severe liquidity crisis in the months leading to the 2022

Transaction. Without a cash injection of $250 million, the financial outlook of the company would have been severely threatened and a bankruptcy filing would have been certain. The transaction participants believed that their proposed transaction would have provided Wesco its needed liquidity runway and stave off a future bankruptcy filing. ECF Nos. 727-29 at 2; 729-13 at 5; 925-1 at 1; 955 at 52, 56; 969 at 140; 1013 at 116–17, 127–28, 144–45. And although the economic interest defense does not require that the transaction be the best available deal, the evidence reflects that the Majority Group's transaction was superior to the Minority Group's proposal; the transaction provided the company its needed liquidity on favorable terms. That a bankruptcy filing eventually occurred and led to a ruling invalidating the transaction does not change the analysis.

These facts support the application of the economic interest defense. The 2026 Noteholders can overcome the defense only upon a showing of malice, fraud, or illegality. *Foster*, 87 N.Y.2d at 750. A finding of malice requires "a showing of serious conduct undertaken only with an intent to cause harm to the particular plaintiff." *U.S. Bank Nat'l Ass'n*, 2019 WL 4744220, at *10.

Acting solely with financial motives, even if not done in good faith, is insufficient to show malice. *See ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, No. 655175/2020, 2022 WL 10085886, at *10 (N.Y. Sup. Ct. Oct. 17, 2022) (finding no malice even though the defendant "may not have acted in good faith in their actions, specifically with regard to shutting down avenues of communication[.]"); *Ruha v. Guior*, 717 N.Y.S.2d 35, 36 (2000) ("[P]laintiffs' bare allegations of malice do not suffice, particularly where such allegations are contradicted by plaintiffs' own claims that defendants' actions were financially motivated[.]"); *Inn Chu Trading Co. v. Sara Lee Corp.*, 810 F. Supp. 501, 506 (S.D.N.Y. 1992) ("[T]he only motive which plaintiff ascribes to Sara Lee is economic gain, which alone does not constitute malice.").

There is no evidence in the record that Platinum and the participating noteholders acted for anything other than economic gain.

On its own, their conduct is insufficient to show malice since it does not reflect conduct "undertaken only with an intent to cause harm." *U.S. Bank Nat'l Ass'n*, 2019 WL 4744220, at *10. There is also no evidence in the record that the transaction participants engaged in illegal or fraudulent conduct.

The economic interest defense precludes the 2026 Noteholders' claim for tortious interference with contract.

## CONCLUSION

The Court recommends that the District Court dismiss the 2024/2026 Noteholders' cause of action for tortious interference with contract.

SIGNED 02/19/2025

_____
Marvin Isgur
United States Bankruptcy Judge