# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WESCO AIRCRAFT HOLDINGS, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:25-CV-202 |
| SSD INVESTMENTS LTD, et al., | § § § | |
| Defendants. | § § § | |

**[PROPOSED] MEMORANDUM ORDER REGARDING THE 2024/2026
NOTEHOLDERS' BREACH-OF-CONTRACT CLAIMS**

This case arises from the bankruptcy of Wesco Aircraft Holdings, Inc. ("Wesco"), the largest independent distribution and supply-chain services provider in the civilian and military aerospace industry. On the same day that it filed its bankruptcy petition, Wesco initiated an adversary proceeding asking the bankruptcy court to decide whether Wesco breached its 2024 and 2026 Indentures by entering into a series of transactions on March 28, 2022 (the "2022 Transactions") that provided Wesco $250 million in new investment in an effort to resolve its urgent liquidity problems.[1] The 2024/2026 Noteholders filed counterclaims seeking, among other things, a declaration that Wesco had breached the 2024 and 2026 Indentures. On January 17, 2025, the bankruptcy court issued a report and recommendation (the "January 17 R&R"), recommending that this Court conclude that the 2022 Transactions complied with the 2024 Indenture but breached the 2026 Indenture, and that as a remedy this Court should "[e]nter a declaration finding that the

---

[1] Unless otherwise defined, capitalized terms in this memorandum order have the same meaning as in the bankruptcy court's January 17 R&R. *See* ECF 3.

rights, liens, and interests that were for the benefit of all of the holders of 2026 Notes as they existed on March 27, 2022, remained in full force and effect on March 29, 2022." ECF 3 at 36.

The parties that provided Wesco with $250 million in new investment in the 2022 Transactions (the "First Lien Noteholders") filed an objection to the January 17 R&R, ECF 32, which Wesco joined, ECF 33. Platinum, Wesco's equity sponsor, also filed an objection to the January 17 R&R, ECF 34. The 2026 Noteholders also filed a limited objection, which asserted alternative grounds for finding a breach of the 2026 Indenture and sought to preserve objections to various interlocutory rulings by the bankruptcy court. ECF 35.

The Court has considered those objections, as well as the responses and replies thereto, *see* ECF 49, 50, 51, 52, 74, 75, 76, and has conducted a *de novo* review of the extensive record and the issues raised in the parties' objections. *See* 28 U.S.C. §157(c)(1). For the reasons that follow, the Court SUSTAINS the First Lien Noteholders' objection, OVERRULES the 2026 Noteholders' objection, DECLARES that the 2022 Transactions did not breach Wesco's obligations under its indentures, and DISMISSES the 2026 Noteholders' breach-of-contract claims.

## FINDINGS OF FACT

### A.    Wesco's Indentures.

In early 2020, Wesco acquired Pattonair, Ltd, a leading aerospace services provider based in the United Kingdom. To finance that transaction, Wesco raised over $2 billion by selling bonds through three indenture agreements: one governing $650 million in senior secured bonds maturing in 2024 and paying 8.5% (the "2024 Notes"); one governing $900 million in senior secured bonds maturing in 2026 and paying 9% (the "2026 Notes"); and one governing $525 million in unsecured

bonds maturing in 2027 and paying 13.125% (the "2027 Notes").  *See* Adv.Dkt.601-20 (2024

Indenture); Adv.Dkt.601-8 (2026 Indenture); Adv.Dkt.601-7 (2027 Indenture).[2]

Section 2.01(e) of each indenture explicitly allowed Wesco to issue additional secured

notes without consent from the existing bondholders.  Adv.Dkt.601-7 at 44-45; Adv.Dkt.601-8 at

54; Adv.Dkt.601-20 at 48.  But because Wesco's ability to issue new secured notes was "subject

to the Issuer's compliance" with the debt and lien baskets, Adv.Dkt.601-8 at 54; *accord*

Adv.Dkt.601-20 at 48; Adv.Dkt.601-7 at 45, issuing additional secured notes in excess of those

limitations required amending the indentures under §9.02, which provided, as relevant here:

> Except as provided below … the Issuer … may amend or supplement this Indenture
> … with the consent of the Holders of at least a majority in aggregate principal
> amount of the then outstanding 2026 Secured Notes other than the 2026 Secured
> Notes beneficially owned by the Issuer or its Affiliates … voting as a single class[.]

Adv.Dkt.601-8 at 130; *accord* Adv.Dkt.601-20 at 122-23; Adv.Dkt.601-7 at 110.  The indentures

provided that additional secured notes "shall be consolidated with and form a single class with the

Initial Secured Notes," Adv.Dkt.601-8 at 54; *accord* Adv.Dkt.601-20 at 48; Adv.Dkt.601-7 at 44,

and shall count towards relevant voting thresholds, Adv.Dkt.601-7 at 44; Adv.Dkt.601-8 at 54;

Adv.Dkt.601-20 at 48.

Both the 2024 and 2026 Indentures also required two-thirds of the existing bondholders in

each issuance to agree before Wesco could release the liens on the collateral:

> [W]ithout the consent of the Holders of at least 66⅔% in aggregate principal
> amount of the 2026 Secured Notes then outstanding (including, without limitation,
> consents obtained in connection with a purchase of, or tender offer or exchange
> offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1)
> have the effect of releasing all or substantially all of the Collateral from the Liens
> created pursuant to the Security Documents (except as permitted by the terms of

---

[2] References to "Adv.Dkt." correspond to docket entries filed in the adversary proceeding, No.
4:23-ap-3091 (Bankr. S.D. Tex.).  References to "Bankr.Dkt." correspond to docket entries filed
in the related bankruptcy proceeding, 4:23-bk-90611 (Bankr. S.D. Tex.).  This order refers to
specific pages in cited docket entries by using native pagination where available (and, where
unavailable, by  using the pagination generated by the automatic ECF header).

this Indenture, the Security Documents or the Intercreditor Agreements) or
changing or altering the priority of the security interests of the Holders of the 2026
Secured Notes in the Collateral[.]

Adv.Dkt.601-8 at 131; *accord* Adv.Dkt.601-20 at 124.

These provisions were drafted and agreed to by sophisticated parties who expressly made
it possible for Wesco to issue new bonds in excess of the then-existing debt and lien baskets in
each series with consent from a majority of the existing bondholders, and to release the liens
securing the 2024 and 2026 Notes with consent from only two-thirds of the existing bondholders,
even though doing so might be against the interests of any dissenting bondholders. That structure
ensured that Wesco would have flexibility to raise capital in the future by issuing new notes in
each series and by creating new security interests senior to the 2024 and 2026 Notes without
requiring unanimous consent from those noteholders. *See* ECF 3 at 2-3 (recognizing that the 2024
and 2026 Indentures "were drafted by brilliant financers and lawyers who contemplated the
potential benefits that a non-pro rata future transaction could offer"); Adv.Dkt.1474 at 4-5
(recognizing the potential need for Wesco to "raise additional capital" by "issu[ing] new debt that
is senior in priority and lien rights to existing debt").

### B. Wesco's Financial Distress.

Just weeks after Wesco acquired Pattonair, the COVID-19 pandemic ripped through the
global economy, with a particularly devastating effect on the aerospace industry. Even as other
sectors began to rebound, "aircraft weren't flying at the rate that they were prior to COVID," an
economic drag that "just continued to linger on" for "much longer than anyone had anticipated."
Adv.Dkt.664 at 34-35. For Wesco—a company whose business model was tied to the production
of new airplanes, *see* Adv.Dkt.700-35 at 3—the swift decline in demand for aerospace services in
combination with supply chain disruptions led to decreased revenue and cash flows, causing a
massive liquidity shortfall. Platinum injected an additional $50 million into the company in an

attempt to resolve Wesco's liquidity problems, but those additional funds were not enough to prevent the crisis that Wesco faced.  By the fourth quarter of 2021, Wesco's liquidity crunch had significantly worsened, and the company estimated that it might miss the interest payment on its outstanding notes due in November 2021, which would have allowed "the debt [to] be called" at a time when Wesco "didn't have the funds to pay [it] back."  Adv.Dkt.664 at 43-44.  Wesco barely made that interest payment, *see* Adv.Dkt.630 at 148, but its cash situation "continued to get tighter and tighter," Adv.Dkt.664 at 47, with advisors scrambling to figure out how to "stretch out … payments" to their vendors and landlords in order to "continue to have cash to operate," Adv.Dkt.664 at 38, 44-45, 47-48.

By early 2022, Wesco's serious financial pressures threatened a negative result on its upcoming statutory audit in the United Kingdom, which would have put Wesco into default on its asset-based lending agreement.  Adv.Dkt.664 at 50-55.  Based on their review, Wesco's auditors indicated that a cash injection of $150 million to $200 million would be required to obtain a clean audit opinion.  *Id.* at 125.  Wesco sought to delay filing its next round of financial statements with its auditors in order to give it time to obtain the necessary liquidity, but the auditors informed Wesco that they would "strike off" the company if they did not receive the statements, which would make it illegal for Wesco to do business in the United Kingdom.  Adv.Dkt.630 at 189; Adv.Dkt.664 at 56.  In short, by early 2022, Wesco faced a genuine liquidity crisis and an urgent, imminent need to generate liquidity.

To address its pressing liquidity problems, Wesco began exploring funding options by the fourth quarter of 2021.  In late 2021, a coalition of noteholders (the "Majority Group"), led by funds managed or advised by PIMCO and Silver Point Capital, L.P.—the two largest sets of holders of the 2024 and 2026 Notes—reached out to discuss potential rescue financing that would

provide the company with the liquidity that it needed to resolve its immediate crisis, leading to an initial confidential proposal in December 2021.  *See* Adv.Dkt.639-1; Adv.Dkt.858 at 107-08; Adv.Dkt.955 at 80.  That proposal was motivated by the view that if Wesco could overcome its immediate liquidity issues, it could "capture the opportunity that was presented by COVID instead of suffering from it," Adv.Dkt.955 at 72, and "emerge as a more valuable franchise than it had going into the downturn," Adv.Dkt.858 at 16-19, 86-87; *see* Adv.Dkt.697 at 229.

Over the next few months, Wesco and the Majority Group engaged in "multiple rounds of negotiations" and "a lot of back and forth" over the terms of a potential rescue financing deal. Adv.Dkt.738 at 30-38; *see* Adv.Dkt.610-11 at 2-5 (documenting at least six counterproposals). That extended negotiation reflected the fact that each side of the deal held significant leverage.  On the one hand, as Wesco's board heard from its advisors, the Majority Group's majority stake gave it "a power position" that could theoretically be used "to prevent the company from getting financing in other ways."  Adv.Dkt.697 at 107-08.  On the other, the Majority Group understood that its substantial existing investment in Wesco would be seriously threatened if the company failed to resolve its liquidity crisis, and worried that Wesco would "pivot" to some other financing source if the Majority Group refused to agree to Wesco's terms.  Adv.Dkt.705-50 at 2-4.

The parties ultimately agreed on a series of contemplated transactions through which the Majority Group would provide Wesco $250 million in new money, as well as reducing cash interest and extending maturities on the Majority Group's existing debt.  As part of those transactions, the Majority Group would exchange their then-held 2024 Notes and 2026 Notes into super-senior first-lien notes (the "1L Notes"), which would mature in late 2026.  *See* Adv.Dkt.610-11 at 7-8.  The transactions would also allow certain holders of the 2027 Notes to exchange those notes into super-senior second-lien notes (the "1.25L Notes"), maturing in 2027.  These

transactions would not only provide Wesco with $250 million in rescue financing, but also improve Wesco's financial position going forward by extending the maturities on its debt and substantially decreasing its cash-interest payments.

Upon hearing that Wesco might strike a deal with the Majority Group, a different coalition representing a minority of the holders of 2024 and 2026 Notes (the "Minority Group") approached Wesco with a proposal to provide roughly $147.5 million in new money. Adv.Dkt.738 at 73. The Minority Group later sent Wesco a revised proposal that would have provided $173 million in funding; that proposal also included an "alternative" structure that would instead have provided $250 million in funding, but that relied on letters of credit that would have to be provided by third parties and collateralized. *See* Adv.Dkt.536-22 at 5-8; Adv.Dkt.1007 at 70-72. After reviewing those proposals, Wesco and its advisors did not believe that the Minority Group's proposals were viable; with respect to the main proposal, Wesco did not see the $173 million in financing as sufficient to satisfy its liquidity concerns, and with respect to the alternative proposal, Wesco determined that its method of securitizing the facilities with third-party letters of credit was not feasible. Adv.Dkt.630 at 184-86; Adv.Dkt.738 at 63-64, 74-75, 83-86, 92; Adv.Dkt.1351 at 12, 21, 33. Wesco also concluded that in any event, the Majority Group's proposal was superior to the Minority Group's proposal in terms of maturity extensions, amortization reductions, and cash interest reductions. *See* Adv.Dkt.630 at 202-03; Adv.Dkt.1351 at 12, 21-23, 32-33. Wesco's board of directors accordingly voted to accept the Majority Group's offer and reject the Minority Group's proposal. Adv.Dkt.630 at 199-203, 209; Adv.Dkt.738 at 112; *see* Adv.Dkt.536-24 at 2.

### C.    The 2022 Transactions.

#### 1.    Events leading up to the 2022 Transactions.

In the period leading up to the 2022 Transactions, the Majority Group (which already held two-thirds of the outstanding 2024 Notes) initially sought to acquire—and believed it had

acquired—two-thirds of the outstanding 2026 Notes. In February 2022, however, the Minority Group announced that it had accumulated more than a third of the outstanding 2026 Notes, in an attempt to block the Majority Group's proposal from going forward. *See* Adv.Dkt.639-4 at 2-3; Adv.Dkt.738 at 56-57. Wesco and the Majority Group accordingly agreed that Wesco would issue additional *pari passu* 2026 Notes to the Majority Group in exchange for the Majority Group's new $250 million investment, as the 2026 Indenture permitted Wesco to do with consent from a majority of the outstanding 2026 Notes (which the Majority Group held). Adv.Dkt.601-8 at 130. With those additional 2026 Notes, the Majority Group would then have the two-thirds majority necessary to consent to the release of the collateral as to the 2026 Notes, allowing Wesco to afford the new 1L Notes exclusive first-lien status. *See id.* at 131.

Wesco repeatedly confirmed to the Majority Group its understanding (consistent with the Majority Group's own understanding) that this approach complied with Wesco's contractual obligations under the 2026 Indenture, and Wesco's counsel at Milbank LLP, a well-respected international law firm, issued an opinion to that effect. Adv.Dkt.1150-11 (certificate and opinion of counsel); *see* Adv.Dkt.604-19 at 7; Adv.Dkt.710-56; Adv.Dkt.858 at 13-16, 188-89; Adv.Dkt.955 at 14-16; Adv.Dkt.1013 at 13-14, 51-52. As multiple witnesses later testified, that approach was consistent with the plain terms of the 2026 Indenture and the parties' understanding of those terms. For instance, one of Wesco's lead negotiators of the 2024 and 2026 Indentures, an advisor from Platinum, testified that he had reviewed the 2022 Transactions, and concluded that they "all seemed to work within the four corners of the document[s]" that he had helped to negotiate. Adv.Dkt.827 at 89-90; *see also, e.g.*, Adv.Dkt.630 at 143; Adv.Dkt.858 at 13-16, 160, 188-89; Adv.Dkt.955 at 14-16.

The evidence at trial also showed that the 2024/2026 Noteholders—sophisticated entities including BlackRock and JPMorgan—were fully aware that the indentures allowed Wesco to "dilute [a minority] group's voting power" by issuing new bonds with majority consent, and then rely on consent from those additional bonds to issue senior debt over the minority noteholders' objection.  Adv.Dkt.705-58 at 2; *see also* Adv.Dkt.705-61; Adv.Dkt.705-64 at 2 (describing that approach as "[n]othing particularly new"); Adv.Dkt.705-65 at 11 (recognizing that Wesco could "circumvent any block in the [2026 Notes] by upsizing the tranche"); Adv.Dkt.970 at 94, 102.  In fact, potential advisors to the 2024/2026 Noteholders provided them with materials specifically informing them that Wesco needed only majority consent to issue additional bonds and thus alter the voting dynamics of each bond class.  Adv.Dkt.970 at 116.  And notably, at least one 2024/2026 Noteholder—JPMorgan—knew of these possibilities firsthand, as it had employed a similar approach in prior transactions where it was the majority noteholder.  *See* Adv.Dkt.970 at 94.  That approach was particularly appropriate for Wesco here, as it allowed the company to obtain its critically needed rescue financing on favorable terms, under which the Majority Group would "charge a lower interest rate over all and in particular on new money."  Adv.Dkt.858 at 106-07.

### 2.    Consummation of the 2022 Transactions.

Wesco and the Majority Group carried out their plan to resolve Wesco's liquidity crisis on March 28, 2022.  On that date, the parties entered into and consummated a series of agreements, each occurring in a specific order:

*First*, Wesco adopted the Third Supplemental Indentures to the 2024, 2026, and 2027 Indentures, which amended the indentures to permit the issuance to the Majority Group of $250 million in additional 2026 Notes secured by the existing collateral.  *See* Adv.Dkt.601-30; Adv.Dkt.601-39; Adv.Dkt.604-18.  The Third Supplemental Indentures contained three principal

amendments:  (1) adding new definitions of "Additional 2026 Secured Notes" and "Note Purchase Agreement"; (2) amending the definition of permitted liens to include liens securing the additional 2026 Notes; and (3) allowing the incurrence of the additional 2026 Notes.  As required by §9.02 of the Indentures, those amendments were approved by the holders of a majority of the 2024, 2026, and 2027 Notes—namely, the Majority Group and certain holders of the 2027 Notes, who together held more than two-thirds of the 2024 Notes, more than 59% of the 2026 Notes, and more than half of the 2027 Notes.

*Second*, Wesco and certain members of the Majority Group entered into the Note Purchase Agreement, under which those members of the Majority Group invested $250 million of new money into the company, and Wesco used its authority under the Third Supplemental Indentures to issue them additional 2026 Notes in exchange.  Adv.Dkt.602-24 at 4, 10.  That issuance comported with the 2026 Indenture, which specifically contemplated the issuance of additional secured notes on a *pari passu* basis in the form of "Additional Secured Notes," subject to limitations on the incurrence of debt and liens.  Adv.Dkt.601-8 at 54, 111.  After the Note Purchase Agreement was consummated, the Majority Group's total share grew from 59% to more than two-thirds of the then-outstanding 2026 Notes (including the new 2026 Notes that Wesco issued to the Majority Group in exchange for their $250 million in new investment).

*Third*, Wesco adopted the Fourth Supplemental Indentures, which released the liens securing the 2024 Notes and 2026 Notes and removed certain covenants that could prevent consummating the 2022 Transactions.  *See* Adv.Dkt.601-34; Adv.Dkt.604-4.  Because the Fourth Supplemental Indentures "ha[d] the effect of releasing all or substantially all of" the collateral from the liens as to the 2024 and 2026 Notes, Adv.Dkt.601-20 at 124; Adv.Dkt.601-8 at 131, they required the consent of two-thirds of the then-outstanding 2024 and 2026 Notes, which the

Majority Group provided.  *See* Adv.Dkt.602-22; Adv.Dkt.603-8; Adv.Dkt.603-10; Adv.Dkt.603-17.

*Finally*, Wesco entered into three additional agreements:  (i) a Permitted Additional Pari Passu Secured Party Joinder with the notes collateral agent (Wilmington Savings Fund Society, or "WSFS") securing the 1L Notes with the same collateral as the 2024 and 2026 Notes, *see* Adv.Dkt.604-15; (ii) an Exchange Agreement with the Majority Group facilitating the exchange of participating 2024 Notes, 2026 Notes, and 2027 Notes for 1L Notes and 1.25L Notes, *see* Adv.Dkt.604-19; and (iii) an Amended and Restated Notes Security Agreement with WSFS reflecting the release of the liens as to the 2024 and 2026 Notes pursuant to the Fourth Supplemental Indentures and the addition of the 1L Notes to the liens pursuant to the Permitted Additional Pari Passu Secured Party Joinder, *see* Adv.Dkt.602-27.

Although they were negotiated at the same time, each of the separate agreements that made up the 2022 Transactions did not by its terms depend on or require any of the subsequent transactions.  For instance, Wesco's adoption of the Third Supplemental Indentures (allowing Wesco to issue additional 2026 Notes) did not mandate—or even mention—Wesco's subsequent adoption of the Fourth Supplemental Indentures (releasing the liens as to the 2024 and 2026 Notes). *See generally* Adv.Dkt.601-39 (Third Supplemental 2026 Indenture).  Likewise, the Note Purchase Agreement (under which the Majority Group provided Wesco with $250 million in new money in exchange for the additional 2026 Notes) did not require and was not conditioned in any way on the subsequent exchange of those notes for the 1L Notes.  *See generally* Adv.Dkt.602-24 (Note Purchase Agreement).

The agreements closed in a sequence agreed to during an 8:15am call involving Wesco and the Majority Group on March 28, 2022.  In advance of that call, Wesco and counsel for the

Majority Group circulated copies of the transaction documents with signature pages attached (though not effective). *See* Adv.Dkt.710-49 at 2; Adv.Dkt.1146-3 at 2. Once each participant verbally confirmed that it was ready to proceed with the various transactions and authorized release of its signature pages, the parties agreed on the call that the signature pages for the transactions would be released in the order described above. Adv.Dkt.1146-5 at 2-3 (closing call agenda); *see* Adv.Dkt.1350 at 59 (describing circulating signed transaction documents and authorizing their release subject to a condition precedent as a "common" closing practice).

The transactions were then consummated in order over the course of the next seven hours. The Third Supplemental Indentures were delivered to the indenture trustee shortly after the closing call ended, at 8:27am and 8:30am. *See* Adv.Dkt.1150-4; Adv.Dkt.1150-5. The wires transmitting the $250 million in new investment from the Majority Group to Wesco were completed at 12:54pm. *See* Adv.Dkt.1150-10. Once Wesco confirmed receipt of funds, at 1:37pm, Wesco instructed the indenture trustee to authenticate and issue the additional 2026 Notes, which were then delivered to the Majority Group. *See* Adv.Dkt.1150-11; Adv.Dkt.1155-1 to -7. About half an hour later, Wesco delivered the Fourth Supplemental Indentures to the indenture trustee along with consent letters from two-thirds of the holders of the 2024 and 2026 Notes (including the new 2026 Notes), amending the 2024 and 2026 Indentures to allow for release of the liens as to the 2024 and 2026 Notes. *See* Adv.Dkt.710-43 at 2; Adv.Dkt.1150-16; Adv.Dkt.1150-18. The indentures governing the 1L and 1.25L Notes were then delivered to the indenture trustee, followed by the exchange of the 2024, 2026, and 2027 Notes for the 1L and 1.25L Notes, with the final step reaching completion around 3:08pm. *See* Adv.Dkt.1150-19; Adv.Dkt.1150-21; Adv.Dkt.1150-23; Adv.Dkt.1184 at 139-40.

Closing the 2022 Transactions allowed Wesco to "get the business back on a normal operating rhythm," spending roughly $50 million settling with its vendors and $90 million on certain debt obligations, which resulted in "things really actually simmer[ing] down quite a bit" for months. Adv.Dkt.664 at 58-59, 65. The company also devoted roughly $70 million to buying up additional inventory based on "feedback from [its] customers and some outside sources" who had suggested that "the market [was] coming back." *Id.* at 59. Investor confidence likewise increased; for instance, convinced "that all of the company's debts would likely … be paid in full … [a]nd that the company had liquidity to last for years," Silver Point spent an additional nearly $40 million buying up Wesco's unsecured 2027 bonds. Adv.Dkt.858 at 145; *see also* Adv.Dkt.925-1 at 1 (PIMCO resolved to "maintain exposure going forward").

### D.    Procedural History.

#### 1.    The adversary proceeding and the bankruptcy court's oral ruling.

In October 2022, seven months after the 2022 Transactions took place, the 2024/2026 Noteholders sued in New York state court, seeking a judgment holding the 2022 Transactions "null and void and not enforceable" and an order avoiding and unwinding them. Adv.Dkt.201-36 at 71.

Unfortunately, while that litigation was pending, Wesco's financial situation once again deteriorated as "[t]he business continued to drag" and its expectations of selling its new inventory evaporated. Adv.Dkt.664 at 65. Despite the new money, extended maturities, and lower cash-interest payments provided by the 2022 Transactions, the company continued to face liquidity problems, exacerbated by the lingering effects of the COVD-19 pandemic, disruptions in the global supply chain, labor shortages, and other challenges facing the aerospace industry. *See id.*; Bankr.Dkt.13 at 5-7. In June 2023, Wesco and its related entities filed voluntary chapter 11 petitions, initiating the bankruptcy proceedings here. The filing of those petitions automatically stayed the suit brought by the 2024/2026 Noteholders in New York state court. *See* Adv.Dkt.21.

On the same day that it filed its chapter 11 petition, Wesco initiated this adversary proceeding seeking a declaration under 28 U.S.C. §2201 confirming that it did not breach its indentures by entering into the 2022 Transactions. S*ee* Adv.Dkt.63 (amended complaint). The 2024/2026 Noteholders counterclaimed, seeking (among other things) a declaration that Wesco breached the 2024 and 2026 Indentures; the imposition of an equitable lien against Wesco, the First Lien Noteholders, and others; equitable subordination of claims held by the First Lien Noteholders and others; and a declaration that the First Lien Noteholders, Platinum, Senator, and Citadel tortiously interfered with the 2024 and 2026 Indentures. Adv.Dkt.144.

After extensive discovery, the parties proceeded to summary judgment, where the bankruptcy court dismissed most of the 2024/2026 Noteholders' counterclaims—including their claims for an equitable lien or equitable subordination, which the bankruptcy court concluded were "disguised avoidance actions" that belonged to Wesco's estate. Adv.Dkt.508 at 14-16. However, the bankruptcy court allowed the 2024/2026 Noteholders' breach-of-contract and tortious-interference claims to proceed to trial. *See id.* at 36-58.[3]

The bankruptcy court held trial on the 2024/2026 Noteholders' claims over 35 days in a six-month span from late January to early July 2024, and issued an interlocutory oral ruling on July 10, 2024. In that oral ruling, the bankruptcy court concluded that Wesco's participation in the 2022 Transactions did not breach the 2024 Indenture, but did breach the 2026 Indenture, because Wesco had consent from two-thirds of the 2024 Notes but not two-thirds of the 2026 Notes to enter into the Third Supplemental Indentures. Adv.Dkt.1474 at 13-14, 37. As a remedy, the bankruptcy court recommended reinstating the liens of the 2026 Notes that were released by the

---

[3] The claims asserted against WSFS were dismissed at the summary judgment stage, and WSFS did not participate as a party in the trial on the remaining claims. Adv.Dkt.509 at 2-3; Adv.Dkt.533 at 3-5; Adv.Dkt.554 at 2.

Fourth Supplemental Indentures. *See id.* at 3 (recommending a declaration that "the rights, liens, and interests that were for the benefit of all of the holders of the 2026 [N]otes as they existed on March 27th, 2022, remained in full force and effect on March 29th, 2022"). The court also concluded that Wesco's participation in the 2022 Transactions breached the 2027 Indenture, but declined to award any remedy for that breach. *Id.* In announcing its oral ruling, the bankruptcy court advised the parties that its ruling was "interlocutory only" and that "the final ruling will be done in a written memorandum opinion," but that in the meantime Wesco and its affiliates should proceed to develop a plan of reorganization based "on what their capital structure has now been declared to be." *Id.* at 3, 38.

The bankruptcy court's oral ruling did not explicitly address whether the $250 million in additional 2026 Notes should be treated as secured *pari passu* with the original 2026 Notes. The parties accordingly asked the bankruptcy court to clarify the status of the $250 million in additional 2026 Notes, and offered to submit further briefing on the issue if needed. The bankruptcy court responded that the Majority Group did not receive any secured 2026 Notes in exchange for the $250 million lifeline that it provided to Wesco, leaving the Majority Group with only an unsecured claim:

> What I intended to say was that because it violated the indenture, that there were no new 2026 notes issued. Obviously the 250 million was received and it needs to be dealt with in a plan and I did not intend to dictate how it was dealt with in a plan. But the 250 million did not ever result in the issuance of additional 2026 notes. I don't mean that to be ambiguous or confusing, but that's what I tried to say.

Bankr.Dkt.2002 at 74.

After the bankruptcy court announced its oral rulings, the parties developed a consensual plan of reorganization, which the bankruptcy court confirmed on December 27, 2024. Bankr.Dkt.2528 (confirmation order); *see* Bankr.Dkt.2550 (corrected confirmation order). That

plan was premised on the bankruptcy court's rulings regarding the status of the 1L Notes, the 1.25L Notes, the 2026 Notes, and the $250 million in new investment by the Majority Group, with all parties preserving their appellate rights with respect to those rulings.  Because these rulings resulted in the First Lien Noteholders receiving less under the confirmed plan—in particular, under the court's rulings that the 1L Notes were not senior to the original 2026 Notes, and that the Majority Group's $250 million in new investment resulted in only an unsecured claim rather than secured 1L Notes—the First Lien Noteholders noticed their appeal of the confirmation order on January 10, 2025.  *See* Bankr.Dkt.2564.  That appeal is currently pending as *In re Wesco Aircraft Holdings, Inc.*, No. 25-cv-161 (docketed Jan. 14, 2025), and is being held in abeyance pending this Court's resolution of this case.

### 2.   The bankruptcy court's report and recommendation.

The bankruptcy court subsequently issued its January 17 R&R on the 2024/2026 Noteholders' breach-of-contract claims.  ECF 3.  As it had in its oral ruling, the bankruptcy court concluded in the January 17 R&R that even though, by its terms, the 2026 Indenture permitted the issuance of additional *pari passu* notes based on a simple majority vote, Wesco breached the 2026 Indenture by adopting the Third Supplemental Indentures without consent from two-thirds of the then-outstanding 2026 Notes.  *Id.* at 28-35.

The bankruptcy court recognized that under the 2026 Indenture, "except in certain enumerated circumstances," Wesco could adopt "any amendment or supplement" to the 2026 Indenture "with the consent … of at least a majority" of the then-outstanding 2026 Notes.  *Id.* at 19.  The bankruptcy court also recognized that more than a simple majority had consented to the Third Supplemental Indentures, which under the 2026 Indenture was sufficient to approve an amendment authorizing the issuance of new *pari passu* notes.  *Id.* at 17, 19-20.  But according to

the bankruptcy court, §9.02 of the 2026 Indenture required Wesco to obtain the consent of two-thirds of the then-outstanding 2026 Notes to adopt the Third Supplemental Indentures, because (in the bankruptcy court's view) the Third Supplemental Indentures "ha[d] the effect of releasing all or substantially all of" the collateral from the liens as to the 2026 Notes. *Id.* at 29-35. As a remedy, the bankruptcy court recommended that this Court should conclude that in light of Wesco's purported breach, the Third Supplemental Indentures "could not have been effective as to the 2026 Noteholders," thereby "negat[ing] the effectiveness against the 2026 Noteholders of every subsequent step" in the 2022 Transactions. *Id.* at 35. In particular, the bankruptcy court recommended that this Court should declare that "the rights, liens, and interests that were for the benefit of all the holders of 2026 Notes … remained in full force and effect" following the 2022 Transactions, ECF 3 at 36, stripping the First Lien Noteholders of the exclusive first-lien status of their 1L Notes and leaving them with only an unsecured claim for the $250 million that they provided to Wesco in the 2022 Transactions.

## CONCLUSIONS OF LAW

This Court disagrees as set forth in this order with the bankruptcy court's recommended factual findings, and with its recommended finding of breach and its recommended remedy. For the reasons explained in Part I below, the 2022 Transactions were proper, appropriate, lawful, and consistent with the terms of the 2024 and 2026 Indentures. Those indentures were negotiated by sophisticated parties who chose their language carefully; if the parties had wanted to bargain for additional sacred rights that would have allowed minority holders to prevent the 2022 Transactions, they could have done so, but they did not. The fact that the 2022 Transactions closed and were executed over the course of a single day is not unusual, and does not make them inconsistent with Wesco's indentures. The 2022 Transactions accordingly did not breach Wesco's

indentures.  In addition, for the reasons explained in Part II, the proper remedy if Wesco had breached the 2026 Indenture would have been a declaration that Wesco is liable for money damages for the purported breach, not an order reinstating the 2026 Noteholders' liens while stripping the First Lien Noteholders' $250 million investment of any security interest at all. Nothing in law or equity supports the bankruptcy court's proposed remedy, which would cost Wesco (the purported breaching party) nothing, but would deprive the First Lien Noteholders (who committed no breach) of their exclusive first-lien status and would treat their $250 million in rescue financing as an unsecured claim.  The Court accordingly SUSTAINS the First Lien Noteholders' objection to the bankruptcy court's January 17 R&R, OVERRULES the 2026 Noteholders' objection, DECLARES that the 2022 Transactions did not breach Wesco's indentures, and DISMISSES the 2026 Noteholders' breach-of-contract claims.

I.   **Wesco's Adoption of the Third Supplemental Indentures and the Remaining 2022 Transactions Fully Complied With Wesco's Obligations Under Its Indentures.**

A.   **Wesco Had the Consent Required by the 2026 Indenture for Each Step in the 2022 Transactions.**

Wesco's adoption of the Third Supplemental Indentures—and all the other steps in the 2022 Transactions—complied with the requirements of the 2026 Indenture (and Wesco's other indentures).  Under §9.02 of the 2026 Indenture, Wesco was authorized to adopt any amendment or supplement "with the consent of the Holders of at least a majority" of the then-outstanding 2026 Notes, except for certain enumerated categories of amendments or supplements that the 2026 Indenture made subject to more stringent consent requirements.  Adv.Dkt.601-8 at 130.  Only one such enumerated exception is relevant here:  the supermajority consent requirement for release of collateral, under which "without the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding … no amendment, supplement or waiver may … have the effect of releasing all or substantially all of the Collateral from the Liens" securing the

2026 Notes.    Adv.Dkt.601-8 at 131.    The 2026 Indenture does not impose any similar supermajority requirement on amendments or supplements that have the effect of authorizing additional 2026 Notes in excess of the debt and lien baskets; instead, amendments or supplements that authorize such notes require only simple-majority consent.  *See* Adv.Dkt.601-8 at 130.

In adopting the Third Supplemental Indentures with simple-majority consent, Wesco fully complied with its obligations under the 2026 Indenture.  None of the three principal amendments made by the Third Supplemental Indentures—adding new definitions of "Additional 2026 Secured Notes" and "Note Purchase Agreement," amending the definition of permitted liens to include liens securing the additional 2026 Notes, and allowing the incurrence of the additional 2026 Notes—had the effect of releasing any collateral, or indeed had any effect on any collateral at all.  Instead, those amendments simply authorized Wesco to issue the additional 2026 Notes in exchange for $250 million in new money from the Majority Group, providing Wesco with the financial lifeline it needed.  As such, the Third Supplemental Indentures required only "the consent of the Holders of at least a majority" of the then-outstanding 2026 Notes.  Adv.Dkt.601-8 at 130-31.  It is undisputed that more than a majority of the then-outstanding 2026 Notes consented to the Third Supplemental Indentures.    *See* Adv.Dkt.604-16.    Wesco's adoption of the Third Supplemental Indentures accordingly complied with its obligations under the 2026 Indenture.

The remaining steps in the 2022 Transactions likewise complied with the requirements of the 2026 Indenture.  After the adoption of the Third Supplemental Indentures authorized Wesco to issue additional 2026 Notes, Wesco and the Majority Group entered into the Note Purchase Agreement, under which the Majority Group provided Wesco with $250 million in new investment in exchange for additional 2026 Notes.  Adv.Dkt.602-24.  It is undisputed that the Note Purchase

Agreement did not affect the collateral or require any further consent under the terms of the 2026 Indenture.

After entering into the Note Purchase Agreement, Wesco proceeded to adopt the Fourth Supplemental Indentures, which provided for the release of the collateral from the liens as to the 2026 Notes.  *See* Adv.Dkt.601-33, 601-34, 604-4.  Because the Fourth Supplemental Indentures *did* "have the effect of releasing all or substantially all" of the collateral as to the 2026 Notes, they required the consent of holders of at least two-thirds of all then-outstanding 2026 Notes. Adv.Dkt.601-8 at 131.  That supermajority consent was provided by the Majority Group, who— after investing an additional $250 million in Wesco through the Note Purchase Agreement—now held more than two-thirds of the 2026 Notes.  The Fourth Supplemental Indentures accordingly complied with the requirements of the 2026 Indenture as well.

Finally, Wesco entered into (1) the Permitted Additional Pari Passu Secured Party Joinder, under which WSFS added the new 1L Notes to the liens under the security documents, (2) the Amended and Restated Notes Security Agreement, which reflected the addition of the 1L Notes to the liens and WSFS' release of the liens as to the 2024 and 2026 Notes pursuant to the Fourth Supplemental Indentures, and (3) the Exchange Agreement, under which participating Majority Group members exchanged their 2024 Notes and 2026 Notes for the 1L Notes.  Adv.Dkt.602-27, 604-19.  Again, it is undisputed that none of these agreements required any further consents under the 2026 Indenture.  The 2022 Transactions thus fully complied with the terms of the 2026 Indenture.

This conclusion is confirmed by the Fifth Circuit's decision in *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555 (5th Cir. 2025), which underscores the importance of adhering to the precise language of indenture agreements.  In *Serta*—which involved syndicated loans rather

than secured bonds—the debtor likewise engaged in an "uptier" transaction in which certain lenders exchanged their existing secured debt for new super-priority debt. *Id.* at 568-69. A group of excluded lenders asserted that the uptier transaction breached an express provision in the debtor's loan agreement that enshrined a "sacred right of pro-rata sharing," under which the debtor was required to allocate any payments of principal or interest and any conversions of its debt pro rata among its lenders of each class, and which could only be waived with unanimous consent. *Id.* at 567. The debtor responded that the unanimous consent requirement did not apply, because another provision of the loan agreement created an exception to that requirement that allowed the debtor to repay its loans on a non-pro rata basis through "open market purchases." *Id.* at 568. The Fifth Circuit agreed with the investors, holding that the uptier transaction in *Serta* was not an "open market purchase" because, among other things, it did not take place on an open market. *Id.* at 578-84.

Unlike the loan agreement in *Serta*, the 2026 Indenture does not include any provision requiring Wesco to obtain unanimous consent from its existing noteholders in order to engage in an uptier transaction. Instead, the 2026 Indenture explicitly requires only majority consent to authorize the issuance of new notes, and requires only a two-thirds supermajority to authorize the release of collateral. Adv.Dkt.601-8 at 130-31. As recounted above, the evidence at trial showed that the parties understood that the 2026 Indenture did not require unanimous consent for an uptier transaction, that it allowed Wesco to dilute a minority group's voting power by issuing new bonds with majority consent and to then rely on consent from those additional bonds to issue senior debt over the minority noteholders' objection, and that those provisions ensured that Wesco would have additional flexibility to raise new capital in the future. *See supra* pp.3-4, 8-9. In short, the provisions of the 2026 Indenture are materially different from the provisions of the loan agreement

at issue in *Serta*, and Wesco fully complied with the conditions that the 2026 Indenture imposes in entering into the 2022 Transactions.

**B.    The 2026 Noteholders' Contrary Arguments Are Unpersuasive.**

The 2026 Noteholders raise various contrary arguments, but none is persuasive.  As their primary argument, the 2026 Noteholders argue that the Third Supplemental Indentures required supermajority consent because they "ha[d] the effect of releasing all or substantially all" of the collateral, Adv.Dkt.601-8 at 131—because they allowed Wesco to issue additional 2026 Notes, which Wesco then issued to the Majority Group in exchange for $250 million in new investment, and which the Majority Group then used to consent to the Fourth Supplemental Indentures and release the collateral from the liens as to the 2026 Notes.  Although none of those steps in the 2022 Transactions individually violated the 2026 Indenture, the 2026 Noteholders argue that Wesco breached the 2026 Indenture by combining those non-breaching steps, because in that "environment" the Third Supplemental Indentures "had the effect of releasing collateral."  ECF 3 at 31.

The 2026 Noteholders are incorrect.  Under the plain language of the 2026 Indenture, Wesco needed to obtain supermajority consent for the Third Supplemental Indentures only if the Third Supplemental Indentures *themselves* "ha[d] the effect of releasing all or substantially all" of the liens securing the 2026 Notes.  Adv.Dkt.601-8 at 131.  The 2026 Noteholders' contrary reading of that language—as reaching not only amendments that *themselves* have the effect of releasing collateral, but any amendment that eventually leads (after multiple intervening steps, including the necessary subsequent supermajority consent) to further amendments that have the effect of releasing collateral, would flout the ordinary meaning of "effect" and invite significant practical difficulties by making it all but impossible to know in advance when supermajority consent is required.

22/39

In the context of a legal instrument, the term "effect" means "[t]he result that an instrument between parties will produce on their relative rights." *Effect* (n.), Black's Law Dictionary (12th ed. 2024). An "amendment, supplement or waiver" accordingly only "ha[s] the effect of releasing all or substantially all of the Collateral," Adv.Dkt.601-8 at 131, if "the result that [the] instrument … will produce on [the parties'] relative rights" is *itself* to release that collateral—not just to initiate a chain of events, including subsequent amendments, that may eventually lead to releasing the collateral. That makes particular sense in the context of a legal instrument like the 2026 Indenture that requires majority votes for some actions and supermajority votes for others. In that context, the focus must be on the immediate effect of the amendment itself—without regard to subsequent actions that may follow—in order to determine in real time whether a supermajority vote is required. Here, the only "result" that the Third Supplemental Indentures themselves "produce[d] on [the parties'] relative rights" was to enable Wesco to issue additional 2026 Notes— an effect that did not require supermajority consent under the express terms of the 2026 Indenture. As a result, under the plain language of the 2026 Indenture, the Third Supplemental Indentures did not require supermajority consent.

That conclusion not only is required by the plain language of the 2026 Indenture, but this Court also finds as a factual matter that it accords with the parties' intent and the 2026 Indenture's general purpose. *See, e.g.*, *In re Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003) (under New York law, a contract must be interpreted "to give effect to its general purpose"); *Greenfield v. Philles Recs.*, 780 N.E.2d 166, 170 (N.Y. 2002) (under New York law, "agreements are construed in accord with the parties' intent"); Adv.Dkt.1474 at 4-6; *see also supra* pp.3-4, 8-9. By requiring supermajority consent for any amendments or supplements that "have the effect of releasing all or substantially all of" the collateral, Adv.Dkt.601-8 at 131, the 2026

Indenture ensures that the liens securing the 2026 Notes will only be released if doing so is in the economic interests of holders of at least two-thirds of the outstanding notes.  But nothing about that supermajority-consent provision prevents majority holders from investing additional funds in Wesco to *acquire* that level of economic interest, or gives minority holders a veto right over whether Wesco may issue additional notes.  In fact, as discussed above, it is undisputed that the 2026 Indenture does *not* impose any supermajority consent requirement on issuing additional 2026 Notes.  The evidence shows that the 2024/2026 Noteholders were sophisticated parties who fully understood that the 2026 Indenture did not impose any such supermajority requirement on the issuance of additional 2026 Notes, even if those additional notes were then voted in favor of releasing the collateral in a subsequent transaction.

Adopting the 2026 Noteholders' interpretation, and construing "effect" to expand the 2026 Indenture's supermajority consent provision to any amendment or supplement whose downstream consequences may include the release of collateral, would also raise difficult line-drawing problems.  Once the inquiry moves beyond the immediate effect of an amendment, there is no logical stopping point.  If an amendment enables the issuance of additional notes, and those additional notes then provide the necessary votes two weeks later to release collateral, is the amendment retroactively subject to the two-thirds supermajority provision?  What if the vote to release the collateral comes two months later or two years later?  Does it matter whether the later vote to release the collateral was foreseeable (or foreseen)?  None of those questions has any clear textual answer—because the plain meaning of the text looks only to the effect of the amendment or supplement itself, not any potential downstream consequences.

And while those questions may be hypothetical in this case, similar questions arise all the time in complex financial transactions, where the need for clarity is paramount and interlocking

agreements are commonplace.  That is precisely why other courts have recognized a need to "hew[] strictly to the chronology required by the contracts" in determining the rights of the parties at a particular moment in a multi-transaction sequence.  *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent Corp.* ("*TriMark*"), 2021 WL 3671541, at *8 (N.Y. Sup. Ct. Aug. 16, 2021) (collecting cases and noting "that the order of operations matters").  A contrary result would threaten serious uncertainty for the indentures here and for countless others that may use similar language, in an area where clarity and predictability are necessary to ensure that lenders and borrowers can price their bonds on a common understanding of their terms and avoid expensive litigation over future amendments.

The 2026 Noteholders also argue that the Third Supplemental Indentures "ha[d] the effect of releasing all or substantially all" of the collateral, Adv.Dkt.601-8 at 131, because (they say) the bankruptcy court correctly concluded that Wesco's adoption of the Third Supplemental Indentures made the subsequent release of the liens "automatic" and "inevitable," ECF 3 at 31-35.  On *de novo* review of the record, *see* 28 U.S.C. §157(c)(1), this Court finds that as a factual matter, the evidence does not support that conclusion.

Nothing about the adoption of the Third Supplemental Indentures compelled the parties to proceed with the Note Purchase Agreement, the Fourth Supplemental Indenture, the release of the liens, or any of the other parts of the 2022 Transactions.  The fact that the parties agreed to the seriatim closing of each transaction during a single closing call on the morning of March 28, 2022—which the evidence showed is a common closing practice, *see* Adv.Dkt.1350 at 59—does not mean that each transaction was automatic or inevitable as soon as the closing call was completed.  On the contrary, after the closing call ended, it took more than four hours for the wire transfers by which the Majority Group paid Wesco $250 million in new investment under the Note

Purchase Agreement to be processed. *See* Adv.Dkt.1150-10. If those funds had not arrived, the additional 2026 Notes would never have been issued, the Fourth Supplemental Indentures would never have received the necessary consents, and the liens would never have been released. More broadly, at any point after the adoption of the Third Supplemental Indentures but before the liens were released—i.e., between about 8:30am and 2:15pm on March 28, 2022, *see* Adv.Dkt.710-43 at 2; Adv.Dkt.1150-4; Adv.Dkt.1150-5; Adv.Dkt.1150-16; Adv.Dkt.1150-18—any party could have rescinded its release of its signature pages and refused to carry out the remaining 2022 Transactions. That might well have triggered litigation, but it would also unquestionably have prevented the release of the liens. Wesco's entry into the Third Supplemental Indentures accordingly did not make the rest of the 2022 Transactions, including the release of the collateral as to the 2026 Notes, "automatic" or "inevitable." *Contra* ECF 3 at 31-35.[4] For that reason as well, the 2026 Noteholders' contention that the Third Supplemental Indentures "ha[d] the effect of releasing all or substantially all" of the collateral, Adv.Dkt.601-8 at 131, is unpersuasive.

### C.    The 2026 Noteholders' Alternative Arguments for Finding a Breach of the 2026 Indenture Are Likewise Unpersuasive.

In their own objection to the January 17 R&R, the 2026 Noteholders raise seven alternative arguments—none of which was accepted by the bankruptcy court—for finding that Wesco

---

[4] The 2026 Noteholders attempt to bolster their assertion that the Third Supplemental Indentures made release of the collateral "automatic" and "inevitable," ECF 3 at 31-35, by relying on New York escrow and agency law. That reliance is misplaced. Even if New York law gave the Majority Group the right (though not the obligation) to enforce completion of the subsequent steps in the 2022 Transactions, it does not follow that the Third Supplemental Indentures made the subsequent release of the collateral automatic or inevitable, much less that the Third Supplemental Indentures themselves "ha[d] the effect of releasing" that collateral. Adv.Dkt.601-8 at 131; *see TriMark*, 2021 WL 3671541, at *8 (recognizing that "committing to do something is not, of course, the same thing as doing it" (brackets omitted)). !

breached the 2026 Indenture by entering into the 2022 Transactions. Those alternative arguments are likewise unpersuasive.[5]

First, the 2026 Noteholders contend that the Third Supplemental Indentures required supermajority consent because the 2026 Indenture requires supermajority consent for any amendment that will "modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse … in any material respect" to the holders of the 2026 Notes. Adv.Dkt.601-8 at 131. But the Third Supplemental Indentures did not "modify the Security Documents," *id.*; they amended only the 2026 Indenture, which is not one of the "Security Documents." Adv.Dkt.601-8 at 45 (defining "Security Documents"). The fact that the Notes Security Agreement (which *is* one of the "Security Documents," *id.*) cross-references the 2026 Indenture does not transform an amendment to the latter into an amendment to the former. The Third Supplemental Indentures also did not modify "the provisions of [the 2026 Indenture] dealing with Collateral," Adv.Dkt.601-8 at 131, by amending the definition of "Permitted Lien," which is not a provision dealing with collateral (as demonstrated by the fact that it also appears in the 2027 Indenture governing *unsecured* notes, *see* Adv.Dkt.601-7 at 28). Finally, as a factual matter, even if the Third Supplemental Indentures had modified either the "Security Documents" or any provision of the 2026 Indenture "dealing with Collateral," they were not "adverse … in any material respect" to the holders of the 2026 Notes. Adv.Dkt.601-8 at 131. Instead, the Third Supplemental Indentures enabled an infusion of $250 million in new money (in other words,

---

[5] The 2026 Noteholders also object to the bankruptcy court's proposed findings that Wesco believed the 2022 Transactions were in its best interest and that those transactions were superior to the Minority Group's proposal. ECF 35 at 28-32. As detailed in this Court's findings of fact above, this Court agrees with the bankruptcy court's proposed findings on those issues. *See supra* pp.5-7. In addition, the 2026 Noteholders challenge several interlocutory rulings by the bankruptcy court. ECF 35 at 36-40. The parties agree that this Court need not address those challenges at this stage, and so the Court refrains from resolving them.

additional collateral) that Wesco needed to address its liquidity issues, improving the likelihood that Wesco would be able to pay off its obligations. *See supra* pp.4-7, 13. What is more, because the new $250 million became part of the collateral package securing the 2026 Notes, the Third Supplemental Indentures did not even dilute the 2026 Noteholders' liens. *See* Adv.Dkt.601-24 at 1-2 (Notes Security Agreement defining collateral to include "all cash").

Second, the 2026 Noteholders contend that the 2022 Transactions violated §4.12(a) of the 2026 Indenture, which provided (until it was deleted by the Fourth Supplemental Indentures) that Wesco could not "directly or indirectly, create, incur, assume, or suffer to exist any Lien of any kind (other than Permitted Liens)" on its assets. Adv.Dkt.601-8 at 100. None of the steps in the 2022 Transactions, however, created any such impermissible new lien. The fact that the Third Supplemental Indentures allowed Wesco to issue new 2026 Notes that subsequently voted in favor of releasing the collateral as to the 2026 Notes, which then allowed the liens as to the 1L Notes, does not mean that the Third Supplemental Indentures themselves "directly or indirectly" created the liens as to the 1L Notes. *Id.* Once again, the 2026 Noteholders' contrary interpretation conflicts with the plain contractual text and would raise severe practical problems, including by making it impossible to know in advance whether any contemplated transaction would breach §4.12(a) by eventually leading to an impermissible lien.

Third, the 2026 Noteholders cite §1.03(7) of the 2026 Indenture, which provides that "[u]nless the context otherwise requires," provisions in the 2026 Indenture "apply to successive events and transactions." Adv.Dkt.601-8 at 50-51. But that rule of construction just makes clear that the requirements in the 2026 Indenture apply to *each one* of a series of successive events and transactions; it does not collapse the entire series into a single transaction. *See Revised Model Simplified Indenture*, 55 Bus. Law. 1115, 1126, 1176 (2000) ("successive events and transactions"

language merely "underscore[s] the intended application and re-application" of indenture provisions to "successive obligors, fiduciaries, mergers, conversion adjustments, etc."). The 2026 Noteholders also cite *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), but this case is nothing like *Sharon Steel*. In that case, the indentures included a "successor obligor" provision that allowed the issuer to assign its debt to any corporate successor that purchased "all or substantially all" of its assets. 691 F.2d at 1044-45. The issuer proceeded to sell off its assets in three different transactions to three different buyers—and then purported to assign its debt to only the last buyer, on the theory that it had sold all its (remaining) assets to that buyer. *Id.* at 1046. The Second Circuit rejected that argument, holding that an issuer cannot engage in a "plan of piecemeal liquidation" and then invoke a successor obligor provision to assign its debt to only "the buyer last in time." *Id.* at 1050-51. But this case does not involve an issuer engaging in a series of similar transactions, like selling off all its assets piecemeal, and then arguing that all but the last transaction should be ignored. Just the opposite: It involves an issuer engaging in a series of different amendments and transactions, with widely varying terms and effects, and arguing that the deliberate structure and timing of those transactions should be *respected*.

Fourth, the 2026 Noteholders make a similar argument under New York law, claiming that it requires collapsing the entire sequence of distinct transactions in the 2022 Transactions into a single transaction. That argument misreads New York law. New York recognizes a canon of *contract interpretation* under which courts "read together as one" documents that are "executed at substantially the same time" and "related to the same subject-matter," so that those agreements are construed consistently and in accordance with the parties' intent. *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941); *see, e.g.*, *BWA Corp. v. Alltrans Express U.S.A., Inc.*, 493 N.Y.S.2d 1, 3 (App. Div. 1985) (instruments executed together "will be read and interpreted together"). But

that is an *interpretive* canon, not a *substantive* doctrine that would collapse multiple separate agreements into a single instrument when that was decidedly not what the parties intended. *See, e.g.*, *Kent v. Universal Film Mfg. Co.*, 193 N.Y.S. 838, 846-47 (App. Div. 1922) (related contracts "are, of course, to be construed together," but that rule "does not require that the two separate instruments must be deemed consolidated and one for all purposes"); *see also CooperVision, Inc. v. Intek Integration Techs.*, 794 N.Y.S.2d 812, 818 (Sup. Ct. 2005) (same). Here, the parties clearly intended the separate steps of the 2022 Transactions to be treated as distinct transactions, and New York law gives effect to that intent. *See, e.g.*, *TriMark*, 2021 WL 3671541, at *8; *MeehanCombs Glob. Credit Opportunities Funds v. Caesars Ent. Corp.*, 80 F.Supp.3d 507, 516-17 (S.D.N.Y. 2015).

Fifth, the 2026 Noteholders contend that the additional 2026 Notes were never properly "authenticated" by a "manual signature" from the indenture trustee. Adv.Dkt.601-8 at 54. But nothing in the 2026 Indenture prohibited the indenture trustee from using multiple copies of the same manual signature to sign multiple notes, and the indenture trustee's signature on the notes is "conclusive evidence" that the notes "ha[ve] been duly authenticated." *Id.* In any event, the 2026 Noteholders are only third-party beneficiaries of the 2026 Indenture, and cannot assert authentication requirements that were "not made for [their] benefit," *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F.Supp.2d 375, 415 (S.D.N.Y. 2011); any such technical defect would not invalidate the notes regardless, *see, e.g.*, *Danco Elec. Contractors, Inc. v. Dormitory Auth. of N.Y.*, 75 N.Y.S.3d 28, 28-29 (App. Div. 2018); the notes were ratified by performance (including their sale and purchase for $250 million), rendering any defect inconsequential, *see, e.g.*, *Feinstein v. Levy*, 503 N.Y.S.2d 821, 822 (App. Div. 1986) (per curiam); and the notes could always be

retroactively reformed in light of the parties' mutual understanding of their validity, *see, e.g.*, *In re Snide*, 418 N.E.2d 656 (N.Y. 1981) (reforming wills signed by opposite spouses).

Sixth, the 2026 Noteholders assert that the 2022 Transactions breached §3.02 and §3.07(h) of the 2026 Indenture, which govern redemptions and purchases. Under §3.02, "[i]f less than all of the 2026 Secured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof, the Trustee will select 2026 Secured Notes for redemption or purchase *pro rata*, by lot or by such method as it shall deem fair and appropriate." Adv.Dkt.601-8 at 66. By its plain terms, that provision does not apply here, because no 2026 Notes were "redeemed pursuant to the provisions of Section 3.07" in the 2022 Transactions; instead, Wesco *exchanged* new 1L Notes for the 2026 Notes held by the First Lien Noteholders. *Id.* As for §3.07(h), it authorizes Wesco to "at any time and from time to time purchase 2026 Secured Notes," and provides that "[a]ny such purchases may be made through open market or privately negotiated transactions with third parties … or otherwise, upon such terms and at such prices as well as with such consideration as [Wesco] may determine." *Id.* at 69. Even assuming that the exchange of the 2026 Notes for 1L Notes in the 2022 Transactions constituted a "purchase" under §3.07(h), that section explicitly authorizes purchases through "privately negotiated transactions with third parties," including the First Lien Noteholders here. *Id.*; *cf. supra* pp.20-22 (discussing *Serta*). In all events, even if the 2022 Transactions were somehow contrary to §3.02 or §3.07(h), a majority of the 2026 Notes properly waived compliance with those provisions under §9.02 of the 2026 Indenture. Adv.Dkt.1446 at 335-36; *see* Adv.Dkt.601-8 at 130 (allowing "a majority … of the 2026 Secured Notes" to "waive compliance in a particular instance … with any provision of this Indenture").

Finally, the 2026 Noteholders contend that the 2022 Transaction breached the "sacred rights" provision in §9.02(10) of the 2026 Indenture, which requires unanimous consent from each

affected holder for any amendment that would "make any change to, or modify, the ranking of the 2026 Secured Notes in respect of right of payment that would adversely affect the Holders of the 2026 Secured Notes." Adv.Dkt.601-8 at 131. But §9.02(10) by its terms applies only to changes in "ranking … in respect of right of payment," or *payment priority*, which asks whether one note must be paid in full before another receives any payment; that subsection does not apply to changes in relative maturity or lien priority. *Id.*; *see In re MPM Silicones, LLC*, 531 B.R. 321, 328 (S.D.N.Y. 2015) (explaining that "[t]he words 'in right of payment' clearly refer only to payment subordination," not "lien subordination"), *aff'd in relevant part and rev'd on other grounds*, 874 F.3d 787 (2d Cir. 2017); *Diversified Realty Servs., Inc. v. Meyers Law Grp., P.C.*, 2014 WL 547034, at *3 (N.D. Cal. Feb. 7, 2014) (distinguishing payment subordination and lien subordination), *aff'd*, 647 F.App'x 736 (9th Cir. 2016). The 2026 Noteholders' contrary interpretation of §9.02(10) conflicts with the supermajority provision of §9.02, which requires only a two-thirds majority of the 2026 Notes (not unanimous consent) to release collateral. Adv.Dkt.601-8 at 131. Their interpretation also flatly conflicts with §4.09(c), which expressly distinguishes priority "in right of payment" from secured status. *See id.* at 93 ("[N]o Indebtedness will be deemed to be contractually subordinated in right of payment … solely by virtue of being unsecured or by virtue of being secured on a junior priority basis.").

In sum, none of the 2026 Noteholders' seven alternative arguments provides any persuasive basis for concluding that the 2022 Transactions breached Wesco's obligations under the 2026 Indenture.[6]

---

[6] No party has objected to the bankruptcy court's recommendation that this Court should find that Wesco did not breach its obligations under the 2024 Indenture by entering into the 2022 Transactions. ECF 3 at 2. This Court has independently reviewed the record and agrees that

**II.      Even If Adopting The Third Supplemental Indentures Breached The 2026 Indenture, The Proper Remedy Would Have Been A Damages Claim Against Wesco.**

For all of the foregoing reasons, this Court concludes that Wesco did not violate its obligations under its indentures by entering into the 2022 Transactions. But even if Wesco had breached the 2026 Indenture in adopting the Third Supplemental Indentures, this Court would still conclude that the bankruptcy court's recommended remedy for any such breach was inappropriate. Instead, the proper remedy for any such breach would simply be to allow the 2026 Noteholders to seek monetary damages from Wesco, which was the breaching party.

Under both New York and Texas law, as under the common law generally, it is well established that the ordinary remedy for a breach of contract is monetary damages for the breach. *See, e.g.*, *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam); *Buckley & Co v. City of New York*, 121 A.D.2d 933, 936 (N.Y. App. Div. 1986); *see also United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion); Restatement (Second) of Contracts §346 & cmt.a (Oct. 2024); 24 Williston on Contracts §64:1 (4th ed. 2025).[7] And under both New York and Texas law, as under the common law generally, equitable remedies for a breach of contract are only available if the plaintiff makes an additional showing that the standard remedy of monetary damages is inadequate. *See, e.g.*, *Credit Suisse AG v. Claymore Holdings, LLC*, 610 S.W.3d 808, 819 (Tex. 2020) (applying New York law); *Orix Cap. Mkts., LLC v. La Villita Motor Inns, J.V.*, 329 S.W.3d 30, 45 (Tex. App. 2010); *Burke v. Bowen*, 353 N.E.2d 567, 569 (N.Y. 1976); *see also* 25 Williston on Contracts §67:8.

---

Wesco did not breach the 2024 Indenture by entering into the 2022 Transactions, for all of the reasons given above (which apply with equal force to the 2024 Indenture) and because in any event Wesco had two-thirds supermajority consent from the 2024 Notes for all of the 2022 Transactions.

[7] Because the relevant principles of New York law (the law governing the 2026 Indenture) and Texas law (the law of the forum here) do not meaningfully differ, this Court need not decide which state's law controls. *See, e.g.*, *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704 (5th Cir. 2023).

Bankruptcy does not alter those basic principles of contract law, and does not afford plaintiffs who sue bankrupt defendants additional remedies that would otherwise be unavailable. *Cf. Butner v. United States*, 440 U.S. 48, 55 (1979).  In other words, the fact that the breaching party's bankruptcy and applicable bankruptcy-law principles may mean that judgment creditors will not be able to recover the full amount of their damages award does not render damages an inadequate remedy.  *See, e.g.*, *Dresser-Rand Co. v. Virtual Automation Inc.,* 361 F.3d 831, 848-49 (5th Cir. 2004); *see also In re First Cent. Fin. Corp.*, 377 F.3d 209, 216 (2d Cir. 2004).  On the contrary, if insolvency were always sufficient to make an award of damages against a defendant legally inadequate, then any plaintiff with a breach-of-contract claim against a bankrupt defendant would always be able to seek specific performance or other equitable remedies as a matter of course.  That plainly is not the law.  *See First Cent.*, 377 F.3d at 216; *Dresser-Rand*, 361 F.3d at 848-49; *In re Robertshaw US Holding Corp.*, 2024 WL 4369717, at *1-2 (S.D. Tex. Oct. 1, 2024); *In re Robertshaw US Holding Corp.*, 662 B.R. 146, 161-62 (Bankr. S.D. Tex. 2024); *In re Provider Meds, LP*, 2014 WL 4162870, at *12 (Bankr. N.D. Tex. Aug. 20, 2014).

Rather than recommending that this Court hold Wesco liable for damages, the bankruptcy court recommended that this Court declare that "the rights, liens, and interests that were for the benefit of [the 2026 Noteholders] … remained in full force and effect" without regard to the 2022 Transactions.  ECF 3 at 36.  That is, rather than recommending that this Court hold Wesco liable for any damages caused by its purported breach of the 2026 Indenture, the bankruptcy court instead recommended that this Court should partially unwind the 2022 Transactions—including multiple agreements that Wesco did *not* breach—by "negat[ing] the effectiveness against the 2026 Noteholders" of the 2022 Transactions, and thereby reinstating the liens securing the 2026 Notes (which were released by the Fourth Supplemental Indenture).  *Id.* at 35.

Even if Wesco had breached its obligations under the 2026 Indenture, the remedy that the bankruptcy court recommended would be inappropriate. As noted above, the traditional remedy for a breach of contract is an award of damages against the breaching party, and the fact that Wesco is bankrupt does not make that award legally inadequate here. The proper remedy for any breach here would accordingly be a damages award against Wesco. But even if equitable relief were available here (which it is not), this Court finds as a matter of equitable discretion that the remedy that the bankruptcy court recommended is not proper equitable relief under the circumstances of this case.[8]

The remedy that the bankruptcy court recommended would not rescind or reform the purportedly breached 2026 Indenture at all. Instead, that remedy would target an entirely different set of contracts (the 2022 Transactions) among different parties, partially negating a series of agreements that were never themselves breached. The bankruptcy court cited no authority, and this Court is aware of none, that would justify remedying a purported breach of one contract (the 2026 Indenture) by partially unwinding a completely different set of contracts among different parties (the 2022 Transactions). Still worse, adopting that proposed remedy would cost Wesco (the purported breaching party) nothing, but would cost the First Lien Noteholders (who committed no breach) the entire benefit of the bargain for which they paid $250 million, stripping them of their exclusive first-lien status and depriving them of any security interest at all for their $250 million in rescue financing. Especially under the circumstances of this case, where the parties entered into the 2022 Transactions believing that they would not breach Wesco's obligations under

---

[8] The bankruptcy court suggested that its recommended remedy was legal rather than equitable. Adv.Dkt.1447 at 7, 19, 21. A remedy that would void (in part) a prior transaction, however, is properly understood as equitable. *See, e.g.*, *Reg'l Props., Inc. v. Fin. & Real Est. Consulting Co.*, 678 F.2d 552, 562 (5th Cir. 1982) (recognizing that "historically, a suit to void a contract sounded in equity").

its indentures and where the 2022 Transactions provided Wesco with $250 million in much-needed rescue financing, extended the maturities on its debt, and substantially decreased its cash-interest payments, *see supra* pp.4-9, penalizing the non-breaching First Lien Noteholders for any purported breach by Wesco in entering into the 2022 Transactions would be plainly inequitable.[9]

The 2026 Noteholders attempt to justify the bankruptcy court's proposed remedy by relying on the Declaratory Judgment Act, but that statute cannot provide the necessary support. The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201. The statute "is procedural only," *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); it creates an exception to the "traditional and conventional" rule that courts "may act only when a complainant is entitled to a coercive remedy, such as a judgment for damages or an injunction," but it does not afford courts the power to remedy a past breach or alter existing legal rights. Wright & Miller, *Federal Practice & Procedure* §2751 (4th ed. 2025); *see, e.g.*, *Evanston Ins. Co. v. Byassee*, 2025 WL 951945, at *3 (W.D. Ky. Mar. 28, 2025) ("A declaration merely states the legal rights and obligations of parties; it doesn't alter those rights."); *Allied World Surplus Lines Ins. Co. v. Elamex USA Corp.*, 2024 WL 2212948, at *7 (S.D.N.Y. May 16, 2024) (similar). The Declaratory Judgment Act accordingly cannot authorize a *substantive* remedy that would not merely declare the existing "rights and other legal relations" of the parties, 28 U.S.C. §2201, but would affirmatively alter those rights by stripping

---

[9] The bankruptcy court's proposed remedy is also contrary to the Bankruptcy Code, which requires that claims should be resolved in the bankruptcy process, *see* 11 U.S.C. §§101(5)(B), 502(c)(2); *Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 36 (1st Cir. 2009), and with the bankruptcy court's prior ruling that the 2026 Noteholders were not entitled to seek an equitable lien or equitable subordination, *see* Adv.Dkt.508 at 14-16.

the (non-breaching) First Lien Noteholders of their exclusive first-lien status and even the *pari passu* secured status of their additional 2026 Notes.

The 2026 Noteholders also cite §6.09 of the 2026 Indenture, but they never raised that provision in the bankruptcy court, making their reliance on it here forfeited. *See Finley v. Johnson*, 243 F.3d 215, 219 n.3 (5th Cir. 2001) ("[I]ssues raised for the first time in objections to the report of a magistrate judge are not properly before the district judge."); *Lone Star State Bank of W. Tex. v. Rabo Agrifinance, LLC*, 644 B.R. 505, 511 (N.D. Tex. 2022) (district court reviews bankruptcy court report and recommendation "as it would … recommendations of a magistrate judge").  In any event, §6.09 simply ensures that a proceeding to enforce the 2026 Indenture will not alter the parties' rights unless and until that proceeding results in a determination altering those rights; it does not afford this Court unlimited equitable authority to take whatever steps it deems necessary to undo a purported breach of the 2026 Indenture.  *Contra* ECF 50 at 26.[10]

Remarkably, the 2026 Noteholders assert for the first time in this Court that the bankruptcy court's remedy did not go far *enough*, and that this Court should *also* invalidate the First Lien Noteholders' exchange of their 2024 Notes for new 1L Notes and strip those 1L Notes of their perfected security interests.  That argument is not only forfeited by the 2026 Noteholders' failure to raise it in the bankruptcy court, *see Finley*, 243 F.3d at 219 n.3; *Lone Star*, 644 B.R. at 511, but is also wrong at every turn.  As already explained, Wesco did not breach the 2026 Indenture (let alone the 2024 Indenture) by entering into the 2022 Transactions, and even if it had, the proper

---

[10] The Court notes that §6.09 follows the American Bar Foundation's model indenture provisions, but contains a scrivener's error that accidentally replaced "discontinued" with "determined" from the following clause.  *Compare* Am. Bar Found., *Model Debenture Indenture Provisions* §509 (1967) ("has been *discontinued* or abandoned for any reason, or has been *determined* adversely" (emphasis added)), *with* Adv.Dkt.601-8 at 118 ("has been *determined* or abandoned for any reason, or has been *determined* adversely" (emphasis added)); *see also* Adv.Dkt.601-24 at 18 (tracking the model indenture language).

remedy for any such breach would be damages against Wesco, not a partial unwinding of the 2022 Transactions to the detriment of the First Lien Noteholders. *A fortiori*, it would be beyond inappropriate to partially unwind the 2022 Transactions even further than the bankruptcy court recommended by invalidating the First Lien Noteholders' exchange of their 2024 Notes for 1L Notes or the secured status of those 1L Notes, which would leave the 2026 Noteholders even better off than if the 2022 Transactions had never happened at all.

Finally, this Court also disagrees with the bankruptcy court's recommendation that this Court should deprive the First Lien Noteholders of the *pari passu* status of the additional 2026 Notes that they acquired in exchange for their $250 million in new investment. Again, Wesco did not breach the 2026 Indenture (or any of its other indentures) by issuing those additional 2026 Notes. *See supra* pp.18-22. Even if Wesco had breached the 2026 Indenture, the proper remedy would be damages against Wesco. *See supra* pp.33-35. And even if this Court were free to adopt an equitable remedy here, the Court finds that it would be clearly inappropriate as a matter of equitable discretion to deny even *pari passu* secured status to the additional 2026 Notes that Wesco issued to the First Lien Noteholders in exchange for $250 million in new investment—a transaction that did not affect the collateral securing the 2026 Notes in any way, and so standing alone could not possibly have required supermajority consent.

## CONCLUSION

For the reasons explained above, the Court SUSTAINS the First Lien Noteholders' objection to the January 17 R&R, OVERRULES the 2026 Noteholders' objection, DECLARES that the 2022 Transactions did not breach Wesco's obligations under its indentures, and DISMISSES the 2024/2026 Noteholders' breach-of-contract claims.

SO ORDERED _____, at McAllen, Texas.


_____
Randy Crane
Chief United States District Judge