**<u>Exhibit A</u>**

**Itemized Objections to Majority Group's Breach of Contract Proposed Order**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WESCO AIRCRAFT HOLDINGS, INC., et al., | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 4:25-CV-202 |
| VS. | § | |
| | § | |
| SSD INVESTMENTS LTD, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**[REVISED] [PROPOSED] MEMORANDUM ORDER REGARDING THE 2024/2026 NOTEHOLDERS' BREACH-OF-CONTRACT CLAIMS**

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

This case arises from the bankruptcy of Wesco Aircraft Holdings, Inc. ("Wesco"), the largest independent distribution and supply-chain services provider in the civilian and military aerospace industry. On the same day that it filed its bankruptcy petition, Wesco initiated an adversary proceeding asking the bankruptcy court to decide whether Wesco breached its 2024 and 2026 Indentures by entering into a disputed liability management exercise series of transactions on March 28, 2022 (the "2022 Transactions") that provided Wesco $250 million in new investment in an effort to resolve its urgent liquidity problems.[1] The 2024/2026 Noteholders filed counterclaims seeking, among other things, a declaration that Wesco had breached the 2024 and 2026 Indentures. On January 17, 2025, the bankruptcy court issued a report and recommendation (the "January 17 R&R"), recommending that this Court conclude that the 2022 Transactions complied with the 2024 Indenture but breached the 2026 Indenture, and that as a remedy this Court should "[e]nter a declaration finding that the rights, liens, and interests that were for the benefit of all of the holders of 2026 Notes as they existed on March 27, 2022, remained in full force and effect on March 29, 2022." ECF 3 at 36.

---

[1] Unless otherwise defined, capitalized terms in this memorandum order have the same meaning as in the bankruptcy court's January 17 R&R. *See* ECF 3.

**Objection 1:**

The January 17 R&R found that the uptier was "a financing transaction with a select group of its noteholders" (the "2022 Transaction"). ECF 3 at 1. The characterization of the uptier as a "series of transactions" is not supported by any citation to the record, nor was this quoted finding in the January 17 R&R objected to by the First Lien Noteholders, as required under 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033(b)(1), and as further discussed in the Supplemental Response to which these Breach Order Itemized Objections are attached ("Supplemental Response"). Moreover, characterizing the 2022 Transaction as a "series of transactions" would be error as shown by the evidence below, and thus the defined term has been changed throughout.

Both sides of the 2022 Transaction admitted that it was a single transaction. Specifically, PIMCO's and Silver Point's designated corporate representative testified at trial that the uptier was, in fact, "***a single unified transaction***," Adv.Dkt.939 at 179:5-22 (emphasis added), while Wesco's Chief Financial Officer (CFO), who was authorized by the board to carry out the 2022 Transaction and was its signatory for Wesco, admitted that this was a "***singular*** transaction" that was "negotiated in its totality as ***a*** transaction." Adv.Dkt.694 at 48:3-10, 69:6-14, 116:24-117:8 (emphasis added). *See also* Adv.Dkt.536-24 at 1-2 (board minutes referring to the "Proposed Transaction"—singular).

*Note*: The text of the Majority Group's proposed order is in orange, with revisions to correct factual errors and inconsistencies in redline. All yellow highlighting in excerpts have been added.

---

Adv.Dkt.939 (Shah, Feb. 27, 2024 Tr.) at 179:5-22:

```
  5        Q     Okay.  So you don't believe that one of your clients'
  6        motivations was that new 1Ls would be more valuable than
  7        unsecured excluded bonds.  Do I have that right?
...
 20              THE WITNESS:  Again, I don't know that I can pin it
 21        on a single motivation, the exchange and the new money were
 22        all part of a single unified transaction, so I don't --
```

---

[*Remainder of Page Left Intentionally Blank*]

2

Adv.Dkt.694 (Carney, Jan. 31, 2024 Tr.) at 48:3-10:

```
3          Q    Okay.  So first of all, your understanding based on what
4     was reported to you, I take it, at that board meeting that
5     there was a singular transaction that was being discussed,
6     correct?
7          A    A transaction, yes.
8          Q    Okay.  And it's defined as the proposed transaction,
9     singular, correct, in the board minutes?
10         A    Yes.
```

Adv.Dkt.694 (Carney, Jan. 31, 2024 Tr.) at 69:6-14:

```
6          Q    And it says, under the executive summary portion, first
7     of all, transaction is the result.  Do you see that?
8          A    Yes, correct.
9          Q    And again, it says "transaction," singular.  Do you agree
10    with me on that?
11         A    Yes.
12         Q    And it says "is," which connotes singular, correct?  In
13    other words, it doesn't say "are," right?
14         A    Right.
```

[*Remainder of Page Left Intentionally Blank*]

3

> Adv.Dkt.694 (Carney, Jan. 31, 2024 Tr.) at 116:24-117:8:
>
> | 24 | Q    Okay.  You can put that to the side.  Mr. Carney, from |
> |---|---|
> | 25 | your perspective as the company's CFO, and I'm going back now |
> | 1 | to the 2022 transaction, the company viewed that transaction |
> | 2 | as a singular transaction that was negotiated in its totality, |
> | 3 | correct? |
> | 4 | A    Yes, we viewed it as a transaction that was -- all the |
> | 5 | parts were negotiated, yes. |
> | 6 | Q    So it was negotiated in its totality as a transaction, |
> | 7 | correct? |
> | 8 | A    Yes. |

---

> Adv.Dkt.536-24 at 1-2 (board minutes referring to singular "Proposed Transaction"):
>
> Mr. Dunne commenced the meeting by introducing the participants and summarizing the status of preparations for a financing and exchange transaction with secured and unsecured noteholders (the "Proposed Transaction").
>
> …
>
> Upon Mr. Holland's motion, the Board proceeded to vote on whether to approve the Proposed Transaction (other than the components of the Proposed Transaction involving debt held by affiliates of Platinum Equity), including, as to the Company, (i) entry into supplemental indentures with respect to the 13.750% Senior PIK Notes due 2028 issued by the Company and (ii) authorization of Raymond Carney to execute and deliver on behalf of the Company any and all applications, contracts, documents, agreements and instruments as he may deem necessary or advisable in relation to the Proposed Transaction. All six directors voted in favor.

Additionally, Wesco's CFO testified that he "understood" before executing the 2022 Transaction documents that the "[$]250 million" in "new money was to be first lien, super-senior debt," thus decidedly not additional *pari passu* 2026 Notes.  Adv.Dkt.694 at 71:18-72:3.  He also testified that "prior to the closing," he had signed "both the third supplemental indenture and the fourth [supplemental] indenture," Adv.Dkt.694 at 58:4-11, and that he signed instructions to both "order and cancel" the new notes before closing the 2022 Transaction, Adv.Dkt.694 at 56:1-4.

Adv.Dkt.694 (Carney, Jan. 31, 2024 Tr.) at 71:18-72:3:

| | |
|---|---|
| 18 | Q    So your understanding was that the majority secured group |
| 19 | required that its new money be in a super-senior position |
| 20 | above existing liens, correct? |
| 21 | A    Yes, that's what I understood. |
| 22 | Q    And that is the 250 million of new money that you talked |
| 23 | about during your direct, correct? |
| 24 | A    Correct. |
| 25 | Q    And just so we're crystal-clear, on March 24th, you |
| 1 | understood that that new money was to be first lien, super- |
| 2 | senior debt, correct? |
| 3 | A    Correct. |

Adv.Dkt.694 (Carney, Jan. 31, 2024 Tr.) at 58:4-11:

| | |
|---|---|
| 4 | Q    Do you doubt, though, that they were both signed prior to |
| 5 | March 28th, 2022? |
| 6 | A    No. |
| 7 | Q    Okay.  So your understanding, if I have this, on behalf |
| 8 | of Wesco, is that both the third supplemental indenture and |
| 9 | the fourth supplement -- supplemental indenture were executed |
| 10 | prior to the closing.  Fair? |
| 11 | A    Because the -- because the signatures were affixed. |

Adv.Dkt.694 (Carney, Jan. 31, 2024 Tr.) at 56:1-4:

| | |
|---|---|
| 1 | Q    Okay.  So, to your knowledge, your signature was affixed |
| 2 | to order and cancel the notes on or before March 23rd, 2022, |
| 3 | correct? |
| 4 | A    Yes. |

***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

The parties that provided Wesco with $250 million in new investment ~~in the 2022 Transactions~~ (the "First Lien Noteholders") filed an objection to the January 17 R&R, ECF 32, which Wesco joined, ECF 33. Platinum, Wesco's equity sponsor, also filed an objection to the January 17 R&R, ECF 34. The 2026 Noteholders also filed a limited objection, which asserted alternative grounds for finding a breach of the 2026 Indenture and sought to preserve objections to various interlocutory rulings by the bankruptcy court. ECF 35.

The Court has considered those objections, as well as the responses and replies thereto, *see* ECF 49, 50, 51, 52, 74, 75, 76, and has conducted a *de novo* review of the extensive record and the issues raised in the parties' objections. *See* 28 U.S.C. §157(c)(1). For the reasons that follow, the Court SUSTAINS the First Lien Noteholders' objection, OVERRULES the 2026 Noteholders' objection~~s~~, DECLARES that the 2022 Transaction~~s~~ did not breach Wesco's obligations under its indentures, and DISMISSES the 2026 Noteholders' breach-of-contract claims.

**Objection 2:**

The First Lien Noteholders made specific objections only to two conclusions of law in the January 17 R&R—namely, that (i) the Bankruptcy Judge erred in his interpretation of the legal effect of his factual findings when concluding that the Third Supplemental Indenture violated the 2026 Indenture, and that (ii) damages was the proper remedy for any such breach under applicable contract law (*see* ECF 32 at 17-18, 27-28)—consistent with the Federal Rule of Bankruptcy Procedure 9033's requirement that an objecting party "must identify each proposed finding or conclusion objected to and state the grounds for objecting." *See also* 28 U.S.C. § 157(c)(1); *see also* Supplemental Response. The 2026 Noteholders by contrast made specific objections to conclusions of law and findings of fact. *See also* Objection 1.

***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

**FINDINGS OF FACT**

**A.     Wesco's Indentures.**

In early 2020, Wesco acquired Pattonair, Ltd, a leading aerospace services provider based in the United Kingdom. To finance that transaction, Wesco raised over $2 billion by selling bonds through three indenture agreements: one governing $650 million in senior secured bonds maturing in 2024 and paying 8.5% (the "2024 Notes"); one governing $900 million in senior secured bonds maturing in 2026 and paying 9% (the "2026 Notes"); and one governing $525 million in unsecured bonds maturing in 2027 and paying 13.125% (the "2027 Notes"). *See* Adv.Dkt.601-20 (2024 Indenture); Adv.Dkt.601-8 (2026 Indenture); Adv.Dkt.601-7 (2027

Indenture).[2]   "On January 9, 2020, Wesco entered into the Notes Security Agreement to provide liens on certain Wesco assets to the holders of the 2024 Notes and 2026 Notes."  ECF 3 at 2 (citing Adv.Dkt.601-24 at 5-6).

**Objection 3:**

The Proposed Order failed to include the Bankruptcy Court's unobjected to finding in the January 17 R&R concerning the Notes Security Agreement, which has been added.

***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

Section 2.01(e) of each indenture ~~explicitly~~ allowed Wesco to issue additional secured notes without consent from the existing bondholders~~.~~ ~~Adv.Dkt.601-7 at 44-45; Adv.Dkt.601-8 at 54; Adv.Dkt.601-20 at 48.  But because Wesco's ability to issue new secured notes was~~ "subject to the Issuer's compliance with Sections 4.09 and 4.12 [t]hereof." ~~with the debt and lien baskets,~~ Adv.Dkt.601-8 at 54; *accord* Adv.Dkt.601-20 at 48; Adv.Dkt.601-7 at 45.  Section 4.12 provides that "The Issuer will not, and will not permit any Subsidiary Guarantor, if any, to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind (other than Permitted Liens)."  Adv.Dkt.601-8 at 100.  I~~, i~~ssuing additional secured notes in excess of those limitations required amending the indentures under §9.02, which provided, as relevant here:

**Objection 4:**

The Proposed Order omits text from its quotation of the 2026 Indenture, which has been added.  By omitting this text, the Proposed Order mischaracterizes Wesco's right to issue Additional Secured Notes, because it excludes the express qualification under the 2026 Indenture that "[Wesco's] ability to issue Additional Secured Notes shall be subject to [Wesco's] compliance with Section [] 4.12 hereof."  Adv.Dkt.601-8 at 54 (2026 Indenture).

Adv.Dkt.601-8 at 54 (2026 Indenture):

Section 2.01      *Form and Dating.*

…

(e)      *Issuance of Additional Secured Notes.*  Additional Secured Notes ranking *pari passu* with the Initial Secured Notes may be issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Initial Secured Notes (other than the issue date, the issue price, the first Interest Payment Date and the initial interest accrual date) and shall have the same terms as to status, redemption or otherwise as the Initial Secured Notes; *provided* that in order for any Additional Secured Notes to have the same CUSIP number as the Initial Secured Notes, such Additional Secured Notes must be fungible with the Initial Secured Notes for U.S. federal income tax purposes; *provided, further,* that the Issuer's ability to issue Additional Secured Notes shall be subject to the Issuer's compliance with Sections 4.09 and 4.12 hereof.

---

[2] References to "Adv.Dkt." correspond to docket entries filed in the adversary proceeding, No. 4:23-ap-3091 (Bankr. S.D. Tex.).  References to "Bankr.Dkt." correspond to docket entries filed in the related bankruptcy proceeding, 4:23-bk-90611 (Bankr. S.D. Tex.).  This order refers to specific pages in cited docket entries by using native pagination where available (and, where unavailable, by~~-~~ using the pagination generated by the automatic ECF header).

Similarly, the Proposed Order omits the limitation imposed by Section 4.12 that "The Issuer will not . . . directly or indirectly, create, incur, assume or suffer to exist [*i.e.*, allow] any Lien of any kind (other than Permitted Liens), securing Indebtedness of the Issuer . . . ." Adv.Dkt.610-8 at 100-101. The Bankruptcy Court did not reach the argument raised by the 2026 Noteholders in the Bankruptcy Court that Wesco's issuance of Additional Secured Notes breached Sections 2.01(e) and 4.12(a) because they "***directly or indirectly***" created, incurred, assumed or allowed any unpermitted Liens—*e.g.*, liens securing the new super senior secured notes. The 2026 Noteholders limited objection to the January 17 R&R included that argument. *See* ECF 35 at 18-19; *see also* ECF 76 at 6-7.

---

**Adv.Dkt.610-8 at 100-101 (2026 Indenture):**

Section 4.12    *Liens.*

(a)    The Issuer will not, and will not permit any Subsidiary Guarantor, if any, to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind (other than Permitted Liens), securing Indebtedness of the Issuer or such Subsidiary Guarantor, if any, on any property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom. If the Issuer or any Subsidiary Guarantor creates any Lien upon any property or assets that are not at such time Collateral in order to secure any Priority Lien Obligations or Parity Lien Indebtedness (other than customary liens on cash collateral in connection with the New ABL Credit Agreement and other revolving credit facilities and other than Excluded Foreign Collateral securing Priority Lien Obligations), it must concurrently grant a first-priority Lien upon such property or assets that would constitute Fixed Asset Collateral or a second-priority Lien upon such property or assets that would constitute Current Asset Collateral, in each case as security for the 2026 Secured Notes or the 2026 Secured Note Guarantees, such that the property or assets subject to such Lien will constitute Collateral under this Indenture and the Security Documents, subject, in each case, to local law limitations and Permitted Liens.

(b)    Any Lien created for the benefit of the Holders of the 2026 Secured Notes pursuant to this Section 4.12 shall be deemed automatically and unconditionally released and discharged upon (i) the release of the Lien that gave rise to the obligation to secure the 2026 Secured Notes, (ii) in the case of any such Lien in favor of any 2026 Secured Note Guarantee, the termination and discharge of such 2026 Secured Note Guarantee in accordance with the terms of this Indenture or (iii) any sale, exchange or transfer (other than a transfer constituting a transfer of all or substantially all of the assets of the Issuer that is governed by Section 5.01 hereof) to any Person not an Affiliate of the Issuer of the property or assets secured by such Lien, or of all of the Capital Stock held by the Issuer or any of its Restricted Subsidiaries in, or all or substantially all the assets of, any Restricted Subsidiary creating such Lien.

(c)    For purposes of determining compliance with this Section 4.12, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of Permitted Liens described in the definition of "Permitted Liens" or pursuant to Section 4.12(a) hereof but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens described in the definition of "Permitted Liens" or pursuant to Section 4.12(a) hereof, the Issuer shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such Lien securing each item of Indebtedness (or any portion thereof) in any manner that complies with this Section 4.12 and will only be required to include the amount and type of such Lien or such item of Indebtedness secured by such Lien in one of the clauses of the definition of "Permitted Liens" and such Lien securing such item of Indebtedness will be treated as being incurred or existing pursuant to only one of such clauses or pursuant to Section 4.12(a) hereof.

(d)    With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence thereof, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

Except as provided below … the Issuer … may amend or supplement this Indenture … with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding 2026 Secured Notes other than the 2026 Secured Notes beneficially owned by the Issuer or its Affiliates … voting as a single class;[.]

[W]ithout the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1) have the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents (except as permitted by the terms of this Indenture, the Security Documents or the Intercreditor Agreements) or changing or altering the priority of the security interests of the Holders of the 2026 Secured Notes in the Collateral . . . or (3) modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse to the Holders of . . . Secured Notes in any material respect other than in accordance with the terms if this Indenture, the Security Documents or the Intercreditor Agreements.

Adv.Dkt.601-8 at 130-131; *accord* Adv.Dkt.601-20 at 122-23; Adv.Dkt.601-7 at 110. ~~The indentures provided that additional secured notes "shall be consolidated with and form a single class with the Initial Secured Notes," Adv.Dkt.601-8 at 54;~~ *accord* ~~Adv.Dkt.601-20 at 48; Adv.Dkt.601-7 at 44, and shall count towards relevant voting thresholds, Adv.Dkt.601-7 at 44; Adv.Dkt.601-8 at 54; Adv.Dkt.601-20 at 48.~~

**Objection 5:**

The Proposed Order's block quote omits text from the 2026 Indenture, which has been added. By omitting this text, the Proposed Order mischaracterizes a legal conclusion about which consent threshold in Section 9.02 (majority, supermajority, or unanimity) applies to a particular amendment as a purported and improper factual conclusion.

---

Adv.Dkt.601-8 at 131 (2026 Indenture):

Section 9.02     *With Consent of Holder of 2026 Secured Notes.*

…

        In addition, without the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1) have the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents (except as permitted by the terms of this Indenture, the Security Documents or the Intercreditor Agreements) or changing or altering the priority of the security interests of the Holders of the 2026 Secured Notes in the Collateral under the ABL Intercreditor Agreement or the Pari Passu Intercreditor Agreement, (2) make any change in the Security Documents, the Intercreditor Agreements or the provisions in this Indenture dealing with the application of proceeds of the Collateral that would adversely affect the Holders of the 2026 Secured Notes or (3) modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse to the Holders of the 2026 Secured Notes in any material respect other than in accordance with the terms of this Indenture, the Security Documents or the Intercreditor Agreements.

---

The Proposed Order also includes purported factual findings that the Bankruptcy Court did not make, which have been stricken. These statements are selective excerpts and quotations from provisions of the 2026 Indenture addressing Additional Secured Notes. If the Court were to include these findings, they should be modified for completeness and accuracy. Specifically, while the 2026 Indenture states that Additional Secured Notes "shall be consolidated with and form a single class with the Initial Secured Notes" for voting, Adv.Dkt.601-8 at 54 (Section 2.01(e)); *accord* Adv.Dkt.601-20 at 53; Adv.Dkt.601-7 at 44, the 2026 Indenture also further provides that "Sections 2.08 and 2.09 hereof shall determine which 2026 Secured Notes are considered to be 'outstanding' for purposes of" voting. Adv.Dkt.601-8 at 130 (Section 9.02). Section 2.08 in turn specifies that the notes "outstanding at any time are all the 2026 Secured Notes authenticated by the Trustee." Adv.Dkt.601-8 at 63 (Section 2.08). And Section 2.02 explains authentication: "A 2026 Secured Note will not be valid until authenticated by the manual signature of an authorized signatory of the Trustee. The signature will be conclusive evidence that the [note] has been duly authenticated and delivered under this Indenture." Adv.Dkt.601-8 at 54 (Section 2.02).

---

Adv.Dkt.601-8 at 54 (2026 Indenture, Section 2.01(e)):

ARTICLE 2
THE NOTES

Section 2.01       *Form and Dating.*

…

(e)       *Issuance of Additional Secured Notes.* Additional Secured Notes ranking *pari passu* with the Initial Secured Notes may be issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Initial Secured Notes (other than the issue date, the issue price, the first Interest Payment Date and the initial interest accrual date) and shall have the same terms as to status, redemption or otherwise as the Initial Secured Notes; *provided* that in order for any Additional Secured Notes to have the same CUSIP number as the Initial Secured Notes, such Additional Secured Notes must be fungible with the Initial Secured Notes for U.S. federal income tax purposes; *provided, further,* that the Issuer's ability to issue Additional Secured Notes shall be subject to the Issuer's compliance with Sections 4.09 and 4.12 hereof.

---

Adv.Dkt.601-8 at 130 (2026 Indenture, Section 9.02):

Section 9.02       *With Consent of Holder of 2026 Secured Notes.*

…

Notes). Sections 2.08 and 2.09 hereof shall determine which 2026 Secured Notes are considered to be "outstanding" for purposes of this Section 9.02.

…

---

---

Adv.Dkt.601-8 at 63 (2026 Indenture, Section 2.08):

ARTICLE 2
THE NOTES

…

Section 2.08　　*Outstanding Notes.*

　　The 2026 Secured Notes outstanding at any time are ==all the 2026 Secured Notes authenticated by the Trustee== except those canceled by it, those delivered to the Issuer for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09 hereof, a 2026 Secured Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the 2026 Secured Note.

…

---

Adv.Dkt.601-8 at 54 (2026 Indenture, Section 2.02):

ARTICLE 2
THE NOTES

…

Section 2.02　　*Execution and Authentication.*

　　At least one Officer must sign the 2026 Secured Notes for the Issuer by manual or facsimile signature.

　　If an Officer whose signature is on a 2026 Secured Note no longer holds that office at the time a 2026 Secured Note is authenticated, the 2026 Secured Note will nevertheless be valid.

　　==A 2026 Secured Note will not be valid until authenticated by the manual signature of an authorized signatory of the Trustee.==  The signature will be conclusive evidence that the 2026 Secured Note has been duly authenticated and delivered under this Indenture.

　　The Trustee will, upon receipt of a written order of the Issuer signed by an Officer of the Issuer (an "*Authentication Order*"), together with the other documents required under Sections 13.02 and 13.03 hereof, if any, authenticate (i) 2026 Secured Notes for original issue, of which $900,000,000 in aggregate principal amount will be issued on the Issue Date and (ii) any Additional Secured Notes.  The aggregate principal amount of 2026 Secured Notes outstanding at any time may not exceed the aggregate principal amount of 2026 Secured Notes authorized for issuance by the Issuer pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof.

…

---

　　These provisions should not be selectively quoted in the Proposed Order because the full text is material to alternate grounds for affirming the January 17 R&R.  The Bankruptcy Court did not reach the argument, raised by the 2026 Noteholders, that the Fourth Supplemental Indenture lacked two-thirds supermajority consent because the additional 2026 Notes that were counted towards that vote were invalid under these provisions.  The undisputed trial record reflects, among other things, that:

- 35 of 38 so-called Additional Secured Notes purportedly issued in the 2022 Transaction and that voted for the Fourth Supplemental Indenture had photocopies of otherwise blank signature pages from the Trustee—*i.e.*, facsimile signatures—claiming to have authenticated such notes, Adv.Dkt.1184 at 170:7-11; Adv.Dkt.1350 at 289:17-20;

> *Compare* Adv.Dkt.1155-2 (additional 2026 Notes) at 8 (photocopied signature in black) *with* 68 (wet-ink signature in blue on another note):
>
> 

- all of those pages, both the originals and the photocopies, were sent to Wesco's counsel un-appended to any notes at least a week *before* closing, and thus before the Third Supplemental Indenture had been approved or the notes compiled, Adv.Dkt.1350 at 72:24-74:17, 284:20-285:6; *see* Adv.Dkt.1298-4 at 1, 4;

- Wesco admitted at trial to knowing that authentication by the Trustee with "wet ink" signatures was required for each note, Adv.Dkt.1184 at 168:3-170:11; and

- the Trustee never saw the purported physical notes, Adv.Dkt.1350 at 285:7-9, 285:20-24, 287:17-18, 288:15-18; and in fact those notes were *destroyed* prior to trial, Adv.Dkt.664 at 104:15-25; and the Trustee did not know until trial that 35 of the 38 purported Additional Secured Notes lacked a wet-ink signature, Adv.Dkt.1350 at 289:17-290:10.

The 2026 Noteholders' limited objection to the January 17 R&R included this argument that was raised before, but not ruled upon by, the Bankruptcy Court. *See* ECF 35 at 22-25; *see also* ECF 76 at 10-13.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~Both the 2024 and 2026 Indentures also required two-thirds of the existing bondholders in each issuance to agree before Wesco could release the liens on the collateral:~~

~~[W]ithout the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1) have the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents (except as permitted by the terms of this Indenture, the Security Documents or the Intercreditor Agreements) or~~

~~changing or altering the priority of the security interests of the Holders of the 2026 Secured Notes in the Collateral[.]~~

~~Adv.Dkt.601-8 at 131; *accord* Adv.Dkt.601-20 at 124.~~

**Objection 6:**

The Proposed Order mischaracterizes the text of the 2026 Indenture as saying that a supermajority was required "before Wesco could release the liens." It does not. Subsection (1) of the supermajority clause of the 2026 Indenture's Section 9.02 states that a two-thirds supermajority is required for any amendment that would "*have the effect of releasing* all or substantially all" of the liens. The full text of the supermajority consent provision is also added above at Objection 5.

---

**Adv.Dkt.601-8 at 131 (2026 Indenture):**

Section 9.02     *With Consent of Holder of 2026 Secured Notes.*

…

In addition, without the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1) have the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents (except as permitted by the terms of this Indenture, the Security Documents or the Intercreditor Agreements) or changing or altering the priority of the security interests of the Holders of the 2026 Secured Notes in the Collateral under the ABL Intercreditor Agreement or the Pari Passu Intercreditor Agreement, (2) make any change in the Security Documents, the Intercreditor Agreements or the provisions in this Indenture dealing with the application of proceeds of the Collateral that would adversely affect the Holders of the 2026 Secured Notes or (3) modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse to the Holders of the 2026 Secured Notes in any material respect other than in accordance with the terms of this Indenture, the Security Documents or the Intercreditor Agreements.

---

Additionally, the complete text of the supermajority consent provision includes subsection (3), which the Proposed Order omits and which requires two-thirds consent for any amendment that would "modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse to the Holders of . . . Secured Notes in any material respect other than in accordance with the terms if this Indenture, the Security Documents or the Intercreditor Agreements." *See* Objections 5, 37.

---

**Adv.Dkt.601-8 at 131 (2026 Indenture):**

Section 9.02     *With Consent of Holder of 2026 Secured Notes.*

…

In addition, without the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1) have the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents (except as permitted by the terms of this Indenture, the Security Documents or the Intercreditor Agreements) or changing or altering the priority of the security interests of the Holders of the 2026 Secured Notes in the Collateral under the ABL Intercreditor Agreement or the Pari Passu Intercreditor Agreement, (2) make any change in the Security Documents, the Intercreditor Agreements or the provisions in this Indenture dealing with the application of proceeds of the Collateral that would adversely affect the Holders of the 2026 Secured Notes or (3) modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse to the Holders of the 2026 Secured Notes in any material respect other than in accordance with the terms of this Indenture, the Security Documents or the Intercreditor Agreements.

---

This provision is the factual basis of an alternative ground for affirmance of the January 17 R&R, which the Bankruptcy Court did not reach, *see* ECF 35 at 20-22, and which the 2026 Noteholders explained further in their limited objection and reply, ECF 35 at 19-20, ECF 76 at 8-10.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

These provisions were drafted and agreed to by sophisticated parties who under certain circumstancesexpressly  made it possible for Wesco, subject to compliance with, for example, Sections 2.01, 2.02, 2.08, 2.09, 4.12, 4.26 and 9.02 of the 2026 Indenture, to issue new bonds in excess of the then-existing debt and lien baskets in each series by "modify[ing] the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse to" existing bondholders with consent from a majority of the existing bondholders, and to "have the effect of releaserelease[ing]" the liens securing the 2024 and 2026 Notes, with the requisite consent of existing bondholdersconsent from only two-thirds of the existing bondholders, even though doing so might be against the interests of any dissenting bondholders. That structure ensured that Wesco would have flexibility to raise capital in the future by issuing new notes in each series and by creating new security interests senior to the 2024 and 2026 Notes without requiring unanimous consent from those noteholders. *See* ECF 3 at 2-3 (recognizing that the 2024 and 2026 Indentures "were drafted by brilliant financers and lawyers who contemplated the potential benefits that a non-pro rata future transaction could offer"); Adv.Dkt.1474 at 4-5 (recognizing the potential need for Wesco to "raise additional capital" by "issu[ing] new debt that is senior in priority and lien rights to existing debt").

**Objection 7:**

Again, the Proposed Order suggests that a two-thirds supermajority was required to "release the liens," but this mischaracterizes key language in the second point of the supermajority clause in Section 9.02 by omitting the phrase "have the effect." *See* Objection 6. Unrebutted expert evidence at trial showed that the 2026 Indenture's imposition of a heightened consent requirement to amendments that "have the effect of releasing" liens, as opposed to just "releasing" liens, differed from a majority of other indentures in the market, but the Proposed Order erroneously elides this distinction.

[*Remainder of Page Left Intentionally Blank*]

14

Adv.Dkt.1249 (Morrison, May 2, 2024 Tr.) at 20:8-24:

```
 8       Q   So now, of that 121, did you further -- do further
 9    analysis as to similarities or differences within lien release
10    protection?
11       A   I did.  I noticed, as I went and looked at super majority
12    rules dealing with lien release, that I found two phrasings of
13    release.
14          One phrasing was the words that we see in Section 9.02 of
15    the at issue indenture.  It -- in 9.02 of -- I think you
16    called it the "operative indenture," so excuse me.  In 9.02 of
17    the operative indenture, the lien release provision has the
18    phrase "have the effect of releasing."  And roughly 40 percent
19    of the indentures contain that phrasing, "have the release of"
20    -- "have the effect of releasing."
21          But there are a large number of indentures that use a
22    more simple phrase, which is "release."  So just the point
23    that many just say "release;" others say "have the effect of
24    releasing."
```

The Proposed Order's characterizations of the consent requirements have thus been clarified by quoting the text of the 2026 Indenture. The interpretation of the 2026 Indenture's unambiguous provisions is a matter of law, and these characterizations should thus not be included as findings of fact. Moreover, no witness recalled the terms of Section 9.02 being a subject of any negotiation before entry into the indenture—*see, e.g.,* Adv.Dkt.827 at 45:10-18, 47:4-7—and therefore the characterizations are not supported by evidence.

***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

**B.    Wesco's Financial Distress.**

Just weeks after Wesco acquired Pattonair, the COVID-19 pandemic ripped through the global economy, with a particularly devastating effect on the aerospace industry. Even as other sectors began to rebound, "aircraft weren't flying at the rate that they were prior to COVID," an economic drag that "just continued to linger on" for "much longer than anyone had anticipated." Adv.Dkt.664 at 34-35. For Wesco—a company whose business model was tied to the production of new airplanes, *see* Adv.Dkt.700-35 at 3—the swift decline in demand for aerospace services in combination with supply chain disruptions led to decreased revenue and cash flows, causing a massive liquidity shortfall. Platinum injected an additional $50 million into the company in an attempt to resolve Wesco's liquidity problems, but those additional funds were not enough to prevent the crisis that Wesco faced.

15

By the fourth quarter of 2021, Wesco's liquidity crunch had significantly worsened, and the company estimated that it might miss the interest payment on its outstanding notes due in November 2021, which would have allowed "the debt [to] be called" at a time when Wesco "didn't have the funds to pay [it] back." Adv.Dkt.664 at 43-44. Wesco barely made that interest payment, *see* Adv.Dkt.630 at 148, but its cash situation "continued to get tighter and tighter," Adv.Dkt.664 at 47, with advisors scrambling to figure out how to "stretch out … payments" to their vendors and landlords in order to "continue to have cash to operate," Adv.Dkt.664 at 38, 44-45, 47-48.

By early 2022, Wesco's serious financial pressures threatened a negative result on its upcoming statutory audit in the United Kingdom, which would have put Wesco into default on its asset-based lending agreement. Adv.Dkt.664 at 50-55. Based on their review, Wesco's auditors indicated that a cash injection of $150 million to $200 million would be required to obtain a clean audit opinion. *Id.* at 125. Wesco sought to delay filing its next round of financial statements with its auditors in order to give it time to obtain the necessary liquidity, but the auditors informed Wesco that they would "strike off" the company if they did not receive the statements, which would make it illegal for Wesco to do business in the United Kingdom. Adv.Dkt.630 at 189; Adv.Dkt.664 at 56. In short, by early 2022, Wesco faced a genuine liquidity crisis and an urgent, imminent need to generate liquidity.

To address its pressing liquidity problems, Wesco began exploring funding options by the fourth quarter of 2021. In late 2021, a coalition of noteholders (the "Majority Group"), led by funds managed or advised by PIMCO and Silver Point Capital, L.P.—the two largest sets of holders of the 2024 and 2026 Notes—reached out to discuss potential rescue financing that would provide the company with the liquidity that it needed to resolve its immediate crisis, leading to an initial confidential proposal in December 2021. *See* Adv.Dkt.639-1; Adv.Dkt.858 at 107-08; Adv.Dkt.955 at 80. ~~That proposal was motivated by the view that if Wesco could overcome its immediate liquidity issues, it could "capture the opportunity that was presented by COVID instead of suffering from it," Adv.Dkt.955 at 72, and "emerge as a more valuable franchise than it had going into the downturn," Adv.Dkt.858 at 16-19, 86-87; *see* Adv.Dkt.697 at 229.~~

**Objection 8:**

The Proposed Order includes factual findings that the Bankruptcy Court did not make relating to the Majority Group's purported subjective motivations for its proposal, which have been removed. The Bankruptcy Court had good reason not to make these findings: for example, PIMCO and Silver Point refused to produce discovery concerning their financial analyses or projections relating to the uptier, which would have illuminated their actual motivations. *See* ECF 47 at 23-24. Moreover, these factual findings are misleading because they fail to address the evidence adduced at trial concerning PIMCO's and Silver Point's actual, self-interested motives, namely the pursuit of an outsized 64% internal rate of return through 2022 Transaction which return was entirely predicated on stripping all liens of the Minority Group. Adv.Dkt.710-54 at 2. Indeed, as discussed further below, *see* Objection 9, the Minority Group proposed alternative

financing proposals that the Majority Group admitted internally were liquidity neutral. Adv.Dkt.705-50 at 2.

Adv.Dkt.710-54 at 2 (PIMCO's March 2022 WAIR PnL):

| WAIR PnL | | Comps* | w/ No Jr Debt | w/ "Hair" |
|---|---|---|---|---|
| **Yield** | | **6.9%** | **8.0%** | **8.8%** |
| *FVS* | | *468* | *579* | *656* |
| **Est PX of new Super Senior** | | **114** | **109** | **106** |
| **PnL Breakdown ($mm)** | | | | |
| Current Holdings | $571 | $125 | $95 | $77 |
| New Money | $142 | 20 | 13 | 9 |
| PIK Fee | 1.125% | 6 | 6 | 6 |
| 1 yr of Coupon | | 50 | 50 | 50 |
| **1 yr PnL** | | **$201** | **$163** | **$142** |
| **1 yr PnL as % of Cost Basis** | | **38%** | **31%** | **27%** |
| Less: 1 yr of Coupon | | (50) | (50) | (50) |
| **Deal PnL** | | **$151** | **$114** | **$92** |
| **Deal PnL as % of Cost Basis** | | **29%** | **22%** | **18%** |
| *Position IRR to Deal @ March 18, 2022* | | *64%* | *49%* | *41%* |
| **Cost Basis (PX)** | | 92 | | |
| **Cost Basis ($mm)** | | **$527** | | |

\* Includes a 1% yield haircut for "hair"

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

Over the next few months, Wesco and the Majority Group engaged in "multiple rounds of negotiations" and "a lot of back and forth" over the terms of a potential rescue financing deal.  Adv.Dkt.738 at 30-38; *see* Adv.Dkt.610-11 at 2-5 (documenting at least six counterproposals).  That extended negotiation reflected the fact that ~~each side of the deal held significant leverage.  On the one hand, as Wesco's board~~ expected ~~heard from its advisors,~~ the Majority Group~~'s~~ to use its ~~majority stake gave it~~ "~~a~~ power position . . . " ~~that could theoretically be used~~ "to prevent the company from getting financing in other ways."  Adv.Dkt.697 at 107-08.  ~~On the other, the Majority Group understood that its substantial existing investment in Wesco would be seriously threatened if the company failed to resolve its liquidity crisis, and worried that Wesco would "pivot" to some other financing source if the Majority Group refused to agree to Wesco's terms.  Adv.Dkt.705-50 at 2-4.~~

**Objection 9:**

The Proposed Order includes factual findings regarding the negotiations of the potential financing proposals that are inconsistent with unobjected to findings in the January 17 R&R, as

well as with the undisputed trial record. The January 17 R&R found only that the Majority Group, not the Company or the Minority Group, had a "power position" in the negotiations. *See* ECF 3 at 16. The January 17 R&R also did not find that this leverage "could theoretically be used"; instead, it found that the Majority Group was "in a '***power position***' that would allow them to ***prevent Wesco from getting financing from other sources***, and Wesco ***expected*** PIMCO and Silver Point ***to use that power***." ECF 3 at 16 (emphases added, citations omitted). The threat of using that power was why "Wesco's engagement with the Minority Group . . . was not robust," ECF 3 at 12, and this "lack of engagement was striking" to the Bankruptcy Court. *See id.* at 16.

The Proposed Order also inserts factual findings about the Company's leverage over the Majority Group that were never made by the January 17 R&R and which are unsupported by the record. The Company's liquidity problem could have been solved through either the Majority Group or the Minority Group proposals. In fact, the Majority Group itself contemporaneously acknowledged that fact. *See* Adv.Dkts.705-50 at 2-3; 868 at 66:11-67:19; 939 at 184:5-185:3.

---

**Adv.Dkt.705-50 at 2 (Feb. 26, 2022 Email):**

| | |
|---|---|
| **From:** | Jason Prager <jprager@silverpointcapital.com> |
| **Sent:** | Sat, 26 Feb 2022 11:33:29 -0500 (EST) |
| **To:** | Michael Gatto <mgatto@silverpointcapital.com>; Ed Mule<emule@silverpointcapital.com> |
| **Cc:** | Eddie Mishan <emishan@silverpointcapital.com>; Matthew Arons<marons@silverpointcapital.com>; Albert Starominsky<astarominsky@silverpointcapital.com>; Jon Zinman<jzinman@silverpointcapital.com>; David Reganato<dreganato@silverpointcapital.com>; Stacy Lowe<slowe@silverpointcapital.com>; JT Davis <jdavis@silverpointcapital.com>; "Ara Lovitt" <alovitt@silverpointcapital.com>; Anthony DiNello<adinello@silverpointcapital.com> |

**Subject:** RE: Incora

All:

After substantial back and forth between SPC, Pimco and Incora/Platinum over the past few days (including our advisors learning that the minority Akin group was offering to PIK their bonds and put up > $100mm of low-cost new money, including via moving assets to non-guarantor restricted subs, a solution that was approx. liquidity neutral vs. our proposal), we reached an agreement in principal on economic terms yesterday afternoon (conditional for both sides on achieving a deal with the unsecureds). We are now moving expeditiously to documentation with the goal of closing the transaction by 3/11. The summary terms are below. Please let us know if you have any questions / would like to discuss.

---

The 2022 Transaction was not about the Majority Group protecting preexisting investments in Wesco—indeed, they exchanged all preexisting notes for new notes—but, rather, it was about the Majority Group achieving a substantial investment return at the direct expense of the Minority Group by virtue of the uptier that took away all of the Minority Group's liens. *See* Objection 8.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

The parties ultimately agreed on a ~~series of contemplated~~ transaction~~s~~ through which the Majority Group would provide Wesco $250 million in new money, as well as reducing cash interest and extending maturities on the Majority Group's existing debt. As part of th~~e~~ ~~at~~ ~~o~~se transaction~~s~~, the Majority Group would exchange their then-held 2024 Notes and 2026 Notes into super-senior first-lien

notes (the "1L Notes"), which would mature in late 2026.  *See* Adv.Dkt.610-11 at 7-8.  The transactions would also allow certain holders of the 2027 Notes to exchange those notes into super-senior second-lien notes (the "1.25L Notes"), maturing in 2027.  ~~These~~ This transactions would not only provide Wesco with $250 million in rescue financing, but also improve Wesco's financial position going forward by extending the maturities on its debt and substantially decreasing its cash-interest payments.

Upon hearing that Wesco might strike a deal with the Majority Group, a different coalition representing a minority of the holders of 2024 and 2026 Notes (the "Minority Group") approached Wesco with a proposal to provide roughly $147.5 million in new money.  Adv.Dkt.738 at 73.  The Minority Group later sent Wesco a revised proposal that would have provided $173 million in funding; that proposal also included an "alternative" structure that would instead have provided $250 million in funding, but that relied on letters of credit that would have to be provided by third parties and collateralized.  *See* Adv.Dkt.536-22 at 5-8; Adv.Dkt.1007 at 70-72.  After reviewing those proposals, Wesco and its advisors did not believe that the Minority Group's proposals were viable; with respect to the main proposal, Wesco did not see the $173 million in financing as sufficient to satisfy its liquidity concerns, and with respect to the alternative proposal, Wesco determined that its method of securitizing the facilities with third-party letters of credit was not feasible.  Adv.Dkt.630 at 184-86; Adv.Dkt.738 at 63-64, 74-75, 83-86, 92; Adv.Dkt.1351 at 12, 21, 33.  <u>"The conclusion was reached without detailed discussions with the Minority Group about the concerns.  For example, the Minority Group offered to back the letter of credit proposal.  As long as the Minority Group was providing the letters of credit, concerns about the quality of collateral would not be pressing.  The lack of engagement was striking." ECF 3 at 19.</u>  "Wesco <u>and its advisors believed</u> ~~also concluded that in any event,~~ the Majority Group's proposal was superior to the Minority Group's proposal in terms of maturity extensions, amortization reductions, and cash interest reductions."  <u>ECF 3 at</u> 16 (citing  ~~*See*~~ Adv.Dkt.630 at 202-03; Adv.Dkt.1351 at 12, 21-23, 32-33<u>)</u>.  <u>"The company concluded that the Majority Group's proposal 'provided the most liquidity for the longest period of time.'" ECF 3 at 16 (citing Adv.Dkt.1351 at 12). "Moreover, PIMCO and Silver Point were in a "power position" that would allow them to prevent Wesco from getting financing from other sources, and Wesco expected PIMCO and Silver Point to use that power."  ECF 3 at 16 (citing Adv.Dkt.697 at 107–08). "Wesco and its advisors rejected the proposal and never made a counterproposal to the Minority Group." ECF 3 at 16 (citing Adv.Dkt.1007 at 78).</u>  Wesco's board of directors accordingly voted to accept the Majority Group's offer and reject the Minority Group's proposal.  Adv.Dkt.630 at 199-203, 209; Adv.Dkt.738 at 112; *see* Adv.Dkt.536-24 at 2.

**Objection 10:**

The Proposed Order's characterization that the parties "ultimately agreed upon a series of contemplated transactions" mischaracterizes the trial record.  To begin, the parties themselves admitted that what the Proposed Order would characterize as a series of transactions was, in fact,

a "single, unified transaction." *See* Objection 1. The Proposed Order's characterization also contradicts the following unobjected to factual findings of the Bankruptcy Court, which are added to the next paragraph of the Proposed Order:

> "PIMCO and Silver Point only offered new money on the condition that the entire transaction would take place." ECF 3 at 31.

> "PIMCO and Silver Point were unwilling to provide new money on a *pari passu* basis." ECF 3 at 31 (citing Adv.Dkts.694 at 70-71; 697 at 106). " Rather, they demanded super-senior first-lien debt." ECF 3 at 31 (citing Adv.Dkts.694 at 71-72; 939 at 200).

> "Counsel to the parties agreed ahead of the Closing Call that 'everything happens in order and at the same time.'" ECF 3 at 31 (citing Adv.Dkt.733-55 at 2).

> "PIMCO and Silver Point authorized their counsel to 'release signature pages' at the closing 'concurrent with the release of all other parties' signature pages.'" ECF 3 at 21 (citing Adv.Dkt.710-9 at 2-4).

> "Pursuant to the agreements made at the Closing Call, each transaction document was deemed delivered automatically without any action required of any party." ECF 3 at 21 (citing Adv.Dkt.694 at 56, 58; 710-56 at 2-8; 711-10 at 2; 1184 at 220, 225-26).

Additionally, the Proposed Order's characterization regarding a supposed series of "contemplated" transactions contradicts PIMCO's and Silver Point's express, pre-closing requirement of having "certainty that everyone performs under each document once this thing gets started" (ECF 3 at 31 (citing Adv.Dkt.782-11 at 1)), as well as PIMCO's own trading records which, on the Closing Date, record only the purchase of new super-senior notes not purported *pari passu* notes. *See* Objection 21. The Proposed Order likewise omits significant additional factual findings from the January 17 R&R that were unobjected to and accurately reflect the undisputed evidentiary record, and thus those omissions are inserted in the markup above.

[*Remainder of Page Left Intentionally Blank*]

> Adv.Dkt.782-11 at 1 (Mar. 23, 2022 Email from Majority Group's deal counsel):
>
> **From:** Libby, Angela M. <angela.libby@davispolk.com>
> **Sent:** Wednesday, March 23, 2022 8:44:06 PM
> **To:** Pisa, Al <APisa@milbank.com>; Bachelis, Nathaniel <NBachelis@milbank.com>
> **Cc:** Massman, Stephanie <stephanie.massman@davispolk.com>; Rouben, Yasmeen <yrouben@paulweiss.com>; Wright, Kate <kwright@milbank.com>; incora.dpw <incora.dpw@davispolk.com>; Witt, Austin <awitt@paulweiss.com>; Pang, Xu <xpang@paulweiss.com>; Weber, John <jweber@paulweiss.com>; Dover, Ethan <edover@paulweiss.com>; Basta, Paul M. <pbasta@paulweiss.com>; Zaccone, Tracey A <tzaccone@paulweiss.com>; Mercadante, Philip <pmercadante@paulweiss.com>; Lanser, Taeler <tlanser@paulweiss.com>; #Incora <Incora@milbank.com>
> **Subject:** RE: Project Elevate/Icicle - Exchange Agreement, Purchase Agreement
>
> Thanks.  That was intentional - just meant to flag I had dropped other folks.  Happy to speak to whomever is appropriate at Paul Weiss as long as it's within the next hour or so, but we simply can't be in a position where we cannot require specific performance of the other parties to this agreement.  ==We are funding new money and need to know that all consents get delivered and the exchange actually happens.  Having certainty that everyone performs under each document once this thing gets started has been a fundamental point for us from day 1.==
>
> Angela M. Libby
>
> **Davis Polk & Wardwell** LLP
> +1 212 450 4433 office
> +1 207 807 8783 mobile
> angela.libby@davispolk.com

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

### C.    The 2022 Transactions.

#### 1.    Events leading up to the 2022 Transactions.

In the period leading up to the 2022 Transactions, the Majority Group (which already held two-thirds of the outstanding 2024 Notes) initially sought to acquire—and believed it had acquired—two-thirds of the outstanding 2026 Notes. "Evidence admitted at trial revealed that the Majority Group determined that it was in error when it believed it held over two-thirds of the 2026 Notes. The Majority Group believed that participation of [] additional institutions was required to obtain the requisite 66 2/3% vote of the 2026 Notes to approve the transaction." ECF 3 at 8 (citing Adv.Dkt.868 at 18; 1013 at 188–89; 1173 at 25). "As it turns out, even the additional participants did not hold a sufficient amount of debt to create a two-thirds majority." ECF 3 at 8. In February 2022, however, the Minority Group announced that it had accumulated more than a third of the outstanding 2026 Notes, in an attempt to block the Majority Group's proposal from going forward. *See* Adv.Dkt.639-4 at 2-3; Adv.Dkt.738 at 56-57. "As of February 16, 2022, the Majority Group only held $522.5 million in 2026 Notes, or 59.2%, available to vote." ECF 3 at 15 (citing Adv.Dkts.542-8 at 2; 868 at 39–40). "Although the group 'held' 67.1% of the 2026 Notes, 1.5% of those holdings were unsettled trades and 6.4% were notes out on loan and ineligible to vote or participate in the exchange." ECF 3 at 17 (citing Adv.Dkts.542-8 at 2; 868 at 39–440, 447). "The Majority Group did hold over two-thirds of the 2024 Notes." ECF 3 at 17 (citing

542-8 at 2; 868 at 38–39). "The Majority Group also held sufficient 2027 Notes to consent to amending the 2027 Indenture." ECF 3 at 17 (citing Adv.Dkts.603-6 at 5; 602-37 at 4; 832 at 77).

~~Wesco and the Majority Group accordingly agreed that Wesco would issue additional *pari passu* 2026 Notes to the Majority Group in exchange for the Majority Group's new $250 million investment, as the 2026 Indenture permitted Wesco to do with consent from a majority of the outstanding 2026 Notes (which the Majority Group held). Adv.Dkt.601-8 at 130. With those additional 2026 Notes, the Majority Group would then have the two-thirds majority necessary to consent to the release of the collateral as to the 2026 Notes, allowing Wesco to afford the new 1L Notes exclusive first-lien status. *See id.* at 131.~~ "The Majority Group did not hold the required two-thirds interest in the 2026 Notes. Rather than fully engage with the Minority Group, the Majority Group decided to proceed by sleight of hand. The Majority Group decided to use its 51% majority stake to issue new 2026 Notes to itself. By becoming holders of the newly issued notes, the Majority Group would raise their ownership percentage to over two-thirds." ECF 3 at 17. "At that point, the Majority Group believed that it could proceed with its non-pro rata transaction." *See* ECF 3 at 17 (finding that Majority Group believed it could proceed, but erroneously concluding that this belief was incorrect). The trial evidence showed that PIMCO and Silver Point were unwilling to provide new money on a *pari passu* basis. Rather, they demanded super-senior first-lien debt in exchange for their new money investment. ECF 3 at 31. "PIMCO and Silver Point only offered new money on the condition that the entire transaction would take place. PIMCO and Silver Point were unwilling to provide new money on a *pari passu* basis." ECF 3 at 31 (citing Adv.Dkts.694 at 70–71; 697 at 106). "Rather, they demanded super-senior first-lien debt." ECF 3 at 31 (citing Adv.Dkts.694 at 71–72; 939 at 200). "From Silver Point's perspective, the transaction would not have worked without elevated lien status because the participating noteholders were providing new money at a lower interest rate than they would if the new money were issued on a *pari passu* basis." ECF 3 at 31 (citing Adv.Dkt.1013 at 107–08). "The Majority Group was also unwilling to open the transaction to all secured noteholders." ECF 3 at 31 (citing Adv.Dkts.694 at 72; 939 at 203). "In fact, there is no evidence that the Majority Group strongly considered the possibility of purchasing additional 2026 Notes on a *pari passu* basis. PIMCO and Silver Point stated, '[w]e are funding new money and need to know that all consents get delivered and the exchange actually happens. Having certainty that everyone performs under each document once this thing gets started has been a fundamental point for us from day 1.'" ECF 3 at 31 (citing Adv.Dkt.782-11 at 1). "PIMCO and Silver Point also indicated they were 'not ever going to be ok removing specific performance' because it was 'a key deal point' for them." ECF 3 at 31 (citing Adv.Dkts.733-55 at 4; 782-11 at 2). "After the failed attempt by PIMCO and Silver Point to acquire the requisite 66 2/3% supermajority of 2026 Notes necessary to consent to their contemplated transaction, the parties redesigned the 2022 Transaction to be comprised of a series of agreements, each of which would trigger the next—a domino agreement." ECF 3 at 32.

**Objection 11:**

The Proposed Order omits numerous unobjected to factual findings, and it includes an erroneous factual finding that Wesco and the Majority Group agreed that Wesco would issue additional *pari passu* 2026 Notes in exchange for the $250 million new money investment. Such a finding is contrary to unobjected to factual findings in the January 17 R&R, and with the indisputable evidence adduced at trial, that "PIMCO and Silver Point were unwilling to provide new money on a *pari passu* basis," ECF 3 at 31 (citing Adv.Dkts.694 at 70-71; 697 at 106), and that they instead "demanded super-senior first-lien debt." ECF 3 at 31 (citing Adv.Dkts.694 at 71-72; 939 at 200). That is why the Bankruptcy Court concluded that "PIMCO and Silver Point only offered new money on the condition that the entire transaction would take place," ECF 3 at 31, and why the Majority Group never objected to that finding. This is further confirmed by admissions from both Wesco's CFO and the Majority Group's designated corporate representative—hence, both sides of the 2022 Transaction—that the Majority Group would not have "provided th[e] [$250 million in] new capital without also receiving super-senior first out debt." Adv.Dkt.939 at 200:7-20; Adv.Dkt.694 at 70:3-24, 71:18-72; *see also* Objections 1 & 10.

The term sheets confirm that the parties agreed that the new money would be in exchange for new super senior debt. Adv.Dkt.610-11 at 7. In each term sheet, the "new money" is included among the "key terms" for the "Super Senior First-Out" notes, which refers to the new 1L Notes.

Adv.Dkt.610-11 at 7 (Feb. 26, 2022 Final Agreed Terms):



[*Remainder of Page Left Intentionally Blank*]

23

Adv.Dkt.1071-18 at 6 (Feb. 25, 2022 Silver Point and PIMCO Term Sheet):



Adv.Dkt.705-17 at 6 (Feb. 22, 2022 Silver Point Term Sheet Draft):



***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

~~Wesco repeatedly confirmed to the Majority Group its understanding (consistent with the Majority Group's own understanding) that this approach complied with Wesco's contractual obligations under the 2026 Indenture, and Wesco's counsel at Milbank LLP, a well-respected international law firm, issued an opinion to that effect. Adv.Dkt.1150-11 (certificate and opinion of counsel);~~ *see*

~~Adv.Dkt.604-19 at 7; Adv.Dkt.710-56; Adv.Dkt.858 at 13-16, 188-89; Adv.Dkt.955 at 14-16; Adv.Dkt.1013 at 13-14, 51-52. As multiple witnesses later testified, that approach was consistent with the plain terms of the 2026 Indenture and the parties' understanding of those terms. For instance, one of Wesco's lead negotiators of the 2024 and 2026 Indentures, an advisor from Platinum, testified that he had reviewed the 2022 Transactions, and concluded that they "all seemed to work within the four corners of the document[s]" that he had helped to negotiate. Adv.Dkt.827 at 89-90; see also, e.g., Adv.Dkt.630 at 143; Adv.Dkt.858 at 13-16, 160, 188-89; Adv.Dkt.955 at 14-16.~~

**Objection 12:**

This paragraph includes factual findings that are irrelevant to the Court's legal conclusion, absent from the January 17 R&R, and contradictory to the evidentiary record. The Bankruptcy Court made no findings in the January 17 R&R as to the participants' subjective understandings of the 2026 Indenture's terms, which in any event are irrelevant to the interpretation of the unambiguous 2026 Indenture. *See HOP Energy, L.L.C. v. Loc. 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012) (under New York law, "a party's subjective intent and understanding of the terms" of an unambiguous contract "is irrelevant"). The Bankruptcy Court held that the 2026 Indenture is an unambiguous contract, ECF 3 at 31, and no party objected to that legal conclusion.

Moreover, the Bankruptcy Court could not have made such factual findings as to Wesco's or the Majority Group's subjective understanding of the 2026 Indenture, because that understanding was informed by discussions with their counsel that they withheld on privilege grounds. For example, during trial, when the Company sought to call a previously unidentified outside lawyer as a witness, the Bankruptcy Court denied the Minority Group's general objection to such testimony but limited the testimony solely to the transaction's mechanics as opposed to its legal merit. Adv.Dkt.1182 at 4:7-21 ("I'm going to deny any motion that he can't testify at all, limit his testimony to true observations that he made, not what anyone told him, not what he grew to understand, not his understand[ing] of the documents."); *see also* Adv.Dkt.827 at 240:1-247:8 (overruling objection to Wesco calling previously undisclosed witness). The Company did not have an understanding of the 2026 Indenture apart from what its representatives learned from counsel and the Company steadfastly protected that understanding with claims of privilege: Mr. Bartels, the nominally independent director on the Company's Board, for example, did not review the relevant provisions of 2026 Indenture until after the 2022 Transaction had been approved. Adv.Dkt.1119 at 38:1-11. Finally, the Majority Group's reliance on opinion letters for the truth of the matter asserted therein is inappropriate because the Court ruled that they did "not come in for any purpose other than to show that they were actually sent." *See* Adv.Dkt.1184 at 107-08 (ruling on admissibility of Adv.Dkt.1150-11 with opinion letter at 6-8, and Adv.Dkt.716-34 with opinion letter at 7-9).

Furthermore, the Bankruptcy Court's unobjected to factual findings, as well as the record evidence, tell a very different factual story about the Majority Group's beliefs than the one they proffer in the Proposed Order. The Bankruptcy Court found that PIMCO and Silver Point first sought to accumulate a *bona fide* two-thirds supermajority of 2026 Notes themselves, and then— only when they realized they could not achieve that threshold alone—did they allow other holders of 2026 Notes into the transaction for the sole purpose of obtaining consent of two-thirds of

existing 2026 Notes. Accordingly, the Bankruptcy Court found that the Majority Group believed that they needed to let other holders of existing 2026 Notes into the transaction to obtain a supermajority, which they were unable to reach even after allowing Citadel and Senator into the group. The following findings of the Bankruptcy Court were thus both accurate and unobjected to:

> The decision to allow additional participants was not an eleemosynary one. Evidence admitted at trial revealed that the Majority Group determined that it was in error when it believed it held over two-thirds of the 2026 Notes. *The Majority Group believed that participation of these additional institutions was required to obtain the requisite 66 2/3% vote of the 2026 Notes to approve the transaction.*

ECF 3 at 7-8 (citing Adv.Dkts.868 at 18; 1013 at 188-89; 1173 at 25).

---

Adv.Dkt.868 (Prager, Feb. 14, 2024 Tr.) at 18:9-22:

```
 9          So your impression given you by Mr. Fastar that he was

10     stressed and worried that there would not be the ability of

11     the co-op members to vote 66 and two-thirds of the 2026 bonds,

12     correct?

13     A    Yeah he was worried that they would not be able

14     (indiscernible) votes of their bonds back (indiscernible) have

15     two-thirds of the bonds in the co-op.

16     Q    Two-thirds of the 2026 bonds, right?

17     A    Yes.

18     Q    And so, during this time -- around this time PIMCO and

19     SilverPoint entered into co-op agreements with Citadel,

20     McQuary (phonetic) and Olympus Peak (phonetic).  Do you recall

21     that?

22     A    I do.
```

---

Adv.Dkt.1013 (Prager, Feb. 12, 2024 Tr.) at 188:17-22, 189:3-23:

```
17      Q    And if I understand both your testimony and the thinking
18   on this, the additional notes path would have required PIMCO
19   and Silver Point to own less bonds, less than two-thirds of
20   the 2026 notes, prior to the date that the transaction was to
21   be effected.  Is that right?
22      A    That's right.
```

...

```
 3      Q    -- do that, you could do the initial notes path with a
 4   simple majority of just over 50 percent, right?
 5      A    Yes.
 6      Q    Okay.  And the -- and that would result in this super
 7   senior tranche of debt, right?  Correct?
 8      A    After -- after multiple transactions, yes.
 9      Q    Okay.  After -- we'll get to the multiple transactions
10   testimony.
11           But after, whether it's one or several, the result of
12   that additional notes path would be new super senior priority
13   debt, correct?
14      A    Correct.
15      Q    Okay.  And I think you testified about the LTV impact of
16   one path versus the other, right?
17      A    Yes.
18      Q    And the reason that the LTV impact of the additional
19   notes path would have been better is because more bondholders
20   would have been excluded from that transaction, right?
21      A    Yes.
22      Q    And that's the transaction you ultimately did, right?
23      A    It was the transaction that we ultimately did.
```

27

Adv.Dkt.1173 (Rochard, Apr. 12, 2024 Tr.) at 25:21-25:

```
21       Q     And your broad understanding is that there was a need for

22             Citadel to join the PIMCO and Silver Point cooperation

23             agreement in order to be part of a two-thirds voting

24             transaction, correct?

25       A     Among other things, yes.
```

This evidence forecloses a factual finding that PIMCO and Silver Point believed that they could do the uptier with only a simple majority of existing 2026 Notes. Both PIMCO and Silver Point admitted that it would have been more economically advantageous for them to have taken such path from the outset. Adv.Dkt.700-76 at 2 (Nov. 3, 2021 Email); Adv.Dkt.727-24 at 3 (Oct. 18, 2021 Email); Adv.Dkt.969 at 13:3-14:22; Adv.Dkt.955 at 233:17-21; Adv.Dkt.1013 at 50:16-51:8, 180:4-12, 188:11-190:2. But it was only after the Minority Group surfaced in late February 2022 with more than one-third of the 2026 Notes that the Majority Group for the first time pivoted to their dilute-to-strip maneuver. Adv.Dkt.879 at 262:3-21; *see* Adv.Dkt.623-4 at 1 (Feb. 16, 2022 Email, saying the Minority Group may have blocking position); Adv.Dkt.639-5 at 3 (Exhibit A to Feb. 21, 2022 Letter reflecting a blocking position of over 36% in the 2026 Notes). The term sheets exchanged by the parties and PIMCO's own investment committee presentation all indicated that the transaction required a two-thirds majority. Adv.Dkt.700-58 at 3; Adv.Dkt.925-1; Adv.Dkt.700-35 at 4; Adv.Dkt.734-8 at 2-3; Adv.Dkt.782-5 at 1; Adv.Dkt.782-4 at 1.

If the Majority Group believed a dilute-to-strip transaction was permissible, it would have gone that route from the beginning since it was more economically advantageous. Or, in the words of PIMCO's lead negotiator, "we're eating our own deal economics if" they let more noteholders into the deal as they eventually did when they let Citadel and Senator into the Majority Group to try to reach two-thirds. Adv.Dkt.700-76 at 2 (Nov. 3, 2021 Email). *See also* Adv.Dkt.955 at 233:17-21; Adv.Dkt.1013 at 188:11-190:2; Adv.Dkt.969 at 33:10-20.

Adv.Dkt.700-76 at 2 (Nov. 3, 2021 Email):

On Nov 3, 2021, at 3:33 PM, Dostart, Samuel <Samuel.Dostart@pimco.com> wrote:

We have/are in close connection with over 2/3rds of the 8.5s so we're eating our own deal economics if we add.

**Samuel P. Dostart**
D: +1 949.220.5989
M: +1 949.375.9517

Adv.Dkt.1013 (Prager, Feb. 12, 2024 Tr.) at 188:17-22, 189:3-23:

```
17      Q    And if I understand both your testimony and the thinking

18      on this, the additional notes path would have required PIMCO

19      and Silver Point to own less bonds, less than two-thirds of

20      the 2026 notes, prior to the date that the transaction was to

21      be effected.  Is that right?

22      A    That's right.
```

...

```
3       Q    -- do that, you could do the initial notes path with a

4       simple majority of just over 50 percent, right?

5       A    Yes.

6       Q    Okay.  And the -- and that would result in this super

7       senior tranche of debt, right?  Correct?

8       A    After -- after multiple transactions, yes.

9       Q    Okay.  After -- we'll get to the multiple transactions

10      testimony.

11           But after, whether it's one or several, the result of

12      that additional notes path would be new super senior priority

13      debt, correct?

14      A    Correct.

15      Q    Okay.  And I think you testified about the LTV impact of

16      one path versus the other, right?

17      A    Yes.

18      Q    And the reason that the LTV impact of the additional

19      notes path would have been better is because more bondholders

20      would have been excluded from that transaction, right?

21      A    Yes.

22      Q    And that's the transaction you ultimately did, right?

23      A    It was the transaction that we ultimately did.
```

***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

~~The evidence at trial also showed that the 2024/2026 Noteholders—sophisticated entities including BlackRock and JPMorgan—were fully aware that the indentures allowed Wesco to "dilute [a minority] group's voting power" by issuing new bonds with majority consent, and then rely on consent from those additional bonds to issue senior debt over the minority noteholders' objection. Adv.Dkt.705-58 at 2; *see also* Adv.Dkt.705-61; Adv.Dkt.705-64 at 2 (describing that approach as "[n]othing particularly new"); Adv.Dkt.705-65 at 11 (recognizing that Wesco could "circumvent any block in the [2026 Notes] by upsizing the tranche"); Adv.Dkt.970 at 94, 102. In fact, potential advisors to the 2024/2026 Noteholders provided them with materials specifically informing them that Wesco needed only majority consent to issue additional bonds and thus alter the voting dynamics of each bond class. Adv.Dkt.970 at 116. And notably, at least one 2024/2026 Noteholder—JPMorgan—knew of these possibilities firsthand, as it had employed a similar approach in prior transactions where it was the majority noteholder. *See* Adv.Dkt.970 at 94. That approach was particularly appropriate for Wesco here, as it allowed the company to obtain its critically needed rescue financing on favorable terms, under which the Majority Group would "charge a lower interest rate over all and in particular on new money." Adv.Dkt.858 at 106-07.~~

**Objection 13:**

As explained above, the parties' subjective understandings are irrelevant to the interpretation of an unambiguous contract. No party objected to the Bankruptcy Court's conclusion that the operative provisions of the 2026 Indenture are unambiguous, and thus the paragraph above is irrelevant to this Court's legal conclusions.

This paragraph also makes factual findings that do not appear in the January 17 R&R and that are contrary to the evidentiary record. For example, the Proposed Order cites internal email discussions within Golden Gate and JPMorgan immediately after a March 1, 2022 Reorg Research article—published just weeks before the 2022 Transaction closed—that, for the first time, discussed the possibility of Wesco issuing additional notes to circumvent the supermajority consent requirements for lien stripping. Adv.Dkt.705-61 at 2 (Mar. 1, 2022 Email). The article, and the correspondence, prognosticated legal challenges if such a transaction was undertaken. *Id*.

[*Remainder of Page Left Intentionally Blank*]

Adv.Dkt.705-61 at 2 (Mar. 1, 2022 Email):

| | |
|---|---|
| **From:** | Will Wang (C) <wwang@goldengatecap.com> on behalf of Will Wang (C) <wwang@goldengatecap.com> |
| **To:** | Lionel Jolivot; Eric Seiden |
| **CC:** | Robert Stobo |
| **Sent:** | 3/1/2022 4:58:24 PM |
| **Subject:** | RE: Incora Reorg Article |

That's seems to be the implication of the article; a 50% majority can amend the baskets. Article basically wraps up by saying that ==pursuing this will invite a lawsuit==

**From:** Lionel Jolivot <ljolivot@aicap.com>
**Sent:** Tuesday, March 1, 2022 7:47 AM
**To:** Will Wang <wwang@goldengatecap.com>; Eric Seiden <eseiden@aicap.com>
**Cc:** Rob Stobo <rstobo@goldengatecap.com>
**Subject:** RE: Incora Reorg Article

==I have not looked at it in this case; but in a lot of bond structures, you can amend the regular debt incurrence covenant with only a regular majority of holders but you need 2/3rds for super-priority incurrence. If it is the case here, could Pimco amend first, incur the additional debt, then get to the 2/3rds?==

**From:** Will Wang <wwang@goldengatecap.com>
**Sent:** Tuesday, March 1, 2022 7:33 AM
**To:** Eric Seiden <eseiden@aicap.com>
**Cc:** Robert Stobo <rstobo@goldengatecap.com>; Lionel Jolivot <ljolivot@aicap.com>
**Subject:** Re: Incora Reorg Article

Thanks. Article makes little sense to me - says a super priming tx is possible with $180m of additional pari debt but says the baskets are only $75m... Feels like the Reorg journalist doesn't have much of any info from our group.

On ==Mar 1, 2022,== at 6:22 AM, Eric Seiden <eseiden@aicap.com> wrote:

==Just wanted to flag this article== hit the tape this morning

The Proposed Order misuses these emails to suggest that the Minority Group were "fully aware" that the 2022 Transaction would be permissible. But Golden Gate's and JPMorgan's actual communications show that the 2026 Noteholders were not expressing a view that the scheme complied with the 2026 Indenture. *See, e.g.*, Adv.Dkt.705-61 at 2 (Mar. 1, 2022 Email) (Golden Gate employee speculates about transaction noting he "ha[d] not looked at [the indenture] in this case," while colleague observes that the article "basically wraps up by saying that pursuing this will invite a lawsuit"); Adv.Dkt.705-64 at 2 (Mar. 1, 2022 Email) (JPMorgan employee summarizing "idea" described in Reorg article and explaining that he "will look at the details of" prior transactions referenced therein).

[*Remainder of Page Left Intentionally Blank*]

Adv.Dkt.705-64 at 2 (Mar. 1, 2022 Email):

| Message | |
| --- | --- |
| **From:** | Seketa, Greg [greg.seketa@jpmorgan.com] |
| **Sent:** | 3/1/2022 8:27:10 PM |
| **To:** | Cook, Robert L [robert.l.cook@jpmorgan.com]; Clouse, Andrew W [andrew.w.clouse@jpmchase.com]; Lenzi, Anne K [anne.k.lenzi@jpmorgan.com] |
| **Subject:** | FW: Incora Reorg Article |

Nothing particularly new.  Just the idea that, instead of offering $75mm to dilute us, they would raise more.  Do offer examples of similar actions taken in other matters:  Bombardier last year.  Trimark too.  I will take a look at the details of those.

Am wondering if we should pick up a subscription to Reorg.

**Reorg®**                                                                          2022-03-01 14:10:59

**Wesco Aircraft**
Incora May Be Able to Circumvent Noteholders' 40% Blocking Position to Pursue Superpriority Uptier Exchange Through the Issuance of Additional Secured Notes

Tue 03/01/2022 08:47 AM

 The Majority Group relies on a false analogy between the 2022 Transaction and other transactions:  in fact, the Majority Group members themselves, and Wesco too, all admitted that a transaction whereby new notes were issued, voted to strip liens, and canceled, was unprecedented in the market prior to the 2022 Transaction.  *See* Adv.Dkt.782-19 at 5 (Silver Point); Adv.Dkt.906-1 at 5 (PIMCO); Adv.Dkt.783-2 at 4 (Platinum); Adv.Dkt.783-3 at 3 (Senator); Adv.Dkt.783-7 at 3 (Debtors) (admissions by the Debtors and Majority Group members); *see also* Adv.Dkt.939 at 167:8-13.  The Majority Group too had doubts about the dilute-to-strip strategy:  the Majority Group pivoted to that strategy after receiving a letter on February 21, 2022 that the Minority Group had more than one third of the 2026 Notes, and two days later Platinum contacted the indenture trustee Bank of New York to suggest that they resign because the transaction would invite substantial litigation.  Adv.Dkt.827 at 182:23-183:5, 183:18-184:14; Adv.Dkt.838-3; Adv.Dkt.879 at 262:3-21; Adv.Dkt.1379-3 at 29:4-17.  Senator likewise described it contemporaneously as a "perfect recipe for litigation."  Adv.Dkt.1384-1 (Bharadwa Dep. Tr.) at 135:18-25.  This is how WSFS became the indenture trustee just prior to the 2022 Transaction.


[*Remainder of Page Left Intentionally Blank*]

32

Adv.Dkt.879 (O'Connell, Feb. 21, 2024 Tr.) at 262:10-15:

```
10      Q    In fact, it wasn't until after Akin sent its February 21,
11      '22, letter that the advisors on both sides commenced
12      conversations about executing a transaction via a third
13      supplemental indenture followed by a fourth supplemental
14      indenture, right?
15      A    Yes, that's my understanding.
```

Adv.Dkt.827 (Smith, Feb. 9, 2024 Tr.) at 182:23-183:5, 183:18-21:

```
23      Q    And is it your testimony that that subject did not come
24      up at the -- well, let me back up. Did you attend the
25      investment committee meeting on February 22, 2022?
1       A    Per the prior document that you just showed me --
2       Q    Yeah.
3       A    -- it looks like I told Linda that I was going to dial in
4       at 12:00 Eastern, and I have no reason to believe that I
5       didn't.
…
18      Q    And you reached out to Bank of New York Mellon, on
19      February 23rd, the day after that investment committee meeting
20      that you think you attended, correct?
21      A    I reached out on February 23rd, correct.
```

The single email cited in the Proposed Order that preceded the Reorg Research article discussed only the possibility of issuing $75 million in Additional Secured Notes, which was within the Company's already-existing lien basket capacity and thus would not have required any amendment, but it also would not have sufficiently diluted the Minority Group for the Majority to get to two-thirds, in any event. Adv.Dkt.705-58 at 2 (Feb. 28, 2022 Email) (JPMorgan employee explaining that "growing the size of the [2026 Noteholders' blocking position]" could "discourage other shenanigans the issuer might attempt to dilute our group's voting power"); *see also* Adv.Dkt.970 at 94:10-95:12, 96:10-97:3, 99:1-102:17.

---

**Adv.Dkt.705-58 at 2 (Feb. 28, 2022 Email):**

| | |
|---|---|
| **From:** | Seketa, Greg [greg.seketa@jpmorgan.com] |
| **Sent:** | 2/28/2022 5:38:18 PM |
| **To:** | Gaines, Shannon M [shannon.m.gaines@jpmorgan.com]; Whipkey, Laurie S [laurie.s.whipkey@jpmorgan.com]; Cook, Robert L [robert.l.cook@jpmorgan.com]; Charette-Feng, Karen [karen.charette-feng@jpmchase.com] |
| **CC:** | Schoenhaut, Michael S [michael.schoenhaut@jpmorgan.com]; Bernbaum, Eric J [eric.j.bernbaum@jpmorgan.com]; Clemens, Timothy J [timothy.j.clemens@jpmorgan.com]; Shlissel, Brian [brian.shlissel@jpmorgan.com] |
| **Subject:** | RE: CUSIP 97789LAB2 on Loan |

That's fine.  Thanks for the update.  Let's let this continue to play out.  It may come to pass that as it becomes more apparent in the market that our group has a blocking position on the '26 bond, some additional bonds will break loose and become available.  That would well serve our interest in growing the size of the block in order to discourage other shenanigans the issuer might attempt to dilute our group's voting power.

---

**Adv.Dkt.970 (Seketa, Mar. 1, 2024 Tr.) at 96:10-97:3:**

```
10        Q     Okay.  And the first reporting of Incora potentially
11   issuing new notes in order to dilute your group's voting power
12   didn't happen until March 1.  Right?
13        A     The first public reporting, yes, on March 1.
14        Q     You didn't have any knowledge prior to it being publicly
15   reported, did you?
16        A     Not the nature of the transaction, no.
17        Q     Or the fact that the transaction would involve the
18   issuance of additional notes.  Correct?
19        A     We didn't know anything about the structure of the
20   transaction.
21        Q     Okay.  So as of February 28, 2022 you wrote this email
22   that expressed your concern about the issuer attempting to
23   dilute your group's voting power.  Correct?
24        A     Yes.
25        Q     And correct me if I'm wrong, but at this time you were
1    concerned only with whether the company could issue up to $75
2    million of additional secured notes.  Right?
3         A     Yes.
```

The Proposed Order also cites a pitch book sent to the 2026 Noteholders by a financial advisor that was seeking engagement after the Reorg Research article was published on March 1,

2022. Proposed Order at 9 (citing Adv.Dkt.705-64). The Majority Group's reliance on this evidence is disingenuous at best. This pitch book merely parrots the possible maneuver described in the Reorg Research article, which also noted that it would result in litigation. An earlier pitch book, delivered prior to the Reorg Research article, noted the market's general understanding that any transaction would require 66 2/3% of all tranches, demonstrating that the later pitch book was responding to the Reorg Research article. Adv.Dkt.703-34 at 11. In any event, the 2026 Noteholders did not retain that advisor, nor adopt the advisor's statement. For that reason, the Court did not admit this document for the truth of the matter asserted. Adv.Dkt.970 at 99:20-107:6.

| Adv.Dkt.703-34 at 11 (Feb. 14, 2022 Deck): | Adv.Dkt.705-65 at 11 (Mar. 1, 2022 Deck): |
|---|---|
| **Priming Secured Financing** | **Priming Secured Financing** |
| **Amount** — [$100-200]M | **Amount** — [$100-200]M |
| **Estimated Cost** — [8-10%] + Fees | **Estimated Cost** — [8-10%] + Fees |
| **ABL Consent** — Yes | **ABL Consent** — Yes |
| **Secured Consent** — 66.67% for lien stripping | **Secured Consent** — 66.67% for lien stripping |
| **Unsecured Consent** — Majority (excl. Platinum) | **Unsecured Consent** — Majority (excl. Platinum) |
| **Strategic Considerations** — If the AHG has a block in 2026 Notes and Silver Point and PIMCO have a block in the 2024 Notes, then only path is a pro rata deal | **Strategic Considerations** — The Company may seek to circumvent any block in the 2026s by upsizing the tranche to dilute the AHG |
| — We believe unsecured noteholders may prefer a priming deal | — We believe unsecured noteholders may prefer a priming deal |

Moreover, as the excerpts from the trial testimony below show, the Court admitted these documents for very limited purposes, which do not include the propositions for which the Majority Group now seeks to use them. Adv.Dkt.970 (Seketa, Mar. 1, 2024 Tr.) at 99:1-13, 102:4-17, 106:6-107:6.

[*Remainder of Page Left Intentionally Blank*]

Adv.Dkt.970 (Seketa, Mar. 1, 2024 Tr.) at 99:1-13,102:4-17 (discussing deck received March 1):

```
1        Q    Prior to March 2022 -- prior to the March 2022
2     transaction multiple financial advisors informed you that the
3     company could amend its debt baskets and issue more than $75
4     million in new notes to dilute your group's blocking position.
5     Correct?
6              MR. ROSENBAUM:  Objection, hearsay.
7              THE COURT:  Overruled.  This is not being done for
8     the truth of whether they thought it's been done for whether
9     he was considering it, so it' a fair question that does not
10    involve the truth of the matter.
11             You can answer.
12             THE WITNESS:  We had received several decks that
13    suggested that the issuance of new notes was a possibility.
...
4        Q    Okay.  And then if you go down, straight down to the
5     bullet by the Strategic Considerations row, underneath the 100
6     to 200 million, and it says, The company may seek to
7     circumvent any block in the 2026s by upsizing the tranche to
8     dilute the ad hoc group.  Do you see that?
9        A    I see it.
10       Q    Okay.  And if you look at Footnote 1, Piper was
11    communicating to you that their views were based on publicly
12    available information.  Correct?
13       A    Yes.
14       Q    And the strategic consideration in the right hand column
15    warned you that the company may seek to circumvent any block
16    that your group had.  Isn't that correct?
17       A    Yes.
```

Adv.Dkt.970 (Seketa, Mar. 1, 2024 Tr.) at 106:6-107:6 (discussing admissibility of Reorg article):

```
 6              THE COURT:  All right.  I'm overruling the
 7      objection.  The reorg article explains that it is talking
 8      about a $75 million limit.  The issue as to whether they could
 9      go up higher than the 75 million is admitted.  In the exhibits
10      it is being offered solely for the purpose of whether the --
11      JPMorgan was warned correctly or incorrectly that additional
12      amounts above the 75 million might be used, which is relevant
13      solely for the defense that is being asserted that JPMorgan
14      should have taken actions such as selling its bonds to protect
15      its interest.
16              I won't tell you they're doing that, I'm not sure
17      that that's a mitigation defense that is valid, but I'm not
18      sure it isn't, and so I'm admitting it as relevant to the
19      mitigation defense that is being -- I'm using the term
20      mitigation, I think you used a slightly different term, I'm
21      admitting it because it has not been excluded from
22      consideration at this point.  I therefore find it to be
23      relevant evidence.  So it is admitted, but really for the
24      limited purpose of, as you said, warning to the company, or
25      notice to the company and --

 1              MR. KIRPALANI:  Yes.
 2              THE COURT:    -- not for the truth of whether they
 3      could, in fact, do that.
 4              MR. KIRPALANI:  Thank you, Your Honor.  I appreciate
 5      it.
 6              THE COURT:  Thank you.
```

Finally, as noted, the 2026 Noteholders advanced additional arguments before the Bankruptcy Court (which were not decided and which were presented in the 2026 Holders' limited objection) as to why the dilute-to-strip scheme undertaken by the Majority Group was impermissible under Sections 2.01(e), 2.02, 2.07, 2.08, 2.09, 4.12, 4.26 and subpoint 3 of the supermajority clause of Section 9.02 of the 2026 Indenture, as well as the 2026 Indenture's Rules of Construction and established principles of Second Circuit law, New York's single integrated transaction doctrine, Section 9.02(10)'s sacred right, Sections 3.02 and 3.07, and, alternatively, the implied covenant of good faith and fair dealing.  *See* ECF 35 at 16-19, 22-25, 27-28; *see also* ECF 76 at 3-4, 6-9, 10-11, 13-14.  Thus, the contention in the Proposed Order that the Minority Group was "fully aware" that the 2026 Indenture allowed for dilution by Wesco and the Majority Group to discharge the Minority Group's liens is simply incorrect.

In sum, the revisions above prevent the needless adoption of erroneous and legally immaterial factual findings.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

#### 2.    Consummation of the 2022 Transaction~~s~~.

Wesco and the Majority Group carried out their plan to resolve Wesco's liquidity crisis on March 28, 2022.  <u>"The 2022 Transaction was documented as follows:" ECF 3 at 19.</u>~~On that date, the parties entered into and consummated a series of agreements, each occurring in a specific order:~~

**Objection 14:**

This section of the Proposed Order has been conformed to the January 17 R&R.  *See* ECF 3 at 19-21.  As discussed further below, the proposed sequencing proffered by the Proposed Order is inconsistent with the January 17 R&R and the evidentiary record.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~*First*, Wesco adopted the Third Supplemental Indentures to the 2024, 2026, and 2027 Indentures, which amended the indentures to permit the issuance to the Majority Group of $250 million in additional 2026 Notes secured by the existing collateral.~~  <u>"The original Indentures were amended via the Third Supplemental Indentures to the 2024, 2026, and 2027 Indentures. The purpose of the Third Supplemental Indentures was to permit the issuance to the Majority Group of $250 million in additional 2026 Notes secured by the existing collateral.  These amendments were made pursuant to the simple majority provision contained in § 9.02 of the original Indentures." ECF 3 at 19-20 (citing</u> Adv.Dkt.601-30; Adv.Dkt.601-39; Adv.Dkt.604-18.<u>)</u>   "The Third Supplemental Indentures contained three principal amendments:  (1) adding new definitions of 'Additional 2026 Secured Notes' and 'Note Purchase Agreement;' (2) amending the definition of permitted liens to include liens securing the additional 2026 Notes; and (3) allowing the incurrence of the additional 2026 Notes.<u>"  ECF 3 at 20.</u>  ~~As required by §9.02 of the Indentures, those amendments were approved by the holders of a~~

38

majority of the 2024, 2026, and 2027 Notes—namely, the Majority Group and certain holders of the 2027 Notes, who together held more than two-thirds of the 2024 Notes, more than 59% of the 2026 Notes, and more than half of the 2027 Notes.

**Objection 15:**

Whether these amendments required majority, supermajority, or unanimous consent is a legal question. The 2026 Noteholders have explained elsewhere their position that the Third Supplemental Indenture required supermajority consent both because, among other reasons: (i) it "ha[d] the effect of releasing" liens; and (ii) allowing the incurrence of additional notes beyond the threshold of the previously negotiated Permitted Lien basket "modif[ied] the Security Documents and the provisions of this Indenture dealing with Collateral in any manner adverse to the Holders of . . . Secured Notes in [a] material respect." *See* ECF 35 at 7. The Bankruptcy Court agreed with the first point, although the Majority Group objected and this Court intends to sustain that objection. The Bankruptcy Court did not reach the second point; the 2026 Noteholders' limited objection asserted that argument as an alternative ground for affirmance, *see* ECF 35 at 16-18, but this Court has expressed an intention to overrule that objection.

The January 17 R&R also made factual findings as to the purpose of the Third Supplemental Indentures, which were omitted by the Proposed Order and which are added back here.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

*Second*, Wesco and certain members of the Majority Group entered into the Note Purchase Agreement, under which those members of the Majority Group invested $250 million of new money into the company, and Wesco used its authority under the Third Supplemental Indentures to issue them additional 2026 Notes in exchange. Adv.Dkt.602-24 at 4, 10. "Wesco's issuance to the Majority Group of $250 million in aggregate principal amount of additional 2026 Notes was performed through the Note Purchase Agreement." ECF 3 at 20 (citing Adv.Dkt.602-24 at 4, 10). "The original 2026 Indenture contemplated the issuance of additional secured notes on a *pari passu* basis in the form of "Additional Secured Notes," subject to limitations on the incurrence of debt and liens." ECF 3 at 20 (citing Adv.Dkt.601-8 at 54, 111). "The Third Supplemental Indentures amended the definitions necessary to permit the purchase of the additional 2026 Notes." ECF 3 at 20 (citing Adv.Dkt.601-39 at 2; Adv.Dkt.601-30 at 2; Adv.Dkt.604-18 at 2). That issuance comported with t"The 2026 Indenture, which specifically contemplated the issuance of additional secured notes on a *pari passu* basis in the form of 'Additional Secured Notes,' subject to limitations on the incurrence of debt and liens." ECF 3 at 20 (citing Adv.Dkt.601-8 at 54, 111). "The Third Supplemental Indentures amended the definitions necessary to permit the purchase of the additional 2026 Notes." ECF 3 at 20 (citing Adv.Dkt.601-39 at 2; Adv.Dkt.601-30 at 2; Adv.Dkt.604-18 at 2).After the Note Purchase Agreement was consummated, the Majority Group's total share grew from 59% to more than two-thirds of the then-outstanding 2026 Notes (including the new 2026 Notes that

~~Wesco issued to the Majority Group in exchange for their $250 million in new investment).~~

**Objection 16:**

The Proposed Order is inconsistent with the January 17 R&R, and it introduces factual findings that diverge from the Bankruptcy Court's findings and that are unnecessary to the Court's legal conclusions.  *See, e.g.*, Objection 1 (discussing purported purchase of additional *pari passu* notes).

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~*Third*, Wesco adopted t~~"The Fourth Supplemental Indentures~~, which~~ released the liens securing the 2024 Notes and 2026 Notes, as held by WSFS as the trustee for the notes, allowed for the issuance of new secured debt, and removed certain covenants that could prevent consummat~~ing~~ion of the 2022 Transaction[]~~s~~." ECF 3 at 20 (citing Adv.Dkt.601-33 at 1-3; Adv.Dkt.601-34 at 1-5; Adv.Dkt.604-4 at 1-5).~~*See* Adv.Dkt.601-34; Adv.Dkt.604-4.~~  "The Fourth Supplemental Indentures were accompanied by the consent letters of a two-thirds majority of holders of 2024 Notes and 2026 Notes (including the holders of the additional 2026 Notes), a majority of the 2027 Notes, and a majority of the Wolverine Top Holding Corporation PIK notes."  ECF 3 at 20 (citing Adv.Dkt.602-22; Adv.Dkt.602-33, Adv.Dkt.603-8; Adv.Dkt.603-10; Adv.Dkt.603-11; Adv.Dkt.603-13; Adv.Dkt.603-17; Adv.Dkt.603-29; Adv.Dkt.604-1; Adv.Dkt.604-17).  ~~Because the Fourth Supplemental Indentures "ha[d] the effect of releasing all or substantially all of" the collateral from the liens as to the 2024 and 2026 Notes, Adv.Dkt.601-20 at 124; Adv.Dkt.601-8 at 131, they required the consent of two-thirds of the then-outstanding 2024 and 2026 Notes, which the Majority Group provided.  *See* Adv.Dkt.602-22; Adv.Dkt.603-8; Adv.Dkt.603-10; Adv.Dkt.603-17.~~

**Objection 17:**

This paragraph has been conformed to the January 17 R&R.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

"The Exchange Agreement facilitated the exchange of participating 2024 Notes, 2026 Notes, and 2027 Notes for 1L Notes and 1.25L Notes. Pursuant to the Exchange Agreement, the participating secured noteholders agreed to deliver their 2024 Notes and 2026 Notes to Wesco, and in exchange, Wesco agreed to issue them the 1L Notes."  ECF 3 at 20-21 (citing Adv.Dkt.604-19 at 17). "Similarly, the participating unsecured noteholders agreed to deliver their 2027 Notes to Wesco in exchange for the 1.25L Notes."  ECF 3 at 21 (citing Adv.Dkt.604-19 at 18). "The Amended and Restated Notes Security Agreement was designed to grant first liens to the holders of the new 1L Notes.  ECF 3 at 21 (citing Adv.Dkt.602-27 at 6-8). ~~*Finally*,~~ Wesco entered into ~~three additional agreements: (i)~~ a Permitted Additional Pari Passu Secured Party Joinder with the notes collateral agent (Wilmington Savings Fund Society, or "WSFS") securing the 1L Notes with the same collateral

as the 2024 and 2026 Notes, *see* Adv.Dkt.604-15.; (ii) an Exchange Agreement with the Majority Group facilitating the exchange of participating 2024 Notes, 2026 Notes, and 2027 Notes for 1L Notes and 1.25L Notes, *see* Adv.Dkt.604-19; and (iii) an Amended and Restated Notes Security Agreement with WSFS reflecting the release of the liens as to the 2024 and 2026 Notes pursuant to the Fourth Supplemental Indentures and the addition of the 1L Notes to the liens pursuant to the Permitted Additional Pari Passu Secured Party Joinder, *see* Adv.Dkt.602-27.

**Objection 18:**

This paragraph has been conformed to the January 17 R&R, while accepting the Proposed Order's addition of the undisputed fact that the Permitted Additional Pari Passu Secured Party Joinder was entered into in connection with the 2022 Transaction.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

Although they were negotiated at the same time, each of the separate agreements that made up the 2022 Transactions did not by its terms depend on or require any of the subsequent transactions. For instance, Wesco's adoption of the Third Supplemental Indentures (allowing Wesco to issue additional 2026 Notes) did not mandate—or even mention—Wesco's subsequent adoption of the Fourth Supplemental Indentures (releasing the liens as to the 2024 and 2026 Notes). *See generally* Adv.Dkt.601-39 (Third Supplemental 2026 Indenture). Likewise, the Note Purchase Agreement (under which the Majority Group provided Wesco with $250 million in new money in exchange for the additional 2026 Notes) did not require and was not conditioned in any way on the subsequent exchange of those notes for the 1L Notes. *See generally* Adv.Dkt.602-24 (Note Purchase Agreement).

**Objection 19:**

The paragraph above includes factual findings that were not made in the January 17 R&R, that are inconsistent with the January 17 R&R and the evidentiary record (as discussed in the Objections below), and that are unnecessary to the Court's legal conclusions.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

The agreements closed in a sequence agreed to during an 8:15am call involving Wesco and the Majority Group on March 28, 2022. In advance of that call, Wesco and counsel for the Majority Group circulated copies of the transaction documents with signature pages attached (though not effective). *See* Adv.Dkt.710-49 at 2; Adv.Dkt.1146-3 at 2. Once each participant verbally confirmed that it was ready to proceed with the various transactions and authorized release of its signature pages, the parties agreed on the call that the signature pages for the transactions would be released in the order described above. Adv.Dkt.1146-5 at 2-3 (closing call agenda); *see* Adv.Dkt.1350 at 59 (describing circulating signed transaction documents and authorizing their release subject to a condition precedent as a "common" closing practice).

"Prior to a closing call that occurred at 8:15 a.m. on March 28, 2022, all parties had possession of fully executed transaction documents.  Pursuant to the agreements made at the Closing Call, each transaction document was deemed delivered automatically without any action required of any party."  ECF 3 at 21 (citing Adv.Dkt.694 at 56, 58; Adv.Dkt.710-56 at 2-8; Adv.Dkt.711-10 at 2; Adv.Dkt.1184 at 220, 225-26.)  "Counsel to the parties agreed ahead of the Closing Call that 'everything happens in order and at the same time.'" ECF 3 at 21 (citing Adv.Dkt.733-55 at 2). "PIMCO and Silver Point authorized their counsel to 'release signature pages' at the closing 'concurrent with the release of all other parties' signature pages.'"  ECF 3 at 21 (citing Adv.Dkt.710-9 at 2-4).  "By 5:06 a.m. ET on March 28, 2022, Wesco's counsel had circulated the fully executed copies of the transaction documents in escrow pending release and requested confirmation of release of signature pages." ECF 3 at 21 (citing Adv.Dkt.1146-3 at 2). "At 7:18 a.m. ET, PIMCO's and Silver Point's counsel sent executed versions of the Exchange Agreement and Note Purchase Agreement to representatives at Silver Point, PIMCO, and Citadel."   ECF 3 at 21 (citing Adv.Dkt.710-49 at 2, 243, 285, 293-97, 299-303.)  "PIMCO's and Silver Point's counsel indicated that they held 'execution versions for all documents' at that point."   ECF 3 at 21-22 (citing Adv.Dkt.710-49 at 2). "On March 28, after every party to the 2022 Transaction had possession of the fully executed transaction documents, the Closing Call began at approximately 8:15 a.m. ET.  The Closing Call lasted about ten minutes."  ECF 3 at 22 (citing Adv.Dkt.1184 at 48). "The Closing Call agenda, which was read as a script during the call, asked the representatives at each firm to confirm they were 'ready to close and that their clients authorize[d] the release of all of their signature pages in the following order in accordance with the Exchange Agreement.'" ECF 3 at 22 (citing Adv.Dkt.1146-5 at 2; Adv.Dkt.1184 at 14, 42-43).  "And the 'authorization [would] be to release all signature pages in the following order without any further action by any party.'"  ECF 3 at 22 (citing Adv.Dkt.1146-5 at 2).  "Each law firm was asked to 'confirm that their clients are ready to close and authorize release of their clients' signature pages,' 'which release will be without any further action by any party.'"  ECF 3 at 22 (citing Adv.Dkt.1146-5 at 3.)

**Objection 20:**

The paragraph above includes factual findings that were not made in the January 17 R&R, that are inconsistent with the January 17 R&R and the evidentiary record (as discussed below), and that are unnecessary to the Court's legal conclusions, so it should be replaced by the unobjected to findings of fact from the January 17 R&R.

*First*, while it is correct that, prior to the closing call, "transaction documents with signature pages attached" were circulated to all parties, the statement that they were "not effective" contravenes the evidentiary record in multiple ways.  For example, the Exchange Agreement expressly states that it "shall become effective" when each counterparty receives executed counterparts "by electronic mail in .pdf."  Adv.Dkt.1146-4 at 40.

Adv.Dkt.1146-4 at 40 (Exchange Agreement):

> 9.03.  Binding Effect; Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  This Agreement shall become effective when it shall have been executed by the Issuer, the Guarantors and each of the Holders, and when each such Person shall have received counterparts hereof (including delivery via facsimile or by electronic mail in .pdf, .tif, or similar format), which, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed signature page to this Agreement by facsimile transmission or other electronic means shall be as effective as delivery of a manually signed counterpart of this Agreement.

It is undisputed that all parties received a ".pdf" of the Exchange Agreement that did "bear the signatures of each of the other parties" prior to the closing call.  In fact, the Proposed Order cites Adv.Dkt.710-49 at 2, which is an email from the Majority Group's counsel releasing to their clients the fully executed Exchange Agreement in PDF with signatures.  *See* Adv.Dkt.710-49 to -52 (four exhibits comprising one email and its attachments).

Adv.Dkt.710-49 at 2 (Mar. 28, 2022 Email and excerpts from the attachment):

**From:**  "Li, Stella" <stella.li@davispolk.com>
**Sent:**  Mon, 28 Mar 2022 07:18:16 -0400 (EDT)

All,
 Please see attached execution versions of the Exchange Agreement and the Note Purchaser Agreement.  We now have execution versions for all documents.
 Thanks,
Stella
 Stella Li
Davis Polk & Wardwell LLP
 +1 212 450 3382 office
+1 607 793 0441 mobile
stella.li@davispolk.com

[*Remainder of Page Left Intentionally Blank*]

Adv.Dkt.710-49 at 2, 293-97 (excerpts from attachment to Mar. 28, 2022 Email):

**THE HOLDERS:**

CCOF Onshore Co-Borrower LLC

By: *Kristen Newville*
   Name: Kristen Newville
   Title: Vice President

   Address:  One Vanderbilt Avenue, Suite 3400, New York, NY 10017
   Facsimile:
   Attention:
   Email:  kristen.newville@carlyle.com

CSP IV ACQUISITIONS, L.P.
By: CSP IV (Cayman 1) General Partner, L.P., its general partner
By: TC Group CSP IV, L.L.C., its general partner
   By: *Kristen Newville*
     Name: Kristen Newville
     Title: Authorized Person

   Address:  One Vanderbilt Avenue, Suite 3400, New York, NY 10017
   Facsimile:
   Attention:
   Email:  kristen.newville@carlyle.com

CCOF Master, L.P.
By: CCOF General Partner, L.P., its general partner
By: CCOF L.L.C., its general partner
   By: *Kristen Newville*
     Name: Kristen Newville
     Title: Authorized Person

   Address:  One Vanderbilt Avenue, Suite 3400, New York, NY 10017
   Facsimile:
   Attention:
   Email:  kristen.newville@carlyle.com

[Signature Page to Exchange Agreement]

. . .

SENATOR GLOBAL OPPORTUNITY MASTER FUND L.P.

By: Senator GP LLC, its General Partner

By:
Name: Evan Gartenlaub
Title: Authorized Person

Holders identified on Annex A[1]

By: Pacific Investment Management Company LLC, as investment manager, adviser or sub-adviser

By:
   Name: Alfred T. Murata
   Title: Managing Director

Address:  650 Newport Center Drive
        Newport Beach, CA 92660
Facsimile: (949) 720-1376
Attention:  Control Group
Email:    ControlGroupNB@pimco.com

. . .

Wolverine Top Holding Corporation

By:
   Name: Mary Ann Sigler
   Title: President and Treasurer

Address: 360 N. Crescent Drive South Building,
        Beverly Hills, CA 90210
Facsimile:  (310) 712-1848
Attention:  John Holland
Email:  jholland@platinumequity.com

. . .

Spring Creek Capital, LLC

By:
   Name: Eric Butcher
   Title:  President

Address:  4111 E 37th St N, Wichita KS 67220
Facsimile:
Attention:  Quentin Manzi
Email:  springcreekops@kochind.com

     The finding that this was circulated to the parties was not objected to.  At 5:06am on the morning of the closing call, the Company's counsel wrote to its constituency, "[p]lease find attached the following documents, circulated in escrow . . . *1. Exchange Agreement . . . to release signature pages at 8am in the Closing Call.*"  ECF 1152-20 at 1 (emphasis added).  Then, as seen in the excerpts above, the Majority Group's counsel sent those documents to their clients at 7:18am.

     Thus, by design, the Exchange Agreement became binding before (or no later than during) the closing call to ensure that, when the Majority Group released any funds from escrow after the

closing call ended, it would get new super senior notes for its $250 million and never end up with additional *pari passu* 2026 Notes. That fact was proven by, among other things: (i) the script of the closing call, which says it is "in accordance with the Exchange Agreement," language that was specifically added to the closing script prior to the transaction closing, and which requires release of "all" signature pages "without any further action by any party," Adv.Dkt.1152-2 at 1, (ii) the Majority Group's pre-closing requirement that it "hav[e] certainty that everyone performs under each document once this thing gets started," Adv.Dkt.782-11 at 1; (iii) the Exchange Agreement's "Binding Effect" clause, excerpted above, and (iv) the integration clause within the Exchange Agreement that expressly makes the Third and Fourth Supplemental Indentures as well as all accompanying consents and other 2022 Transaction documents part of one integrated agreement, Adv.Dkt.1146-4 at 11, 17, 41.

---

Adv.Dkt.1152-2 at 1 (Closing Call Agenda):

### INCORA CLOSING CALL AGENDA

…

1. The agenda for the call will be as follows: we will ask representatives of each of the firms to confirm they are ready to close and that their ~~clients'~~clients authorize the release of all of their signature pages ~~will be released~~ in the following order in accordance with the Exchange Agreement. This ~~release will be~~authorization will be to release all signature pages in the following order without any further action by any party. The order is as follows:

---

Adv.Dkt.782-11 at 1 (Mar. 23, 2022 Email from Majority Group's deal counsel):

**From:** Libby, Angela M. <angela.libby@davispolk.com>
**Sent:** Wednesday, March 23, 2022 8:44:06 PM
**To:** Pisa, Al <APisa@milbank.com>; Bachelis, Nathaniel <NBachelis@milbank.com>
**Cc:** Massman, Stephanie <stephanie.massman@davispolk.com>; Rouben, Yasmeen <yrouben@paulweiss.com>; Wright, Kate <kwright@milbank.com>; incora.dpw <incora.dpw@davispolk.com>; Witt, Austin <awitt@paulweiss.com>; Pang, Xu <xpang@paulweiss.com>; Weber, John <jweber@paulweiss.com>; Dover, Ethan <edover@paulweiss.com>; Basta, Paul M. <pbasta@paulweiss.com>; Zaccone, Tracey A <tzaccone@paulweiss.com>; Mercadante, Philip <pmercadante@paulweiss.com>; Lanser, Taeler <tlanser@paulweiss.com>; #Incora <Incora@milbank.com>
**Subject:** RE: Project Elevate/Icicle - Exchange Agreement, Purchase Agreement

Thanks. That was intentional - just meant to flag I had dropped other folks. Happy to speak to whomever is appropriate at Paul Weiss as long as it's within the next hour or so, but we simply can't be in a position where we cannot require specific performance of the other parties to this agreement. We are funding new money and need to know that all consents get delivered and the exchange actually happens. Having certainty that everyone performs under each document once this thing gets started has been a fundamental point for us from day 1.

Angela M. Libby

**Davis Polk & Wardwell** LLP
+1 212 450 4433 office
+1 207 807 8783 mobile
angela.libby@davispolk.com

---

Adv.Dkt.1146-4 at 11, 17, 41 (Exchange Agreement):

"Exchange Documentation" means, collectively, this Agreement, the Exchange Consent Documents, the New Indentures, the Global Notes, the New Collateral Documents, the ABL Intercreditor Agreement, the New Notes Intercreditor Agreement and all definitive documentation governing, or related to, the Exchange, the Exchanged Notes and the New Notes, including all exchange agreements, consent agreements, indentures, security agreements, pledge agreements, certificates, instruments and other agreements.

"Transaction Documents" means, collectively, the Exchange Documentation and the Note Purchase Documents.

9.08.    Entire Agreement.    This Agreement and the other Transaction Documents constitute the entire contract between the parties with respect to the Exchange.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Transaction Documents.  Nothing in this Agreement or in the other Transaction Documents, expressed or implied, is intended to confer upon any Person (other than (i) the parties hereto and thereto and their respective successors and assigns permitted hereunder, (ii) the Indemnified Persons and other Persons entitled to payments as provided in Article VIII, and (iii) any Non-Party Existing 2026 Notes Holder, solely for purposes of Section 2.04) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Transaction Documents.

The Proposed Order also references unspecific testimony from the Trustee's witness that was not mentioned or credited by the Bankruptcy Court, reciting what that witness said was a "common" practice in other unrelated closings, where conditions are fulfilled before signatures are released.  Adv.Dkt.1350.  But that testimony is immaterial to this case, since that is not what happened in this closing.  Here, as the Bankruptcy Court's unobjected to factual findings state and the irrefutable evidence proves: "Pursuant to the agreements made at the Closing Call, each transaction document was deemed delivered automatically without any action required of any party." ECF 3 at 21 (citing Adv.Dkt.694 at 56, 58; Adv.Dkt.710-56 at 2-8; Adv.Dkt.711-10 at 2; Adv.Dkt.1184 at 220, 225-26).  Not one other document executed as part of the 2022 Transaction includes the "Binding Effect" language found in the Exchange Agreement, which made it enforceable upon receipt of a fully executed PDF, thus undermining even further the pertinence of what the Trustee's witness said generically about what was "common" in other closings he participated in.

*Second*, the Majority Group's characterization of the closing call is incomplete and inconsistent with the text of the script, which is set forth below.

[*Remainder of Page Left Intentionally Blank*]

46

Adv.Dkt.1146-5 (Closing Call Agenda):

**INTERNAL MILBANK DRAFT ONLY**
3/26/22

### INCORA CLOSING CALL AGENDA

Good Morning.

Let's begin with a roll call. We ask that a representative from each group confirm you are on the line:

**Wilmington Savings**

**Pryor Cashman**

**Latham**

**Morgan Lewis**

**Cahill**

**Davis Polk**

**Paul Weiss**

**Platinum**

**Incora**

1. The agenda for the call will be as follows: we will ask representatives of each of the firms to confirm they are ready to close and that their clients authorize the release of all of their signature pages in the following order in accordance with the Exchange Agreement. This authorization will be to release all signature pages in the following order without any further action by any party. The order is as follows:

(i) the release of signatures to each of the "Purchase Consent Documents", consisting of the 2024 Consent Letter and Third Supplemental Indenture, the 2026 Consent Letter and Third Supplemental Indenture, the 2027 Consent Letter and Third Supplemental Indenture, the Holdco PIK Notes Consent Letter and First Supplemental Indenture; the ABL Amendment as well as any ancillary documents related to any of the foregoing;

(ii) the release of signatures to the Notes Purchase Agreement relating to the purchase of 250 million dollars of Additional 2026 Notes;

(iii) as soon as such notes purchase has been consummated, the release of signatures to each of the "Exchange Consent Documents", consisting of the 2024 Exchange Consent Letter and Fourth Supplemental Indenture, the 2026 Exchange Consent Letter and Fourth Supplemental Indenture, the 2027 Exchange Consent Letter and Fourth Supplemental Indenture and the Holdco PIK Notes Exchange Consent Letter and Second Supplemental Indenture; as well as any ancillary documents related to any of the foregoing;

(iv) the release of signatures to the Permitted Pari Passu Secured Party Joinder and the Amended and Restated Notes Security Agreement; as well as any ancillary documents related to any of the foregoing; and

47

(v) as soon as the foregoing Exchange Consent Documents have been delivered, the release of signatures to the Exchange Agreement effectuating the exchange into the New 1st Lien and 1.25 Lien Notes; as well as all Collateral Documents named therein and exhibits to the Exchange Agreement, including the 1st Lien and 1.25 Lien indentures, and all ancillary documents related to any of the foregoing;

2. And now we will ask representatives of each of the firms to confirm they are ready to close and that their clients' signature pages will be released in the order described, which release will be without any further action by any party:

(i) Can a representative of Davis Polk confirm that their clients are ready to close and authorize release of their clients' signature pages?

(ii) Can a representative of Paul Weiss please confirm that their clients are ready to close and authorize release of their clients' signature pages?

(iii) Can a representative of Morgan Lewis please confirm that their clients are ready to close and authorize release of their clients' signature pages?

(iv) Can a representative of Cahill confirm that their clients are ready to close and authorize release of the ABL Lenders' signature pages?

(v)  Can a representative of Platinum or Latham confirm that Platinum is ready to close and authorize release of Platinum's signature pages?

(vi) Can a representative of Wilmington or Pryor Cashman confirm that Wilmington is ready to close and authorize release of Wilmington's signature pages?

(vii) Milbank confirms release of each of the local Texas, Pennsylvania and Florida counsel opinions and each of the Milbank opinions, noting that the Milbank opinion being delivered in connection with the Notes Purchase Agreement is released concurrently with the release of signatures to the Notes Purchase Agreement, and the Milbank opinions being delivered in connection with the Exchange Agreement are released concurrently with the release of signatures to the Exchange Agreement.

(viii) Milbank also confirms that the Release Certificate instructing the release from the Escrow Account is being circulated to the Wilmington, Pryor Cashman and Davis Polk teams, for Davis Polk to please reply confirmed.

3. Initiation of wires

- Wilmington– please confirm that, upon receiving such certificate and email confirmation, you are ready to initiate the wire transfer in accordance with the instructions you've received?
- PIMCO or Davis Polk on PIMCO's behalf – please confirm that you are ready to initiate wire transfers in accordance with the instructions you've received?

**Thank you to everyone and congratulations. Please be sure to circulate any wire confirmations or fed ref numbers on the email chain provided. We will circulate an email confirmation of the issuance of the physical additional 2026 notes.**

[*Remainder of Page Left Intentionally Blank*]

As discussed further below, "Andres Osornio, counsel to Wesco, testified that the parties agreed on the Closing Call that the authorization to release signatures would be without any further action by any party, and that after the Closing Call, there was nothing else to be agreed upon or negotiated in connection with the 2022 Transaction."  ECF 3 at 22-23 (citing Adv.Dkt.1184 at 8-10, 206).

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~The transactions were then consummated in order over the course of the next seven hours.  The Third Supplemental Indentures were delivered to the indenture trustee shortly after the closing call ended, at 8:27am and 8:30am.  *See* Adv.Dkt.1150-4; Adv.Dkt.1150-5.  The wires transmitting the $250 million in new investment from the Majority Group to Wesco were completed at 12:54pm.  *See* Adv.Dkt.1150-10.  Once Wesco confirmed receipt of funds, at 1:37pm, Wesco instructed the indenture trustee to authenticate and issue the additional 2026 Notes, which were then delivered to the Majority Group.  *See* Adv.Dkt.1150-11; Adv.Dkt.1155-1 to -7.  About half an hour later, Wesco delivered the Fourth Supplemental Indentures to the indenture trustee along with consent letters from two-thirds of the holders of the 2024 and 2026 Notes (including the new 2026 Notes), amending the 2024 and 2026 Indentures to allow for release of the liens as to the 2024 and 2026 Notes.  *See* Adv.Dkt.710-43 at 2; Adv.Dkt.1150-16; Adv.Dkt.1150-18.  The indentures governing the 1L and 1.25L Notes were then delivered to the indenture trustee, followed by the exchange of the 2024, 2026, and 2027 Notes for the 1L and 1.25L Notes, with the final step reaching completion around 3:08pm.  *See* Adv.Dkt.1150-19; Adv.Dkt.1150-21; Adv.Dkt.1150-23; Adv.Dkt.1184 at 139-40.~~ "The Closing Call was completed at around 8:25 a.m. ET, at which point the signatures for the note purchase and exchange documents were automatically released."  ECF 3 at 22 (citing Adv.Dkt.1146-5 at 2-3; Adv.Dkt.1184 at 246).  "By 8:26 a.m. ET, PIMCO's and Silver Point's counsel confirmed the release of the funds from escrow and the signature pages."  ECF 3 at 22 (citing Adv.Dkt.716-15 at 2; Adv.Dkt.1150-7 at 1).  "The email was sent by PIMCO's and Silver Point's counsel to representatives of Silver Point, PIMCO, and Citadel."  ECF 3 at 22 (citing Adv.Dkt.716-15 at 2).  "An internal Citadel email sent at 8:26 a.m. ET indicated the 'transaction has officially closed.'"  ECF 3 at 22 (citing Adv.Dkt.1117-15 at 1).  "At 8:27 a.m. ET, WSFS's counsel confirmed the escrowed funds were to be released."  ECF 3 at 22 (citing Adv.Dkt.1150-8 at 1).  "At 8:53 a.m. ET, a representative of Carlyle emailed members of Spring Creek confirming that the transaction '[c]losed this morning' and that 'all sig[nature] pages released, [and] wires released.'"  ECF 3 at 22 (citing Adv.Dkt.723-8 at 2).  "Andres Osornio, counsel to Wesco, testified that the parties agreed on the Closing Call that the authorization to release signatures would be without any further action by any party, and that after the Closing Call, there was nothing else to be agreed upon or negotiated in connection with the 2022 Transaction."  ECF 3 at 22-23 (citing Adv.Dkt.1184 at 8-10, 206).

**Objection 21:**

This paragraph is inconsistent with the January 17 R&R, and it includes facts that are misleading and inconsistent with the record. In particular, it implies that funds were sent after the Third Supplemental Indenture and the Note Purchase Agreement were executed. That is false. *Everyone involved* confirmed that signatures were released and thus the transaction closed *during the closing call*, and the funds were released from escrow *after* the closing call but before anything else had occurred.

*First*, multiple transaction participants confirmed immediately after the closing call that the transaction *had* closed and signature pages *had been* released, saying "signature pages have now been released," "transaction has officially closed," and that the transaction "closed this morning, all sig pages released, wires released."

Adv.Dkt.716-15 at 2 (Mar. 28, 2022 Email, sent at 8:26am from Majority Group's counsel to their clients):

| | |
|---|---|
| **From:** | "Massman, Stephanie" <stephanie.massman@davispolk.com> |
| **Sent:** | Mon, 28 Mar 2022 08 26:03 -0400 (EDT) |
| **To:** | "Li, Stella" <stella.li@davispolk.com>; "Zhang, Helen"<helen.zhang@davispolk.com>; "jzinman@silverpointcapital.com"<jzinman@silverpointcapital.com>; "Samuel.Dostart@pimco.com"<Samuel.Dostart@pimco.com> |
| **Cc:** | "Chai, Heidi" <Heidi.Chai@pimco.com>; Matt Seanor<mseanor@silverpointcapital.com>; "mtwigg@silverpointcapital.com"<mtwigg@silverpointcapital.com>; CreditAdmin<CreditAdmin@silverpointcapital.com>; FEDS <FEDS@silverpointcapital.com>; Citadel US Voluntary Reorg <USVoluntaryReorg@citadel.com>; Alan Rochard<Alan.Rochard@citadel.com>; "jonny.cheatle@citadel.com"<jonny.cheatle@citadel.com>; "paul.sullivan@citadel.com"<paul.sullivan@citadel.com>; Jordan Zahn <Jordan.Zahn@citadel.com>; "Andrew Warren" <Andrew.Warren@citadel.com>; Kevin Newstead<Kevin.Newstead@citadel.com>; "Shute, Graham" <Graham.Shute@pimco.com>; "ellen.wheeler@pimco.com" <ellen.wheeler@pimco.com>; "Kemp, Chris"<Chris.Kemp@pimco.com>; "Podolanczuk, Andy" <Andy.Podolanczuk@pimco.com>; "Bennett, John" <John.Bennett@StateStreet.com>; "Hudgins, Alexandra"<Alexandra.Hudgins@pimco.com>; "Anavim, Nersi"<Nersi.Anavim@statestreet.com>; ProjectElevateEVR<ProjectElevateEVR@evercore.com>; incora.dpw <incora.dpw@davispolk.com> |
| **Bcc:** | "s_pp_exch" <s_pp_exch@pimco.com>; "Hudgins, Alexandra" <alexandra.hudgins@pimco.com>; "Podolanczuk, Andy" <andy.podolanczuk@pimco.com>; "Kemp, Chris" <chris.kemp@pimco.com>; "Wheeler, Ellen" <ellen.wheeler@pimco.com>; "Shute, Graham" <graham.shute@pimco.com>; "Chai, Heidi" <heidi.chai@pimco.com>; "Dostart, Samuel" <samuel.dostart@pimco.com> |
| **Subject:** | RE: Incora - Closing Call |

**This Message Is From an External Sender**
This message came from outside your organization.

All --
The signature pages have now been released and we have confirmed release of the funds held in the escrow account.
For those that have not prefunded into escrow, please initiate your wires and send the DPW team the federal reference numbers so we can convey those to the company.
We will follow up once the company has confirmed the issuance of the physical additional 2026 notes.
Best,
Stephanie
    Stephanie Massman
    Davis Polk & Wardwell LLP
    +1 212 450 3415 office
    +1 214 232 8225 mobile

*[Remainder of Page Left Intentionally Blank]*

Adv.Dkt.1117-15 at 1 (Mar. 28, 2022 Email, sent at 8:26am from Citadel's lead negotiator to others internally):

**From:** Rochard, Alan <Alan.Rochard@citadel.com>
**Sent:** Monday, March 28, 2022 8:26 AM
**To:** Newstead, Kevin <Kevin.Newstead@citadel.com>; Feingerts, Bradley <Bradley.Feingerts@citadel.com>; Zahn, Jordan <Jordan.Zahn@citadel.com>; Cheatle, Jonny <Jonny.Cheatle@citadel.com>; MacIntosh, Mike <Mike.MacIntosh@citadel.com>; Hickman, Pete <Pete.Hickman@citadel.com>; Sullivan, Paul <Paul.Sullivan@citadel.com>
**Cc:** Citadel US Voluntary Reorg <USVoluntaryReorg@citadel.com>; Warren, Andrew <Andrew.Warren@citadel.com>
**Subject:** RE: Incora New Money Funding Workstreams

All – transaction has officially closed. 
Redacted

Thanks,
Alan

Adv.Dkt.723-8 at 2 (Mar. 28, 2022 Email, sent at 8:53am from Carlyle's lead negotiator to others aligned with Carlyle):

**From:** Jesse Hou
**Sent:** Monday, March 28, 2022 8:53 AM
**To:** 'Butcher, Eric K' <Eric.Butcher@kochind.com>; 'Sherman, Adam' <Adam.Sherman@springcreekcap.com>; 'Ruch, Craig' <Craig.Ruch@springcreekcap.com>
**Subject:** RE: Incora update

Closed this morning, all sig pages released, wires released, wires should hit this afternoon, then press release + cleansing materials + final docs all to be posted simultaneously.

Thank you all for the responsiveness and the patience throughout this process. Glad we got to this outcome.

Jesse Hou
Email: jesse.hou@carlyle.com

*Second*, the emails immediately after the closing call show that the release of the escrow funds happened before any other actions that day, all of which were simply ministerial collation of papers. In fact, the Company only circulated the Third Supplemental Indenture *after* the Majority Group's counsel and the Trustee's counsel confirmed the release of funds from escrow.

Adv.Dkt.1150-7 (Mar. 28, 2022 Email, displaying timestamp in Coordinated Universal Time, four hours ahead of Eastern Daylight Time):

**From:** Massman, Stephanie[stephanie.massman@davispolk.com]
**Sent:** Mon 3/28/2022 12:25:51 PM Coordinated Universal Time
**To:** Wright, Kate[kwright@milbank.com]; incora.dpw[incora.dpw@davispolk.com]; Healy, Patrick[PHealy@wsfsbank.com]; jmcnichol@wsfsbank.com[jmcnichol@wsfsbank.com]; psibley@pryorcashman.com[psibley@pryorcashman.com]; Lieberman, Seth H.[SLieberman@PRYORCASHMAN.com]; Smith, David W.[DSmith@PRYORCASHMAN.com]
**Cc:** #Incora[Incora@milbank.com]
**Subject:** RE: Project Elevate - Escrow Release Certificate

Release Confirmed

Stephanie Massman
Davis Polk & Wardwell LLP

Adv.Dkt.1150-8 (Mar. 28, 2022 Email, sent at 8:27:04am):

From: Smith, David W.[DSmith@PRYORCASHMAN.com]
Sent: Mon 3/28/2022 8:27:04 AM Eastern Daylight Time
To: Wright, Kate[kwright@millbank.com]; incora.dpw[incora.dpw@davispolk.com]; Healy, Patrick[PHealy@wsfsbank.com]; jmcnichol@wsfsbank.com[jmcnichol@wsfsbank.com]; Sibley, Patrick[PSibley@PRYORCASHMAN.com]; Lieberman, Seth H.[SLieberman@PRYORCASHMAN.com]
Cc: #Incora[Incora@millbank.com]
Subject: RE: Project Elevate - Escrow Release Certificate

Release Confirmed.

_____

DAVID W. SMITH
Partner
PRYOR CASHMAN LLP

---

Adv.Dkt.1150-4 at 1 (Mar. 28, 2022 Email, sent at 8:27:16am):

From: Osornio, Andres[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1601E985A84E4293B329E2BFDA7A99CF-OSORNIO, AN]
Sent: Mon 3/28/2022 12:27:16 PM Coordinated Universal Time
To: Healy, Patrick[PHealy@wsfsbank.com]; Smith, David W.[DSmith@PRYORCASHMAN.com]; Lieberman, Seth H.[SLieberman@PRYORCASHMAN.com]; Sibley, Patrick[PSibley@PRYORCASHMAN.com]
Cc: Libby, Angela M.[angela.libby@davispolk.com]; Pera, Michael[michael.pera@davispolk.com]; incora.dpw[incora.dpw@davispolk.com]; Zhang, Helen[helen.zhang@davispolk.com]; #Incora[Incora@millbank.com]
Subject: Incora - Supplemental Indentures to permit 2026 Additional Notes (1)
Attachment: Email 1.zip

Dear WSFS team –

As discussed on the closing call, attached please find the execution versions of the Third Supplemental Indenture of the existing 2024 Notes, the Third Supplemental Indenture of the existing 2026 Notes, the Third Supplemental Indenture of the existing 2027 Notes and the First Supplemental Indenture of the HoldCo PIK Notes to permit the incurrence of the 2026 Additional Notes, which are entered into pursuant to the consent letters and the related Officer's Certificates and Opinions of Counsel all of which have been separately delivered.

Best regards,
Andres

Andres Osornio Oramona | Milbank | Associate
Phone/m: he/him/his
55 Hudson Yards | New York, NY 10001-2163
T: +1.212.530.5013 | C: +1.646.946.0494
AOsornio@milbank.com | milbank.com

---

Further, as to what the Majority Group alleges happened after the closing call, the Bankruptcy Court did not admit the emails circulated after the closing call for the truth of the matter asserted, instead ruling that the language "release confirmed" and "attached please find" are verbal acts and admitted for truth, while other statements were admitted for notice only. *See, e.g.*, Adv.Dkt.1184 at 57:10-58:4 (admitting "attached please find" through "2026 Additional Notes" for the truth and the remainder of 1150-4 for notice), 66:3-12 (admitting "Release Confirmed" as a verbal act, for the truth, and the remainder of 1150-7 for notice), 67:15-21 (admitting "Release Confirmed" as a verbal act, for the truth, and the remainder of 1150-8 for notice).

The Proposed Order further errs by implying that the Trustee authenticated, issued, and delivered the additional notes at 1:37pm, citing Adv.Dkt.1155-1 to -7. But WSFS did not take any actions to execute or authenticate the transaction documents on the day of the closing. In fact, no one from WSFS was present in the closing room when associates from counsel representing the Company and Majority Group compiled the purported additional notes. Adv.Dkt.1350 at 285:7-9

(no one from WSFS was at counsel's office for the closing); Adv.Dkt.1184 at 87:14-88:10, 90:24-91:6 (only associates from counsel representing Silver Point, PIMCO, and the Company were in the room with the new notes to collate them).  Although the Trustee provided confirmation of receipt of certain transaction documents over email, it did not provide authentication for the additional 2026 Notes.  Adv.Dkt.1184 at 193:15-194:21 (WSFS never responded to authenticate additional 2026 Notes).  In fact, it was Wesco's counsel that made the call to cancel the additional 2026 Notes, not WSFS.  Adv.Dkt.1184 at 197:5-24.  *See also* Adv.Dkt.1184 at 206:2-12 (the parties authorized the release of all of their signature pages "without any further action by any party"), 220:3-10, 225:9-226:4 (all transaction documents were executed before the closing call).

---

Adv.Dkt.1350 (Healy, June 3, 2024 Tr.) at 285:7-9 (no one from WSFS was at counsel's office for the closing):

```
7      Q    Okay.  And no one from WSFS or its counsel was at

8      Milbanks' office on March 28th.

9      A    No.
```

---

[*Remainder of Page Left Intentionally Blank*]

Adv.Dkt.1184 (Osornio, Apr. 18, 2024 Tr.) at 193:15-194:21 (WSFS never responded to authenticate the purported additional 2026 Notes):

15     Q   So picking up where we left off, 1:37 p.m., you send an

16     authentication order to WSFS, right?

17     A   Yes.

18     Q   1:38, they send an email back saying receipt confirmed,

19     right?

20     A   Yes.

21     Q   And that's at Tab 10 of your binder, and that's ECF 716-

22     34, right?

23     A   Correct.

24     Q   And then you send the fourth supplemental indenture at

25     2:13 p.m.; is that right?

1     A   Yes.

2     Q   Okay.  So 1:37 authentication order sent, 1:38 p.m. WSFS

3     says receipt confirmed, and 2:13 p.m., you send the fourth

4     supplemental indenture.  But between the time that you sent

5     the authentication order for the notes at 1:37 p.m. and the

6     time that you sent the fourth supplemental indentures at 2:13

7     p.m., you didn't hear anything from WSFS or its counsel other

8     than the message saying receipt confirmed, correct?

9     A   Correct.

10     Q   Okay.  And we previously looked an authentication

11     delivery that was dated March 28, 2022, correct?

12     A   Yes.

13     Q   Okay.  And that was attached to the email that Kate

14     Wright sent on March 26, 2022?

15     A   Yes.

16     Q   But between 1:37 p.m. and 2:13 p.m. on March 28, 2022,

17     WSFS never sent you an authentication and delivery, correct?

18     A   Correct.

19     Q   Okay.  And WSFS' counsel didn't send you that either,

20     right?

21     A   No.

Adv.Dkt.1184 (Osornio, Apr. 18, 2024 Tr.) at 197:5-24 (Osornio made the call to cancel the purported additional 2026 Notes, not WSFS):

```
5     Q     You did not, on March 28, 2022, you didn't receive an
6     instruction from WSFS to cancel the purported notes, did you?
7     A     Correct.
8     Q     But at some point in the afternoon of March 28, 2022, you
9     instructed the Milbank associates to cancel the purported
10    notes?
11    A     Yes.
12    Q     And you made the determination of when to instruct those
13    Milbank associates?
14    A     Could you specify what you mean that I made the
15    determination?
16    Q     Sure.  Putting aside what factors you considered -- we're
17    not going into that -- but you made the determination of when
18    the Milbank associates would be instructed to cancel the
19    notes.
20    A     Correct.
21    Q     Okay.  And between the time the notes were compiled and
22    the time the notes were stamped as cancelled, those purported
23    notes never left Milbank's offices, right?
24    A     Correct.
```

[*Remainder of Page Left Intentionally Blank*]

55

Adv.Dkt.1184 (Osornio, Apr. 18, 2024 Tr.) at 206:2-24 (the parties authorized the release of all of their signature pages "without any further action by any party"):

```
 1        BY MR. STEIN:
 2        Q    On the closing call, the parties also agreed that the
 3        authorization to release signatures would be without any
 4        further action by any party; is that correct?
 5        A    Correct.
 6        Q    And after the closing call, there was nothing else left
 7        to be agreed upon or negotiated, correct, in connection with
 8        the 2022 transaction?
 9        A    Correct.
10        Q    And it was just a matter of implementing everything that
11        had been agreed to on the call, right?
12        A    In the order agreed on the call, yes.
13             MR. STEIN:  Your Honor, move to strike the answer.
14        The question I asked was: It was just a matter of implementing
15        everything that had been agreed to on the call; is that
16        correct?
17             THE COURT:  What's your answer to that?
18             THE WITNESS:  Could you specify what you mean by
19        agreed on the call?
20        BY MR. STEIN:
21        Q    It was just a matter of implementing everything that had
22        been agreed to on the call after the closing call had
23        completed.
24        A    Yes.
```

In fact, nothing was ever delivered.  PIMCO's contemporaneous trading records for the 2022 Transaction do not reflect any purchase of any additional, *pari passu* 2026 Notes. The description in PIMCO's trade ticket for the 2022 Transaction instead reflects that its new money investment was to purchase "INCORA SUPER SENIOR 10.5% BONDS," *i.e.*, the 1L Notes.  *See generally* Adv.Dkt.725-28 (PIMCO Trading Report showing that PIMCO purchased only new 1L Notes and not purported additional 2026 Notes); Adv.Dkt.969 at 156:6-157:24, 158:22-25

(confirming the accuracy of PIMCO's Trading Report); Adv.Dkt.905-6 at 2-3 (Mar. 18, 2022 Emails).

Adv.Dkt.725-28 at 25 (PIMCO Trading Report showing that PIMCO purchased only new 1L Notes and not purported additional 2026 Notes):

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1508 | PIMCO Global StocksPLUS & Income Fund | 03/28/2022 | 03/28/2022 | 950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 875,000.00 | 100.00 Buy (Backstop) |
| 1509 | PCM Fund, Inc. | 03/28/2022 | 03/28/2022 | 950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 826,000.00 | 100.00 Buy (Backstop) |
| 1510 | BMO Global Strategic Bond Fund | 03/28/2022 | 03/28/2022 | 950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 438,000.00 | 100.00 Buy (Backstop) |
| 1511 | Texas Children's Hospital Foundation | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 244,000.00 | 100.00 Buy (Backstop) |
| 1512 | PIMCO Tactical Income Opportunities Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,103,000.00 | 100.00 Buy (Backstop) |
| 1513 | PIMCO Global Income Opportunities Fund | 03/28/2022 | 03/28/2022 | US950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,329,000.00 | 100.00 Buy (Backstop) |
| 1514 | Desjardins Floating Rate Income Fund | 03/28/2022 | 03/28/2022 | US950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 289,000.00 | 100.00 Buy (Backstop) |
| 1515 | Desjardins Global Tactical Bond Fund | 03/28/2022 | 03/28/2022 | US950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 1,045,000.00 | 100.00 Buy (Backstop) |
| 1516 | PIMCO Strategic Income Fund, Inc. | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,134,000.00 | 100.00 Buy (Backstop) |
| 1517 | PIMCO Corporate & Income Opportunity Fund | 03/28/2022 | 03/28/2022 | 950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 12,328,000.00 | 100.00 Buy (Backstop) |
| 1518 | PIMCO High Income Fund | 03/28/2022 | 03/28/2022 | 950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 5,337,000.00 | 100.00 Buy (Backstop) |
| 1519 | PIMCO Income Strategy Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,719,000.00 | 100.00 Buy (Backstop) |
| 1520 | PIMCO Income Strategy Fund II | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 5,397,000.00 | 100.00 Buy (Backstop) |
| 1521 | PIMCO Corporate & Income Strategy Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 3,810,000.00 | 100.00 Buy (Backstop) |
| 1522 | PIMCO Funds: PIMCO Low Duration Credit Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 391,000.00 | 100.00 Buy (Backstop) |
| 1523 | PIMCO Dynamic Income Opportunities Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 16,585,000.00 | 100.00 Buy (Backstop) |
| 1524 | PIMCO Funds: PIMCO High Yield Spectrum Fund | 03/28/2022 | 03/28/2022 | US950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 130,000.00 | 100.00 Buy (Backstop) |
| 1525 | PIMCO ETF Trust: PIMCO 0-5 Year High Yield Corporate Bond Index Exchange-Traded Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 426,000.00 | 100.00 Buy (Backstop) |
| 1526 | Bakery and Confectionery Union and Industry International Pension Fund | 03/28/2022 | 03/28/2022 | US950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 185,000.00 | 100.00 Buy (Backstop) |
| 1527 | Employees' Retirement System of the State of Rhode Island | 03/28/2022 | 03/28/2022 | US950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 105,000.00 | 100.00 Buy (Backstop) |
| 1528 | PIMCO Dynamic Income Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 40,091,000.00 | 100.00 Buy (Backstop) |
| 1529 | PIMCO Flexible Credit Income Fund | 03/28/2022 | 03/28/2022 | US950814AA1 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 22,247,000.00 | 100.00 Buy (Backstop) |
| 1530 | PIMCO ETFs plc: PIMCO US Short-Term High Yield Corporate Bond Index UCITS ETF | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 598,000.00 | 100.00 Buy (Backstop) |
| 1531 | PIMCO OP Trust Flexible Credit Fund, L.P. | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 1,823,000.00 | 100.00 Buy (Backstop) |
| 1532 | PIMCO Tactical Income Fund | 03/28/2022 | 03/28/2022 | US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,403,000.00 | 100.00 Buy (Backstop) |

Detail from seventh column:

| | | | | |
|---|---|---|---|---|
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 875,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 826,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 438,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 244,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,103,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,329,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 289,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 1,045,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,134,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 12,328,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 5,337,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,719,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 5,397,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 3,810,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 391,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 16,585,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 130,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 426,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 185,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 105,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 40,091,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 22,247,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 598,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 1,823,000.00 | 100.00 | Buy (Backstop) |
| US950814AA18 | INCORA SUPER SENIOR 10.5% BONDS**DEF** | 2,403,000.00 | 100.00 | Buy (Backstop) |

Silver Point's and Citadel's trading records also contradict the erroneous sequencing narrative in the Proposed Order. Silver Point's trading records for March 28, 2022, show that it recorded purchases of new super senior notes *before* additional *pari passu* 2026 Notes; so, they have the sequence backwards since new super senior notes were supposed to come last in the purported chain of events. *Compare* Adv.Dkt.729-53 at rows 2585-3199 (Silver Point trade log) (acquiring 1L Notes), *with id*. at rows 3200-3208 (acquiring additional 2026 Notes). Meanwhile, Citadel's corporate representative testified that Citadel had to physically receive Additional 2026

Notes before exchanging them for new 1L Notes, but Mr. Rochard had no basis to believe that Citadel had physically received Additional 2026 Notes before receiving new 1L Notes. Adv.Dkt.1173 at 49:4-20, 51:20-52:1.

| Adv.Dkt.1173 (Rochard, Apr. 12, 2024 Tr.) at 49:4-20, 51:20-52:1: |
|---|
| 4      Q   And on the next page, your answer was "Mr. Newstead was |
| 5      asking me if we could just receive the new 1L, and I |
| 6      subsequently actually corrected him in that chat, explaining |
| 7      to him that we should actually receive the new 2026 notes |
| 8      physically before exchanging them for the 1L." Do you see |
| 9      that? |
| 10     A   Correct. |
| 11     Q   Okay. So does that refresh your recollection that you |
| 12     said physically yesterday? |
| 13     A   It does, yes. |
| 14     Q   Okay. Thank you. So at the time you responded to Mr. |
| 15     Newstead with that clarification about physical receipt of the |
| 16     new 2026 notes, Citadel didn't yet physically receive those |
| 17     new 2026 notes, correct? |
| 18     A   I don't know. |
| 19     Q   Do you have any reason to believe that it did? |
| 20     A   I don't, but again, I don't know. |
| ... |
| 20     Q   And Citadel never actually received additional 2026 notes |
| 21     physically, correct? |
| 22     A   I don't know if we received a paper copy of the 2026 |
| 23     notes. |
| 24     Q   And you don't know sitting here today where those |
| 25     additional 2026 notes are physically, do you? |
| 1     A   I don't know. |

Finally, the Proposed Order's misleading narrative also fails because it tries to side-step when the Exchange Agreement became binding on the parties.  Unlike the other transaction documents, there was no email sent to the other parties that attached the Exchange Agreement or purported to release its signature pages after the closing call.  That document was only circulated prior to closing, and (as explained above), by its own terms became binding and effective on or before the closing call.  Adv.Dkt.1184 at 212:16-213:6; Adv.Dkts.710-56 at 2; 1184 at 234:18-235:1; *see also* Objection 20.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~Closing the 2022 Transactions allowed Wesco to "get the business back on a normal operating rhythm," spending roughly $50 million settling with its vendors and $90 million on certain debt obligations, which resulted in "things really actually simmer[ing] down quite a bit" for months.  Adv.Dkt.664 at 58-59, 65.  The company also devoted roughly $70 million to buying up additional inventory based on "feedback from [its] customers and some outside sources" who had suggested that "the market [was] coming back."  *Id.* at 59.  Investor confidence likewise increased; for instance, convinced "that all of the company's debts would likely … be paid in full … [a]nd that the company had liquidity to last for years," Silver Point spent an additional nearly $40 million buying up Wesco's unsecured 2027 bonds. Adv.Dkt.858 at 145; *see also* Adv.Dkt.925-1 at 1 (PIMCO resolved to "maintain exposure going forward").~~  <u>Once "the fully executed transaction documents were possessed by the parties and the funds were released in escrow," "all actions necessary for the execution of the 2022 Transaction had been taken . . . ."  ECF 3 at 33.  "The Majority Group did not believe its $250 million investment into the purchase of additional 2026 Notes was at risk for not being exchanged for the new first-lien 1L Notes through the Exchange Agreement."  ECF 3 at 32.</u>

## Objection 22:

None of these factual findings appear in the January 17 R&R and none of them are relevant to the Court's legal conclusion.  However, the Court should adopt the factual findings included above, which were not objected to by the Majority Group.  For the Court's reference, the following is the complete text from which the first sentence is taken, which has been edited to remove the legal conclusions that this Court intends to reject.  "The execution of the 2022 Transaction became irrevocable once the fully executed transaction documents were possessed by the parties and the funds were released in escrow. At that point, all actions necessary for the execution of the 2022 Transaction had been taken, and each step of the 2022 Transaction was automatically effective without further action by any party."  ECF 3 at 33.

[*Remainder of Page Left Intentionally Blank*]

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

**D.     Procedural History.**

    **1.  The adversary proceeding and the bankruptcy court's oral ruling.**

    In October 2022, seven months after the 2022 Transaction~~s~~ took place, the 2024/2026 Noteholders sued in New York state court, seeking a judgment holding the 2022 Transaction~~s~~ "null and void and not enforceable" and an order avoiding and unwinding ~~them~~it.  Adv.Dkt.201-36 at 71.

    ~~Unfortunately, while that litigation was pending, Wesco's financial situation once again deteriorated as "[t]he business continued to drag" and its expectations of selling its new inventory evaporated.  Adv.Dkt.664 at 65.  Despite the new money, extended maturities, and lower cash-interest payments provided by the 2022 Transactions, the company continued to face liquidity problems, exacerbated by the lingering effects of the COVD-19 pandemic, disruptions in the global supply chain, labor shortages, and other challenges facing the aerospace industry.  *See id.*; Bankr.Dkt.13 at 5-7.~~  In June 2023, Wesco and its related entities filed voluntary chapter 11 petitions, initiating the bankruptcy proceedings here.  The filing of those petitions automatically stayed the suit <u>against Wesco</u> brought by the 2024/2026 Noteholders in New York state court.  *See* Adv.Dkt.21.  <u>The Bankruptcy Court subsequently granted Wesco's motion to extend the automatic stay to the Majority Group.  *See* Adv.Dkt.194.</u>

**Objection 23:**

    None of these factual findings appear in the January 17 R&R and none of them are relevant to the Court's legal conclusion.  They are also misleading in that they fail to mention a significant contributing factor to the bankruptcy: the Majority Group saddled the Company with new indemnification obligations.  Adv.Dkt.694 at 74:2-6.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

    On the same day that it filed its chapter 11 petition, Wesco initiated this adversary proceeding seeking a declaration under 28 U.S.C. §2201 confirming that it did not breach its indentures by entering into the 2022 Transaction~~s~~.  *See* Adv.Dkt.63 (amended complaint).  The 2024/2026 Noteholders counterclaimed, seeking (among other things) a declaration that Wesco breached the 2024 and 2026 Indentures; the imposition of an equitable lien against Wesco, the First Lien Noteholders, and others; equitable subordination of claims held by the First Lien Noteholders and others; and a declaration that the First Lien Noteholders, Platinum, Senator, and Citadel tortiously interfered with the 2024 and 2026 Indentures.  Adv.Dkt.144.

    After extensive discovery, the parties proceeded to summary judgment, where the bankruptcy court dismissed most of the 2024/2026 Noteholders' counterclaims—including their claims for an equitable lien or equitable

subordination, which the bankruptcy court concluded were "disguised avoidance actions" that belonged to Wesco's estate. Adv.Dkt.508 at 14-16. However, the bankruptcy court allowed the 2024/2026 Noteholders' breach-of-contract and tortious-interference claims to proceed to trial. *See id.* at 36-58.[3]

The bankruptcy court held trial on the 2024/2026 Noteholders' claims over 35 days in a six-month span from late January to early July 2024, and issued an interlocutory oral ruling on July 10, 2024. In that oral ruling, the bankruptcy court concluded that Wesco's participation in the 2022 Transactions did not breach the 2024 Indenture, but did breach the 2026 Indenture, because Wesco had consent from two-thirds of the 2024 Notes but not two-thirds of the 2026 Notes to enter into the Third Supplemental Indentures. Adv.Dkt.1474 at 13-14, 37. The Bankruptcy Court thus found that "the Third Supplemental Indenture was not properly approved and could not have been effective against the 2026 Noteholders." ECF 3 at 35. According to the Bankruptcy Court, "[t]his negates the effectiveness against the 2026 Noteholders of every subsequent step in the series of transactions," and therefore "the rights, liens, and interests that were for the benefit of all of the holders of 2026 Notes as they existed on March 27, 2022, remained in full force and effect on March 29, 2022." *Id.* at 35-36. As a remedy, the bankruptcy court recommended reinstating the liens of the 2026 Notes that were released by the Fourth Supplemental Indentures. *See id.* at 3 (recommending a declaration that "the rights, liens, and interests that were for the benefit of all of the holders of the 2026 [N]otes as they existed on March 27th, 2022, remained in full force and effect on March 29th, 2022"). The court also concluded that Wesco's participation in the 2022 Transactions breached the 2027 Indenture, but declined to award any remedy for that breach. *Id.* In announcing its oral ruling, the bankruptcy court advised the parties that its ruling was "interlocutory only" and that "the final ruling will be done in a written memorandum opinion," but that in the meantime Wesco and its affiliates should proceed to develop a plan of reorganization based "on what their capital structure has now been declared to be." *Id.* at 3, 38.

**Objection 24:**

The Proposed Order has been revised to quote, rather than characterize, the Bankruptcy Court's recommended findings.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

The bankruptcy court's oral ruling did not explicitly address whether the $250 million in additional 2026 Notes should be treated as secured *pari passu* with the original 2026 Notes. The parties accordingly asked the bankruptcy court to clarify the status of the $250 million in additional 2026 Notes, and offered to submit further briefing on the issue if needed. The bankruptcy court responded that the

---

[3] The claims asserted against WSFS were dismissed at the summary judgment stage, and WSFS did not participate as a party in the trial on the remaining claims. Adv.Dkt.509 at 2-3; Adv.Dkt.533 at 3-5; Adv.Dkt.554 at 2.

Majority Group did not receive any secured 2026 Notes in exchange for the $250 million ~~lifeline~~ investment that it provided to Wesco, leaving the Majority Group with only an unsecured claim:

> What I intended to say was that because it violated the indenture, that there were no new 2026 notes issued.  Obviously the 250 million was received and it needs to be dealt with in a plan and I did not intend to dictate how it was dealt with in a plan.  But the 250 million did not ever result in the issuance of additional 2026 notes.  I don't mean that to be ambiguous or confusing, but that's what I tried to say.

Bankr.Dkt.2002 at 74.

After the bankruptcy court announced its oral rulings, the parties developed a consensual plan of reorganization, which the bankruptcy court confirmed on December 27, 2024.  Bankr.Dkt.2528 (confirmation order); *see* Bankr.Dkt.2550 (corrected confirmation order).  That plan was premised on the bankruptcy court's rulings regarding the status of the 1L Notes, the 1.25L Notes, the 2026 Notes, and the $250 million in new investment by the Majority Group, with all parties preserving their appellate rights with respect to those rulings.  Because these rulings resulted in the First Lien Noteholders receiving less under the confirmed plan—in particular, under the court's rulings that the 1L Notes were not senior to the original 2026 Notes, and that the Majority Group's $250 million in new investment resulted in only an unsecured claim rather than secured 1L Notes—the First Lien Noteholders noticed their appeal of the confirmation order on January 10, 2025.  *See* Bankr.Dkt.2564.  That appeal is currently pending as *In re Wesco Aircraft Holdings, Inc.*, No. 25-cv-161 (docketed Jan. 14, 2025), and is being held in abeyance pending this Court's resolution of this case.

### 2. The bankruptcy court's report and recommendation.

The bankruptcy court subsequently issued its January 17 R&R on the 2024/2026 Noteholders' breach-of-contract claims.  ECF 3.  As it had in its oral ruling, the bankruptcy court concluded in the January 17 R&R that ~~even though, by its terms, the 2026 Indenture permitted the issuance of additional *pari passu* notes based on a simple majority vote,~~ Wesco breached the 2026 Indenture by adopting the Third Supplemental Indentures without consent from two-thirds of the then-outstanding 2026 Notes.  *Id.* at 28-35.

**Objection 25:**

This mischaracterizes the 2026 Indenture to suggest it expressly permits "the issuance of additional *pari passu* notes based on a simple majority vote."  Instead, the 2026 Indenture, by the terms of Section 9.01, does not require *any* vote "to provide for the issuance of Additional Secured Notes in accordance with the limitations set forth in this Indenture as of the Issue Date," and Section 9.02 does not expressly discuss consent thresholds for issuing new notes at all.

Adv.Dkt.601-8 at 128-129 (2026 Indenture, Section 9.01):

Section 9.01    *Without Consent of Holders of 2026 Secured Notes.*

Notwithstanding Section 9.02 hereof, without the consent of any Holder of 2026 Secured Notes, the Issuer, the Guarantors, the Trustee and the Notes Collateral Agent, as applicable, may amend or supplement this Indenture, the Escrow Agreement, the Security Documents, the Intercreditor Agreements, the 2026 Secured Notes or the 2026 Secured Note Guarantees:

…

(7)    to provide for the issuance of Additional Secured Notes in accordance with the limitations set forth in this Indenture as of the Issue Date;

Adv.Dkt.601-8 at 130-131 (2026 Indenture, Section 9.02):

Section 9.02    *With Consent of Holder of 2026 Secured Notes.*

Except as provided below in this Section 9.02, the Issuer, the Guarantors, the Trustee and the Notes Collateral Agent may amend or supplement this Indenture (including, without limitation, Sections 3.09, 4.10 and 4.14 hereof), the Escrow Agreement, the 2026 Secured Notes, the 2026 Secured Note Guarantees, the Security Documents or the Intercreditor Agreements may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding 2026 Secured Notes other than the 2026 Secured Notes beneficially owned by the Issuer or its Affiliates (including, without limitation, Additional Secured Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the 2026 Secured Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium on, if any, or interest, if any, on, the 2026 Secured Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Escrow Agreement, the 2026 Secured Notes, the 2026 Secured Note Guarantees, the Security Documents or the Intercreditor Agreements, may be waived with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding 2026 Secured Notes other than the 2026 Secured Notes beneficially owned by the Issuer or its Affiliates (including, without limitation, Additional Secured Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, 2026 Secured Notes). Sections 2.08 and 2.09 hereof shall determine which 2026 Secured Notes are considered to be "outstanding" for purposes of this Section 9.02.

Upon the request of the Issuer accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence reasonably satisfactory to the Trustee of the consent of the Holders of 2026 Secured Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02, 9.06, 13.02 and 13.03 hereof, the Trustee and Notes Collateral Agent, if applicable, will join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture and amendment or supplement to the Security Documents unless such amended or supplemental indenture or amendment or supplement to the Security Documents affects the Trustee's and Notes Collateral Agent's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee and the Notes Collateral Agent may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture and amendment or supplement to the Security Documents.

It is not necessary for the consent of the Holders of 2026 Secured Notes under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer will mail (or with respect to Global Notes, to the extent permitted or required by applicable DTC procedures or regulations, send electronically) to the Holders of 2026 Secured Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuer to deliver such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to Sections 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the 2026 Secured Notes then outstanding voting as a single class may waive compliance in a particular instance by the Issuer or Guarantors with any provision of this Indenture, the 2026 Secured Notes, any 2026 Secured Note Guarantees, the Escrow Agreement, the Security Documents or the Intercreditor Agreements. However, without the consent of each Holder affected, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any 2026 Secured Notes held by a non-consenting Holder):

Adv.Dkt.601-8 at 130-131 (2026 Indenture, Section 9.02):

> (1)     reduce the principal amount of 2026 Secured Notes whose Holders must consent to an amendment, supplement or waiver;
>
> (2)     reduce the principal of or change the Stated Maturity of any 2026 Secured Note or alter or waive any of the provisions relating to the dates on which the 2026 Secured Notes may be redeemed or the redemption price thereof with respect to the redemption of the 2026 Secured Notes (other than any change to the notice periods with respect to such redemption);
>
> (3)     reduce the rate of or change the time for payment of interest, including default interest, on any 2026 Secured Note;
>
> (4)     waive a Default or Event of Default in the payment of principal of, premium on, if any, or interest, if any, on, the 2026 Secured Notes (except a rescission of acceleration of the 2026 Secured Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding 2026 Secured Notes and a waiver of the payment default that resulted from such acceleration);
>
> (5)     make any 2026 Secured Note payable in anything other than U.S. dollars;
>
> (6)     make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders of 2026 Secured Notes to receive payments of principal of, premium on, if any, or interest, if any, on, the 2026 Secured Notes;
>
> (7)     subject to the final paragraph in Section 3.10, modify the obligation of the Issuer to repurchase 2026 Secured Notes pursuant to Section 3.10, 4.10 or 4.14 hereof, after the date of an event giving rise to such repurchase obligation;
>
> (8)     release any Guarantor that is a Significant Subsidiary from any of its obligations under its 2026 Secured Note Guarantee or this Indenture, except in accordance with the terms of this Indenture;
>
> (9)     make any change in the preceding amendment and waiver provisions;
>
> (10)     make any change to, or modify, the ranking of the 2026 Secured Notes in respect of right of payment that would adversely affect the Holders of the 2026 Secured Notes; or
>
> (11)     waive or modify in a manner materially adverse to the interests of the Holders the provisions relating to the Initial Issuer's obligation to redeem the 2026 Secured Notes in a Special Mandatory Redemption.
>
> In addition, without the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the 2026 Secured Notes), no amendment, supplement or waiver may (1) have the effect of releasing all or substantially all of the Collateral from the Liens created pursuant to the Security Documents (except as permitted by the terms of this Indenture, the Security Documents or the Intercreditor Agreements) or changing or altering the priority of the security interests of the Holders of the 2026 Secured Notes in the Collateral under the ABL Intercreditor Agreement or the Pari Passu Intercreditor Agreement, (2) make any change in the Security Documents, the Intercreditor Agreements or the provisions in this Indenture dealing with the application of proceeds of the Collateral that would adversely affect the Holders of the 2026 Secured Notes or (3) modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse to the Holders of the 2026 Secured Notes in any material respect other than in accordance with the terms of this Indenture, the Security Documents or the Intercreditor Agreements.

It is undisputed that Section 9.01 does not apply here.  As of the date of the 2022 Transaction, the Company could not issue more than $75 million of additional *pari passu* 2026 Notes.  Adv.Dkt.970 at 86:16-87:8; Adv.Dkt.697 at 191:16-192:22.  And the Company's "ability" to issue additional *pari passu* notes, found in Section 2.01(e), was subject to its compliance with

Section 4.12(a)'s prohibition on issuing such notes to "directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind (other than Permitted Liens)."  It is thus a legal question whether, under the undisputed facts here, the Third Supplemental Indenture was permissible with simple majority consent where its purpose was issuance of additional 2026 Notes to allow for a ginned-up supermajority to create, incur, or allow new otherwise unpermitted liens.  *See* Objection 4 (discussing Section 4.12).

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

The bankruptcy court recognized that under the 2026 Indenture, "except in certain enumerated circumstances," Wesco could adopt "any amendment or supplement" to the 2026 Indenture "with the consent … of at least a majority" of the then-outstanding 2026 Notes. Id. at 19.  The bankruptcy court also recognized that more than a simple majority had consented to the Third Supplemental Indentures~~, which under the 2026 Indenture was sufficient to approve an amendment authorizing the issuance of new pari passu notes~~. Id. at 17, 19-20.  But according to the bankruptcy court, §9.02 of the 2026 Indenture required Wesco to obtain the consent of two-thirds of the then-outstanding 2026 Notes to adopt the Third Supplemental Indentures, because (in the bankruptcy court's view) the Third Supplemental Indentures "ha[d] the effect of releasing all or substantially all of" the collateral from the liens as to the 2026 Notes.  Id. at 29-35.  As a remedy, the bankruptcy court recommended that this Court should conclude that in light of Wesco's purported breach, the Third Supplemental Indentures "could not have been effective as to the 2026 Noteholders," thereby "negat[ing] the effectiveness against the 2026 Noteholders of every subsequent step" in the 2022 Transaction~~s~~.  Id. at 35.  In particular, the bankruptcy court recommended that this Court should declare that "the rights, liens, and interests that were for the benefit of all the holders of 2026 Notes … remained in full force and effect" following the 2022 Transaction~~s~~, ECF 3 at 36, stripping the First Lien Noteholders of the exclusive first-lien status of their 1L Notes and leaving them with only an unsecured claim for the $250 million that they provided to Wesco in the 2022 Transaction~~s~~.

**Objection 26:**

*See* Objection 25.

### CONCLUSIONS OF LAW

This Court disagrees as set forth in this order with the bankruptcy court's ~~recommended factual findings, and with its~~ recommended finding of breach.  While this Court need not reach the remedy, having found no breach, the Court would disagree with the bankruptcy court's ~~and its~~ recommended remedy as well.  For the reasons explained in Part I below, the 2022 Transaction~~s~~ wa~~sere~~ proper, appropriate, lawful, and consistent with the terms of the 2024 and 2026 Indentures.  Those indentures were negotiated by sophisticated parties who chose their language carefully; if the parties had wanted to bargain for additional sacred rights that would have allowed minority holders to prevent the 2022 Transaction~~s~~, they could have

65

done so, but they did not.  This Court concludes as a matter of law that the protections in the 2026 Indenture identified by the 2026 Noteholders did not prevent the 2022 Transaction.  The fact that the 2022 Transactions closed and were was executed over the course of a single day is not unusual, and does not make them it inconsistent with Wesco's indentures.  The 2022 Transactions accordingly did not breach Wesco's indentures.  In addition, for the reasons explained in Part II, the proper remedy if Wesco had breached the 2026 Indenture would have been a declaration that Wesco is liable for money damages for the purported breach, not an order reinstating the 2026 Noteholders' liens while stripping the First Lien Noteholders' $250 million investment of any security interest at all.  Nothing in law or equity supports the bankruptcy court's proposed remedy, which would cost Wesco (the purported breaching party) nothing, but would deprive the First Lien Noteholders (who committed no breach) of their exclusive first-lien status and would treat their $250 million in rescue financing as an unsecured claim.  The Court accordingly SUSTAINS the First Lien Noteholders' objection to the bankruptcy court's January 17 R&R, OVERRULES the 2026 Noteholders' objections, DECLARES that the 2022 Transactions did not breach Wesco's indentures, and DISMISSES the 2026 Noteholders' breach-of-contract claims.

**Objection 27:**

For the avoidance of doubt, the 2026 Noteholders object to the legal conclusions contained in this paragraph and in the paragraphs below.  The 2026 Noteholders also respectfully submit that, having found there is no breach, the Court need not reach any further conclusions regarding the remedies issue.  However, consistent with the Court's oral order "to submit in writing on or before November 4, 2025, instances when the factual findings in the parties' proposed orders (Dkt. Nos. 96, 97, 100, 101, 103) are wrong or inconsistent with the factual findings in the Reports and Recommendations (Dkt. Nos. 1, 3, 36)," ECF 105 at 1, the 2026 Noteholders do not repeat those objections here.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

I.  **Wesco's Adoption of the Third Supplemental Indentures and the RemainingThe 2022 Transactions Fully Complied With Wesco's Obligations Under Its Indentures.**

A.  **Wesco Had the Consent Required by the 2026 Indenture for Each Step in the 2022 Transactionsthe Third Supplemental Indenture.**

Wesco's adoption of the Third Supplemental Indentures  — and all the other steps in the 2022 Transactions  —complied with the requirements of the 2026 Indenture (and Wesco's other indentures).  Under §9.02 of the 2026 Indenture, Wesco was authorized to adopt any amendment or supplement "with the consent of the Holders of at least a majority" of the then-outstanding 2026 Notes, except for certain enumerated categories of amendments or supplements that the 2026 Indenture made subject to more stringent consent requirements.  Adv.Dkt.601-8 at 130.  Only one such enumerated exception is relevant here:The Bankruptcy Court's made its recommendation based on one exception in particular:  the supermajority

consent requirement for release of collateral, under which "without the consent of the Holders of at least 66⅔% in aggregate principal amount of the 2026 Secured Notes then outstanding … no amendment, supplement or waiver may … have the effect of releasing all or substantially all of the Collateral from the Liens" securing the 2026 Notes.  Adv.Dkt.601-8 at 131.  The 2026 Indenture does not <u>expressly</u> impose any similar supermajority requirement on amendments or supplements that have the effect of authorizing additional 2026 Notes in excess of the debt and lien baskets; ~~instead,~~ amendments or supplements that authorize such notes <u>thus</u> require only simple-majority consent.  *See* Adv.Dkt.601-8 at 130.

In adopting the Third Supplemental Indentures with simple-majority consent, Wesco fully complied with its obligations under the 2026 Indenture.  None of the three principal amendments made by the Third Supplemental Indentures—adding new definitions of "Additional 2026 Secured Notes" and "Note Purchase Agreement," amending the definition of permitted liens to include liens securing the additional 2026 Notes, and allowing the incurrence of the additional 2026 Notes—had the effect of releasing any collateral <u>or modified the provisions of the 2026 Indenture dealing with</u> ~~, or indeed had any effect on any~~ collateral at all.  Instead, those amendments simply authorized Wesco to issue the additional 2026 Notes in exchange for $250 million in new money from the Majority Group, providing Wesco with the financial lifeline it needed.  As such, the Third Supplemental Indentures required only "the consent of the Holders of at least a majority" of the then-outstanding 2026 Notes.  Adv.Dkt.601-8 at 130-31.  It is undisputed that more than a majority of the then-outstanding 2026 Notes consented to the Third Supplemental Indentures. *See* Adv.Dkt.604-16.  Wesco's adoption of the Third Supplemental Indentures accordingly complied with its obligations under the 2026 Indenture.

The <u>rest of</u> ~~remaining steps in~~ the 2022 Transaction~~s~~ likewise complied with the requirements of the 2026 Indenture.~~  After the adoption of the Third Supplemental Indentures authorized Wesco to issue additional 2026 Notes, Wesco and the Majority Group entered into the Note Purchase Agreement, under which the Majority Group provided Wesco with $250 million in new investment in exchange for additional 2026 Notes.  Adv.Dkt.602-24.  It is undisputed that the Note Purchase Agreement did not affect the collateral or require any further consent under the terms of the 2026 Indenture.~~

**Objection 28:**

The factual conclusions here are unnecessary to support the Court's legal conclusion, and they are inconsistent with the January 17 R&R and the evidentiary record for the reasons set forth above, including because the Majority Group did not pay $250 million in consideration for *pari passu* 2026 Notes.  *See* Objections 1 & 11; *see also* ECF 35 at 20-22; ECF 76 at 9-10.  Further, it is not "undisputed" that the Note Purchase Agreement "did not affect the collateral or require any further consent under the terms of the 2026 Indenture."  As explained above, the 2026 Noteholders argued before the Bankruptcy Court and here in their limited objection that the issuance of additional 2026 Notes for the purpose of creating new otherwise unpermitted liens—*i.e.*, the liens

securing the Majority Group's new super senior notes—breached Sections 2.01(e) and 4.12(a). *See* Objections 4, 5, & 25; *see also* ECFs 35 at 16-19; 76 at 6-7.

Additionally, the 2026 Noteholders argued before the Bankruptcy Court and here in their limited objection that, by purporting to amend the definition of Permitted Liens by $250 million, the Third Supplemental Indenture impermissibly modified provisions in the 2026 Indenture "dealing with Collateral" as well as "the Security Documents," and these modifications were "adverse to the Noteholders of the 2026 Secured Notes in [a] material respect"; thus, the Third Supplemental Indenture required two-thirds supermajority consent under subsection (3) of Section 9.02's supermajority protection—*i.e.*, the "Adverse Effect Protection." *See* Objections 6, 7, & 15; *see also* ECFs 35 at 16-18, 27-28; 76 at 3-6, 13-14. Indeed, Wesco's sole board member who testified at trial admitted that he knew beforehand that the 2022 Transaction "would harm the excluded holders' security interest in the collateral." Adv.Dkt.697 at 106:1-4.

---

Adv.Dkt.697 (Vorderwuelbecke, Feb. 1, 2024 Tr.) at 106:1-4:

1          You knew, as a Board member, that this transaction

2     would harm the excluded holders' security interest in the

3     collateral, correct?

4     A     That is correct.

---

Likewise, the 2026 Noteholders argued before the Bankruptcy Court and in their limited objection to the January 17 R&R that the 2026 Indenture's Rules of Construction, established Second Circuit law, and New York's single integrated transaction doctrine all also render the 2022 Transaction impermissible. *See* Objections 1, 10; *see also* ECFs 35 at 19-22; 76 at 8-10. And, finally, the 2026 Noteholders also argued before the Bankruptcy Court and in their limited objection that the 2022 Transaction breached sacred right Section 9.02(10) as well as Sections 3.02 and 3.07 of the 2026 Indenture along with, alternatively, the covenant of good faith and fair dealing. *See* Objections 5, 6, 7, 28, & 31; *see also* ECFs 35 at 25-28, 39; 76 at 13-14.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~After entering into the Note Purchase Agreement, Wesco proceeded to adopt the Fourth Supplemental Indentures, which provided for the release of the collateral from the liens as to the 2026 Notes. *See* Adv.Dkt.601-33, 601-34, 604-4. Because the Fourth Supplemental Indentures *did* "have the effect of releasing all or substantially all" of the collateral as to the 2026 Notes, they required the consent of holders of at least two-thirds of all then-outstanding 2026 Notes. Adv.Dkt.601-8 at 131. That supermajority consent was provided by the Majority Group, who—after investing an additional $250 million in Wesco through the Note Purchase Agreement—now held more than two-thirds of the 2026 Notes. The Fourth Supplemental Indentures accordingly complied with the requirements of the 2026 Indenture as well.~~

**Objection 29:**

The factual conclusions here are unnecessary to support the Court's legal conclusion, and they are incorrect for the reasons set forth above.  *See* Objection 5.

> ***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

> ~~Finally, Wesco entered into (1) the Permitted Additional Pari Passu Secured Party Joinder, under which WSFS added the new 1L Notes to the liens under the security documents, (2) the Amended and Restated Notes Security Agreement, which reflected the addition of the 1L Notes to the liens and WSFS' release of the liens as to the 2024 and 2026 Notes pursuant to the Fourth Supplemental Indentures, and (3) the Exchange Agreement, under which participating Majority Group members exchanged their 2024 Notes and 2026 Notes for the 1L Notes. Adv.Dkt.602-27, 604-19.  Again, it is undisputed that none of these agreements required any further consents under the 2026 Indenture.~~  The 2022 ~~Transaction~~s thus fully complied with the terms of the 2026 Indenture.

**Objection 30:**

The factual conclusions here are unnecessary to support the Court's legal conclusion, and the implied sequence is incorrect for the reasons set forth above.  *See, e.g.*, Objections 16-18, 20-22, 28-29.

> ***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

> This conclusion is confirmed by the Fifth Circuit's decision in *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555 (5th Cir. 2025), which underscores the importance of adhering to the precise language of investment agreements.  In *Serta*— which involved syndicated loans rather than secured bonds—the debtor likewise engaged in an "uptier" transaction in which certain lenders exchanged their existing secured debt for new super-priority debt.  *Id.* at 568-69.  A group of excluded lenders asserted that the uptier transaction breached an express provision in the debtor's loan agreement that enshrined a "sacred right of pro-rata sharing," under which the debtor was required to allocate any payments of principal or interest and any conversions of its debt pro rata among its lenders of each class, and which could only be waived with unanimous consent.  *Id.* at 567.  The debtor responded that the unanimous consent requirement did not apply, because another provision of the loan agreement created an exception to that requirement that allowed the debtor to repay its loans on a non-pro rata basis through "open market purchases."  *Id.* at 568. The Fifth Circuit agreed with the investors, holding that the uptier transaction in *Serta* was not an "open market purchase" because, among other things, it did not take place on an open market.  *Id.* at 578-84.

> Unlike the loan agreement in *Serta*, the 2026 Indenture does not include any provision requiring Wesco to obtain unanimous consent from its existing noteholders in order to engage in an uptier transaction.  ~~Instead, the 2026 Indenture explicitly requires only majority consent to authorize the issuance of new notes,~~

~~and requires only a two-thirds supermajority to authorize the release of collateral.~~
~~Adv.Dkt.601-8 at 130-31. As recounted above, the evidence at trial showed that~~
~~the parties understood that the 2026 Indenture did not require unanimous consent~~
~~for an uptier transaction, that it allowed Wesco to dilute a minority group's voting~~
~~power by issuing new bonds with majority consent and to then rely on consent from~~
~~those additional bonds to issue senior debt over the minority noteholders' objection,~~
~~and that those provisions ensured that Wesco would have additional flexibility to~~
~~raise new capital in the future. *See supra* pp.3-4, 8-9. In short, t~~The provisions of
the 2026 Indenture are materially different from the provisions of the loan
agreement at issue in *Serta*, and Wesco fully complied with the conditions that the
2026 Indenture imposes in entering into the 2022 Transaction~~s~~.

**Objection 31:**

The factual conclusions here are unnecessary to support the Court's legal conclusion, and
they are incorrect for the reasons set forth above. *See, e.g.*, Objections 4-7, 13, 15. The statement
that the 2026 Indenture "explicitly requires only majority consent to authorize the issuance of new
notes, and requires only a two-thirds supermajority to authorize the release of collateral" is simply
inaccurate when compared against the 2026 Indenture. *See* Objections 4, 5, 6, 13. There is nothing
on pages 130 to 131 of the 2026 Indenture that "explicitly requires only majority consent" to issue
new notes. Nothing in the majority consent paragraph of Section 9.02 on page 130 refers to the
issuance of new notes with majority consent. The only discussion of consent for the issuance of
new notes is found at Section 9.01(7) on page 129, which provides that no consent is needed to
issue additional notes "in accordance with the limitations set forth in this Indenture as of the Issue
Date." It is undisputed that the $250 million in additional 2026 Notes purportedly issued in the
2022 Transaction fell outside those limitations, which is why the Third Supplemental Indenture
purported to modify the definition of Permitted Liens. And Section 9.02's lien-release protection
on page 130 does not just require a two-thirds majority for "release of collateral" but also for
amendments that "*have the effect of* releasing the collateral," while Section 9.02's adverse-effect
protection requires two-thirds consent for "any" modification of either the 2026 Indenture
provisions dealing with Collateral or the Security Documents in "any" manner materially adverse
to holders of 2026 Notes. Section 2.01(e), moreover, subordinates Wesco's "ability" to issue
Additional Secured Notes to its compliance with Section 4.12's direct and indirect protection of
the Liens securing 2026 Notes. *See* Objections 5-7, 15, 28(discussing supermajority clause
requirements); Objection 25 (discussion Section 9.01 and consent for issuing new notes).

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

**B.     The 2026 Noteholders' Contrary Arguments Are Unpersuasive.**

The 2026 Noteholders raise various contrary arguments, but none is
persuasive. As their primary argument, the 2026 Noteholders argue that the Third
Supplemental Indentures required supermajority consent because they "ha[d] the
effect of releasing all or substantially all" of the collateral, Adv.Dkt.601-8 at 131—
because they allowed Wesco to issue additional 2026 Notes, which Wesco then
issued to the Majority Group ~~in exchange for $250 million in new investment~~, and
which the Majority Group then used to consent to the Fourth Supplemental

Indentures and release the collateral from the liens as to the 2026 Notes. Although the Third Supplemental Indenture did not release the liens~~none of those steps in the 2022 Transactions individually violated the 2026 Indenture~~, the Bankruptcy Court concluded ~~2026 Noteholders argue~~ that Wesco breached the 2026 Indenture ~~by combining those non-breaching steps,~~ because in the~~cat~~ "environment" of the 2022 Transaction the Third Supplemental Indentures "had the effect of releasing collateral." ECF 3 at 31.

Th~~at is e 2026 Noteholders are~~ incorrect. Under the plain language of the 2026 Indenture, Wesco needed to obtain supermajority consent for the Third Supplemental Indentures only if the Third Supplemental Indentures *themselves* "ha[d] the effect of releasing all or substantially all" of the liens securing the 2026 Notes. Adv.Dkt.601-8 at 131. The 2026 Noteholders' contrary reading of that language—as reaching not only amendments that *themselves* have the effect of releasing collateral, but any amendment that eventually leads (after multiple intervening steps, including the necessary subsequent supermajority consent) to further amendments that have the effect of releasing collateral, would flout the ordinary meaning of "effect." ~~and invite significant practical difficulties by making it all but impossible to know in advance when supermajority consent is required.~~

In the context of a legal instrument, the term "effect" means "[t]he result that an instrument between parties will produce on their relative rights." *Effect* (n.), Black's Law Dictionary (12th ed. 2024). An "amendment, supplement or waiver" accordingly only "ha[s] the effect of releasing all or substantially all of the Collateral," Adv.Dkt.601-8 at 131, if "the result that [the] instrument … will produce on [the parties'] relative rights" is *itself* to release that collateral—not just to initiate a chain of events, including subsequent amendments, that may eventually lead to releasing the collateral. That makes particular sense in the context of a legal instrument like the 2026 Indenture that requires majority votes for some actions and supermajority votes for others. In that context, the focus must be on the immediate effect of the amendment itself—without regard to subsequent actions that may follow—in order to determine in real time whether a supermajority vote is required. Here, the only "result" that the Third Supplemental Indentures themselves "produce[d] on [the parties'] relative rights" was to enable Wesco to issue additional 2026 Notes—an effect that this Court holds did not require supermajority consent under ~~the express terms of~~ the 2026 Indenture. As a result, under the plain language of the 2026 Indenture, the Third Supplemental Indentures did not require supermajority consent.

**Objection 32:**

The 2026 Indenture is an unambiguous contract, and the express terms of Section 9.02 expressly address consent requirements, but this language in the Proposed Order repeats the error, explained in the Objection above this one, that the 2026 Indenture "explicitly requires only majority consent to authorize the issuance of new notes." *See* Objection 25, 31. Additionally, the Court made no factual findings as to practical difficulties from the interpretation of the 2026

Indenture.  There is no evidence in the record on which to reach such a conclusion, and the Majority Group thus cites none.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~That conclusion not only is required by the plain language of the 2026 Indenture, but this Court also finds as a factual matter that it accords with the parties' intent and the 2026 Indenture's general purpose.~~ *~~See, e.g.~~*~~,~~ *~~In re Westmoreland Coal Co. v. Entech, Inc.~~*~~, 794 N.E.2d 667, 670 (N.Y. 2003) (under New York law, a contract must be interpreted "to give effect to its general purpose");~~ *~~Greenfield v. Philles Recs.~~*~~, 780 N.E.2d 166, 170 (N.Y. 2002) (under New York law, "agreements are construed in accord with the parties' intent"); Adv.Dkt.1474 at 4-6;~~ *~~see also supra~~* ~~pp.3-4, 8-9.~~  By requiring supermajority consent for any amendments or supplements that "have the effect of releasing all or substantially all of" the collateral, Adv.Dkt.601-8 at 131, the 2026 Indenture ensures that the liens securing the 2026 Notes will only be released if doing so is in the economic interests of holders of at least two-thirds of the outstanding notes. ~~But nothing about that supermajority-consent provision prevents majority holders from investing additional funds in Wesco to~~ *~~acquire~~* ~~that level of economic interest, or gives minority holders a veto right over whether Wesco may issue additional notes.  In fact, as discussed above, it is undisputed that the 2026 Indenture does~~ *~~not~~* ~~impose any supermajority consent requirement on issuing additional 2026 Notes. The evidence shows that the 2024/2026 Noteholders were sophisticated parties who fully understood that the 2026 Indenture did not impose any such supermajority requirement on the issuance of additional 2026 Notes, even if those additional notes were then voted in favor of releasing the collateral in a subsequent transaction.~~

**Objection 33:**

As explained above, the January 17 R&R did not make any findings concerning the "parties' intent," and this proposed finding of fact is squarely contradicted by the January 17 R&R's conclusion that "[t]he Majority Group believed that participation of these additional institutions was required to obtain the requisite 66 2/3% vote of the 2026 Notes to approve the transaction."  ECF 3 at 7-8 (citing Adv.Dkts.868 at 18; 1013 at 188-89; 1173 at 25).  As discussed above, that finding was correct and the Majority Group did not object to that conclusion.  *See* Objection 12.

The evidence in the record, moreover, does not support the view that the Company and the Majority Group believed that the 2022 Transaction could be completed permissibly with a simple majority, and they both shielded their counsels' advice with claims of privilege.  *See* Objection 12.

The factual conclusions here are unnecessary to support the Court's legal conclusion, and they are incorrect for the reasons set forth above, including because the Majority Group never "held" the additional 2026 notes.  *See* Objections 5 & 21.  Additionally, the interpretation of a written agreement to discern its purpose is a question of law, not a question of fact.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~Adopting the 2026 Noteholders' interpretation, and construing "effect" to expand the 2026 Indenture's supermajority consent provision to any amendment or supplement whose downstream consequences may include the release of collateral, would also raise difficult line-drawing problems. Once the inquiry moves beyond the immediate effect of an amendment, there is no logical stopping point. If an amendment enables the issuance of additional notes, and those additional notes then provide the necessary votes two weeks later to release collateral, is the amendment retroactively subject to the two-thirds supermajority provision? What if the vote to release the collateral comes two months later or two years later? Does it matter whether the later vote to release the collateral was foreseeable (or foreseen)? None of those questions has any clear textual answer—because the plain meaning of the text looks only to the effect of the amendment or supplement itself, not any potential downstream consequences.~~

**Objection 34:**

The Court should decline to adopt a proposed order that includes these hypothetical questions because they are answered by the unobjected to factual finding of the January 17 R&R: "The Majority Group did not believe its $250 million investment into the purchase of additional 2026 Notes was at risk for not being exchanged for the new first-lien 1L Notes through the Exchange Agreement." ECF 3 at 32.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

~~And while those questions may be hypothetical in this case, similar questions arise all the time in complex financial transactions, where the need for clarity is paramount and interlocking agreements are commonplace. That is precisely why o~~Other courts have recognized a need to "hew[] strictly to the chronology required by the contracts" in determining the rights of the parties at a particular moment in a multi-transaction sequence. *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent Corp.* ("*TriMark*"), 2021 WL 3671541, at *8 (N.Y. Sup. Ct. Aug. 16, 2021) (collecting cases and noting "that the order of operations matters"). ~~A contrary result would threaten serious uncertainty for the indentures here and for countless others that may use similar language, in an area where clarity and predictability are necessary to ensure that lenders and borrowers can price their bonds on a common understanding of their terms and avoid expensive litigation over future amendments.~~

The 2026 Noteholders also argue that the Third Supplemental Indentures "ha[d] the effect of releasing all or substantially all" of the collateral, Adv.Dkt.601-8 at 131, because (they say) the bankruptcy court correctly concluded that Wesco's adoption of the Third Supplemental Indentures made the subsequent release of the liens "automatic" and "inevitable," ECF 3 at 31-35. The plain text of the Third Supplemental Indentures ~~On *de novo* review of the record, *see* 28 U.S.C.~~

§157(c)(1), this Court finds that as a factual matter, the evidence does not support that conclusion.

Nothing about the adoption of the Third Supplemental Indentures compelled the parties to proceed with the Note Purchase Agreement, the Fourth Supplemental Indenture, the release of the liens, or any of the other parts of the 2022 Transactions. The fact that the parties agreed to the seriatim closing of each transaction during a single closing call on the morning of March 28, 2022—which the evidence showed is a common closing practice, see Adv.Dkt.1350 at 59—does not mean that each transaction was automatic or inevitable as soon as the closing call was completed. On the contrary, after the closing call ended, it took more than four hours for the wire transfers by which the Majority Group paid Wesco $250 million in new investment under the Note Purchase Agreement to be processed. See Adv.Dkt.1150-10. If those funds had not arrived, the additional 2026 Notes would never have been issued, the Fourth Supplemental Indentures would never have received the necessary consents, and the liens would never have been released. More broadly, at any point after the adoption of the Third Supplemental Indentures but before the liens were released—i.e., between about 8:30am and 2:15pm on March 28, 2022, see Adv.Dkt.710-43 at 2; Adv.Dkt.1150-4; Adv.Dkt.1150-5; Adv.Dkt.1150-16; Adv.Dkt.1150-18—any party could have rescinded its release of its signature pages and refused to carry out the remaining 2022 Transactions. That might well have triggered litigation, but it would also unquestionably have prevented the release of the liens. Wesco's entry into the Third Supplemental Indentures accordingly did not make the rest of the 2022 Transactions, including the release of the collateral as to the 2026 Notes, "automatic" or "inevitable." Contra ECF 3 at 31-35.[4] For that reason as well, the 2026 Noteholders' contention that the Third Supplemental Indentures "ha[d] the effect of releasing all or substantially all" of the collateral, Adv.Dkt.601-8 at 131, is unpersuasive.

**Objection 35:**

These factual findings were not made in the January 17 R&R, and they are inconsistent with and unsupported by the record. See Objection 20 (discussing "common"). The parties agreed on the closing call, "in accordance with the Exchange Agreement," to release signature pages in order "without any further action by any party." See Objection 20. The Majority Group cites no evidence—because there is none—that its members were ever at any risk, legal or factual, (i) of

[4] The 2026 Noteholders attempt to bolster their assertion that the Third Supplemental Indentures made release of the collateral "automatic" and "inevitable," ECF 3 at 31-35, by relying on New York escrow and agency law. That reliance is misplaced. Even if New York law gave the Majority Group the right (though not the obligation) to enforce completion of the subsequent steps in the 2022 Transactions, it does not follow that the Third Supplemental Indentures made the subsequent release of the collateral automatic or inevitable, much less that the Third Supplemental Indentures themselves "ha[d] the effect of releasing" that collateral. Adv.Dkt.601-8 at 131; see TriMark, 2021 WL 3671541, at *8 (recognizing that "committing to do something is not, of course, the same thing as doing it" (brackets omitted)).

74

holding additional *pari passu* 2026 Notes in exchange for their $250 million as opposed to the new super senior notes which is what they actually received in consideration for that new money, or (ii) that the Company would or could use the additional debt capacity to issue additional 2026 Notes to any other party. Rather, the Majority Group refused to take any such risk and therefore, at its insistence, the parties designed the 2022 Transaction documents and the closing call to prevent even a modicum of risk. Adv.Dkt.610-28 at 2, 5. Adv.Dkt.538-53 at 2. Adv.Dkt.1119 at 14:13-25. Nor is there any evidence whatsoever in the record that "any party could have rescinded its release of its signature pages," and thus the Majority Group cites none. To the contrary, signatures were released on the closing call without any further action by any party. *See* Objection 21.

---

**Adv.Dkt.610-28 at 2, 5 (Dec. 24, 2021 Email attaching Majority Group term sheet):**

**From:** Schaible, Damian S.[damian.schaible@davispolk.com]
**Sent:** Fri 12/24/2021 7:27:50 PM (UTC)
**To:** ddunne@milbank.com[ddunne@milbank.com]
**Cc:** roopesh.shah@evercore.com[roopesh.shah@evercore.com];
daniel.lakhdhir@evercore.com[daniel.lakhdhir@evercore.com]; Finelli, Jon[jon.finelli@davispolk.com]; Massman, Stephanie[stephanie.massman@davispolk.com]; Zhang, Helen[helen.zhang@davispolk.com]; Schaible, Damian S.[damian.schaible@davispolk.com]
**Subject:** [EXTERNAL] Incora
2021.12.23 - Letter to Sponsor Company (with Proposal) [executed].PDF

CAUTION: This email originated from outside of Evercore. Do not click links or open attachments unless you recognize the sender and are expecting the attachment or link.

Dennis - Happy holidays and hope all great. As discussed I wanted to pass along the attached cover note and strawperson termsheet reflecting some thoughts from our holders. Obviously the attached is just indicative but if helpful to discuss and see how we can progress, we would welcome the conversation.

Best
Damian

...

**Transaction Overview**

| | |
|---|---|
| Summary | ■ Amend certain existing credit documents to permit: <br> ► $[200]mm new money in the form of Super Senior First Lien Debt <br> ► Participating Secured Noteholders to exchange their existing notes into Super Senior First Lien Debt <br> ► Opportunity for Unsecured / HoldCo Noteholders to exchange into PIK super senior secured second-out debt |
| Participating Secured Noteholders | ■ Holders of >[66 2/3]% in face value of Secured Notes due 2024 and >[50]% in face value of Secured Notes due 2026 represented by Davis Polk, Evercore, and Kirkland & Ellis |
| Consent Required | ■ **Secured Notes:** 66 2/3% of each tranche, voting separately <br> ■ **Unsecured Notes:** 50.1% of non-Platinum noteholders <br> ■ **HoldCo Notes:** 50.1% of non-Platinum noteholders |
| New Money | ■ $[200]mm Super Senior First Lien Debt provided by Participating Secured Noteholders <br> ► Maturity: November 2026, springing to August 2024 if more than $[ ]mm of Secured Notes due 2024 remain outstanding <br> ► Rate¹: 7.5% cash / 3% PIK <br> ► Call Protection: NC-life <br> ► Financial Covenants: None <br> ► Negative Covenants: to include $[ ]mm basket for incurrence of PIK super senior secured second-out debt <br> ■ Sizing and terms subject to diligence on the company's situation and liquidity needs |
| Treatment of Secured Notes | ■ Par-for-par exchange into Super Senior First Lien Debt, available only to Participating Secured Noteholders <br> ► Terms to match $[200]mm new money Super Senior First Lien Debt <br> ► Maturity extension fee and/or amendment fee: quantum and allocation to be agreed <br> ■ Secured Notes held by non-participating holders maintain second lien behind Super Senior First Lien Debt (and PIK super senior secured second-out debt, if any) |
| Treatment of Unsecured Notes and HoldCo Notes | ■ Unsecured / HoldCo Noteholders (including notes held by Platinum and affiliates, if any) potentially offered the opportunity to exchange into PIK super senior secured second-out debt |

---

75

Adv.Dkt.538-53 at 2 (Mar. 3, 2022 Board Minutes):

**MINUTES OF A MEETING OF
THE BOARD OF DIRECTORS OF
WOLVERINE INTERMEDIATE HOLDING CORPORATION**

**March 3, 2022**

A meeting of the Board of Directors of Wolverine Intermediate Holding Corporation, a Delaware corporation (the "Company" and, together with its subsidiaries, "Incora"), was held via Zoom.

…

Mr. Abramson then led a discussion of negotiations on a comprehensive liability management transaction with the Majority Group and Carlyle (the "Potential Majority Transaction") as a means to provide necessary short-term liquidity and to extend the maturity of a substantial portion of Incora's 2024-dated debt. Mr. Abramson reported that a preliminary agreement on key economic terms for the Potential Majority Transaction had been reached with Majority Group (with further discussions in progress with Carlyle) after the Majority Group had declined to provide financing on a pari passu basis with existing notes. Mr. Abramson also reported that Company had begun to provide Akin Gump with diligence under an NDA and that the Minority Group had selected Perella Weinberg Partners to act as its financial advisor. He then described certain potential transactions that the Minority Group could offer as alternatives to the Potential Majority Transaction.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

**C.** **The 2026 Noteholders' Alternative Arguments for Finding a Breach of the 2026 Indenture Are Likewise Unpersuasive.**

In their own objection to the January 17 R&R, the 2026 Noteholders raise seven alternative arguments—none of which was reached ~~accepted~~ by the bankruptcy court—for finding that Wesco breached the 2026 Indenture by entering into the 2022 Transactions. Those alternative arguments are likewise unpersuasive.[5]

---

[5] The 2026 Noteholders also object to the bankruptcy court's proposed findings that Wesco believed the 2022 Transactions wasere in its best interest and that those transactions wasere superior to the Minority Group's proposal. ECF 35 at 28-32. As detailed in this Court's findings of fact above, this Court agrees with the bankruptcy court's proposed findings on those issues. *See supra* pp.5-7. ~~In addition, the 2026 Noteholders challenge several interlocutory rulings by the bankruptcy court. ECF 35 at 36-40. The parties agree that this Court need not address those challenges at this stage, and so the Court refrains from resolving them.~~

**Objection 36:**

The Proposed Order implies that the Bankruptcy Court rejected these arguments, when instead it did not reach these arguments after concluding that the 2022 Transaction breached the lien-release protection of the 2026 Indenture.  Footnote 3 has been revised to reflect that, for the reasons discussed in the Supplemental Response, the Court should enter a final judgment.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

First, the 2026 Noteholders contend that the Third Supplemental Indentures required supermajority consent because the 2026 Indenture requires supermajority consent for any amendment that will "modify the Security Documents or the provisions of this Indenture dealing with Collateral in any manner adverse … in any material respect" to the holders of the 2026 Notes.  Adv.Dkt.601-8 at 131.  But the Third Supplemental Indentures did not "modify the Security Documents," *id.*; they amended only the 2026 Indenture, which is not one of the "Security Documents."  Adv.Dkt.601-8 at 45 (defining "Security Documents").  The ~~e fact th~~at the Notes Security Agreement (which *is* one of the "Security Documents," *id.*) incorporates by reference ~~cross-references~~ definitions in the 2026 Indenture that were amended by the Third Supplemental Indenture does not transform an amendment to the latter into an amendment to the former.  The Third Supplemental Indentures also did not modify "the provisions of [the 2026 Indenture] dealing with Collateral," Adv.Dkt.601-8 at 131, by amending the definition of "Permitted Lien," which is not a provision dealing with collateral (as demonstrated by the fact that it also appears in the 2027 Indenture governing *unsecured* notes, *see* Adv.Dkt.601-7 at 28).  ~~Finally, as a factual matter, even if the Third Supplemental Indentures had modified either the "Security Documents" or any provision of the 2026 Indenture "dealing with Collateral," they were not "adverse … in any material respect" to the holders of the 2026 Notes.  Adv.Dkt.601-8 at 131.  Instead, the Third Supplemental Indentures enabled an infusion of $250 million in new money (in other words, additional collateral) that Wesco needed to address its liquidity issues, improving the likelihood that Wesco would be able to pay off its obligations.  See supra pp.4-7, 13.  What is more, because the new $250 million became part of the collateral package securing the 2026 Notes, the Third Supplemental Indentures did not even dilute the 2026 Noteholders' liens.  See Adv.Dkt.601-24 at 1-2 (Notes Security Agreement defining collateral to include "all cash").~~

**Objection 37:**

These factual findings were not made by the January 17 R&R and are irrelevant to the Court's legal conclusion.  They are also inconsistent with and unsupported by the record, as set forth below.  *First*, the unrebutted evidence in the record is that, during negotiations of the 2026 Indenture, the Minority Group specifically bargained to tighten the Permitted Lien baskets to prevent dilution of their security interests.  Adv.Dkt.1247 at 20:11-21:24, 113:12-114:9; *see* Adv.Dkt.696-25 at 3; Adv.Dkt.1119 at 145:18-147:18, 150:11-151:6.

Adv.Dkt.1247 (Cook, May 1, 2024 Tr.) at 20:11-21:24, 113:12-114:9:

11    Q    And there's a sub-bullet under that says "reduce to 30

12    million/10 percent."  What does that mean?

13    A    Again, this -- that this was like the carveouts for the

14    existed -- so an additional amount that they had, and -- and

15    this is  -- I believe, in having reviewed this back-and-forth,

16    there was a larger covenant basket to issue, and we were

17    asking for a restriction of that to that 30 million and 10

18    percent of adjusted EBITDA.

19    Q    And why was the general liens basket important to you?

20    A    Yeah.  Again, the context of this investment was it was a

21    relatively high degree of leverage in the -- in the market at

22    the time, so about, you know, six times secured and more than

23    that unsecured.  So, you know, understanding the ability to

24    issue additional debt in a structure, that leverage is very

25    important.  So we were -- we were focused on the incremental

1    baskets that they had.

2    Q    And what about liens was important to you, if anything?

3    A    Well, again, we're -- in our -- we mostly purchased

4    secureds in this.  We were thinking about it from the context

5    of, effectively, we're lending against the value of those

6    assets.  And so it was important to restrict additional debt

7    against that same pool of assets.

8    Q    Okay.  Do you recall if the lien basket was tightened as

9    a result of comments from the market, between, you know, the

10    first offering memo and the ultimate deal issuance?

11    A    Yes.  The -- many of the covenants, including the lien

12    covenants, were -- were tightened from initial marketing to

13    final.

14    Q    Did that impact JPMorgan's decision-making in deciding to

15    invest in these securities?

16    A    For sure.  You're -- you're asking the general tightening

17    of covenants, the -- or the lien covenants specifically?

18    A    Lien covenants specifically.

19    A    Yeah.  I mean, certainly, that was an important factor.

20    I think a lot of these factors were important to us, in terms

21    of our investment decision-making.

22    Q    And ultimately, did JPMorgan decide to invest in debt

23    securities issued by Incora?

24    A    We did.

...

```
12    Q    Okay.  And in forming the view on the deal, referring to
13    the 2019 Wesco deal, you and your team would have reviewed the
14    information that was available to J.P. Morgan at the time,
15    correct?
16    A    We would've.  Yes, we would've.
17    Q    And that would've included things like the preliminary
18    offering memorandum, right?
19    A    That would be correct.
20    Q    And that would have disclosed the risks associated with
21    the deal, as well as the covenants that were contemplated at
22    the time, right?
23    A    Just for clarification, you're saying the preliminary
24    versus final.  Is there a distinction that I'm supposed to be
25    --

1     Q    Well, you would've reviewed both the preliminary and the
2     final offering memorandum when they became available to you,
3     correct?
4     A    I think people on my team would have.  I'm not -- I don't
5     know that I would have reviewed the preliminary.
6     Q    Okay.  But certainly, people on your team would have
7     reviewed that, and that would've informed their advice to you
8     in connection with the deal, correct?
9     A    I think that's correct.
```

Adv.Dkt.696-25 at 3 (Nov. 1, 2019 Proposed Covenant Changes):

### Proposed Covenant Changes – Wesco Air Senior Secured Notes

JP Morgan Asset Management – November 1, 2019

- Expansion of Guarantor Group
  - to more fully capture total assets/net sales and EBITDA
  - Include foreign subsidiaries
- EBITDA Definition/Calculation
  - PF cost savings forward look reduced to 12 months (from 18 months)
  - PF cost savings capped at 20% of EBITDA
- Net Debt Calculation
  - No more than $50mm of cash may be netted against debt
- Limitation on Indebtedness
  - Credit Facility
    - Remove $375mm plus $100mm/30% EBITDA provision
    - Reduce "unlimited amount" provision to 4.2x (currently 4.7x)
  - General Debt / General Liens
    - Reduce to $30mm/10% of Adj EBITDA (currently greater of $100mm/30% of EBITDA)
  - 
    - Remove the provision that allows 6.3x Total Debt Ratio
      - This would have been in addition to the typical 2.0x FCCR provision

79

Adv.Dkt.1119 (Yu, Apr. 5, 2024 Tr.) at 146:15-147:18; 150:11-151:6:

| | |
|---|---|
| 15 | Q    Okay.  And now going down to the section entitled |
| 16 | permitted liens, again from your perspective, what does that |
| 17 | mean? |
| 18 | A    From my perspective, permitted liens governs the ability |
| 19 | of the bond issuer to issue additional secured debt.  And the |
| 20 | way a company would be permitted to issue additional secured |
| 21 | debt is they would have to access the various baskets listed |
| 22 | within that section and comply with any requirements attached |
| 23 | to those various baskets. |
| 24 | Q    Why is that a provision of the offering memo that you |
| 25 | included in your writeup? |
| 1 | A    I included it because I view the permitted liens to be |
| 2 | highly important in understanding the protections of a |
| 3 | bondholder. |
| 4 | Q    Why is that? |
| 5 | A    Permitted lien -- the ability for a company to issue |
| 6 | secured debt is important in the sense from the perspective of |
| 7 | a secured bondholder by virtue of the lien you've been granted |
| 8 | on the underlying assets or collateral of the company should a |
| 9 | company restructure the value you will recover to -- as part |
| 10 | of getting back the value of your debt. |
| 11 | It's dependent on the ratio of secured debt to the value |
| 12 | of the collateral.  To the extent a company issues more |
| 13 | secured debt, that dilutes the available collateral for you as |
| 14 | a secured bondholder. |
| 15 | And then from an unsecured bondholder perspective, so the |
| 16 | extent more secured debt is issued that potentially will lead |
| 17 | to less available recoveries to you as an unsecured bondholder |
| 18 | in the restructuring. |

...

...

```
11    Q    Okay.  And you mentioned a bit earlier that the offering

12    memo that you based this writeup on was not the final.  Do I

13    have that right?

14    A    That's right.  Yes.

15    Q    And did the permitted lien baskets in the final change

16    from the permitted lien baskets that were part of your

17    writeup?

18    A    Yes, they did.

19    Q    How so?

20    A    Yes.  From my understanding, there were two notable

21    changes.  One, starting with the general basket we discussed,

22    I believe that $100 million became $25 million.

23         And then secondly, within the credit facility basket,

24    prong two, cash capped grow amount, that was defined to be

25    $260 million within the original version of the offering
```

...

```
1     memorandum.  I believe that was reduced to $50 million.

2          So in totality, permitted lien capacity from the

3     preliminary offering memorandum was $260 million plus $100

4     million to equal $360 million.  And from my understanding, the

5     final version of the offering memorandum reduced that down to

6     $75 million in total.
```

*Second*, the statement that "the new $250 million became part of the collateral package" is also false.  It is undisputed that at least $26 million could never have become part of the collateral package because it *never reached the Company*.  Instead, it was paid directly to advisors. Adv.Dkt.664 at 58:5-23. So, at most $224 became part of the collateral package; moreover, the Majority Group also received approximately $16 million in "PIK fees" from the $250 million, so the net proceeds of the 2022 Transaction were $208 million.   Adv.Dkt.694 at 57:11-20; Adv.Dkt.1352 at 109:15-110:5.

Adv.Dkt.694 (Carney, Jan. 31, 2024 Tr.) at 57:11-20:

| | |
|---|---|
| 11 | Q    And how much money did the company get in that |
| 12 | transaction? |
| 13 | A    So we received, after fees, about $224 million. |
| 14 | Q    Do you know the total amount of debt that was issued as |
| 15 | part of the transaction? |
| 16 | A    Yes, it was $250 million. |
| 17 | Q    So a $26 million difference.  What was that? |
| 18 | A    That was fees that we paid the various advisors including |
| 19 | legal advisors, bankers and then other advisors that helped us |
| 20 | prepare for the transaction. |

Adv.Dkt.1352 (Steffen, June 6, 2024 Tr.) at 109:15-110:5:

| | |
|---|---|
| 15 | Q    And you were asked some questions about the chart that |
| 16 | shows the difference in principal amount of the debt exchanged |
| 17 | to the debt issued to the transaction fees of some $42 |
| 18 | million, correct? |
| 19 | A    That is correct. |
| 20 | Q    And was the entirety of that $42 million professional |
| 21 | services fees? |
| 22 | A    It was not. |
| 23 | Q    What else did it consist of? |
| 24 | A    It included what was characterized a PIK fees. |
| 25 | Q    And do you know how much was professional service fees |
| 1 | versus how much was PIK fees? |
| 2 | A    Well, professional services fees were approximately |
| 3 | $26,000; the remainder was PIK fees. |
| 4 | Q    Twenty-six million, do you mean? |
| 5 | A    Twenty-six million.  I apologize.  Yes. |

*Third*, it is undisputed that the 2026 Noteholders only had a second lien on cash collateral. Adv.Dkt.879 at 271:10-272:9, 275:14-276:1. So even if the Company did get $250 million of new cash, it would have been used to satisfy debts owed to the ABL lender.

*Fourth*, as noted above, Wesco's board member admitted to knowing when he voted to approve the 2022 Transaction that it "would harm the excluded holders' security interest in the collateral." *See* Objection 28.

*Fifth*, and more fundamentally, the evidentiary record also shows that the Company paid much of $224 million to trade creditors and accrued interest shortly after receipt, which is why the Company had liquidity issues so soon after the 2022 Transaction. Adv.Dkt.664 at 58:15-59:16 ("we had to figure out, you know, how to manage the cash because first and foremost we wanted to get vendors paid . . . . We had to make up for the Katsumi hole of about $40 million [and] we were going to have to make about a $50 million payment on the interest."); Adv.Dkt.694 at 96:9-19 (five "months after the liquidity came in . . . there was another liquidity problem").

*Sixth*, the Proposed Order mischaracterizes the Notes Security Agreement: it does not just cross-reference the 2026 Indenture but rather incorporates by reference definitions from the 2026 Indenture. One of the definitions incorporated by reference in the Notes Security Agreement is the definition of "Permitted Liens." As the 2026 Noteholders previously argued, this amended the Notes Security Agreement, which is one of the Security Documents. *See* ECF 35 at 16-18; ECF 76 at 4-6.

In summary, the Bankruptcy Court would not have reached the conclusion that there was no adverse effect, given that the 2026 Noteholders would only have a second lien on an amount of new money that was less than the amount of new debt, and that new money was promptly paid to unsecured creditors. The Court should not do so here.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

Second, the 2026 Noteholders contend that the 2022 Transaction~~s~~ violated §4.12(a) of the 2026 Indenture, which provided (until it was deleted by the Fourth Supplemental Indentures) that Wesco could not "directly or indirectly, create, incur, assume, or suffer to exist any Lien of any kind (other than Permitted Liens)" on its assets. Adv.Dkt.601-8 at 100. T~~None of the steps in t~~he 2022 Transaction~~s~~, however, created ~~any~~ <u>no</u> such impermissible new lien~~s~~. The fact that the Third Supplemental Indentures allowed Wesco to issue new 2026 Notes that subsequently voted in favor of releasing the collateral as to the 2026 Notes, which then allowed the liens as to the 1L Notes, does not mean that the Third Supplemental Indentures themselves "directly or indirectly" created the liens as to the 1L Notes. *Id.* Once again, the 2026 Noteholders' contrary interpretation conflicts with the plain contractual text ~~and would raise severe practical problems, including by making it impossible to know in advance whether any contemplated transaction would breach §4.12(a) by eventually leading to an impermissible lien~~.

Third, the 2026 Noteholders cite §1.03(7) of the 2026 Indenture, which provides that "[u]nless the context otherwise requires," provisions in the 2026

Indenture "apply to successive events and transactions."  Adv.Dkt.601-8 at 50-51. But that rule of construction just makes clear that the requirements in the 2026 Indenture apply to *each one* of a series of successive events and transactions; it does not collapse the entire series into a single transaction.  *See Revised Model Simplified Indenture*, 55 Bus. Law. 1115, 1126, 1176 (2000) ("successive events and transactions" language merely "underscore[s] the intended application and re-application" of indenture provisions to "successive obligors, fiduciaries, mergers, conversion adjustments, etc.").  The 2026 Noteholders also cite *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), but this case is nothing like *Sharon Steel*.  In that case, the indentures included a "successor obligor" provision that allowed the issuer to assign its debt to any corporate successor that purchased "all or substantially all" of its assets.  691 F.2d at 1044-45.  The issuer proceeded to sell off its assets in three different transactions to three different buyers—and then purported to assign its debt to only the last buyer, on the theory that it had sold all its (remaining) assets to that buyer.  *Id.* at 1046.  The Second Circuit rejected that argument, holding that an issuer cannot engage in a "plan of piecemeal liquidation" and then invoke a successor obligor provision to assign its debt to only "the buyer last in time."  *Id.* at 1050-51.  But this case does not involve an issuer engaging in a series of similar transactions, like selling off all its assets piecemeal, and then arguing that all but the last transaction should be ignored.  Just the opposite:  It involves an issuer engaging in a series of different amendments ~~and transactions~~, with widely varying terms and effects, and arguing that the deliberate structure and timing of those transactions should be *respected*.

Fourth, the 2026 Noteholders make a similar argument under New York law, claiming that it requires collapsing the entire ~~sequence of distinct transactions in the~~ 2022 Transaction~~s~~ into a single transaction.  That argument misreads New York law.  New York recognizes a canon of *contract interpretation* under which courts "read together as one" documents that are "executed at substantially the same time" and "related to the same subject-matter," so that those agreements are construed consistently and in accordance with the parties' intent.  *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941); *see, e.g.*, *BWA Corp. v. Alltrans Express U.S.A., Inc.*, 493 N.Y.S.2d 1, 3 (App. Div. 1985) (instruments executed together "will be read and interpreted together").  But that is an *interpretive* canon, not a *substantive* doctrine that would collapse multiple separate agreements into a single instrument when that was decidedly not what the parties intended.  *See, e.g.*, *Kent v. Universal Film Mfg. Co.*, 193 N.Y.S. 838, 846-47 (App. Div. 1922) (related contracts "are, of course, to be construed together," but that rule "does not require that the two separate instruments must be deemed consolidated and one for all purposes"); *see also CooperVision, Inc. v. Intek Integration Techs.*, 794 N.Y.S.2d 812, 818 (Sup. Ct. 2005) (same).  ~~Here, the parties clearly intended the separate steps of the 2022 Transactions to be treated as distinct transactions, and New York law gives effect to that intent.  See, e.g., TriMark, 2021 WL 3671541, at *8; MeehanCombs Glob. Credit Opportunities Funds v. Caesars Ent. Corp., 80 F.Supp.3d 507, 516-17 (S.D.N.Y. 2015).~~

**Objection 38:**

The Proposed Order includes purported factual findings as to the structure of the transaction and the parties' intent that are inconsistent with the R&R and with the evidentiary record.  As explained above, the parties intended to complete a single, integrated transaction, *see* Objection 1.  Additionally, the Court made no factual findings as to practical difficulties from the interpretation of the 2026 Indenture.  There is no evidence in the record on which to reach such a conclusion, and the Majority Group thus cites none.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

Fifth, the 2026 Noteholders contend that the additional 2026 Notes were never properly "authenticated" by a "manual signature" from the indenture trustee. Adv.Dkt.601-8 at 54.  ~~But nothing in the 2026 Indenture prohibited the indenture trustee from using multiple copies of the same manual signature to sign multiple notes, and t~~The indenture trustee's <u>"authenticat[ion]" by "manual </u>signature<u>"</u> on the notes is "conclusive evidence" that the notes "ha[ve] been duly authenticated." *Id.* In any event, the 2026 Noteholders are only third-party beneficiaries of the 2026 Indenture, and cannot assert authentication requirements <u>unless</u> ~~that~~they were "~~not~~ made for [their] benefit," *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F.Supp.2d 375, 415 (S.D.N.Y. 2011); any such technical defect would not invalidate the notes regardless, *see, e.g.*, *Danco Elec. Contractors, Inc. v. Dormitory Auth. of N.Y.*, 75 N.Y.S.3d 28, 28-29 (App. Div. 2018); the notes were ratified by performance (including their sale and purchase for $250 million), rendering any defect inconsequential, *see, e.g.*, *Feinstein v. Levy*, 503 N.Y.S.2d 821, 822 (App. Div. 1986) (per curiam); and the notes could always be retroactively reformed in light of the parties' mutual understanding of their validity, *see, e.g.*, *In re Snide*, 418 N.E.2d 656 (N.Y. 1981) (reforming wills signed by opposite spouses).

**Objection 39:**

The stricken text is misleading because it ignores the text of the 2026 Indenture.  Section 2.02 provides both that "[a]t least one Officer must sign the 2026 Secured Notes for the Issuer *by manual or facsimile signature*," and that "A 2026 Secured Note will not be valid until *authenticated by the manual signature* of an authorized signatory of the Trustee."  While the Court may disagree with the interpretation of "manual" as requiring a signature drawn onto the note by the hand—even though that would render superfluous the "manual or facsimile" language concerning the officer's signature, which the 2026 Noteholders argue would be legally erroneous—the Proposed Order's statement that "nothing in the 2026 Indenture" placed such a limitation disregards language in the 2026 Indenture and is at best misleading.

[*Remainder of Page Left Intentionally Blank*]

---

Adv.Dkt.601-8 at 54 (2026 Indenture):

Section 2.02    *Execution and Authentication.*

At least one Officer must sign the 2026 Secured Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a 2026 Secured Note no longer holds that office at the time a 2026 Secured Note is authenticated, the 2026 Secured Note will nevertheless be valid.

A 2026 Secured Note will not be valid until authenticated by the manual signature of an authorized signatory of the Trustee. The signature will be conclusive evidence that the 2026 Secured Note has been duly authenticated and delivered under this Indenture.

The Trustee will, upon receipt of a written order of the Issuer signed by an Officer of the Issuer (an "*Authentication Order*"), together with the other documents required under Sections 13.02 and 13.03 hereof, if any, authenticate (i) 2026 Secured Notes for original issue, of which $900,000,000 in aggregate principal amount will be issued on the Issue Date and (ii) any Additional Secured Notes. The aggregate principal amount of 2026 Secured Notes outstanding at any time may not exceed the aggregate principal amount of 2026 Secured Notes authorized for issuance by the Issuer pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof.

The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate 2026 Secured Notes. An authenticating agent may authenticate 2026 Secured Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

---

Additionally, there is no support for the conclusion that these protections are not for the benefit of other holders of the 2026 Notes, whose consent rights would be undermined by breaches thereof.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

Sixth, the 2026 Noteholders assert that the 2022 Transactions breached §3.02 and §3.07(h) of the 2026 Indenture, which govern redemptions and purchases. Under §3.02, "[i]f less than all of the 2026 Secured Notes are to be redeemed pursuant to the provisions of Section 3.07 hereof, the Trustee will select 2026 Secured Notes for redemption or purchase *pro rata*, by lot or by such method as it shall deem fair and appropriate." Adv.Dkt.601-8 at 66. By its plain terms, that provision does not apply here, because no 2026 Notes were "redeemed pursuant to the provisions of Section 3.07" in the 2022 Transactions; instead, Wesco *exchanged* new 1L Notes for the 2026 Notes held by the First Lien Noteholders. *Id.* As for §3.07(h), it authorizes Wesco to "at any time and from time to time purchase 2026 Secured Notes," and provides that "[a]ny such purchases may be made through open market or privately negotiated transactions with third parties … or otherwise, upon such terms and at such prices as well as with such consideration as [Wesco] may determine." *Id.* at 69. Even assuming that the exchange of the 2026 Notes for 1L Notes in the 2022 Transactions constituted a "purchase" under §3.07(h), that section explicitly authorizes purchases through "privately negotiated transactions with third parties," including the First Lien Noteholders here. *Id.*; *cf. supra* pp.20-22 (discussing *Serta*). In all events, even if the 2022 Transactions was~~ere~~ somehow contrary to §3.02 or §3.07(h), a majority of the 2026 Notes properly waived

---

86

compliance with those provisions under §9.02 of the 2026 Indenture. Adv.Dkt.1446 at 335-36; *see* Adv.Dkt.601-8 at 130 (allowing "a majority … of the 2026 Secured Notes" to "waive compliance in a particular instance … with any provision of this Indenture not otherwise subject to a unanimous consent or two-thirds consent requirement as set forth in Section 9.02).

Finally, the 2026 Noteholders contend that the 2022 Transaction breached the "sacred rights" provision in §9.02(10) of the 2026 Indenture, which requires unanimous consent from each affected holder for any amendment that would "make any change to, or modify, the ranking of the 2026 Secured Notes in respect of right of payment that would adversely affect the Holders of the 2026 Secured Notes." Adv.Dkt.601-8 at 131. But §9.02(10) by its terms applies only to changes in "ranking … in respect of right of payment," or *payment priority*, which asks whether one note must be paid in full before another receives any payment; that subsection does not apply to changes in relative maturity or lien priority. *Id.*; *see In re MPM Silicones, LLC*, 531 B.R. 321, 328 (S.D.N.Y. 2015) (explaining that "[t]he words 'in right of payment' clearly refer only to payment subordination," not "lien subordination"), *aff'd in relevant part and rev'd on other grounds*, 874 F.3d 787 (2d Cir. 2017); *Diversified Realty Servs., Inc. v. Meyers Law Grp., P.C.*, 2014 WL 547034, at *3 (N.D. Cal. Feb. 7, 2014) (distinguishing payment subordination and lien subordination), *aff'd*, 647 F.App'x 736 (9th Cir. 2016). The 2026 Noteholders' contrary interpretation of §9.02(10) conflicts with the supermajority provision of §9.02, which requires only a two-thirds majority of the 2026 Notes (not unanimous consent) to release collateral. Adv.Dkt.601-8 at 131. Their interpretation also flatly conflicts with §4.09(c), which expressly distinguishes priority "in right of payment" from secured status. *See id.* at 93 ("[N]o Indebtedness will be deemed to be contractually subordinated in right of payment … solely by virtue of being unsecured or by virtue of being secured on a junior priority basis.").

In sum, none of the 2026 Noteholders' seven alternative arguments provides any persuasive basis for concluding that the 2022 Transactions breached Wesco's obligations under the 2026 Indenture.[6]

---

[6] No party has objected to the bankruptcy court's recommendation that this Court should find that Wesco did not breach its obligations under the 2024 Indenture by entering into the 2022 Transactions. ECF 3 at 2. This Court thus adopts that recommendation has independently reviewed the record and agrees that Wesco did not breach the 2024 Indenture by entering into the 2022 Transaction, for all of the reasons given above (which apply with equal force to the 2024 Indenture) and because in any event Wesco had two-thirds supermajority consent from the 2024 Notes for all of the 2022 Transaction.

**Objection 40:**

Footnote 6 has been revised because, as explained in the Supplemental Response, the Court should adopt the conclusions of the Bankruptcy Court as to which no objection was made rather than undertaking a *de novo* review of such findings.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

**II.    Even If Adopting The Third Supplemental Indentures Breached The 2026 Indenture, The Proper Remedy Would Have Been A Damages Claim Against Wesco.**

**Objection 41:**

There is no need for the Court to reach the remedies issue if it concludes that the 2022 Transaction did not breach the 2026 Indenture.  The 2026 Noteholders thus respectfully submit that the Court strike the entirety of this section and say nothing further in its order concerning the remedies issue.  Additionally, the 2026 Noteholders refer to their response to the First Lien Noteholders' objection to the January 17 R&R for a more complete recitation of their arguments regarding remedies.  *See* ECF 50 at 21-38.  However, if the Court wishes to make further conclusions of law, the Majority Group's Proposed Order should be revised as set forth below.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

For all of the foregoing reasons, this Court concludes that Wesco did not violate its obligations under its indentures by entering into the 2022 Transactions.  But even if Wesco had breached the 2026 Indenture in adopting the Third Supplemental Indentures, this Court would still conclude that the bankruptcy court's recommended remedy for any such breach was inappropriate.  Instead, the proper remedy for any such breach would simply be to allow the 2026 Noteholders to seek monetary damages from Wesco, which was the breaching party.

Under both New York and Texas law, as under the common law generally, it is well established that the ordinary remedy for a breach of contract is monetary damages for the breach.  *See, e.g.*, *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam); *Buckley & Co v. City of New York*, 121 A.D.2d 933, 936 (N.Y. App. Div. 1986); *see also United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion); Restatement (Second) of Contracts §346 & cmt.a (Oct. 2024); 24 Williston on Contracts §64:1 (4th ed. 2025).[7]  And under both New York and Texas law, as under the common law generally, equitable remedies for a breach of contract are only available if the plaintiff makes an additional showing that the standard remedy of monetary damages is inadequate.  *See, e.g.*, *Credit Suisse AG v. Claymore Holdings, LLC*, 610 S.W.3d 808, 819 (Tex.

---

[7] Because the relevant principles of New York law (the law governing the 2026 Indenture) and Texas law (the law of the forum here) do not meaningfully differ, this Court need not decide which state's law controls.  *See, e.g.*, *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704 (5th Cir. 2023).

2020) (applying New York law); *Orix Cap. Mkts., LLC v. La Villita Motor Inns, J.V.*, 329 S.W.3d 30, 45 (Tex. App. 2010); *Burke v. Bowen*, 353 N.E.2d 567, 569 (N.Y. 1976); *see also* 25 Williston on Contracts §67:8.

Bankruptcy does not alter those basic principles of contract law, and does not afford plaintiffs who sue bankrupt defendants additional remedies that would otherwise be unavailable. *Cf. Butner v. United States*, 440 U.S. 48, 55 (1979). In other words, the fact that the breaching party's bankruptcy and applicable bankruptcy-law principles may mean that judgment creditors will not be able to recover the full amount of their damages award does not render damages an inadequate remedy. *See, e.g.*, *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848-49 (5th Cir. 2004); *see also In re First Cent. Fin. Corp.*, 377 F.3d 209, 216 (2d Cir. 2004). On the contrary, if insolvency were always sufficient to make an award of damages against a defendant legally inadequate, then any plaintiff with a breach-of-contract claim against a bankrupt defendant would always be able to seek specific performance or other equitable remedies as a matter of course. That plainly is not the law. *See First Cent.*, 377 F.3d at 216; *Dresser-Rand*, 361 F.3d at 848-49; *In re Robertshaw US Holding Corp.*, 2024 WL 4369717, at *1-2 (S.D. Tex. Oct. 1, 2024); *In re Robertshaw US Holding Corp.*, 662 B.R. 146, 161-62 (Bankr. S.D. Tex. 2024); *In re Provider Meds, LP*, 2014 WL 4162870, at *12 (Bankr. N.D. Tex. Aug. 20, 2014).

Rather than recommending that this Court hold Wesco liable for damages, the bankruptcy court recommended that this Court declare that "the rights, liens, and interests that were for the benefit of [the 2026 Noteholders] … remained in full force and effect" without regard to the 2022 Transaction~~s~~. ECF 3 at 36. ~~That is, rather than recommending that this Court hold Wesco liable for any damages caused by its purported breach of the 2026 Indenture, the bankruptcy court instead recommended that this Court should partially unwind the 2022 Transaction— including multiple agreements that Wesco did *not* breach—by "negat[ing] the effectiveness against the 2026 Noteholders" of the 2022 Transaction, and thereby reinstating the liens securing the 2026 Notes (which were released by the Fourth Supplemental Indenture). *Id.* at 35.~~

Even if Wesco had breached its obligations under the 2026 Indenture, the remedy that the bankruptcy court recommended would be inappropriate. As noted above, the traditional remedy for a breach of contract is an award of damages against the breaching party, and the fact that Wesco is bankrupt does not make that award legally inadequate here. The proper remedy for any breach here would accordingly be a damages award against Wesco~~. But even if equitable relief were available here (which it is not), this Court finds as a matter of law that it would not~~

~~award an equitable remedy and would instead award money damages, even if a finding of breach were found.~~[8]

The remedy that the bankruptcy court recommended would not rescind or reform the purportedly breached 2026 Indenture at all. ~~Instead, that remedy would target an entirely different set of contracts (the 2022 Transaction) among different parties, partially negating a series of agreements that were never themselves breached. The bankruptcy court cited no authority, and this Court is aware of none, that would justify remedying a purported breach of one contract (the 2026 Indenture) by partially unwinding a completely different set of contracts among different parties (the 2022 Transaction). Still worse, adopting that proposed remedy would cost Wesco (the purported breaching party) nothing, but would cost the First Lien Noteholders (who committed no breach) the entire benefit of the bargain for which they paid $250 million, stripping them of their exclusive first-lien status and depriving them of any security interest at all for their $250 million in rescue financing. Especially under the circumstances of this case, where the parties entered into the 2022 Transactions believing that they would not breach Wesco's obligations under its indentures and where the 2022 Transactions provided Wesco with $250 million in much-needed rescue financing, extended the maturities on its debt, and substantially decreased its cash-interest payments, see supra pp.4-9, penalizing the non-breaching First Lien Noteholders for any purported breach by Wesco in entering into the 2022 Transactions would be plainly inequitable.~~[9] ~~As a result, even if there were a finding of breach, the appropriate remedy (if any) would be money damages~~.

**Objection 42:**

While the Court need not reach the remedies issue, and thus this section should be struck in its entirety, *see* Objection 41, the circumstances described above are inconsistent with and contradicted by the January 17 R&R. The Majority Group believed that they needed a two-thirds supermajority to do the 2022 Transaction, *see* Objections 12, 33, but they proceeded anyway to get an outsize return. The implication that the Majority Group did the transaction for the benefit of the Company, rather than to get an outsize return, also lacks support in the January 17 R&R. There were other sources of financing, but the Majority Group's used its "power position" to prevent the Company from even engaging with the Minority Group. Objection 9. The supposed

---

[8] The bankruptcy court suggested that its recommended remedy was legal rather than equitable. Adv.Dkt.1447 at 7, 19, 21. A remedy that would void (in part) a prior transaction, however, is properly understood as equitable. *See, e.g.*, *Reg'l Props., Inc. v. Fin. & Real Est. Consulting Co.*, 678 F.2d 552, 562 (5th Cir. 1982) (recognizing that "historically, a suit to void a contract sounded in equity").

[9] The bankruptcy court's proposed remedy is also contrary to the Bankruptcy Code, which requires that claims should be resolved in the bankruptcy process, *see* 11 U.S.C. §§101(5)(B), 502(c)(2); *Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 36 (1st Cir. 2009), and with the bankruptcy court's prior ruling that the 2026 Noteholders were not entitled to seek an equitable lien or equitable subordination, *see* Adv.Dkt.508 at 14-16.

"inequitable" result of this remedy is addressed at length in the Minority Group's response to the Majority Group's objection, *see* ECF 50, but the notion that the Majority Group were innocent bystanders here strains credulity.  With respect to footnote 9, the 2026 Noteholders respectfully refer to their limited objection, ECF 35 at 36-37, which explains why the Bankruptcy Court erred when it concluded that they were not entitled to seek equitable lien or equitable subordination.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

The 2026 Noteholders attempt to justify the bankruptcy court's proposed remedy by relying on the Declaratory Judgment Act, but that statute cannot provide the necessary support.  The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. §2201.  The statute "is procedural only," *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); it creates an exception to the "traditional and conventional" rule that courts "may act only when a complainant is entitled to a coercive remedy, such as a judgment for damages or an injunction," but it does not afford courts the power to remedy a past breach or alter existing legal rights.  Wright & Miller, *Federal Practice & Procedure* §2751 (4th ed. 2025); *see, e.g.*, *Evanston Ins. Co. v. Byassee*, 2025 WL 951945, at *3 (W.D. Ky. Mar. 28, 2025) ("A declaration merely states the legal rights and obligations of parties; it doesn't alter those rights."); *Allied World Surplus Lines Ins. Co. v. Elamex USA Corp.*, 2024 WL 2212948, at *7 (S.D.N.Y. May 16, 2024) (similar).  The Declaratory Judgment Act accordingly cannot authorize a *substantive* remedy that would not merely declare the existing "rights and other legal relations" of the parties, 28 U.S.C. §2201, but would affirmatively alter those rights by stripping the (non-breaching) First Lien Noteholders of their exclusive first-lien status and even the *pari passu* secured status of their additional 2026 Notes.

The 2026 Noteholders also cite §6.09 of the 2026 Indenture~~, but they never raised that provision in the bankruptcy court, making their reliance on it here forfeited.  *See Finley v. Johnson*, 243 F.3d 215, 219 n.3 (5th Cir. 2001) ("[I]ssues raised for the first time in objections to the report of a magistrate judge are not properly before the district judge."); *Lone Star State Bank of W. Tex. v. Rabo Agrifinance, LLC*, 644 B.R. 505, 511 (N.D. Tex. 2022) (district court reviews bankruptcy court report and recommendation "as it would … recommendations of a magistrate judge").  In any event,~~ §6.09 simply ensures that a proceeding to enforce the 2026 Indenture will not alter the parties' rights unless and until that proceeding results in a determination altering those rights; it does not afford this Court unlimited equitable authority to take whatever steps it deems necessary to undo a purported breach of the 2026 Indenture.  *Contra* ECF 50 at 26.[10]

---

[10] ~~The Court notes that §6.09 follows the American Bar Foundation's model indenture provisions, but contains a scrivener's error that accidentally replaced "discontinued" with "determined" from~~

**Objection 43:**

While the Court need not reach the remedies issue, and thus this section should be struck in its entirety, *see* Objection 41, the Proposed Order incorrectly states that the 2026 Noteholders "never raised" Section 6.09 "in the bankruptcy court." That is false. Prior to entry of the R&Rs and confirmation of the plan of reorganization, the 2026 Noteholders sought entry of an order granting adequate protection and specifically cited and quoted from Section 6.09. Bankr.Dkt.1958 at 11. The 2026 Noteholders made this motion two weeks before the Majority Group sought clarification concerning the status of the $250 million in new money at an August 13, 2024 status conference, which the Majority Group discusses in the Proposed Order's procedural background above. Bankr.Dkt.2002 at 74:5-75:3. The Majority Group objected to that motion but did not address Section 6.09. *See* Bankr.Dkt.2094. Had the Majority Group wanted to argue that the 2026 Indenture contained a scrivener's error, it should have done so then, but it did not. Accordingly, the footnote has been stricken. In any event, the parties agreed to bifurcate liability and remedies, Adv.Dkt.193 at 7, so the Proposed Order's assertion of forfeiture would be misplaced anyway.

---

Bankr.Dkt.1958 at 11 (Adequate Protection Motion):

26.    The Court's decision is consistent with, among other things, Section 6.09 of the

2026 Indenture, which provides,

Section 6.09 *Restoration of Rights and Remedies.*

*If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been determined or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceedings or any other proceedings, the Issuer, any Guarantor, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies hereunder of the Trustee and the Holders shall continue as though no such proceeding had been instituted.*

Adv. Pro., Docket No. 601-8 at 118 (emphasis added).

---

***Text of Majority Group Proposed Breach Order (with Revisions in Redline):***

~~Remarkably, t~~The 2026 Noteholders also assert ~~for the first time in this Court~~ that ~~the bankruptcy court's remedy did not go far *enough*, and that~~ this Court should ~~also~~ invalidate the First Lien Noteholders' exchange of their 2024 Notes for ~~the following clause. *Compare* Am. Bar Found., *Model Debenture Indenture Provisions* §509 (1967) ("has been *discontinued* or abandoned for any reason, or has been *determined* adversely" (emphasis added)), *with* Adv.Dkt.601-8 at 118 ("has been *determined* or abandoned for any reason, or has been *determined* adversely" (emphasis added)); *see also* Adv.Dkt.601-24 at 18 (tracking the model indenture language)~~ [Deleted].

new 1L Notes and strip those 1L Notes of their perfected security interests.  That argument is ~~not only forfeited by the 2026 Noteholders' failure to raise it in the bankruptcy court, *see Finley*, 243 F.3d at 219 n.3; *Lone Star*, 644 B.R. at 511, but is also~~ wrong ~~at every turn~~.  As already explained, Wesco did not breach the 2026 Indenture (let alone the 2024 Indenture) by entering into the 2022 Transaction~~s~~, and even if it had, the proper remedy for any such breach would be damages against Wesco, not a partial unwinding of the 2022 Transaction~~s~~ to the detriment of the First Lien Noteholders.  ~~*A fortiori*, it would be beyond inappropriate to partially unwind the 2022 Transactions even further than the bankruptcy court recommended by invalidating the First Lien Noteholders' exchange of their 2024 Notes for 1L Notes or the secured status of those 1L Notes, which would leave the 2026 Noteholders even better off than if the 2022 Transactions had never happened at all~~.

**Objection 44:**

While the Court need not reach the remedies issue, and thus this section should be struck in its entirety, *see* Objection 41, the parties agreed to bifurcate liability and remedies, and thus the Proposed Order's assertions of forfeiture are misplaced.  Adv.Dkt.193 at 7.  Further, the Proposed Order cites no evidence (as there is none) for the proposition that the 2026 Noteholders are "better off" now than they would have been had the 2022 Transaction not happened at all.  That statement relies on numerous hypotheticals that were not proven at trial, including the assumption that the Company would not have accepted a pro rata proposal for new liquidity if the Majority Group had not used its power position to coerce the Company to attempt the 2022 Transaction.

### *Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

Finally, this Court also disagrees with the bankruptcy court's recommendation that this Court should deprive the First Lien Noteholders of the *pari passu* status of the additional 2026 Notes that they acquired in exchange for their $250 million in new investment.  Again, Wesco did not breach the 2026 Indenture (or any of its other indentures) by issuing those additional 2026 Notes.  *See supra* pp.18-22.  Even if Wesco had breached the 2026 Indenture, the proper remedy would be damages against Wesco.  *See supra* pp.33-35.  ~~And even if this Court were free to adopt an equitable remedy here, the Court finds that it would be clearly inappropriate to grant any equitable relief and would award money damages.~~

**Objection 45:**

As discussed above, Objection 41, the Court need not address remedies in this order given its legal conclusion that the 2022 Transaction did not breach the 2026 Indenture.  But even if the Court were to address remedies to find that an equitable remedy is unavailable, it need not reach the question of whether, if an equitable remedy were available, the 2026 Noteholders should be entitled to such a remedy here.  As the 2026 Noteholders previously explained, money damages do not provide an adequate remedy as a matter of applicable state law, ECF 50 at 28-31, and thus the Bankruptcy Court could have (and should have, if needed) granted any number of equitable

remedies, ECF 50 at 31-38.  Such remedies would be appropriate under the specific circumstances here, based on the factual findings of the Bankruptcy Court.  ECF 50 at 38-40.

*Text of Majority Group Proposed Breach Order (with Revisions in Redline):*

## CONCLUSION

For the reasons explained above, the Court SUSTAINS the First Lien Noteholders' objection to the January 17 R&R, OVERRULES the 2026 Noteholders' objections, DECLARES that the 2022 Transactions did not breach Wesco's obligations under its indentures, and DISMISSES the 2024/2026 Noteholders' breach-of-contract claims.

SO ORDERED _____, at McAllen, Texas.

_____
Randy Crane
Chief United States District Judge